1  KEVIN W. COLEMAN (CSB168538)
   CHRISTOPHER H. HART (CSB184117)
2  NUTI HART LLP
   411 30TH Street, Suite 408
3  Oakland, CA 94609-3311
   Telephone: 510-506-7152
4  Email: kcoleman@nutihart.com
          chart@nutihart.com
5

6  TALITHA GRAY KOZLOWSKI (NV SBN 9040)
   GARMAN TURNER GORDON LLP
7  7251 Amigo Street, Suite 210
   Las Vegas, NV 89119
8  Telephone: 725-777-3000
   Email: tgray@gtg.legal
9

10 Counsel for Kavita Gupta,
   Chapter 11 Trustee

11

12 **UNITED STATES BANKRUPTCY COURT**

13 **DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.:  BK-S-18-12456 GS |
| DESERT OASIS APARTMENTS, LLC, | Chapter 11 |
| Debtor. | |
| | Date:      October 15, 2020 |
| | Time:      9:30 a.m. |
| | Judge:     Hon. Gary Spraker |

**COVER SHEET TO NUTI HART LLP'S FIRST INTERIM APPLICATION FOR COMPENSATION AND EXPENSE REIMBURSEMENT**

| | |
|---|---|
| Fee Application | First Interim Fee Application |
| Applicant | Nuti Hart LLP |
| Capacity | General Counsel to Chapter 11 trustee Kavita Gupta |
| Debtor | Desert Oasis Apartments, LLC |
| Compensation Period | March 28, 2019 – July 31, 2020 |
| Previous Fees Requested | $0.00 |
| Previous Costs Requested | $0.00 |
| Total Fees and Costs Previously Requested | $0.00 |

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

| | |
|---|---|
| First Interim Fees Requested | $542,656.43 |
| First Interim Costs Requested | $   2,006.25 |
| Total Fees and Costs Requested | **$544,662.68** |
| Number of Hours | 1040.9 |
| | |
| Blended Rate | $521.33 per hour |
| | |
| Summary of Fees by Professional | <u>See</u> **Exhibit 1** hereto |
| Summary of Fees by Task Code | <u>See</u> **Exhibit 2** hereto |
| Summary of Expenses by Type | <u>See</u> **Exhibit 3** hereto |

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

KEVIN W. COLEMAN (CSB168538)
CHRISTOPHER H. HART (CSB184117)
NUTI HART LLP
411 30TH Street, Suite 408
Oakland, CA 94609-3311
Telephone: 510-506-7152
Email: kcoleman@nutihart.com
          chart@nutihart.com

TALITHA GRAY KOZLOWSKI (NV SBN 9040)
GARMAN TURNER GORDON LLP
7251 Amigo Street, Suite 210
Las Vegas, NV 89119
Telephone: 725-777-3000
Email: tgray@gtg.legal

Counsel for Kavita Gupta,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>DESERT OASIS APARTMENTS, LLC,<br><br>Debtor. | Case No.:  BK-S-18-12456-GS<br><br>Chapter 11<br><br><br>Date:      October 15, 2020<br>Time:      9:30 a.m.<br>Judge:     Hon. Gary Spraker |

## NUTI HART LLP'S FIRST INTERIM APPLICATION FOR COMPENSATION AND EXPENSE REIMBURSEMENT

Nuti Hart LLP ("NH" or "Firm"), attorneys for Kavita Gupta ("Trustee"), Chapter 11 trustee for the bankruptcy for the estate of Desert Oasis Apartments LLC ("DOA" or "Debtor"), hereby seeks interim allowance of $542,656.43 in fees and reimbursement of $2,006.25 in expenses ("Application") incurred rendering services to the Trustee during the period from March 28, 2019 through July 31, 2020 ("Compensation Period").  In support hereof, NH states as follows:

//

//

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

# I.    INTRODUCTION

On April 30, 2018, Bradley J. Busbin, as Trustee of the Gonzales Charitable Reminder Unitrust One ("Gonzales Trust") filed involuntarily petitions for relief under Chapter 7 of the Bankruptcy Code against DOA and two affiliates Desert Land LLC and Desert Oasis Investments LLC.  An order for relief and order converting the cases to Chapter 11 was entered on June 29, 2018.  The three debtors' cases were thereafter jointly administered.

This Court entered an order directing the appointment of a Chapter 11 trustee on March 21, 2019 [Dkt. 519].  The United States Trustee appointed Ms. Gupta to serve in that capacity on March 27, 2019 [Dkt. 522], and the Court confirmed that appointment on April 2, 2019 [Dkt. 528].  The Trustee subsequently resigned from the Desert Land case, and this Court appointed Jeffrey I. Golden as successor Chapter 11 trustee for Desert Land on June 18, 2020.   An order terminating joint administration was entered on August 10, 2020 [Dkt. 1439].

The Trustee and NH entered into one retention agreement ("Engagement Agreement") pursuant to which NH provided services to all three of the jointly-administered cases in which Ms. Gupta served as trustee, which agreement provided that NH would be compensated on an hourly basis at rates ranging from $425.00 per hour and $575.00 per hour [Dkt. 545-1, Exh. A]. On May 24, 2019, the Court authorized the Trustee to retain NH as her general counsel pursuant to the terms of the Engagement Agreement *nunc pro tunc* to March 28, 2019 [Dkt. 679, ¶2].

NH maintained four separate billing matters in these cases.  Where services were rendered for the benefit of a specific debtor's estate, time was billed to the matter number assigned to that debtor's estate.  For example, negotiations with potential purchasers making offers only on the Desert Oasis Apartments property were charged solely to DOA.  However, certain services rendered by NH applied to all three Debtors – such as filing NH's employment application and appearing at case status conferences – which were billed to a fourth matter number.  The accompanying Declaration of Kevin W. Coleman ("Coleman Decl.") attaches two invoices.  Exhibit A is the Firm's invoice for services rendered solely for DOA.  Exhibit B is the invoice generated for services applicable to all three estates.  The allocation of the "shared" service fees reflected on Exhibit B is discussed in Section VI below.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

This Application has been prepared in accordance with the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330* adopted by the Executive Office for United States Trustees, as referenced by the *Region 17 United States Trustee Guidelines*, as well as in accordance with Bankruptcy Rule 2016 and Local Rule 2016. The fees charged by NH in the Chapter 11 Case are billed in accordance with its existing procedures in effect during the Compensation Period. NH has not charged a "premium" in excess of its normal hourly rates to provide services to the Trustee in the Chapter 11 Case. The hourly rates charged for the services rendered by NH are set forth in Exhibits A and B to the Coleman Decl., and summarized on **Exhibit 1**. There is no agreement or understanding between NH and any other person, other than members of the firm, for the sharing of compensation to be received for services rendered in this Chapter 11 Case.

A Chapter 11 plan has not been filed, however, the Trustee is currently in discussions with the Gonzales Trust (its only significant non-insider creditor) concerning a plan. The DOA estate is current on all monthly operating reports due as of the filing of this Application, and fees under 28 U.S.C. §1930(a)(6) due as of the filing of this Application have been paid.

## II.    BACKGROUND

DOA and its related debtors collectively owned approximately 38.5 acres of real property situated on the south end of the Las Vegas strip (the "Assemblage") at the time these cases commenced. DOA's part of the Assemblage consisted of approximately 6 acres of land developed with a 180-unit apartment building (the "Apartments") on the eastern portion of the Assemblage. The Debtors had attempted to sell the Assemblage since 2003. Over that period, the Debtors retained several brokers and investment bankers, including Merrill Lynch, Goldman Sachs, CB Richard Ellis, Cantor Fitzgerald, and Cushman-Wakefield. However, no credible buyer for the Assemblage had materialized by the time the Debtors were placed involuntarily into bankruptcy.

In August 2018, the Debtors retained Colliers Nevada LLC dba Colliers International ("Colliers") to act as brokers in connection with sale of the Assemblage. After her appointment,

the Trustee continued to work with Colliers, who aggressively marketed the Assemblage through the expiration of its listing period in mid-October 2019.

At the time of her appointment, secured claims against the Assemblage totaled approximately $200 million, and interest on several of the loans was accruing at the rate of 20%. This debt was held by four different secured lenders holding liens on separate parcels within the Assemblage.  In addition, all parcels within the Assemblage were encumbered by a judgment lien recorded by the Gonzales Trust a few days before the involuntary bankruptcy petitions were filed.  One of the lenders – Desert Land Loan Acquisition LLC ("DLLA") – was controlled by insiders.  To put it mildly, the interests and objectives of these creditor groups did not always align.

The three cases all involved single asset real estate, no realistic plan was in prospect, and only DOA was in a position to make adequate protection payments.  Nevertheless, it initially appeared to the Trustee that the Assemblage could be sold for a price sufficient to pay all creditors in full.  But given the length of time the Debtors had been in Chapter 11, continued forbearance by the secured lenders in seeking stay relief could not be assumed.  When no viable offers had materialized by the end of 2019, the Trustee shifted to an auction strategy.

In December 2019, the Trustee obtained approval to retain Colliers and Keen-Summit Capital Partners LLC ("Keen-Summit") to run an auction process that simultaneously marketed both the Assemblage and individual parcels comprising the Assemblage, including the Apartments.  On January 3, 2020, the Court approved bid procedures authorizing the Trustee to solicit bids for the Assemblage and five separate lots, it set a deadline for submission of offers and a date for the auction.  As a result of the auction process pursued by the Trustee, on June 15, 2020, the Court approved a sale of the Apartments to ED-DEN Investment Co., Inc. for $15.6 million.  The sale to ED-DEN closed on June 30, 2020.  The Court also approved sales of the Desert Land LLC parcels via credit bid to the Shotgun Entities and DLLA on behalf of the Aspen Creditors, and sale of the Desert Oasis Investments LLC parcel to The Three Affiliated Tribes of the Fort Berthold Indian Reservation.

The sale of the Apartments generated approximately $10.1 million for creditors other than its first lien holder, The Northern Trust Company.  The sale of the Desert Oasis Investments parcel generated $508,500.00 for creditors other than its first lien holder, Juniper Loan Servicing.[1] The sales of the Desert Land parcels to Shotgun and DLLA/Aspen have to date generated only $240,000.00 in unencumbered funds for the Desert Land estate.[2]  Hence, approximately ninety-five (95%) percent of the funds available to creditors other than secured creditors as a result of the auction process were realized by Desert Oasis Apartments.

Northern Trust has been paid substantially all of its secured claim, and the Trustee is holding $9,774,423.65[3] in cash as of the filing of this Application.  Estimated Chapter 11 administrative claims through July 31, 2020, and an estimated reserve for The Northern Trust Company's remaining secured claim are as follows:

//

//

//

//

//

//

---

[1]    The sale of the Desert Oasis Investments parcel was for a price less than what was owed to Juniper Loan Servicing, however, Juniper agreed to a carveout of $508,500.

[2]    Before she resigned as trustee in Desert Land, the Trustee filed a motion seeking to surcharge the DLLA/Aspen collateral.  As of the filing of this Application, no order has been made with respect to surcharge of the DLLA/Aspen collateral. To the extent that the Court imposes a surcharge against the DLLA/Aspen collateral for fees and costs incurred by NH or other estate professionals for sale of the Assemblage, the Court should make an order subrogating the estate of Desert Oasis Apartments to the rights of NH and the other professionals with respect to such surcharge.  *See, generally* FMC Medical Plan v. Owens, 122 F.3d 1258, 1260 n.1 (9th Cir. 1997) (citing Black's Law Dictionary definition of subrogation as "the exchange of a third person who has paid a debt in the place of the creditor to whom he has paid it, so that he may exercise against the debtor all the rights which the creditor, if unpaid, might have done....")

[3]    Out of the $10.1 million, the Trustee had to pay brokers commission and other costs of sale, a break-up fee and expense reimbursement to the stalking-horse bidder on the Apartments, and satisfy certain pre-paid rent obligations.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

| | Cash on Hand |
|---|---|
| | $9,774,423.65 |

| Admin. Claimant | Amount |
|---|---|
| Kavita Gupta, Chapter 11 trustee | (estimated) $418,200.00 |
| Nuti Hart LLP | $544,662.68 |
| Garmin Turner Gordon LLP | $35,697.57 |
| Grobstein Teeple LLP | $64,994.27 |
| Schwartzer & McPherson (disputed) | $91,838.98 |
| Quarterly UST Fees | $156,000.00 |
| Trade Debts | 0.00 |
| Estimated Reserve for Northern Trust | $100,000.00 |
| **Total** | $1,155,393.50 |

## III.    STANDARD FOR ALLOWANCE OF FEES

Section 330(a) of the Bankruptcy Code provides in pertinent part:

(1)    After [notice and a hearing] . . . the court may award to a trustee . . . or professional person employed under section 327 or 1103 –

(A) reasonable compensation for actual, necessary services rendered by the trustee . . . attorney . . . ; and

(B) reimbursement of actual, necessary expenses.

*See* 11 U.S.C. §330(a)(1).

The analysis of a fee request under Bankruptcy Code section 330 uses the 'lodestar' approach, under which the reasonable number of hours expended is multiplied by a reasonable hourly rate.  Unsecured Creditors' Committee v. Puget Sound Plywood, Inc., 924 F.2d 955, 960 (9th Cir. 1991).  The Court must therefore determine if the hours expended were reasonable. Section 330(a)(3) provides certain guidelines for evaluating the reasonableness of requested compensation.  It provides in pertinent part:

(3)    In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including:

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

(A)    the time spent on such services;

(B)    the rates charged for such services;

(C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

*See* 11 U.S.C. §330(a)(3).

The Coleman Decl. establishes that NH actually incurred the fees and expenses set forth in Exhibits A and B.  The rates charged by NH ($425 to $575 per hour) are comparable to those charged by similar attorneys in Las Vegas.[4]  As discussed below, the amounts charged are reasonable in light of the complexity of these cases and the issues they presented, the amount of debt involved, and the experience of the attorneys rendering services in this case.  (A description of these individuals' experience and qualifications are set forth in the accompanying declaration of Mr. Coleman.)

## IV.    SUMMARY OF SERVICES RENDERED

### A.  Asset Disposition

As described in more detail in Section V below, NH's services relating to sale of the Assemblage and Apartments assisted the Trustee with:

- understanding the nature of the real property assets in the estates

---

[4]    For example, Sam A. Schwartz of Schwartz PLLC has been in practice since 1997, and as of 2018 charged $625.00 per hour for services as debtor's counsel in the *In re Lucky Dragon Hotel and Casino, LLC*, Case No. 18-10792-mkn [Dkt. 254-1, p. 2 of 16].  John Patrick Fritz of Levene Neal Bender Yoo & Brill, LLC served as committee counsel in the *Lucky Dragon* case, was admitted to practice in 2006, and charged $565.00 per hour in 2018 [Dkt. 544-1, p. 2 of 53].  Kevin W. Coleman was admitted to practice in 1993, served as law clerk to the Hon. Mitchel Goldberg (Bankr. C.D. Cal.) and R. Lynne Riddle (Bankr. C.D. Cal.), formerly served as Chair of the Creditors Rights, Bankruptcy, and Business Restructuring Practice Group at Schnader Harrison Segal & Lewis LLP, and has represented trustees, debtors-in-possession, financial institutions and parties to significant executory contracts in complex Chapter 11 in cases across the United States for over 25 years.  Mr. Coleman's rate is $575.00 per hour.

NUTH HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

- formulating, adjusting, and implementing sale strategy
- retaining brokers
- conferring with the brokers, parties in interest, and the Court concerning the status of sale efforts
- negotiating with and conducting due diligence on potential buyers
- drafting and negotiating the terms of auction and bid procedures
- filing the necessary motions to obtain approval for the bid procedures and to approve the sale
- responding to the joint motion to suspend the bankruptcy case, or alternatively, extend the auction, including appeal of the order denying the joint motion and efforts to stay this Court's order
- addressing disputes over the scope of the evidentiary hearing component of the auction and sale hearing
- appearing at the auction and sale hearing
- closing the Apartments sale, and preparing various ancillary agreements implementing that sale
- responding to backup bidder's attempt to withdraw offer prior to closing
- filing a motion to pay breakup fee and expense reimbursement to the stalking horse bidder on the Apartments, and
- reviewing and analyzing The Northern Trust Company's secured claim.

The foregoing services were necessary because sale of the Apartments (either as part of the Assemblage or separately) was the principle means to pay creditors in this case. NH expended 181.2 hours and incurred $94,995.00 in fees for services directly related to sale of the Apartments, which services are detailed on pages 4 to 19 of Exhibit A to the Coleman Decl. NH expended 796.8 hours and incurred $423,225.00 in fees for services related to sale of the Assemblage, which services are detailed on pages 3 to 46 of Exhibit B to the Coleman Decl., and discussed in more detail in Section V. NH submits that the amount of time expended on sale of the Apartments and the Assemblage was reasonable in light of what the assets appeared to be

worth at the time of the Trustee's appointment, the importance of maintaining creditor confidence in the sale process, the numbers of buyers who expressed interest, the challenges associated with obtaining the secured lenders' consent to the terms under which brokers would be retained, the difficulty of managing multiple creditor groups with conflicting interests, and the litigation surrounding the timing of the auction and hearing on approval of the sales.

**B. Analysis and Recovery of Other Assets**

NH investigated and filed five (5) adversary proceedings seeking recovery of debts owed by insiders to Desert Oasis Apartments. NH has also analyzed and conferred with the Trustee on other potential avoidance actions. NH filed proofs of claim in the cases of Desert Land LLC and SkyVue Las Vegas LLC, and negotiated a tolling agreement with the Gonzales Trust to preserve the Trustee's claims that the judgment lien recorded shortly before the involuntary petitions were filed are avoidable under 11 U.S.C. §547(b). The foregoing services were necessary because the sale of the Apartments did not generate sufficient funds to pay all creditors in full. NH expended 42.3 hours incurring $22,942.50 in fees rendering services relating to the investigation and recovery of other assets for the DOA estate, which services are detailed on pages 2 to 4 of Exhibit A to the Coleman Decl. NH submits that the amount of time expended on investigating and recovering other assets was reasonable given the scale of DOA's operations pre-bankruptcy and the number of actions commenced.

**C. Intercompany Claim Investigation**

Amended schedules of assets filed by Desert Oasis Apartments and Desert Land prior to the Trustee's appointment indicated that Desert Oasis Apartments owed Desert Land $4.5 million. NH advised the Trustee on her duties in connection with the purported intercompany claim, and took steps to disclose this issue to the Court and the Office of the United States Trustee.

NH subsequently assisted the Trustee and the Trustee's financial advisors in determining the basis for the purported intercompany claim, which included subpoenaing records from several banks and DOA's former managers, review of the accounting and bank records, and interviewing the Debtors' former accountant. As a result of this investigation, it was discovered

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

that the obligation appearing on the Debtors' books and records was based on an erroneous internal accounting entry made in 2001. The former accountant who made the error signed a declaration explaining that a mistake was made, why the mistake was made, and confirming that the intercompany account balance had been overstated by $5 million since that time. After reviewing the accountant's declaration and supporting materials and conferring with counsel for the Debtor and counsel for the Debtor's managers, they determined that the purported $4.5 million claim was scheduled in error, and so filed amended schedules eliminating that purported debt on April 23, 2020 [Dkt. 1080 & 1081].

The foregoing services were necessary in order to ascertain what claims were properly allowable in the Desert Oasis Apartments case, and otherwise comply with the Trustee and NH's disclosure duties imposed under the Bankruptcy Code and Rules. NH expended 67.0 hours and incurred $34,370.00 in fees for services relating to investigating and resolving the purported intercompany claim against the DOA estate, which services are detailed on pages 21 to 25 of Exhibit A to the Coleman Decl. NH submits that the amount of time expended on the investigation into the purported intercompany claim was reasonable in light of the fact that the purported claim had limited documentary support, the Debtors' managers could not offer a clear explanation for the origin of the claim, the claim ostensibly arose nearly 20 years ago, and relevant evidence had to be obtained from third parties.

### D.    Case Administration

NH also assisted the Trustee by conducting due-diligence into the proceedings in the three Debtors' cases prior to her appointment, prepared status conference statements and appeared at several case status conferences, assisted the Trustee with filing monthly operating reports, and conferred with the Trustee on case management issues. NH also responded to inquiries from DOAs creditors, conferred with the Trustee and the Office of the United States Trustee concerning affirmative claims the Trustee determined were held by Desert Oasis Apartments against Desert Land, and the Trustee's decision to resign as trustee from the Desert Land case. NH also began preparation of an application to terminate joint administration, but before that application was filed the Court issued its own order to show-cause why joint

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

administration should be terminated.

The foregoing services were necessary to assist the Trustee in understanding the issues to be addressed in the case, complying with her obligations under the Federal Rules of Bankruptcy Procedure, and orders of the Court. NH expended 18.6 hours and incurred $9,585.00 in fees for services relating to case administrative matters for the DOA estate, which services are detailed on pages 1 to 2 of Exhibit A to the Coleman Decl.  NH expended 61.3 hours and incurred $33,132.50 in fees for services relating to case administration for all three of the Debtors' estates, which services are detailed on pages 1 to 3 of Exhibit B to the Coleman Decl.  NH submits that the amount of time expended on these activities was reasonable given the length of time the Debtors operated in Chapter 11 prior to the Trustee's appointment, and the number of case status conferences conducted by the Court.

**E.  Cash Collateral**

NH assisted the Trustee in complying with her duties under Bankruptcy Code section 363 with respect to use of cash collateral.  NH expended 6.2 hours and incurred $3,340.00 in fees for services concerning cash collateral matters in the DOA estate, which services are detailed on pages 20 to 21 of Exhibit A to the Coleman Decl.

**F.  Fee/Employment Applications**

NH expended 10.9 hours and incurred $6,222.50 in fees to prepare its application to become employed and assist other professionals retained by the Trustee to become employed in all three Debtors cases.  The Firm's services concerning Employment of NH and other estate professionals for all three cases are detailed on page 46 of Exhibit B to the Coleman Decl.

NH also expended 12.6 hours and incurred $7,245.00 in fees to begin preparation of this Application, which services are detailed on page 20 of Exhibit A to the Coleman Decl. (Additional fees for preparation of this Application charged after August 1 will be included in the next fee application.)

NUTI HART LLP
411 30ᵀᴴ STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

### G. Executory Contracts

NH expended 9.8 hours and incurred $4,405.00 in fees to prepare a motion seeking to reject executory contracts not assumed by the purchaser of the Apartments property, which services are detailed on pages 19 and 20 of Exhibit A to the Coleman Decl.

### H. Plan and Disclosure Statement

After the Apartments sale closed, NH began discussions with the Trustee and parties in interest concerning how to resolve the Desert Oasis Apartments bankruptcy case, including whether there would be support for a consensual liquidating plan, and the possible structures for a liquidating plan. NH expended 4.6 hours and incurred $2,270.00 in fees for services concerning a potential plan in the DOA estate, which services are detailed on page 25 of Exhibit A to the Coleman Decl.

### I. Review/Objections to Claims

After the Apartments sale closed, it appeared very likely that a material distribution to unsecured creditors would occur. Consequently, NH reviewed several claims filed by trade creditors, which appeared to have been paid in the ordinary course of business. NH also reviewed, analyzed, and has sought additional information to substantiate approximately $1.6 million in scheduled claims asserted by insiders- Citation Financial, LLC, Compass Investments Holdings, LLC, and Tivoli Motel, Inc. NH expended 3.7 hours and incurred $1,782.50 in fees for services concerning claims review and objections in the DOA estate, which services are detailed on page 25 of Exhibit A to the Coleman Decl.

### J. Objection to Schwartzer Fee Application

Schwartzer & McPherson ("S&M"), counsel to the Debtors, filed its second and final fee application in June 2019. The Trustee opposed S&M's fee application [Dkt. 737] for a number of reasons, including that S&M failed to disclose receipt of retainers from insider entities that were not disinterested in its employment application or Rule 2014 statements, and that it failed to explain a possible unauthorized draw on retainers it received from the Debtors. If sustained, S&M faced disgorgement of sums paid to it and denial of all compensation. In re Park-Helena Corp., 63 F.3d 877, 881 (9th Cir.1995) (ordering debtor's counsel to disgorge $150,000 retainer

because of failure to adequately disclose source of retainer); <u>In re Woodcraft Studios, Inc.</u>, 464

B.R. 1, 8 (N.D. Cal. 2011) (Rule 2014's disclosure requirement is strictly applied).  In order to

avoid a ruling on the Trustee's objection, S&M agreed to have its application treated as an

interim application, with all parties reserving rights to object to S&M's final fee application

[Dkt. 819].  The Trustee intends to renew her objections if and when S&M seeks final approval

of its fees.  NH expended 38.9 hours and incurred $17,372.50 in fees related to the objection to

S&M's fee application.  The Firm's services relating to the objection to the S&M fee application

are detailed on pages 47 and 48 of Exhibit B to the Coleman Decl.  NH submits that the amount

of time expended on the objection to the S&M fee application was reasonable in light of the

serious disclosure issues presented, and the amount of compensation requested by S&M.

**K.  Air Travel**

NH flew to Las Vegas on several occasions for hearings and settlement conferences.

However, NH is not charging for airport to airport travel time.  Time incurred in air travel

to/from Las Vegas is detailed on pages 48 to 49 of Exhibit B to the Coleman Decl.

**V.    SERVICES RELATED TO SALE OF REAL PROPERTY**

As noted, the majority of the services rendered by NH related to sale of the real property.

From the outset it was clear that a sale of the Apartments – as part of the Assemblage or

separately – was the only means to pay DOA's creditors.  Hence, all of NH's efforts related to

sale of the real property were necessary for the administration of the DOA estate.  The following

discussion is intended to assist the Court in understanding what NH's services entailed, and why

the amounts charged are reasonable under the circumstances.

**A.  Sale Strategy (Assemblage Sale)**

Given the length of time the Assemblage had been on the market and apparent lack of

results, the Trustee needed to understand the history of the Debtors' efforts to market the

Assemblage in order to assess what changes to marketing strategy may be warranted.  NH

participated along with the Trustee in meetings with the Debtors' managers, Colliers, and the

secured creditors to obtain information about what had transpired and identify potential sale

opportunities.  NH also reviewed several of the offers made for the real properties prior to the

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

Trustee's appointment, as well as several appraisals – including an appraisal prepared for the Gonzales Trust valuing the entire Assemblage at $307 million.

These inquiries suggested that some viable buyers were reluctant to engage because of a perceived unwillingness by the Debtors' former management to sell at a realistic price. At the Trustee's direction, Colliers lowered the listing price, sent out an updated Offering Memorandum, updated the property listing on multiple brokerage platforms, and met directly with numerous prospects to update them on the Trustee's appointment and interest in concluding a sale.

Recognizing that these were single asset real estate cases and that the estates would not be afforded an unlimited amount of time to find a buyer, the Trustee asked Colliers to provide weekly reports and participate in weekly conference calls in order to monitor the status of its marketing efforts, gauge market feedback, and discuss steps that could be taken to encourage potential bidders to come forward with offers. NH participated in these broker calls in order to *inter alia* assess the results of marketing efforts and accurately report on the status of sale efforts to interested parties and the Court.

Colliers continued to market the Assemblage through October, targeting potential buyers in the gaming, entertainment, and retail space. While there had appeared to be serious interest in the Assemblage from several potential buyers earlier on, by October 2019, neither the Debtors nor the Trustee had received any viable offers for the Assemblage during the 14-month period of the Colliers listing. By that time, the parties who had previously expressed interest had largely gone silent. Consequently, the Trustee concluded that a shift to an auction strategy was warranted. NH therefore conferred with the Trustee and brokers on implementing an auction process. After COVID-19 began impacting capital markets, NH conferred with the Trustee and her brokers concerning whether and under what terms the auction could be postponed.

As described on pages 3 to 9 on Exhibit B to the Coleman Decl., NH expended 106.1 hours and incurred $54,362.50 in fees related to formulating and adjusting the strategy for sale of the Assemblage.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

**B. Marketing the Assemblage/Negotiations With Potential Buyers**

NH dealt directly with several potential buyers for the Assemblage, several of whom made offers that would have paid all creditors in full.  Among other things, NH reviewed the offers and conferred with the Trustee, her brokers, and the potential buyers regarding the structure of the proposed transactions and other terms.  NH also conducted due diligence on potential buyers, including assessing their financial capacity to close.  NH also explained to potential buyers how sales in the bankruptcy context differed from a typical commercial real estate transaction, including the requirements associated with the court approval process.  In connection with the foregoing, NH negotiated and drafted numerous non-disclosure agreements to facilitate the potential buyer's due-diligence, and allow the potential buyer to share information about their financial capacity with the Trustee.

After confirming proof of funds for a potential investor in Las Vegas Live at the Strip LLC ("Las Vegas Live"), NH negotiated and drafted an asset purchase agreement with Las Vegas Live.  The agreement contemplated a purchase of the Assemblage at a price of $385 million, but that agreement also made clear that the Trustee would continue to market the Assemblage while Las Vegas Live finalized its investor agreements.  The Trustee opened an escrow at First American Title, but Las Vegas Live apparently was unable to secure its investment capital, and so did not make a required $5 million earnest money deposit.

Although none of the offers on the Assemblage made prior to the start of the auction process came to fruition, all of them had the potential to pay creditors in full.  It was therefore necessary to conduct due-diligence on the buyers and their purported investors, review the proposals and engage with potential buyers on the terms, and take reasonable steps to assist the buyers in coming forward with a viable offer that could be presented to interested parties and the Court.

Colliers/Keen-Summit commenced the marketing process for the auction in mid-January 2020.  These marketing efforts resulted in several offers on the Assemblage.  Once again, NH reviewed the proposals, conferring with the Trustee and the brokers, and conferring with bidders and their counsel about the terms of sale and the bid process.  None of these offers proved viable,

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

in part for reasons discussed in the Section V.C. below.  Nevertheless, NH's services were necessary and intended at the time to facilitate at having at least two qualified bidders on the Assemblage at the auction.

As described on pages 9 to 20 on Exhibit B to the Coleman Decl., NH expended 172.0 hours and incurred $93,860.00 in fees related to marketing and negotiations with potential buyers of the Assemblage, including due-diligence on the *bona fides* of those potential buyers.  The foregoing amounts are reasonable given the number of parties who expressed interest in the Assemblage.

**C. Communications/Negotiations With Creditors and Parties in Interest**

Immediately after her appointment, all of the secured creditors asked the Trustee to provide greater transparency into the marketing and sale process.  In order to allow information on leads/offers to be shared confidentially, NH drafted common interest agreements with the secured creditors.  Insider entities, the trustee for SkyVue Las Vegas LLC, and one other interested party, Kathy Bogan, also requested information about the sale efforts, and so NH prepared common interest agreements with those entities as well.  Thereafter, NH prepared periodic reports to and conducted a series of conference calls with parties in interest on the status of sale efforts over this period.

In mid-October, NH informed the secured creditors and other interested parties why the Trustee believed it appropriate to shift to an auction strategy, and sought their consent to the terms under which brokers would be retained to run an auction process.  These discussions also focused on bidding procedures, the timeline for an auction, and related matters.  After the auction process commenced in January, NH reviewed, commented on, and transmitted the periodic sale status reports prepared by the brokers, and responded to inquiries from interested parties' questions about the details relayed in those reports.

As the auction process proceeded, issues emerged that required additional communications and negotiations with the secured creditors and other interested parties. Although the response to the brokers' marketing efforts had been quite robust, by the end of

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

February, several obstacles to sale of the Assemblage had become manifest. Consistent feedback from potential buyers indicated that:

- Casino and gaming entities were not interested in the Assemblage due to the fact that there was a "glut" of capacity in Las Vegas, and it was impossible to obtain financing for new casino development

- Buyers were unwilling to pay more than the amount of secured debt for the Assemblage

- Several potential buyers were reluctant to expend the time and incur the expense of pursuing a transaction in a situation where the secured lenders could purchase the assets via a credit bid, particularly for a stalking horse due to the fact that under the bid procedures, no break-up fee would be payable in the event the property was sold via a credit bid.[5]

Then in March, COVID-19 impacted the capital markets and the commercial real estate market in Las Vegas. Several interested parties asked the Trustee to postpone the auction as a result of COVID-19.

NH expended a significant amount of effort explaining to creditors/interested parties what impediments stood in the path of an Assemblage sale even before COVID-19 struck (i.e., the credit bidding issue), and attempting to reach an agreement with the secured creditors that would address this issue. In addition, NH also explained that it appeared increasingly unlikely that the Assemblage would sell for more than the secured debt, and that the Trustee could not consistent with her duties as a Chapter 11 trustee administer assets solely for the benefit of secured creditors. NH therefore attempted to negotiate carveout agreements that would *inter alia* generate a "meaningful" distribution to unsecured creditors. In connection therewith, NH analyzed what legal requirements a carveout agreement had to satisfy, it assessed the Trustee's

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

---

[5] In other words, the serious and credible potential buyers clued into the fact that it would cost them significant sums to conduct due diligence, assess the feasibility of their development plans, arrange financing, formulate offers, hire counsel, and participate in the process, but any one of four secured lenders could torpedo the transaction by credit bidding unless they paid more than $250 million for the Assemblage – something they were not prepared to do.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

1  ability to surcharge the secured lenders' collateral in the absence of a carveout, and it formulated

2  proposals to the secured lenders.

3  　　　Had the secured lenders all agreed to limit their credit bid rights and consented to

4  reasonable carveouts, the Trustee would have been open to extending the auction deadlines for

5  the entire Assemblage and the separate lots.  However, despite NH and the Trustee's repeated

6  efforts, it was impossible to obtain the secured creditors' unanimous consent.

7  　　　As described on pages 20 to 27 on Exhibit B to the Coleman Decl., NH expended 144.3

8  hours and incurred $74,977.50 in fees related to communications with secured creditors and

9  interested parties, including efforts to negotiate agreements to resolve the impediments to sale of

10  the Assemblage.  The foregoing charges were reasonable in light of the importance of

11  maintaining creditor confidence in the sale process, the complexity of the agreements the Trustee

12  sought to negotiate with the secured lenders, and the number and conflicting interests of the

13  secured lenders.

14  **D.  Broker Retention (Assemblage)**

15  　　　As explained above, the Trustee elected to continue working with Colliers after she was

16  appointed.  Colliers requested certain modifications to the listing agreement, and so NH advised

17  the Trustee on these modifications.  NH also prepared a motion [Dkt. 848] seeking to extend the

18  term of the original Colliers listing agreement for sixty (60) days, which the Court approved on

19  October 18, 2019 [Dkt. 863].

20  　　　After the Trustee concluded that it was necessary to pivot to an auction process, she

21  interviewed five brokers to assist in that effort, including Colliers and Keen-Summit Capital

22  Partners LLC ("Keen-Summit").  NH participated in some of the interviews, conferred with the

23  Trustee on broker retention issues, and assisted with the negotiation of the original terms of a

24  proposed joint broker agreement between Colliers and Keen-Summit.

25  　　　At first, the Trustee contemplated one retention agreement with Colliers/Keen-Summit

26  pursuant to which Colliers/Keen-Summit would market the Assemblage as a whole and in

27  separate parcels.  Under this initial proposal, Colliers/Keen-Summit was willing to agree to a

28  lower commission, but in exchange wanted the secured creditors to agree that in the event a

parcel was sold by credit bid, the purchasing lender would pay a minimum fee and expense reimbursement, including marketing and advertising costs. As explained above, NH negotiated with the secured lenders for several weeks starting in mid-October to reach agreement on these terms, but it proved impossible to obtain the consent of all of the secured lenders to the minimum fee, or to make contributions to marketing expenses.

As described on pages 27 to 32 on Exhibit B to the Coleman Decl., NH expended 52.4 hours and incurred $27,340.00 in fees related to extension of the Colliers listing agreement, interviews with candidates to run an auction process, negotiating the original terms of retention with Colliers/Keen-Summit, and then attempting to obtain the secured lenders' consent to those terms. The foregoing charges were reasonable given the number of retention agreements that had to be negotiated and approved, and the fact that these agreements involved terms that were not typical for a normal listing agreement.

**E.  Bid Procedures**

While negotiations relating to broker retention were underway, the Trustee also negotiated auction and bidding procedures with interested parties. The Trustee filed her motion to approve the bid procedures on December 20, 2019 [Dkt. 956], which was granted on January 3, 2020 [Dkt. 972].

As described on pages 32 to 35 on Exhibit B to the Coleman Decl., NH expended 51.9 hours and incurred $29,722.50 in fees related to the formulation, negotiation, and obtaining approval of the bid procedures. The foregoing charges were reasonable in light of the numbers of parties with whom the Trustee had to negotiate with over the bid procedures, the need to accommodate a dual-track sale strategy, and the detail of those procedures.

**F.  Response to Joint Motion to Suspend/Extend Auction**

On April 6, 2020, DLLA, the Shotgun Entities, the Sher Group, and the trustee for SkyVue Las Vegas LLC filed a motion to suspend all of the jointly administered bankruptcy cases and/or extend the auction dates ("Joint Motion to Suspend/Extend") [Dkt. 1039]. None of the moving parties in the Joint Motion to Suspend/Extend were creditors of Desert Oasis Apartments, but nevertheless they sought to prevent the auction from going forward as scheduled

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

on all property comprising the Assemblage including the Apartments based on their belief that each parcel was more valuable if sold together.[6]

NH prepared the Trustee's response to the Joint Motion to Suspend/Extend [Dkt. 1052] along with declarations from the Trustee and her broker setting out the history of marketing efforts and the challenges encountered even before the outbreak of COVID-19. The response also outlined the circumstances under which the Trustee could support an extension of the sale deadlines. Importantly, however, the Trustee explained that she could not postpone the auction of the Apartments if that would cause the DOA estate to be in breach of the sale contract with 3D Investments.[7]

The Court denied the Joint Motion to Suspend/Extend on April 23, 2020 [Dkt. 1077], specifically finding that given the circumstances the Trustee had sound reasons for not postponing the auction [Dkt. 1075, p. 20]. DLLA appealed the order denying the Joint Motion to Suspend/Extend, and sought emergency stays pending appeal from this Court and the United States District Court. NH prepared oppositions to the stay motions, both of which were denied. DLLA subsequently sought voluntary dismissal of its appeal.

As described on pages 35 to 38 on Exhibit B to the Coleman Decl., NH expended 91.4 hours and incurred $49,735.00 in fees related to the Joint Motion to Suspend/Extend. The foregoing amounts are reasonable in light of the factual record the Trustee had to place before the Court in her response, the appeal, and DLLA's multiple attempts to stay the order denying the Motion to Suspend/Extend.

---

[6]    Compass Investments and Citation Holdings, two insider-controlled entities that assert disputed claims in the Desert Oasis Apartments case, later joined the Joint Motion to Suspend/Extend.

[7]    After the Joint Motion to Suspend/Extend was filed, NH negotiated an agreement with 3D Investments to delay the sale hearing and closing deadlines. 3D Investments, however, was only willing to extend those dates for approximately 30 days because: (a) it was concerned about an increase in vacancy rates due to COVID-19 job losses and wanted to be in a position to make agreements with tenants to keep them in place, and (b) it did not want its deposit and other capital tied up for an extended period not knowing if it would be the successful bidder.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

### G. Motion to Approve Sale

NH prepared and filed the Trustee's motion to approve sale free and clear of liens on April 23, 2020 [Dkt. 1079]. The Northern Trust Company objected to the motion to sell the Apartments free and clear of its lien. NH reviewed and analyzed the authorities relied on by Northern Trust, and prepared a reply. NH also conferred with the Trustee and opposing counsel regarding Northern Trust's objections.

As the date originally set for the auction approached, the Trustee decided to postpone the auction for two weeks to give additional time for two potential bidders to come forward with offers on the Assemblage. NH served notice of the Trustee's decision to postpone the auction to June 5, 2020, and appeared at a status conference on the sale. Unfortunately, neither potential buyer submitted offers on the Assemblage.

NH later learned that the order approving bidding procedures may not have been served by mail on certain beneficial interest holders of the Aspen loan, and a small number of unsecured creditors of DOA were not served with the sale motion or bid procedures order. Consequently, NH prepared an ex-parte application to approve a form of notice to these omitted creditors [Dkt. 1174]. DLLA and the SkyVue Las Vegas trustee opposed the ex-parte application (joined by the insider controlled entities and the Debtors), arguing that the entire sale process had to be restarted from the beginning. NH then prepared a reply [Dkt. 1183]. The Court overruled these objections and approved the form of notice [Dkt. 1185]. Supplemental notice was served on all of the omitted creditors as directed by the Court, and as expected, none of these creditors objected to the sale or manner of notice.

DLLA, however, appeared to continue in its attempts to delay the auction and sale. On May 29, 2020, DLLA filed an exhibit list and demand for witnesses [Dkt. 1226] making clear that it intended to elicit testimony at the sale hearing on the entire history of the Trustee's efforts to sell the real properties, to introduce appraisal evidence in an attempt to show that the properties were being sold for less than market value, and to re-litigate the Trustee's decision to proceed with the auction in the midst of COVID-19 despite this Court's explicit ruling on April 23, 2020 that the Trustee had sound reasons for not postponing the auction [Dkt. 1075, p. 20].

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

NH prepared the witnesses to testify, but it also drafted a motion *in limine*. Ultimately, the Trustee and DLLA were able to reach an agreement that narrowed the number of disputes that the Court would have to resolve at the sale hearing and therefore eliminated the need for live testimony. Resolution of these disputes on the eve of the sale hearing avoided the necessity of filing the *in limine* motion.

NH appeared at the auction and sale hearing on June 5, 2020. (Both Christopher Hart and Kevin Coleman appeared at the June 5 sale hearing because it was not clear whether any other parties in interest or the Court would request live testimony from the Trustee/brokers or successful bidders on good faith purchaser issues, and Mr. Hart was talked with handling the evidentiary aspects of this hearing.) At the sale hearing, the Court overruled The Northern Trust Company's objection to the sale free and clear of liens, and approved the sale of the Apartments to ED-DEN Investments Co., LLC for $15.6 million.

As described on pages 38 to 43 on Exhibit B to the Coleman Decl., NH expended 127.4 hours and incurred $69,700.00 in fees related to the motion to sell free and clear of liens, addressing disputes over the scope of evidence at the sale hearing, preparing for and appearing at the sale hearing/auction. The amount of these charges were reasonable in light of complexity of the issues involved with sale free and clear of liens, the number of liens involved in the motion, and DLLA's tactics with regard to the evidence that would have to be introduced at the sale hearing.

**H. Analysis of Sale Economics**

NH reviewed liens on the Assemblage and the extent of encumbrances against the property over the course of the case through the sale to assist the Trustee in understanding what sale price would be sufficient to pay all creditors in full. At the Court's request, the Trustee filed a notice setting forth the amount of all encumbrances on May 29, 2020 [Dkt. 1222].

As described on pages 43 to 46 on Exhibit B to the Coleman Decl., NH expended 51.3 hours and incurred $23,527.50 in fees determining the extent of indebtedness against the Assemblage. The foregoing amounts were reasonable in light of the number of lenders involved, and the number of instances where the Trustee needed to assess the extent of the indebtedness.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

**I. Broker Retention (Apartments)**

In view of the impossibility of unanimous creditor consent on broker retention discussed in Section V.D above, in early November 2019 the Trustee modified her approach and negotiated three separate retention agreements for Colliers/Keen-Summit – one of which concerned the Apartments and parcels owned by Desert Land that were subject to liens in favor of the Shotgun Entities. This agreement required the estates and/or the secured creditors to pay for marketing costs. Initially, Northern Trust was unwilling to consent to use of cash collateral to pay DOA's portion of the marketing costs, and so NH negotiated an agreement with the Gonzales Trust to cover these expenses in exchange for a junior lien on the Apartments. The Trustee filed her motion to retain Colliers/Keen-Summit to sell the Apartments and the Shotgun parcels on November 27, 2019 [Dkt. 888] setting out *inter alia* why the Court could grant a junior lien on the Apartments to the Gonzales Trust. After the motion was filed, Northern Trust relented and consented to use of cash collateral for the advertising, and so the motion and retention agreement was modified to reflect that change. The motion to approve Colliers/Keen-Summit's retention was approved over the objections of the Debtors and other insider-controlled entities on December 19, 2019 [Dkt. 953].

As described on pages 4 to 7 on Exhibit A to the Coleman Decl., NH expended 31.7 hours and incurred $17,267.50 in fees related to negotiating and obtaining approval for the terms under which Colliers/Keen-Summit would be retained to sell the Apartments and Shotgun parcels. The foregoing amounts are reasonable in view of Northern Trust's initial refusal to consent to use of cash collateral for marketing expenses.

**J. Auction of Apartments**

As a result of the auction process, on April 2, 2020, the Trustee received an offer from 3D Investments LLC to purchase the Apartments for $9 million, a price that appeared to be in line with other pricing guidance given by other potential buyers. NH conferred with the Trustee and the brokers on a counter-offer, but 3D Investments was unwilling to increase its purchase price. NH reviewed the stalking horse purchase agreement prepared by 3D Investments, which

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

the Trustee subsequently executed.  The 3D Investments purchase agreement required closing to occur no later than June 10, 2020.

Approximately ten (10) offers were received on the Apartments by the April 30 bid deadline, ranging from a low of $1,500,000 up to $9,100,000.00.  NH reviewed those offers with the Trustee and the brokers.  As required by the bid procedures order, NH also served notice on interested parties of all offers made, identified which bids were and were not qualified, and explained why any bids were not considered qualified.  NH also worked with the Trustee and approximately five (5) more bidders after the bid deadline to allow them to qualify late in order to facilitate their participation in the auction.  NH also prepared a spreadsheet identifying terms in the offers that had an economic impact in order to facilitate the Trustee's ability to make "apples to apples" comparisons of the offers at the auction.

As noted, ED-DEN Investments emerged as the successful bidder for the Apartments. Stone Street Capital agreed at the sale hearing to act as a back-up bidder at the price of $15.25 million.[8]  After the sale to ED-DEN closed, NH prepared a motion seeking authorization to disburse the breakup fee and expense reimbursement to 3D Investments, the stalking horse bidder [Dkt. 1347], which the Court granted on August 17, 2020 [Dkt. 1440].

As described on pages 7 to 18 on Exhibit A to the Coleman Decl., NH expended 124.5 hours and incurred $63,577.50 in fees related to the auction of the Apartments.  The foregoing amounts are reasonable in light of the number of parties tendering bids on the Apartments.

---

[8]    Following the auction, Stone Street communicated to the Trustee that is wished to withdraw its backup bid, and demanded a return of its deposit from the Trustee, the Trustee's brokers and counsel, and Fidelity National Title Co.  NH responded to Stone Street's demands explaining the terms of the bid procedures to Stone Street (which made backup offers irrevocable and deposits non-refundable), and pointed out the instances where it acknowledged that it was familiar with and agreed to be bound by the bid procedures.  Fidelity ultimately agreed that Stone Street was bound to the terms of its backup offer until after the anticipated closing of the ED-DEN sale and refused Stone Street's demand for immediate refund of the deposit.  However, because the sale to ED-DEN closed on June 30, 2020, the Trustee authorized Fidelity to release the Stone Street deposit back to it on the first business day after the closing.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

### K.  Northern Trust Payoff Demand

The Court's order approving sale of the Apartments free and clear of The Northern Trust Company's liens required that all proceeds of sale be held subject to further order [Dkt. 1264]. Northern Trust subsequently filed a motion asking the Court to direct the Trustee to disburse the amount it claimed to be owed.  NH reviewed and analyzed The Northern Trust Company's secured claim, particularly, the propriety of its claim for default interest and its claim for approximately $600,000.00 in attorney's fees.  NH negotiated a $90,000 reduction in the attorney's fees component of Northern Trust's claim, and conferred with the Trustee and counsel for the Gonzales Trust on these issues.

As described on pages 18 to 19 on Exhibit A to the Coleman Decl., NH expended 25.0 hours and incurred $14,150.00 in fees related to analyzing Northern Trust's claim, conferring with Northern Trust and the Gonzales Trust with respect to that claim.  The foregoing amounts were reasonable in light of the fact that Northern Trust's claim for default interest and attorney's fees had to be analyzed under both state law and bankruptcy law, and the efforts that had to be undertaken in order to negotiate a $90,000.00 reduction in the attorney-fee component of Northern Trust's claim.

## VI.    BASIS FOR ALLOCATING FEES FOR "SHARED" SERVICES

NH incurred $479,952.50 in fees during the Compensation Period providing services to all three Debtors' estates. *See* Coleman Decl., Exh. B, and Exhibit 2 to this Application. $423,225.00 of those fees related to sale of the Assemblage, including disputes over how and when to conduct the auction.  The remaining fees were incurred in connection with case administration activities applicable to all three debtors (such as preparing case status reports and appearing at case status conferences), NH's employment application and assisting other professionals to become employed in all three jointly-administered cases, and an objection to Debtors' counsel's final fee application that also concerned all three of the Debtors' estates.

Under Nevada law, multiple parties will be held jointly and severally liable for an award of attorney's fees when their joint actions cause a single loss.  University of Nevada v. Tarkanian, 879 P.2d 1180, 1188, 110 Nev. 581, __ (Nev. 1994); Alutiiq Int'l Solutions, LLC v.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

OIC Marianas Ins. Corp., 149 F.Supp.3d 1208, 1219 (D. Nev. 2016).  Nevada law also imposes joint and several liability for attorney's fees where the actions of multiple parties cause the attorney's fees to be incurred, but one or more of the parties is unable to pay the award. Gunderson v. D.R. Horton, Inc., 319 P.3d 606, 617 (Nev. 2014) *citing* Concord Boat Corp. v. Brunswick Corp., 309 F.3d 494, 497 (8th Cir. 2002).  While *Tarkanian* and *Gunderson* involved fee-shifting statutes outside of bankruptcy, the Ninth Circuit has held that principles developed in non-bankruptcy fee-shifting contexts are applicable to an award of compensation under Bankruptcy Code section 330.  In re Manoa Finance Co., 853 F.2d 687, 691 (9th Cir. 1988).  As *Manoa Finance* explained, non-bankruptcy fee-shifting principles guide the application of section 330 in order to further section 330's objective of "compensat[ing] attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11." Id. *citing* 124 Cong.Rec. 33,994 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 6505, 6511.

NH provided the "shared" services pursuant to one retention agreement to which all three of the estates were parties.  The "shared" services were performed at the joint request of the Trustee in her capacity as trustee in all three of the cases.  Had NH been retained by Desert Oasis Apartments, Desert Oasis Investments, and Desert Land outside of bankruptcy in connection with sale of the Assemblage –an endeavor that each desired because of their belief that the properties were worth more if sold together than separately – each of those entities would have been jointly and severally obligated to compensate NH for the entire amount of the resulting fees.  *See* Radaker v. Scott, 855 P.2d 1037, 1041, 109 Nev. 653, 660 (Nev. 1993) (participants in joint venture are jointly and severally liable for liabilities incurred in furtherance of the joint enterprise); Molezzo Reporters v. Patt, 579 P.2d 1243, 1244, 94 Nev. 540, 542 (Nev. 1978) (attorney arranging for services of court reporter is jointly and severally liable with his client for the cost of the reporting services). Therefore, in order to comply with *Manoa Finance*'s direction to fix compensation at a level comparable to what the professional would be paid for similar services outside of bankruptcy, the Court should begin its analysis of the allocation issue with the

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

understanding that Nevada law would hold each of the estates jointly and severally liable for the "shared" service fees.

The purpose of allocating fees between multiple estates is to achieve a result that is fair between creditors of each estate. In re Tropicana Entertainment, LLC, 2014 WL 7450610, *6 (Bankr. D. Del., 2014) ("Chapter 11 debtors and their professionals must undertake many time-consuming and expensive tasks, regardless of the size of the estate or the number of creditors. An allocation based solely on the amount of debt or number of casino properties would be inequitable."). While there is no single fixed methodology, courts generally attempt to allocate fees based on the relative benefits of the services to each estate. In re Energy Future Holdings Corp., 593 B.R. 217, 258 (Bankr. D. Del. 2018) ("In addition, the evidence shows that Kirkland's allocation of asbestos-, tax-, and makewhole-related services properly tracked the benefits conferred to each estate."); Tropicana Entertainment, 2014 WL 7450610, *6.

For the reasons discussed below, NH submits that its services rendered to all three debtor estates should be allocated in the following manner:

| NH Services Rendered to All Three Debtors' Estates | | | | |
|---|---|---|---|---|
| Category | Fees | Amount Allocated to Desert Oasis Apartments LLC | Amount Allocated to Desert Oasis Investments LLC | Amount Allocated to Desert Land LLC |
| Assemblage Sale | $423,225.00 | $342,812.27 | $16,965.23 | $63,447.50 |
| Case Administration | $33,132.50 | $11,044.16 | $11,044.17 | $11,044.17 |
| Employment Apps. | $6,222.50 | $2,074.16 | $2,074.17 | $2,074.17 |
| Obj. to Schwartzer Fee App. | $17,372.50 | $5,790.84 | $5,790.83 | $5,790.83 |
| Air Travel | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | |
| TOTAL | $479,952.50 | $361,721.43 | $35,874.40 | $82,356.67 |

As shown in the table, NH has allocated one-third of the time spent on Case Administration, Employment Applications, Objection to the Schwartzer & McPherson fee applications, and Air Travel to each of the three estates. This is because, although necessary to

the administration of the cases, the benefits to each estate of the services in these categories cannot be quantified in monetary terms.

But with respect to fees and expenses relating to sale of the Assemblage, the benefits of those services to each estate can be quantified monetarily. As noted above, sale of the Apartments generated $10.1 million for creditors other than Northern Trust. The sale of the Desert Oasis Investments parcel generated $508,500.00 for creditors other than Juniper Loan Servicing. And sale of the Desert Land parcels has to date generated $240,000.00 for creditors other than the Shotgun Entities.

Pursuant to a Court approved stipulation between the Trustee for Desert Land, the Shotgun Entities, and the Trustee [Dkt. 1461] ("Shotgun Surcharge Stipulation"), NH expects to be allowed and paid $63,447.50 in Assemblage sale costs in the case of Desert Land. Assuming that occurs, after deducting that sum from the total Assemblage sale costs of $423,225.00, a balance of $359,777.50 would remain.[9] The DOA estate was the primary beneficiary of the services related to sale of the Assemblage[10] given that ninety-five and two/tenths (95.2%) percent of the net sale proceeds after payment of secured creditors was paid to the DOA estate. Accordingly, NH submits that it is appropriate to allocate 95.2% of the remaining Assemblage sale costs to the DOA estate.

//

---

[9]  But if for some reason the Court does not approve payment of this sum to NH for Assemblage sale fees, any reduction should be shouldered by the DOA estate and added to NH's allowed fees in this case. As explained in this section, the DOA estate's creditors consented to and were the primary beneficiaries of NH's services related to sale of the Assemblage.

[10]  As the Court determined in its memorandum decision denying the Joint Motion to Suspend the Bankruptcy Cases or Extend the Auction [Dkt. 1075, p. 19], a Chapter 11 trustee's primary duty is to maximize the return to unsecured creditors, not secured creditors. *See* Chapter 11 Trustee Handbook, p. 37; In re KVN Corporation, Inc., 541 B.R. 1, 5 (9th Cir. BAP 2014) ("Generally, a trustee should not sell property subject to a security interest unless the sale generates funds for the benefit of unsecured creditors."); *See also* Reno Snax Sales, LLC v. Heritage Bank of Nev. (In re Reno Snax Sales, LLC), 2013 WL 3942974 (9th Cir. BAP July 31, 2013) (trustee's fiduciary duty does not extend to "'act[ing] for the benefit of any particular creditor'" or party-in-interest, *citing* 3 Collier on Bankruptcy ¶ 323.02[1] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. rev. 2012).

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

The proposed allocation is fair for other reasons.  All of DOA's creditors, including the Gonzales Trust, The Northern Trust Company, and insider-controlled entities, took the position when the Trustee was appointed that the real property was worth more if sold together rather than as separate parcels, and so actively encouraged the Trustee to sell the Apartments as part of the Assemblage [Dkt. 1075, p. 11].   Northern Trust, the Gonzales Trust, and the insider-controlled claimants were all (at their request) kept apprised of the Trustee's marketing of the Assemblage.  They were also involved in the negotiations over retention of brokers and formulation of the bid procedures.  Hence, Northern Trust, the Gonzales Trust, and the insiders had knowledge of and consented to the Trustee's efforts to sell the Apartments as part of the Assemblage.

While it ultimately proved impossible to sell the Assemblage, the marketing efforts and bid process undertaken for the Assemblage resulted in sale of the Apartments for $15.6 million, and as noted 95.2% of the funds generated for the benefit of unsecured creditors were paid to the DOA estate.  This sum should allow the Trustee to distribute approximately 55-60 cents on the dollar to the estate's unsecured creditors assuming there are no other asset recoveries.[11]  Under these circumstances, NH submits that it is fair to allocate 95.2% of Assemblage sale expenses not paid through the Shotgun Surcharge Stipulation to the DOA estate.

---

[11]  Again, the Trustee believes that the Gonzales Trust's judgment lien is avoidable as a preference.  But to the extent the Gonzales Trust can be considered a holder of a secured claim arising from its judgment lien, allocation of 95% of the remaining Assemblage sale costs to Desert Oasis Apartments is also warranted under surcharge principles.  Under Bankruptcy Code section 506(c), a trustee can surcharge collateral to recover the actual and necessary costs of preserving and liquidating the collateral.  11 U.S.C. §506(c).  Surcharge is warranted *inter alia* where the secured creditor explicitly or impliedly consents to the expenses giving rise to the surcharge.  Compton Impressions. Ltd. v. Queen City Bank, N.A. (In re Compton Impressions), 217 F.3d 1256, 1260 (9th Cir. 2000); In re Visual Industries, 57 F.3d 321 (3d Cir. 1995) (surcharging collateral for sale costs).  Here, the Gonzales Trust consented to the Assemblage Sale costs by: (a) filing the involuntary cases, (b) seeking the appointment of the Trustee, (c) encouraging the Trustee to sell the Assemblage, (d) requesting periodic reports on sale efforts, (e) participating in negotiations over broker retention, (f) offering to pay a ratable amount of Assemblage sale marketing costs, (g) supporting the Trustee's motion to approve bid procedures and the sale process generally, and (h) stating on the record that it could consent to a carveout.

**VII.    EXPENSES INCURRED**

NH incurred a total of $6,018.74 in expenses providing services to the Trustee in all three Debtors' estates, of which NH is allocating one-third to the DOA estate, or $2,006.25.  These expenses are summarized on Exhibit 3 to this Application, and detailed on pages 50 to 52 of Exhibit B to the Coleman Decl.  The items for which expense reimbursement are being sought are not included in NH's overhead, and are not, therefore, a part of the hourly rates charged by NH.  Included in the charges are fees related to obtaining admission *pro hac vice* in this case, expenses associated with travel to Las Vegas (although NH did not charge for time in transit), PACER charges, CourtCall charges, the cost of obtaining a UCC-1 lien search, transcript fees, postage, and copying.  NH charges $0.15 per page for scanning and photocopying, and all other costs at the actual cost, without any profit on such expenses.

NH submits that the expenses that it has incurred and paid in rendering legal services to the Trustee are reasonable and necessary under the circumstances of the Chapter 11 Case, and that the reimbursement to NH for such expenses is appropriate and should be allowed.  (Because of delays in processing certain CourtCall and other expenses, some expenses incurred prior to July 31, 2020 may appear on NH's second fee application.)

//
//
//
//
//
//
//
//
//
//

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

# VIII.  CONCLUSION

Wherefore, NH respectfully requests that this Court:

1.      Allow the Firm interim compensation in the amount of $542,656.43 and reimbursement of $2,006.25 in expenses rendering services to the Trustee in the Desert Oasis Apartments case for the period March 28, 2019 through July 31, 2020;

2.      Authorize the Trustee to disburse the amount of the allowed fees and costs to NH; and

3.      Grant such other further relief that is just and proper

DATED: September 17, 2020                      NUTI HART LLP


                                               By:    */s/ Kevin W. Coleman*
                                                      Kevin W. Coleman
                                                      Attorneys for Kavita Gupta,
                                                      Chapter 11 Trustee

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

# EXHIBIT 1

## SUMMARY OF FEES BY PROFESSIONAL

Compensation Period:                          March 28, 2019 – July 31, 2020

Total Hours:                                  1040.9

Total Due for Professional Services Rendered:  $542,656.43

Total Due for Costs Advance:                  $   2,006.25

**Total Current Fees and Costs:**             **$544,662.68**

Blended Rate:                                 $521.33

_____

| DESERT OASIS APARTMENTS | | | | |
|---|---|---|---|---|
| **Professional** | **Grad. Year** | **Rate** | **Hours** | **Fees** |
| Kevin W. Coleman | 1993 | $575.00 | 202.6 | $116,495.00 |
| Christopher H. Hart | 1996 | $575.00 | 13.8 | $7,935.00 |
| Gregory C. Nuti | 1990 | $575.00 | 9.5 | $5,462.50 |
| Kimberly Fineman | 1996 | $425.00 | 120.1 | $51,042.50 |
| **TOTAL-DESERT OASIS APARTMENTS** | | | **346.0** | **$180,935.00** |

| DESERT OASIS APARTMENTS (ALLOCATED) | | | | |
|---|---|---|---|---|
| **Professional** | **Grad. Year** | **Rate** | **Hours** | **Fees** |
| Kevin W. Coleman | 1993 | $575.00 | 396.4 | $222,766.50 |
| Christopher H. Hart | 1996 | $575.00 | 40.9 | $21,518.42 |
| Gregory C. Nuti | 1990 | $575.00 | 53.0 | $30,503.18 |
| Kimberly Fineman | 1996 | $425.00 | 204.6 | $86,933.33 |
| **TOTAL-DESERT OASIS APART. (ALLOCATED)** | | | **694.9** | **$361,721.43** |

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

# EXHIBIT 2

## SUMMARY OF FEES BY TASK CODE

---

| DESERT OASIS APARTMENTS | | | |
|---|---|---|---|
| | CATEGORY | TOTAL HOURS BILLED | TOTAL FEES |
| A. | Asset Disposition | | |
| | *-Broker Retention* | 31.7 | $17,267.50 |
| | *-Auction of Apartments Parcel* | 124.5 | $63,577.50 |
| | *-Northern Trust Payoff Demand* | 25.0 | $14,150.00 |
| | | 181.2 | $94,995.00 |
| B. | Analysis and Recovery of Other Assets | 42.3 | $22,942.50 |
| C. | Intercompany Claim Investigation | 67.00 | $34,370.00 |
| D. | Case Administration | 18.6 | $9,585.00 |
| E. | Cash Collateral | 6.2 | $3,340.00 |
| F. | NH First Interim Fee Application | 12.6 | $7,245.00 |
| G. | Executory Contracts | 9.8 | $4,405.00 |
| H. | Plan and Disclosure Statement | 4.6 | $2,270.00 |
| I. | Review/Objections to Claims | 3.7 | $1,782.50 |
| | **Total:** | **346.0** | **$180,935.00** |

| DESERT OASIS APARTMENTS (ALLOCATED) | | | |
|---|---|---|---|
| | CATEGORY | TOTAL HOURS BILLED | TOTAL | ALLOCATED TO DOA |
| A. | Sale of the Assemblage | | | |
| | *-Sale Strategy* | 106.1 | $54,362.50 | |
| | *-Marketing/Neg. With Potential Buyers* | 172.0 | $93,860.00 | |
| | *-Comm./Neg. With Creditors* | 144.3 | $74,977.50 | |
| | *-Broker Retention* | 52.4 | $27,340.00 | |
| | *-Bid Procedures* | 51.9 | $29,722.50 | |
| | *-Joint Motion to Suspend/Extend* | 91.4 | $49,735.00 | |
| | *-Motion to Approve Sale* | 127.4 | $69,700.00 | |
| | *-Analysis of Sale Economics* | 51.3 | $23,527.50 | |
| | | 796.8 | $423,225.00 | $342,812.27 |
| B. | Case Administration | 61.3 | $33,132.50 | $11,044.16 |
| C. | NH and Other Prof. Employment App. | 10.9 | $6,222.50 | $2,074.16 |
| D. | Objection to Schwartzer Fee App. | 38.9 | $17,372.50 | $5,790.84 |
| E. | Air Travel | 37.0 | $0.00 | $0.00 |
| | **Total:** | **944.9** | **$479,952.50** | **$361,721.43** |

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

# EXHIBIT 3

## SUMMARY OF EXPENSES BY TYPE

| DESERT OASIS APARTMENTS (ALLOCATED) | | | |
|---|---|---|---|
| | CATEGORY | TOTAL EXPENSES BILLED | ALLOCATED TO DOA |
| A. | Transcript Fees | $35.00 | $11.67 |
| B. | CourtCall fees | $224.00 | $74.67 |
| C. | Pro Hac Admission Fees | $622.00 | $207.34 |
| D. | Out of Town Travel | $4,472.52 | $1,490.84 |
| E. | PACER | $194.60 | $64.86 |
| F. | Copying | $50.47 | $16.83 |
| G. | Postage | $240.15 | $80.05 |
| H. | Public Records Search Fees | $180.00 | $60.00 |
| | **Total:** | **$6,018.74** | **$2,006.25** |

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152