STEVEN T. GUBNER – Nevada Bar No. 4624
JERROLD L. BREGMAN
*Pro Hac Vice* application pending, and granted in the related case of Desert Land, LLC)
SUSAN K. SEFLIN – *Pro Hac Vice* granted in related case
BRUTZKUS GUBNER
300 S. 4th Street, Suite 1550
Las Vegas, NV 89101
Telephone: (702) 835-0800
Facsimile: (866) 995-0215
Email: sgubner@bg.law
jbregman@bg.law
sseflin@bg.law

Attorneys for Jeffrey I. Golden,
Chapter 11 Trustee of creditor Desert Land, LLC

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re:

DESERT OASIS APARTMENTS, LLC,

Debtor.

Case No. BK-S-18-12456 GS
Chapter 11

**DECLARATION OF JERROLD L. BREGMAN IN SUPPORT OF DESERT LAND, LLC'S MOTION FOR AN ORDER ALLOWING ITS CLAIM AT $4.5 MILLION FOR PURPOSES OF PLAN CONFIRMATION, VOTING, AND ANY DISTRIBUTION RESERVE, PURSUANT TO RULE 3018(a)**

Hearing Date: March 11, 2021
Hearing Time: 1:30 p.m.

**DECLARATION OF JERROLD L. BREGMAN**

**I, Jerrold L. Bregman, hereby declare**:

1. I am an attorney at Brutzkus Gubner, attorneys for Jeffrey I. Golden, not individually but in his capacity as the duly appointed and serving Chapter 11 trustee ("Trustee Golden") for the bankruptcy estate of Desert Land, LLC ("Desert Land") whose case is pending in the above-captioned Court as Case No. BK-S-18-12454 GS (the "Desert Land Case"). I submit this Declaration in support of *Desert Land's Motion For An order Allowing Its Claim At $4.5 Million For Purposes Of Plan Confirmation, Voting, and*

*Any Distribution Reserve, Pursuant to Rule 3018(a)* filed contemporaneously herewith (the "Motion").[1]

2. The facts stated herein are known to me to be true based on my personal knowledge. I am over 18 years of age, and if called upon to testify, I could and would competently testify to each of the facts set forth herein.

3. I am one of the attorneys at Brutzkus Gubner with principal responsibility for representing Trustee Golden in the Desert Land Case. In the course of representing Trustee Golden in this matter, Brutzkus Gubner obtained and I have reviewed all of the documents that are described herein and attached hereto as exhibits.

4. Certain of the documents attached hereto as exhibits were produced to Brutzkus Gubner, upon my request in writing therefor, by Kevin Coleman, an attorney at the law firm of Nuti Hart LLP, counsel to Trustee Gupta. In this regard, Mr. Coleman and I expressly addressed in written correspondence the question of whether Trustee Gupta would be asserting any privileges in connection with any of the documents that Mr. Coleman would cause to be produced to Brutzkus Gubner in response to my written request. Mr. Coleman communicated to me in writing that Trustee Gupta would not be asserting any privilege in connection with any of the documents he would cause to be produced to Brutzkus Gubner in response to my written request. I am informed and believe that subsequently Mr. Coleman caused those certain documents to be produced to Brutzkus Gubner in response to my written request which Brutzkus Gubner received, which I have personally reviewed, and which are Bates stamped "N/H – [six digit number]" (the "Gupta Documents").

5. On behalf of our respective clients, Mr. Coleman and I negotiated and our respective clients, Trustee Golden and Trustee Gupta, entered into that certain written "Tolling Agreement" effective as of June 22, 2020, which was then executed and delivered by each of Trustee Golden and Trustee Gupta. Pursuant to that Tolling Agreement, Trustee Gupta, on behalf of the Apartments estate, agreed that with respect to claims that Desert Land may have against Apartments, all periods of limitation, statutes of repose, and other time-based limitations were tolled for the benefit of Desert Land from the effective date

[1] Capitalized terms not herein defined shall have the meanings ascribed to them in the Motion.

thereof to and including September 23, 2020.

6. In the course of our representation of Trustee Golden in this matter, Brutzkus Gubner has come into possession of a variety of documents that I am informed were caused to be produced by Lenard Schwartzer, an attorney at the law firm of Schwartzer McPherson, who previously served as counsel to the Debtors, including Desert Land, in response to my written request. Brutzkus Gubner received these documents, which I have personally reviewed, which are identified herein as the "Schwartzer Documents."

7. The Schwartzer Documents included a document purporting to be Desert Land's as-filed and signed 2005 Federal Tax Return. A true and correct copy of that document, which I have no reason to doubt is genuine, reflects Apartments' indebtedness to Desert Land in the amount of $5.627 million.

8. On Trustee Golden's behalf, Brutzkus Gubner prepared the DL Claim and caused such claim to be filed in Apartments' bankruptcy case. A true and correct copy of the DL Claim is hereto attached as **Exhibit 1**. To my knowledge, after inquiry, as of the date hereof there has been no objection filed to the DL Claim. Nor to my knowledge, after inquiry, did any party in Apartments' 2011 Case ever file an objection to Desert Land's claim in that case.

9. The Gupta Documents included Trustee Gupta's letter of resignation, dated June 9, 2020, addressed to Edward M. McDonald of the Office of the United States Trustee (the "Resignation Letter"). That Resignation Letter includes, among other things, a discussion of Desert Land's claim against Apartments, embodied in the DL Claim, wherein Trustee Gupta writes that such claim may be ***either*** (a) a "'valid debt, … or (b) as something other than 'true indebtedness ….'".

10. The Schwartzer Documents included documents purporting to be Desert Land's as-filed and signed 2018 and 2019 Federal Tax Returns, each of which reflects the signature of Trustee Gupta. I have no reason to doubt these documents are genuine. A true and correct copy of the first page, and of the relevant page included therein (reflecting amounts owing from Apartments to Desert Land), of Desert Land's 2018 Federal Tax Return, and of Desert Land's 2019 Federal Tax Return, in each case with tax payer identification numbers redacted and highlighting added, are hereto attached as **Exhibit 2** and **Exhibit 3**, respectively.

11. The Gupta Documents included that certain document entitled "Inter-Company Debt Investigation," dated June 12, 2020, a true and correct copy of the first page and of the relevant page thereof (page 3 of 12) are hereto attached as **Exhibit 4**.

12. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 5**.

13. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 6**.

14. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 7**.

15. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 8**.

16. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 9**.

17. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 10**.

18. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 11**.

19. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 12**.

20. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 13**.

21. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 14**.

22. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 15**.

///

///

///

23. The Gupta Documents included certain email correspondence, including that certain correspondence a true and correct copy of which is hereto attached as **Exhibit 16**.

24. On December 1, 2020, I transmitted a letter on behalf of Trustee Golden to John D. Fiero, a lawyer at Pachulski Stang Ziehl & Jones, in his capacity as counsel for Trustee Gupta, the substance of which communicated most if not all of the factual and legal arguments contained in the Motion as to why the DL Claim is and should be considered and allowed in the Apartments case as a general unsecured claim that is not subject to subordination in the amount of $4.5 million. As of the date hereof, I am informed and believe, upon inquiry, that neither we nor Trustee Golden has received any response from Trustee Gupta, or on her behalf, responding to the substance of our letter of December 1, 2020.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this day, February 11, 2021, in Denver, Colorado.

Jerrold L. Bregman

# EXHIBIT 1

**Fill in this information to identify the case:**

Debtor 1 Desert Oasis Apartments, LLC

Debtor 2 ____________________
(Spouse, if filing)

United States Bankruptcy Court for the: District of Nevada

Case number 18-12456-gs

# Official Form 410
# Proof of Claim

**04/19**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Desert Land, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor ____________________

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? ____________________

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|
| Name: Jeffrey I. Golden, Trustee for Desert Land, LLC | Name: |
| Number Street: 650 Town Center Dr., Suite 600 | Number Street: |
| City: Costa Mesa State: CA ZIP Code: 92626 | City State ZIP Code |
| Contact phone: 714-966-1000 | Contact phone: |
| Contact email: jgolden@wgllp.com | Contact email: |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☑ Yes. Claim number on court claims registry (if known) 3-1

Filed on 09/23/2020 (MM / DD / YYYY)

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? ____________________

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 4,500,000.00 . **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Account stated. See attached addendum for details.

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: ____________________

**Basis for perfection:** ____________________

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**: $__________

**Amount of the claim that is secured:** $__________

**Amount of the claim that is unsecured:** $__________ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $__________

**Annual Interest Rate** (when case was filed)_______%

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $__________

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: ____________________

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $________ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $________ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $________ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $________ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $________ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $________ |

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☑ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 12/14/2020 (MM / DD / YYYY)

Signature: [signature]

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Jeffrey (First name) | I. (Middle name) | Golden (Last name) |
| Title | Chapter 11 Trustee for the bankruptcy estate of Desert Land, LLC | | |
| Company | Desert Land, LLC<br>Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 650 Town Center Dr., Suite 600 (Number Street) | | |
| | Costa Mesa (City) | CA (State) | 92626 (ZIP Code) |
| Contact phone | 714-966-1000 | Email | jgolden@wgllp.com |

**ADDENDUM TO AMENDED PROOF OF CLAIM**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| DESERT OASIS APARTMENTS, LLC, | : | Case No. BK-S-18-12456-GS |
| Debtor. | : | |

**ADDENDUM TO AMENDED PROOF OF CLAIM OF DESERT LAND, LLC**

Jeffrey I. Golden, solely in his capacity as the duly appointed and serving chapter 11 trustee (the "Trustee") for the bankruptcy estate of Desert Land, LLC ("Desert Land"), asserts the amended proof of claim (the "Amended Claim") to which this Addendum is annexed, on behalf of the estate of Desert Land against Desert Oasis Apartments, LLC ("Apartments"), the chapter 11 debtor herein. The Trustee, on behalf of the estate of Desert Land, asserts the following claims against Apartments upon personal knowledge as to himself and his own acts, and as to all other matters upon information and believe, based upon the investigation, analysis and advice made by and through his attorneys.

**I. Account Stated of Not Less than $4.5 Million.**

1. As of the date the order for relief was entered, Apartments owed its related entity Desert Land, LLC ("Desert Land") $4.5 million. This liability is reflected on the following documents: (a) Schedule F of Apartments' Schedules and Statement of Financial Affairs [Doc. #96] filed in In re Desert Oasis Apartments, LLC, Case No. 18-12456-gs (the "Apartments' Bankruptcy Case"), on July 13, 2018, page 18, which page is attached hereto as **Exhibit A**; (b) Schedule F of Apartments' Schedules and Statement of Financial Affairs' [Doc. #104] filed in In

re Desert Land, LLC, Case No. 18-12454-gs (the "Desert Land Bankruptcy case"), on July 13, 2018, page 19, which is attached hereto as **Exhibit B**; and (c) Schedule F of the Amended Schedules [Doc. #104] filed in the Apartments' Bankruptcy Case on August 28, 2018, page 4, which page is attached hereto as **Exhibit C**. This liability is also reflected on Desert Land's tax returns for the years 2005 through and including 2019.

2. In the first Desert Oasis Apartments, LLC bankruptcy case, Case No. 11-17208 (the "First Apartments' Bankruptcy Case"), Apartments scheduled $5,468,103.96 as due and owing to Desert Land. *See*, Schedule F, Doc. #35 filed on May 24, 2011, page 20, which page is attached hereto as **Exhibit D**.

3. Furthermore, Apartments' Chapter 11 Plan of Reorganization [Doc. #89 in the First Apartments' Bankruptcy Case] (the "Apartments' 2011 Plan") provided for the allowance and treatment of the $5,468,103.96 owed by Apartments to Desert Land. *See*, page 4 of the Apartments' 2011 Plan. The Apartments' 2011 Plan is attached hereto as **Exhibit E**. In the Apartments' 2011 Plan, the "Desert Land, LLC" unsecured claim is provided for under Class 4 treatment. The claim was subordinated to the claims of non-insider general unsecured creditors but was otherwise allowed with treatment to be paid in full. *See*, page 4 of the Apartments' 2011 Plan. The Apartments' 2011 Plan was confirmed pursuant to Court order entered on December 30, 2011 [Doc. #203 in the First Apartments' Bankruptcy Case]. Thus, the Trustee is informed and believes that Apartments owes Desert Land at least $4.5 million and that the entered confirmation order in the First Apartments' Bankruptcy Case is controlling.

## II. Reservation of Rights.

4. Right to Amend. The Trustee expressly reserves the right to further amend or supplement this Amended Claim to correct, clarify, explain, expand, supplement or add to any portion of the claim asserted herein, or otherwise to increase the dollar amount of such claim

and/or provide additional information and documentation in connection with the claim, including as it may be amended, and including in response to any objection. Moreover, the Trustee specifically reserves the right to conduct discovery with respect to this matter in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

5. No Admission. Nothing contained in this Amended Claim shall be deemed an admission by the Trustee. The Trustee expressly reserves the right to withdraw this Amended Claim in his sole discretion with the effect to be as if this Amended Claim had never been filed.

Debtor **Desert Oasis Apartments, LLC** Case number (if known) **18-12456-LEB**
Name

**3.3** **Nonpriority creditor's name and mailing address**
**Citation Financial, LLC**
**10181 Park Run Drive**
**#200**
**Las Vegas, NV 89145**
**Date(s) debt was incurred** _
**Last 4 digits of account number** _

**As of the petition filing date, the claim is:** *Check all that apply.* **$1,150,000.00**
☐ Contingent
☐ Unliquidated
☐ Disputed
**Basis for the claim:** _
Is the claim subject to offset? ■ No ☐ Yes

**3.4** **Nonpriority creditor's name and mailing address**
**Classic Design Group**
**600 Cervantes Drive**
**Henderson, NV 89014**
**Date(s) debt was incurred** _
**Last 4 digits of account number** _

**As of the petition filing date, the claim is:** *Check all that apply.* **$114.34**
☐ Contingent
☐ Unliquidated
☐ Disputed
**Basis for the claim:** _
Is the claim subject to offset? ■ No ☐ Yes

**3.5** **Nonpriority creditor's name and mailing address**
**Compass Investments Holdings, LLC**
**10181 Park Run Drive**
**#200**
**Las Vegas, NV 89145**
**Date(s) debt was incurred** _
**Last 4 digits of account number** _

**As of the petition filing date, the claim is:** *Check all that apply.* **$350,000.00**
☐ Contingent
☐ Unliquidated
☐ Disputed
**Basis for the claim:** _
Is the claim subject to offset? ■ No ☐ Yes

**3.6** **Nonpriority creditor's name and mailing address**
**Desert Land, LLC**
**10181 Park Run Drive**
**#200**
**Las Vegas, NV 89145**
**Date(s) debt was incurred** _
**Last 4 digits of account number** _

**As of the petition filing date, the claim is:** *Check all that apply.* **$4,500,000.00**
☐ Contingent
☐ Unliquidated
☐ Disputed
**Basis for the claim:** _
Is the claim subject to offset? ■ No ☐ Yes

**3.7** **Nonpriority creditor's name and mailing address**
**HD Supply**
**4825 E Cheyenne Avenue**
**Las Vegas, NV 89115**
**Date(s) debt was incurred** _
**Last 4 digits of account number** _

**As of the petition filing date, the claim is:** *Check all that apply.* **$595.80**
☐ Contingent
☐ Unliquidated
☐ Disputed
**Basis for the claim:** _
Is the claim subject to offset? ■ No ☐ Yes

**3.8** **Nonpriority creditor's name and mailing address**
**LeaseStar LLC**
**2201 Lakeside Blvd**
**Richardson, TX 75082**
**Date(s) debt was incurred** _
**Last 4 digits of account number** _

**As of the petition filing date, the claim is:** *Check all that apply.* **$50.14**
☐ Contingent
☐ Unliquidated
☐ Disputed
**Basis for the claim:** _
Is the claim subject to offset? ■ No ☐ Yes

**3.9** **Nonpriority creditor's name and mailing address**
**RealPage, Inc.**
**2201 Lakeside Blvd**
**Richardson, TX 75082**
**Date(s) debt was incurred** _
**Last 4 digits of account number** _

**As of the petition filing date, the claim is:** *Check all that apply.* **$671.77**
☐ Contingent
☐ Unliquidated
☐ Disputed
**Basis for the claim:** _
Is the claim subject to offset? ■ No ☐ Yes

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

Debtor **Desert Oasis Apartments, LLC** Case number (if known) **18-12456-LEB**
Name

| | | | |
|---|---|---|---|
| 3.3 | Nonpriority creditor's name and mailing address<br>**Citation Financial, LLC**<br>**10181 Park Run Drive**<br>**#200**<br>**Las Vegas, NV 89145**<br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | **$1,150,000.00** |
| 3.4 | Nonpriority creditor's name and mailing address<br>**Classic Design Group**<br>**600 Cervantes Drive**<br>**Henderson, NV 89014**<br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | **$114.34** |
| 3.5 | Nonpriority creditor's name and mailing address<br>**Compass Investments Holdings, LLC**<br>**10181 Park Run Drive**<br>**#200**<br>**Las Vegas, NV 89145**<br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | **$350,000.00** |
| 3.6 | Nonpriority creditor's name and mailing address<br>**Desert Land, LLC**<br>**10181 Park Run Drive**<br>**#200**<br>**Las Vegas, NV 89145**<br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | **$4,500,000.00** |
| 3.7 | Nonpriority creditor's name and mailing address<br>**HD Supply**<br>**4825 E Cheyenne Avenue**<br>**Las Vegas, NV 89115**<br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | **$595.80** |
| 3.8 | Nonpriority creditor's name and mailing address<br>**LeaseStar LLC**<br>**2201 Lakeside Blvd**<br>**Richardson, TX 75082**<br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | **$50.14** |
| 3.9 | Nonpriority creditor's name and mailing address<br>**RealPage, Inc.**<br>**2201 Lakeside Blvd**<br>**Richardson, TX 75082**<br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br>Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | **$671.77** |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

Debtor **Desert Oasis Apartments, LLC** Case number (if known) **18-12456-LEB**
Name

**3.3 Nonpriority creditor's name and mailing address**

**Citation Financial, LLC**
**10181 Park Run Drive**
**#200**
**Las Vegas, NV 89145**

**Date(s) debt was incurred _**

**Last 4 digits of account number _**

**As of the petition filing date, the claim is:** *Check all that apply.* **$1,150,000.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim: _**

Is the claim subject to offset? ■ No ☐ Yes

---

**3.4 Nonpriority creditor's name and mailing address**

**Classic Design Group**
**600 Cervantes Drive**
**Henderson, NV 89014**

**Date(s) debt was incurred _**

**Last 4 digits of account number _**

**As of the petition filing date, the claim is:** *Check all that apply.* **$114.34**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim: _**

Is the claim subject to offset? ■ No ☐ Yes

---

**3.5 Nonpriority creditor's name and mailing address**

**Compass Investments Holdings, LLC**
**10181 Park Run Drive**
**#200**
**Las Vegas, NV 89145**

**Date(s) debt was incurred _**

**Last 4 digits of account number _**

**As of the petition filing date, the claim is:** *Check all that apply.* **$350,000.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim: _**

Is the claim subject to offset? ■ No ☐ Yes

---

**3.6 Nonpriority creditor's name and mailing address**

**Desert Land, LLC**
**10181 Park Run Drive**
**#200**
**Las Vegas, NV 89145**

**Date(s) debt was incurred _**

**Last 4 digits of account number _**

**As of the petition filing date, the claim is:** *Check all that apply.* **$4,500,000.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim: _**

Is the claim subject to offset? ■ No ☐ Yes

---

**3.7 Nonpriority creditor's name and mailing address**

**HD Supply**
**4825 E Cheyenne Avenue**
**Las Vegas, NV 89115**

**Date(s) debt was incurred _**

**Last 4 digits of account number _**

**As of the petition filing date, the claim is:** *Check all that apply.* **$595.80**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim: _**

Is the claim subject to offset? ■ No ☐ Yes

---

**3.8 Nonpriority creditor's name and mailing address**

**LeaseStar LLC**
**2201 Lakeside Blvd**
**Richardson, TX 75082**

**Date(s) debt was incurred _**

**Last 4 digits of account number _**

**As of the petition filing date, the claim is:** *Check all that apply.* **$50.14**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim: _**

Is the claim subject to offset? ■ No ☐ Yes

---

**3.9 Nonpriority creditor's name and mailing address**

**RealPage, Inc.**
**2201 Lakeside Blvd**
**Richardson, TX 75082**

**Date(s) debt was incurred _**

**Last 4 digits of account number _**

**As of the petition filing date, the claim is:** *Check all that apply.* **$671.77**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim: _**

Is the claim subject to offset? ■ No ☐ Yes

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

B6F (Official Form 6F) (12/07) - Cont.

In re Desert Oasis Apartments, LLC, Debtor

Case No. 11-17208-BAM (If known)

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (*See instructions above.*) | CODEBTOR | HUSBAND, WIFE, JOINT OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO.<br>Criterion Brock<br>PO Box 22107<br>Milwaukie, OR 97269 | | | Trade debt | | | | 600.05 |
| ACCOUNT NO.<br>De Lage Landen Financial Services<br>PO Box 41602<br>Philadelphia, PA 19101 | | | Trade debt | | | | 176.27 |
| ACCOUNT NO.<br>Desert Land, LLC<br>10181 Park Run Drive<br>#200<br>Las Vegas, NV 89145 | | | | | | | 5,468,103.96 |
| ACCOUNT NO.<br>Ellipse Communications, Inc.<br>PO Box 801814<br>Dallas, TX 75380 | | | Trade debt | | | | 211.00 |
| ACCOUNT NO. 0304<br>For Rent Magazine<br>75 Remittance Drive<br>#1705<br>Chicago, IL 60675-1705 | | | Trade debt | | | | 3,494.70 |

Sheet no. 1 of 4 continuation sheets attached to Schedule of Creditors Holding Unsecured Nonpriority Claims

Subtotal ➤ $ 5,472,585.98

Total ➤ $

(Use only on last page of the completed Schedule F.)
(Report also on Summary of Schedules and, if applicable on the Statistical Summary of Certain Liabilities and Related Data.)

Exhibit D_001

LENARD E. SCHWARTZER (NV Bar No. 0399)
JEANETTE E. MCPHERSON (NV Bar No. 5423)
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
Email: bkfilings@s-mlaw.com

Counsel for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>**DESERT OASIS APARTMENTS, LLC,**<br><br>Debtor. | Case No. BK-S-11-17208-BAM<br>Chapter 11<br><br>Hearing Date:<br>Hearing Time:<br>Place: Courtroom #3 |

**DESERT OASIS APARTMENT, LLC'S AMENDED PLAN OF REORGANIZATION**

**ARTICLE I**

**SUMMARY**

This Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of DESERT OASIS APARTMENT, LLC (the "Debtor"). The Debtor owns the real property and improvements located in Las Vegas, NV described as Assessor's Parcel Number 162-28-310-001 (the "Property"). The Property consists of approximately 6.4 acres located on the south side of Mandalay Bay Road approximately 800 feet east of Las Vegas Boulevard. On the Property is an apartment complex consisting of 128 one- and two-bedroom units. Approximately, 92%-95% of the apartment units are occupied by tenants ("Tenants"). The Property is worth approximately $6,500,000 and is subject to a loan in the approximate amount of $3,076,000 now held by Wells Fargo Bank, N.A., as trustee for the Registered Holders of JPMorgan Chase Commercial Mortgage Pass-Through Certificates, Series 2004-FL1 (the "Bank") which has matured.

The current owner obtained title to the Property in August of 1999.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

This Plan provides for one class of priority claims; one class of secured claims; one class of unsecured claims; and one class of equity security holders. **Under the Plan, the rights of Tenants are unimpaired.** The Bank will receive distributions which the proponent of this Plan has valued at 100 cents on the dollar. The Plan proposes to pay the Bank in full over a period of 10 years using the rental income from the Tenants to pay market rate interest of 4.5% per annum and principal amortized over 25 years and a balloon payment at the end of 10 years obtained through sale or refinancing when the mortgage markets become more normal. Tenants with priority claims for deposits will be paid 100% in the normal course of operation of the apartment complex. Under the Plan, the unsecured claim of Tom Gonzales is unimpaired. Under the Plan, the unsecured creditors, except insiders, will be paid over eleven months without interest. Under the Plan, insiders will agree to subordinate their claims to the claims of other unsecured creditors. This Plan also provides for the 100% payment of all other administrative, including fees payable to the Office of the United States Trustee, and priority claims upon confirmation.

All creditors and equity security holders should refer to Articles III through V of this Plan for information regarding the precise treatment of their claim. A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01 Class 1. All allowed claims entitled to priority under § 507 of the Code.

2.02 Class 2. The claim of the Bank, to the extent allowed as a secured claim under § 506 of the Code.

2.03 Class 3. The claim of Tom Gonzales.

2.04 Class 4. All unsecured claims allowed under § 502 of the Code.

2.05 Class 5. Equity interests in the Debtor.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**ARTICLE III**

**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,**

**U.S. TRUSTEES FEES, AND PRIORITY TAX CLAIMS**

3.01 Unclassified Claims. Under section §1123(a)(1), administrative expense claims, and priority tax claims are not in classes.

3.02 Administrative Expense Claims. Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

3.03 Priority Tax Claims. Each holder of a priority tax claim will be paid on the Effective Date of this Plan, in cash.

3.04 United States Trustee Fees. All fees required to be paid by 28 U.S.C. §1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. Any U.S. Trustee Fees owed on or before the Effective Date of this Plan will be paid on the Effective Date.

**ARTICLE IV**

**TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

4.01 Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 - Priority Claims | unimpaired | Class 1 is unimpaired by this Plan, and each holder of a Class 1 Priority Claim will be paid in full, in cash, upon the later of the effective date of this Plan as defined in Article VIII, or the date on which such claim is allowed by a final non-appealable order. |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| | | |
|---|---|---|
| Class 2 – Secured Claim of Bank (approximately $3,100,000) | impaired | Class 2 is impaired by this Plan. The Bank will be paid its claim in full, including principal, accrued interest and costs and reasonable attorneys' fees. This amount shall be paid with interest at the rate of 4.5% per annum from the Effective Date. Beginning on 1st day of the 1st month following the Effective Date, the Bank shall be paid an amount necessary to amortize its claim over 25 years together with interest. In addition payments for insurance and real estate taxes will be escrowed. The balance of the Claim shall be all due and payable in 10 years from the Effective Date. There will be no pre-payment penalty. The loan will be assumable. The Bank shall retain its lien on the Property with the same priority it held of the date of the Debtor's Petition. |
| Class 3 – Tom Gonzales ($10,000,000) | unimpaired | Class 3 is unimpaired by this Plan. Tom Gonzales will be paid the Parcel A Transfer Fee pursuant to the terms of the Desert Land Plan of Reorganization. That payment is due when, and only when, there is a Parcel A Transfer as defined in that plan. This claim is unsecured. This claim is subject to setoffs and counterclaims by the Debtor. |
| Class 4 - General Unsecured Creditors | impaired | Class 4 is impaired by this Plan. Non-Insider General Unsecured Creditors will be paid in full, without interest from the rent collected from the Tenant. Beginning on 1st day of the 1st month following the Effective Date, Class 4 will be paid $3,000 per month pro rata for approximately 9 months.<br>Desert Land, LLC, Citation Financial, LLC and Compass Investments Holdings, LLC have agreed to subordinate their claims to the claims of other unsecured creditors and will be paid only after all other unsecured creditors are paid in full and reasonable reserves for maintenance and repair of the Property have been funded. |
| Class 5- Equity Security Holders of the Debtor | unimpaired | Class 5 is unimpaired by this Plan. Equity Security Holders (the members of the Debtor) will retain their equity interest in the Debtor. |

## ARTICLE V

## ALLOWANCE AND DISALLOWANCE OF CLAIMS

5.01 Disputed Claim. A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either: (i) a proof of claim has been filed or deemed

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

5.02 Delay of Distribution on a Disputed Claim. No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

5.03 Settlement of Disputed Claims. The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## ARTICLE VI

## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.01 Assumed Executory Contracts and Unexpired Leases.

(a) The Debtor assumes the following executory contracts and/or unexpired leases effective upon the:

- Leases with Tenants.
- Westcorp Management Group - property management

(b) The Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed under section 6.01(a) above, or before the date of the order confirming this Plan, upon the effective date of this Plan. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan.

## ARTICLE VII

## MEANS FOR IMPLEMENTATION OF THE PLAN

The means for implementation of this Plan is the rents paid by Debtor's existing and future Tenants. The Debtor will sell or refinance the Property within 120 months following the Effective Date. The proceeds from such sale or refinance shall be used to fund the balloon payment to the Bank as set forth in the Plan. If the Property is sold, the Debtor and its affiliates which own the adjacent land will pay the Parcel A Transfer fee to Gonzales from the sales proceeds.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**ARTICLE VIII**

**GENERAL PROVISIONS**

8.01 Definitions and Rules of Construction. The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan. Additionally, the following definitions apply:

a. The "Bank" shall mean Wells Fargo Bank, N.A., as trustee for the Registered Holders of JPMorgan Chase Commercial Mortgage Pass-Through Certificates, Series 2004-FL1.

b. The "Property" shall mean the real property and improvements thereon located in Las Vegas, NV described as Assessor's Parcel Number 162-28-310-001 (the "Property") consisting of approximately 6.4 acres located on the south side of Mandalay Bay Road and approximately 800 feet east of Las Vegas Boulevard.

c. The "Tenants" shall mean the tenants who rent apartment units on the Property.

d. The "Effective Date" of this Plan is the fifteenth business day following the date of the entry of the order of confirmation. But if a stay of the confirmation order is in effect on that date, the effective date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

e. The "Desert Land Plan of Reorganization" is that plan of reorganization that was confirmed in the case of *In re Desert Land, LLC*, Case No. BK-S-02-16202-RCJ by an order entered April 13, 2003 as amended by decisions of the Bankruptcy Appellate Panel for 9th Circuit and the Court of Appeals for the 9th Circuit.

f. The "Parcel A Transfer Fee" is the fee provided to be paid to Tom Gonzales in the Desert Land Plan of Reorganization when, and only when, there is a Parcel A Transfer as defined in the Desert Land Plan of Reorganization.

8.02 Severability. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

8.03 Binding Effect. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

8.04 Captions. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

8.05 Controlling Effect. Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Nevada govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

8.06 Governance. The Debtor will maintain its current form of governance and its current managers until such managers are replaced as provided in its existing Operating Agreement.

8.07 Revesting of Assets in the Debtor. Upon confirmation of the Plan, all property of the estate of the Debtor shall be revested in the Debtor, pursuant to 11 U.S.C. § 1141(c), which shall retain such property as the Reorganized Debtor free and clear of all claims and interests of the creditors, except as set forth in the Plan.

8.08 Disbursing Agent. The Debtor will serve as disbursing agent and shall make all payments required under the Plan. The disbursing agent may employ or contract with other entities to assist in or to perform the distribution of the property and shall serve without bond.

8.09 Request for Application of 11 U.S.C. § 1129(b). The Debtor, as Plan proponent, will request the Court to find that the provisions for dissenting classes provide for fair and equitable treatment of said creditors, and to confirm its Plan notwithstanding the requirements of § 1129(a)(8) as to such classes.

8.10 Post-Confirmation Management of the Debtor. The Debtor shall be managed post-confirmation by its current manager, David Gaffin.

8.11 Post-Confirmation Litigation. The Debtor anticipates post-confirmation litigation with Tom Gonzales over the enforcement of the terms of the Plan of Reorganization entered in the Desert Land, LLC Chapter 11 case, as amended by the decisions of the Bankruptcy Appellate Panel for the 9th Circuit and the Court of Appeals for the 9th Circuit, and except for collection matters that may occur in the normal course of the Debtor's business, and the determination of certain claims. The Debtor reserves the right to prosecute any objections to claims.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

8.12 Post-Confirmation Default. In the event the Debtor becomes delinquent in duty or obligation under the Plan, the affected creditor or creditors may provide written notice of such default to the Debtor and its counsel at the following addresses:

Lenard E. Schwartzer, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Blvd, Ste. 1
Las Vegas, NV 89146-5308

Desert Oasis Apartments, LLC
10181 Park Run Drive, Ste. 200
Las Vegas, NV 89145

The Debtor shall thereafter have fifteen (15) business days from receipt of said notice in which to cure the default. In the event such default remains uncured, the affected creditor or creditors may bring the matter before the Bankruptcy Court. At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtor to bring the payment(s) current in a reasonable period of time. The Bankruptcy Court may also consider conversion of the case to a Chapter 7 of the Code or dismissal if the same is in the best interests of creditors.

8.13 Federal Income Tax Consequences of the Plan. The Plan will have limited tax consequences. The Debtor, as a limited liability company, has elected to be treated as a partnership for federal income tax purposes and, therefore, does not pay federal income tax. The Plan does not call for forgiveness of any debt. Creditors are advised to discuss with their own tax advisor any tax effect to the creditor of such payments.

8.14 Injunction. From and after the Effective Date, and except as provided in the Plan and the Confirmation Order, all entities that have held, currently hold, or may hold a Claim, are permanently enjoined from taking any of the following actions on account of any such Claims: (i) commencing or continuing in any manner any action or other proceeding against the Debtor, or its Property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtor or the Reorganized Debtor, or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor or the Reorganized Debtor, or their respective property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtor or the Reorganized Debtor, or their

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

respective property; or (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.

8.15 Exculpation. From the Petition Date through the Effective Date, the Debtor and its managers, attorneys, agents and employees shall not have any liability to the Debtor or any other claimants or creditors, or other parties in interest in the Bankruptcy Case for any act or omission in connection with or arising out of the Bankruptcy Case, including, without limitation, prosecuting confirmation of the Plan, confirmation of the Plan, and the administration of the estate, the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects, such persons will be entitled to rely on the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Case and the Plan.

8.16 Post-petition Employment of Counsel. Following the Effective Date, the Debtor may continue to employ counsel for necessary legal services. Counsel may be paid from the Debtor without further order of the Court.

8.17 Closing Case. The estate shall be deemed to be fully administered upon the commencing of distributions to the Class 1 creditor and the case may be closed.

**ARTICLE IX**

**DISCHARGE**

Discharge. The Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date.

Respectfully submitted,

Desert Oasis Apartments, LLC
By /s/David Gaffin
David Gaffin, Manager
The Plan Proponent

Prepared by:

SCHWARTZER & MCPHERSON LAW FIRM

By:
Lenard E. Schwartzer, Esq.
*Counsel for the Debtor and Debtor in Possession*
*And Plan Proponent*

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT 2

Form **1065** Department of the Treasury Internal Revenue Service

# U.S. Return of Partnership Income

For calendar year 2018, or tax year beginning ______, ______, ending ______, ______

OMB No. 1545-0123 **2018**

| | | |
|---|---|---|
| A Principal business activity: INVESTMENT | Name of partnership: DESERT LAND LLC C/O KAVITA GUPTA, CHAPTER 11 TRUSTEE | D Employer identification number: [redacted] |
| B Principal product or service: REAL ESTATE | Type or Print — Number, street, and room or suite no. If a P.O. box, see instructions: 1300 BRISTOL ST NO, STE 100 | E Date business started: 08/26/1996 |
| C Business code number: 531120 | City or town, state or province, country, and ZIP or foreign postal code: NEWPORT BEACH CA 92660 | F Total assets: $ 358274881. |

G Check applicable boxes: (1) ☐ Initial return (2) ☐ Final return (3) ☐ Name change (4) ☒ Address change (5) ☐ Amended return

H Check accounting method: (1) ☒ Cash (2) ☐ Accrual (3) ☐ Other (specify) ▶

I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 2

J Check if Schedules C and M-3 are attached ▶ ☒

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| Section | Line | Description | | Amount |
|---|---|---|---|---|
| Income | 1 a | Gross receipts or sales | 1a | |
| | b | Returns and allowances | 1b | |
| | c | Balance. Subtract line 1b from line 1a | 1c | |
| | 2 | Cost of goods sold (attach Form 1125-A) | 2 | |
| | 3 | Gross profit. Subtract line 2 from line 1c | 3 | |
| | 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | 4 | |
| | 5 | Net farm profit (loss) (attach Schedule F (Form 1040)) | 5 | |
| | 6 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | 6 | |
| | 7 | Other income (loss) (attach statement) | 7 | |
| | 8 | **Total income (loss).** Combine lines 3 through 7 | 8 | |
| Deductions (see instructions for limitations) | 9 | Salaries and wages (other than to partners) (less employment credits) | 9 | |
| | 10 | Guaranteed payments to partners | 10 | |
| | 11 | Repairs and maintenance | 11 | |
| | 12 | Bad debts | 12 | |
| | 13 | Rent | 13 | |
| | 14 | Taxes and licenses | 14 | |
| | 15 | Interest (see instructions) | 15 | |
| | 16 a | Depreciation (if required, attach Form 4562) | 16a | |
| | b | Less depreciation reported on Form 1125-A and elsewhere on return | 16b | |
| | | | 16c | |
| | 17 | Depletion **(Do not deduct oil and gas depletion.)** | 17 | |
| | 18 | Retirement plans, etc. | 18 | |
| | 19 | Employee benefit programs | 19 | |
| | 20 | Other deductions (attach statement) | 20 | |
| | 21 | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | 21 | |
| | 22 | **Ordinary business income (loss).** Subtract line 21 from line 8 | 22 | 0. |
| Tax and Payments | 23 | Interest due under the look-back method-completed long-term contracts (attach Form 8697) | 23 | |
| | 24 | Interest due under the look-back method-income forecast method (attach Form 8866) | 24 | |
| | 25 | BBA AAR imputed underpayment (see instructions) | 25 | |
| | 26 | Other taxes (see instructions) | 26 | |
| | 27 | **Total balance due.** Add lines 23 through 27 | 27 | |
| | 28 | Payment (see instructions) | 28 | |
| | 29 | **Amount owed.** If line 28 is smaller than line 27, enter amount owed | 29 | |
| | 30 | **Overpayment.** If line 28 is larger than line 27, enter overpayment | 30 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

Kavita Gupta, solely as Trustee — Signature of partner or limited liability company member — Date 9/14/19

May the IRS discuss this return with the preparer shown below (see instr.)? ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| KERMITH BOFFILL | [signature] | 9/16/19 | | P[redacted] |

Firm's name ▶ GROBSTEIN TEEPLE, LLP — Firm's EIN ▶ [redacted]

Firm's address ▶ 6300 CANOGA AVENUE, SUITE 1500W WOODLAND HILLS, CA 91367 — Phone no. 818-532-1020

LHA For Paperwork Reduction Act Notice, see separate instructions. 811001 12-21-18 Form **1065** (2018)

DESERT LAND LLC C/O KAVITA GUPTA, CHAPTE

| SCHEDULE K | OTHER ITEMS | STATEMENT 4 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| GROSS RECEIPTS FOR SECTION 59A(E) | 505,157. |
| SECTION 199A QUALIFIED BUSINESS INCOME | -4,023,766. |
| SECTION 199A W-2 WAGES | 76,814. |
| SECTION 199A UNADJUSTED BASIS | 252,799. |
| SECTION 199A REIT DIVIDENDS | 0. |
| SECTION 199A PTP INCOME | 0. |

| SCHEDULE L | OTHER CURRENT ASSETS | STATEMENT 5 |
|---|---|---|

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| BOND DEPOSIT | 0. | 1,900. |
| CITATION FINANCIAL | 24,880,129. | 24,880,129. |
| COMPASS INVESTMENTS | 5,294,213. | 5,294,213. |
| DESERT OASIS APARTMENTS | 4,499,329. | 4,467,329. |
| DUE FROM - BB | 144,030. | 144,030. |
| DUE FROM - DG | 584,474. | 584,474. |
| DUE FROM - HAPPI | 0. | 9,975. |
| DUE FROM - HB | 2,539,584. | 2,539,584. |
| EMPLOYEE ADVANCES | 3,420. | 3,420. |
| SKYVUE LAS VEGAS | 10,923,967. | 10,926,467. |
| TIVOLI MOTEL INC | 75,000. | 75,000. |
| TOTAL TO SCHEDULE L, LINE 6 | 48,944,146. | 48,926,521. |

| SCHEDULE L | OTHER ASSETS | STATEMENT 6 |
|---|---|---|

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| CAPITALIZED INTEREST - DESERT OASIS INVESTMENT | 46,835,599. | 46,835,599. |
| ROUNDING | 2. | 0. |
| TOTAL TO SCHEDULE L, LINE 13 | 46,835,601. | 46,835,599. |

# EXHIBIT 3

EXTENSION GRANTED TO 09/15/20

Form **1065** Department of the Treasury Internal Revenue Service

# U.S. Return of Partnership Income

OMB No. 1545-0123

**2019**

For calendar year 2019, or tax year beginning ________, ________, ending ________, ________

▶ **Go to www.irs.gov/Form1065 for instructions and the latest information.**

A Principal business activity: INVESTMENT

B Principal product or service: REAL ESTATE

C Business code number: 531120

Type or Print — Name of partnership: DESERT LAND LLC C/O KAVITA GUPTA, CHAPTER 11 TRUSTEE

Number, street, and room or suite no. If a P.O. box, see instructions: 1300 BRISTOL ST NO, STE 100

City or town, state or province, country, and ZIP or foreign postal code: NEWPORT BEACH CA 92660

D Employer identification number: [redacted]

E Date business started: 08/26/1996

F Total assets: $ 358326736.

G Check applicable boxes: (1) ☐ Initial return (2) ☐ Final return (3) ☐ Name change (4) ☐ Address change (5) ☐ Amended return

H Check accounting method: (1) ☒ Cash (2) ☐ Accrual (3) ☐ Other (specify) ▶

I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 2

J Check if Schedules C and M-3 are attached ▶ ☒

K Check if partnership: (1) ☐ Aggregated activities for section 465 at-risk purposes (2) ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| Section | Line | Description | Ref | Amount |
|---|---|---|---|---|
| Income | 1a | Gross receipts or sales | 1a | |
| | b | Returns and allowances | 1b | |
| | c | Balance. Subtract line 1b from line 1a | 1c | |
| | 2 | Cost of goods sold (attach Form 1125-A) | 2 | |
| | 3 | Gross profit. Subtract line 2 from line 1c | 3 | |
| | 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | 4 | |
| | 5 | Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) | 5 | |
| | 6 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | 6 | |
| | 7 | Other income (loss) (attach statement) | 7 | |
| | 8 | **Total income (loss).** Combine lines 3 through 7 | 8 | |
| Deductions (see instructions for limitations) | 9 | Salaries and wages (other than to partners) (less employment credits) | 9 | |
| | 10 | Guaranteed payments to partners | 10 | |
| | 11 | Repairs and maintenance | 11 | |
| | 12 | Bad debts | 12 | |
| | 13 | Rent | 13 | |
| | 14 | Taxes and licenses | 14 | |
| | 15 | Interest (see instructions) | 15 | |
| | 16a | Depreciation (if required, attach Form 4562) | 16a | |
| | b | Less depreciation reported on Form 1125-A and elsewhere on return | 16b | |
| | | | 16c | |
| | 17 | Depletion **(Do not deduct oil and gas depletion.)** | 17 | |
| | 18 | Retirement plans, etc. | 18 | |
| | 19 | Employee benefit programs | 19 | |
| | 20 | Other deductions (attach statement) | 20 | |
| | 21 | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | 21 | |
| | 22 | **Ordinary business income (loss).** Subtract line 21 from line 8 | 22 | 0. |
| Tax and Payments | 23 | Interest due under the look-back method-completed long-term contracts (attach Form 8697) | 23 | |
| | 24 | Interest due under the look-back method-income forecast method (attach Form 8866) | 24 | |
| | 25 | BBA AAR imputed underpayment (see instructions) | 25 | |
| | 26 | Other taxes (see instructions) | 26 | |
| | 27 | **Total balance due.** Add lines 23 through 26 | 27 | |
| | 28 | Payment (see instructions) | 28 | |
| | 29 | **Amount owed.** If line 28 is smaller than line 27, enter amount owed | 29 | |
| | 30 | **Overpayment.** If line 28 is larger than line 27, enter overpayment | 30 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true,correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ Kavita Gupta, solely as Trustee not individually ▶ 5/29/20

Signature of partner or limited liability company member — Date

May the IRS discuss this return with the preparer shown below? See instr. ☒ Yes ☐ No

**Paid Preparer Use Only**

Print/Type preparer's name: KERMITH BOFFILL | Preparer's signature: [signature] | Date: 5/29/20 | Check ☐ if self-employed | PTIN: [redacted]

Firm's name ▶ GROBSTEIN TEEPLE, LLP | Firm's EIN ▶ [redacted]

Firm's address ▶ 6300 CANOGA AVENUE, SUITE 1500W WOODLAND HILLS, CA 91367 | Phone no. 818-532-1020

LHA For Paperwork Reduction Act Notice, see separate instructions. 911001 12-30-19 Form **1065** (2019)

DESERT LAND LLC C/O KAVITA GUPTA, CHAPTE

| SCHEDULE K | NONDEDUCTIBLE EXPENSE | STATEMENT 4 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| EXPENSES ON BOOKS NOT ON RETURN | 59,834. |
| TOTAL TO SCHEDULE K, LINE 18C | 59,834. |

| SCHEDULE K | OTHER ITEMS | STATEMENT 5 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| GROSS RECEIPTS FOR SECTION 59A(E) | 494,390. |
| SECTION 199A - RENTAL INCOME (LOSS) | 148,265. |
| SECTION 199A W-2 WAGES | 38,934. |
| SECTION 199A UNADJUSTED BASIS OF ASSETS | 252,799. |

| SCHEDULE L | OTHER CURRENT ASSETS | STATEMENT 6 |
|---|---|---|

| DESCRIPTION | BEGINNING OF TAX YEAR | END OF TAX YEAR |
|---|---|---|
| BOND DEPOSIT | 1,900. | 1,900. |
| CITATION FINANCIAL | 24,880,129. | 24,880,129. |
| COMPASS INVESTMENTS | 5,294,213. | 5,294,213. |
| DESERT OASIS APARTMENTS | 4,467,329. | 4,467,329. |
| DUE FROM - BB | 144,030. | 144,030. |
| DUE FROM - DG | 584,474. | 584,474. |
| DUE FROM - HAPPI | 9,975. | 9,975. |
| DUE FROM - HB | 2,539,584. | 2,539,584. |
| EMPLOYEE ADVANCES | 3,420. | 4,620. |
| SKYVUE LAS VEGAS | 10,926,467. | 10,926,467. |
| TIVOLI MOTEL INC | 75,000. | 75,000. |
| TOTAL TO SCHEDULE L, LINE 6 | 48,926,521. | 48,927,721. |

# EXHIBIT 4

**Desert Land, LLC, Case No. 18-12454-gs**
**STATUS OF PENDING LEGAL MATTERS**
**Updated June 12, 2020**

| ***Case Administration*** | | |
|---|---|---|
| **Action** | **Deadline** | **Comment** |
| May '20 Monthly Operating Report | June 20, 2020 | |
| Motion for Miscellaneous Relief Related to Real Property Collateral ("Surcharge Motion") | June 16, 2020, 1:30 p.m. | |
| Motion to Approve Surcharge Stipulation With Shotgun Creek Entities | June 16, 2020, 1:30 p.m. | |
| Motion to Terminate Joint Administration | ASAP | |
| Appeal of Order Denying Joint Motion to Suspend Case, Extend Auction<br>(Case No. 20-cv-00844-JCM) | Tbd | Several creditors filed a motion to suspend the bankruptcy cases or continue the auction due to COVID-19. The Court denied that motion on April 23, 2020, and the creditors appealed. Both the bankruptcy court and district court denied motions for stays pending appeal. |
| Schwartzer & McPherson final fee application<br>(Debtor's counsel) | Tbd | S&M filed a final fee application, which the Trustee and others opposed *inter alia* because S&M failed to adequately disclose potential inter-debtor conflicts or the source of its retainers in its employment application. The court did not rule on the objections, but instead allowed S&M's fees on an interim basis only. |

| ***Potential Litigation*** | | |
|---|---|---|
| **Action** | **Deadline** | **Comment** |
| Avoidance Actions (Cash Transfers) | June 27, 2020 | Grobstein Teeple LLP completed an analysis of transfers out of Desert Land's bank accounts during the 4 years prior to the petition date, which is attached hereto as **Exhibit A**. |
| Avoidance of Gonzales Trust judgment lien | June 27, 2020 | Tom Gonzales obtained a judgment from the US Dist. Court (Case No. 15-cv-00915 RCJ) in the amount of approx. $13.177 million on April 25, 2018. Gonzales filed the involuntary petitions against Desert Land and its affiliates on April 28, 2018. Decisions by the USDC and the Bankruptcy Court determined that Gonzales did not hold a lien or have an equitable priority claim prior to recording the judgment lien.<br><br>The judgment lien appears to be avoidable as a preference under 11 U.S.C. § 547(b). |
| Compass Investments LLC (insider) | June 27, 2020 | Per amended Schedule B [Dkt. 1081], Compass Investments LLC owed Desert Land $5,294,213.00 as of the petition date, but that this amount was subject to defenses.<br><br>Compass did not receive transfers of Desert Land funds within 4 years prior to the petition date. |

# EXHIBIT 5

**Kevin Coleman**

**From:** Kavita Gupta <kgupta@guptaferrer.com>
**Sent:** Thursday, March 28, 2019 4:33 PM
**To:** Kevin Coleman; Chris Hart
**Cc:** Greg Nuti
**Subject:** Desert Land
**Attachments:** SchwartzerEmail.pdf

Dear all –

**Confidential bids**. Attached is the link for the confidential bids received by the Debtor. The password is 18-12454.

**Potential Conflict of Interest**. Attached is D's counsel's email regarding the $4.5M scheduled debt of Desert Land, LLC in Desert Oasis Apartments' schedules. Counsel for the secured creditor in the Desert Oasis Apartments had no insights as to this debt. In the interim, please research the question of whether this debt would constitute a conflict requiring my resignation. As we discussed, I have to accept my appointment by next Wednesday at the latest.

**Local Counsel**. Please provide the contact information for suggested local counsel.

Could you please forward to Kim; I don't have her email.

Thanks,

---

**From:** Angela Hosey <AFHosey@s-mlaw.com>
**Date:** Thursday, March 28, 2019 at 1:58 PM
**To:** Kavita Gupta <kgupta@guptaferrer.com>, Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Subject:** RE: Desert Land et al

Ms. Gupta:

Below is the DropBox link for the requested confidential documents.

https://www.dropbox.com/sh/jip898rj61itvh9/AAD9HqjFjCQ9szSZAgOlJZDRa?dl=0

**Angela Hosey**
**Office Manager**
Schwartzer & McPherson Law Firm
2850 S. Jones Boulevard, Suite 1
Las Vegas, NV 89146-5308

Telephone No.: (702) 228-7590
Facsimile No.: (702) 892-0122

E-Mail: afhosey@s-mlaw.com

***This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail and delete all copies of this message.***

2

37

N/H-016822

**Subject:** Desert Land et al
**Date:** Thursday, March 28, 2019 at 1:44:21 PM Pacific Daylight Time
**From:** Lenard Schwartzer
**To:** Kavita Gupta
**CC:** Angela Hosey

Kavita-
I have to look it up and consult with my client.
Desert Land's assets consist of the property owned directly by Desert Land and its 100% subsidiary-Desert Oasis Investments.

Lenard E. Schwartzer, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
702-228-7590

**From:** Kavita Gupta <kgupta@guptaferrer.com>
**Sent:** Thursday, March 28, 2019 12:52 PM
**To:** Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Subject:** Re: Desert Land et al

Hi Lenard – Quick question on Desert Oasis Apartments. The schedules list a $4.5M general unsecured debt owed by Desert Land. Could you provide details on this debt? Date incurred, basis for debt ect... Thank you,
Kavita

**Kavita Gupta**
GUPTA | FERRER LLP
1300 Bristol Street North, Suite 100
Newport Beach, CA 92660
Tel: 949.387.4470
Fax: 949.258.9786
www.guptaferrer.com
vCard Bio

**Confidentiality Notice**: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure**: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Date:** Thursday, March 28, 2019 at 10:40 AM

**To:** Kavita Gupta <kgupta@guptaferrer.com>
**Cc:** Angela Hosey <AFHosey@s-mlaw.com>, Taylor Jorgensen <TJorgensen@s-mlaw.com>
**Subject:** Desert Land et al

Kavita-
I will be in my office tomorrow and will call you tomorrow morning around 9 a.m. to set up a time for you to meet with the managers of the LLCs (Howard Bulloch and David Gaffin) and me and to view the properties. Next week, any day works for me except Wednesday.
We will gather the requested documents concerning insurance and licenses and email them to you.
The Operating Reports are up to day. These reports show the various operations. The main business operation is the Desert Oasis Apartments which is managed by WestCorp. The income from the apartments is subject to a cash collateral stipulation with The Northern Trust Company. There is also a motel (mostly weekly/monthly tenants) managed by Hospitality Associates. There is a retail building with a month to month tenant which is managed by the Debtors
The insurance has been maintained. There is an insurance premium payment due by April 1, 2019. I will provide you with the invoice.

Lenard E. Schwartzer, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
702-228-7590

---

**From:** Kavita Gupta <kgupta@guptaferrer.com>
**Sent:** Thursday, March 28, 2019 10:09 AM
**To:** Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Cc:** Angela Hosey <AFHosey@s-mlaw.com>; Taylor Jorgensen <TJorgensen@s-mlaw.com>
**Subject:** Re: Desert Land et al

Hi Lenard –

Thank you for your email. I will be on site next week and I would be happy to meet with you and your clients.

Would you be available this afternoon or tomorrow morning for a call and if so, please let me know what time works for you. I'm available today any time after 2:15 and most of tomorrow. I had some questions about operational issues and would also like copies of certain documents – e.g., insurance policies, licenses ect.

Best,

**Kavita Gupta**
GUPTA | FERRER LLP
1300 Bristol Street North, Suite 100
Newport Beach, CA 92660
Tel: 949.387.4470
Fax: 949.258.9786
www.guptaferrer.com
vCard Bio

**Confidentiality Notice**: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure**: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Date:** Thursday, March 28, 2019 at 9:59 AM
**To:** Kavita Gupta <kgupta@guptaferrer.com>
**Cc:** Angela Hosey <AFHosey@s-mlaw.com>, Taylor Jorgensen <TJorgensen@s-mlaw.com>
**Subject:** Desert Land et al

Ms. Gupta
Feel free to contact me regarding this case.
My clients and I are available to meet you in Las Vegas or telephone conference with you tomorrow or next week.

Lenard E. Schwartzer, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
702-228-7590

# EXHIBIT 6

**From:** Joshua Teeple
**To:** Kevin Coleman
**Cc:** Kavita Gupta; Howard Grobstein; Kevin Meacham; Ben Howard
**Subject:** Re: Desert Land Intercompany Analysis
**Date:** Friday, June 14, 2019 1:06:41 PM

Understood Kevin. We have received some additional information and will update our analysis and keep you updated if we need your assistance to obtain additional information.

JOSHUA TEEPLE | Partner
gtllp.com | jteeple@gtllp.com | Linkedin
MAIN 949.381.5655 |FAX 949.381.5665
DIRECT 949.381.5656 |MOBILE 949.614.3435

On Jun 14, 2019, at 1:03 PM, Kevin Coleman <kcoleman@nutihart.com> wrote:

Hi Joshua,

I really need to underscore how important it is to complete this analysis ASAP.

If there is actually an inter-estate claim, Kavita may need to resign from one of the cases, or at a minimum we will have to file a motion laying out all of the facts and circumstances relating to the inter-company debt so the court can decide whether Kavita should continue as trustee in all cases. If we appear to delay, there is a risk we could be accused of being inattentive or trying to sweep the issue under the rug. None of us (and it would be all of us) want to find ourselves in the horrible of position of being disqualified and denied compensation from all three cases – or suffer the attendant reputational damage.

Please copy Kavita and I on your attempts to get the underlying documents you need for the analysis so that we can act promptly to compel their production if the Debtors and/or its accountants fail to respond timely.

Best regards,

--Kevin

**From:** Joshua Teeple [mailto:jteeple@gtllp.com]
**Sent:** Thursday, June 13, 2019 1:21 PM
**To:** Kavita Gupta <kgupta@guptaferrer.com>; Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Howard Grobstein <hgrobstein@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>
**Subject:** Desert Land Intercompany Analysis

Hi Kavita. I had a deadline of tomorrow to get the intercompany analysis to you. We

have sent the preliminary analysis and have requested additional information. We will update the analysis if that information changes the analysis, but let us know if you need anything else at this time. Thank you.

Josh

JOSHUA TEEPLE | Partner
www.gtllp.com | jteeple@gtllp.com | Linkedin
MAIN 949.381.5655 | FAX 949.381.5665
DIRECT 949.381.5656 | MOBILE 949.614.3435

<image002.jpg>
**SEND DOCUMENTS TO ME SECURELY USING THIS LINK**

# EXHIBIT 7

**From:** Kevin Coleman
**To:** "Lenard Schwartzer"
**Cc:** Joshua Teeple; Ben Howard; Kavita Gupta; Chris Hart
**Subject:** Desert Land, et al *** Potential Inter-Company Claims
**Date:** Tuesday, June 18, 2019 5:28:00 PM
**Attachments:** Desert Land 2002 YE JOURNAL ENTRY.PDF
image003.png
**Importance:** High

---

Hi Lenard,

As I think you know, the Trustee's financial advisors have been trying to determine if intercompany claims exist. According to tax returns and Quickbooks records, Desert Oasis Apartments, LLC owed Desert Land, LLC $4,499,329.00 as of December 31, 2017.

As far as they have been able to determine, the potential intercompany obligation to Desert Land was created by a journal entry in Quickbooks in 2002, which is attached. As you can see, it was apparently booked as a year-end adjustment on December 31, 2002. My understanding is that the Trustee's financial advisors have asked for documentation to validate the journal entry, but the Debtor's management has been unable to provide it. I also understand that the financial advisors have asked management for an explanation of what gave rise to the obligation (was it a loan or other cash infusion, allocation of expenses, etc.) and for copies of any agreements memorializing the advance, but they have been unable to provide those either.

We will be filing a motion in order to bring the potential inter-estate conflict of interest to the attention of the Court, creditors, and the UST, and am therefore asking you to confirm with your clients whether they disagree with any of the following statements:

1. The oldest financial records referencing the intercompany obligation from Desert Oasis Apartments, LLC to Desert Land, LLC go back to 2002, and no prior records relating to this transaction are available;
2. It is unclear whether the intercompany obligation arose in 2002 or at an earlier date;
3. The Debtors management does not recall the underlying reasons for why Desert Oasis Apartments is reflected as having a liability to Desert Land, LLC; and
4. No written agreement between Desert Oasis Apartments, LLC and Desert Land, LLC (or other writing signed by Desert Oasis Apartments, LLC) can be located that memorializes the reasons an intercompany debt is reflected on the Debtors' books and records and tax returns.

If any of these statements are inaccurate, or if you have any other information concerning the purported intercompany debt from Desert Oasis Apartments to Desert Land, please let us know by the end of this week.

If you have any questions or wish to discuss, please feel free to contact me.

Best regards,

--Kevin

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com

**DESERT LAND, LLC**

**Detail of Journal Entry "2002 YE adj" booked into QuickBooks as of 12/31/2002**

| ACCT | Date | Transaction Type | Memo/Description | Account | Debit | Credit |
|---|---|---|---|---|---|---|
| 1000000 Petty Cash | 12/31/2002 | Journal Entry | 2002 YE adj | 1000000 Petty Cash | 1,200.00 | |
| 1012900 Cash - Olympus Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1012900 Cash - Olympus Inn | 403.54 | |
| 1013900 Cash - Desert Oasis Motel | 12/31/2002 | Journal Entry | 2002 YE adj | 1013900 Cash - Desert Oasis Motel | 15,913.34 | |
| 1014900 Cash - Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1014900 Cash - Happi Inn | 11,350.23 | |
| 1110003 Casa Malaga Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 1110003 Due From Affiliates:Casa Malaga Motel, Inc. | 257,544.03 | |
| 1110007 Desert Oasis Apartments, LLC | 12/31/2002 | Journal Entry | 2002 YE adj | 1110007 Due From Affiliates:Desert Oasis Apartments, LLC | 7,218,823.56 | |
| 1110009 The Ranch, LLC | 12/31/2002 | Journal Entry | 2002 YE adj | 1110009 Due From Affiliates:The Ranch, LLC | 103,153.03 | |
| 1110012 Glass Pool | 12/31/2002 | Journal Entry | 2002 YE adj | 1110012 Due From Affiliates:Glass Pool | 1,100.81 | |
| 1110018 Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1110018 Due From Affiliates:Happi Inn | 5,475.24 | |
| 1110019 Olympus Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1110019 Due From Affiliates:Olympus Inn | 10,954.33 | |
| 1110020 Desert Oasis Motel | 12/31/2002 | Journal Entry | 2002 YE adj | 1110020 Due From Affiliates:Desert Oasis Motel | 60.70 | |
| 1110021 Desert Ranch | 12/31/2002 | Journal Entry | 2002 YE adj | 1110021 Due From Affiliates:Desert Ranch | 1,657.00 | |
| 1310000 Payroll Asset | 12/31/2002 | Journal Entry | 2002 YE adj | 1310000 Payroll Asset | 85.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-08-601-003 | 1505000 Fixed Assets:Land | 631,649.69 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Adj. Basis Desert Ranch LLC | 1505000 Fixed Assets:Land | | 18,665,123.39 |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-024 | 1505000 Fixed Assets:Land | 640,760.35 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 162-28-301-011 | 1505000 Fixed Assets:Land | 2,832,598.24 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 162-33-101-002 | 1505000 Fixed Assets:Land | 5,000.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 162-28-301-007,008,012 | 1505000 Fixed Assets:Land | 25,848,089.25 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Desert Oasis Motel Land | 1505000 Fixed Assets:Land | 9,632,834.20 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Tivoli Motel Land | 1505000 Fixed Assets:Land | 1,001,954.23 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Sov. Bank Enfield Land | 1505000 Fixed Assets:Land | 167,682.45 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Sov. Bank Farmington Land | 1505000 Fixed Assets:Land | 134,145.76 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-012 | 1505000 Fixed Assets:Land | 419,567.34 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Pt Gov Lots 164,166,175 | 1505000 Fixed Assets:Land | 1,106,103.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Mandalay Haven Site | 1505000 Fixed Assets:Land | 4,246,965.93 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-025 | 1505000 Fixed Assets:Land | 571,940.53 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-011 | 1505000 Fixed Assets:Land | 417,833.60 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-08-601-001 | 1505000 Fixed Assets:Land | 1,305,273.39 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-027 | 1505000 Fixed Assets:Land | 1,132,266.58 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-003 | 1505000 Fixed Assets:Land | 886,522.19 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Tivoli Motel | 1510000 Fixed Assets:Building | 3,992,816.91 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Sov. Bank Farmington | 1510000 Fixed Assets:Building | 536,583.02 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Sov. Bank Enfield | 1510000 Fixed Assets:Building | 706,250.61 | |
| 1520000 Furniture and Fixtures | 12/31/2002 | Journal Entry | 2002 YE adj | 1520000 Fixed Assets:Furniture and Fixtures | 7,938.00 | |
| 1610000 Building | 12/31/2002 | Journal Entry | 2002 YE adj | 1610000 Fixed Assets:Accumulated Depreciation:Building | | 201,371.00 |
| 1350000 Refundable Deposits | 12/31/2002 | Journal Entry | 2002 YE adj | 1350000 Refundable Deposits | 400,000.00 | |
| 1711801 Capital Invested | 12/31/2002 | Journal Entry | 2002 YE adj | 1711801 Notes Receivable - External:[Borrower Name]:[Specific Note (if applicable)]:Capital:Capital Invested | 25,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Keating - 2002 YE adj | 1800000 Equity Investments | 25,475.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Airport - 2002 YE adj | 1800000 Equity Investments | 7,500.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | 70LP - 2002 YE adj | 1800000 Equity Investments | 35,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Cedar Mountain - 2002 YE adj | 1800000 Equity Investments | 52,030.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Lewis - 2002 YE adj | 1800000 Equity Investments | 236,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Frias - 2002 YE adj | 1800000 Equity Investments | 25,000.00 | |
| 1999000 Suspense | 12/31/2002 | Journal Entry | 2002 YE adj | 1999000 Suspense | 307,650.14 | |
| 2000000 Accounts Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2000000 Accounts Payable | | 113.28 |
| 2010900 Credit Card Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2010900 Credit Card Payable | | 9,252.51 |
| 2100003 Casa Malaga Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 2100003 Due To Affiliates:Casa Malaga Motel, Inc. | | 150.00 |
| 2100010 Tivoli Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 2100010 Due To Affiliates:Tivoli Motel, Inc. | | 4,994,601.14 |
| 2100013 Miami Beach | 12/31/2002 | Journal Entry | 2002 YE adj | 2100013 Due To Affiliates:Miami Beach | | 1,695.76 |
| 2100018 Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 2100018 Due To Affiliates:Happi Inn | | 825.31 |
| 2100022 Sovereign Bank - Enfield | 12/31/2002 | Journal Entry | 2002 YE adj | 2100022 Due To Affiliates:Sovereign Bank - Enfield | | 104,584.22 |
| 2100023 Sovereign Bank - Farmington | 12/31/2002 | Journal Entry | 2002 YE adj | 2100023 Due To Affiliates:Sovereign Bank - Farmington | | 83,667.41 |
| 2210000 Refundable Depositss | 12/31/2002 | Journal Entry | 2002 YE adj | 2210000 Refundable Depositss | | 19,694.00 |
| 2240000 Sales Tax Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2240000 Sales Tax Payable | | 4,023.00 |
| 2400001 T Gonzales | 12/31/2002 | Journal Entry | 2002 YE adj | 2400001 Notes Payable - External:T Gonzales | | 41,500,000.00 |
| 2400002 Aspen Financial | 12/31/2002 | Journal Entry | 2002 YE adj | 2400002 Notes Payable - External:Aspen Financial | | 16,082,000.00 |
| 2400003 Consolidated Mortgage | 12/31/2002 | Journal Entry | 2002 YE adj | 2400003 Notes Payable - External:Consolidated Mortgage | | 7,835,706.00 |
| 2400004 First Security - Enfield | 12/31/2002 | Journal Entry | 2002 YE adj | 2400004 Notes Payable - External:First Security - Enfield | | 528,288.60 |
| 2400005 First Security - Farmington | 12/31/2002 | Journal Entry | 2002 YE adj | 2400005 Notes Payable - External:First Security - Farmington | | 422,630.64 |
| 2610000 Deferred Installment Gain | 12/31/2002 | Journal Entry | 2002 YE adj | 2610000 Deferred Installment Gain | | 13,499,972.44 |
| 3000000 Opening Balance Equity (3) | 12/31/2002 | Journal Entry | 2002 YE adj | 3000000 Opening Balance Equity (3) | 38,987,547.48 | |
| | | | | | 103,953,698.70 | 103,953,698.70 |

N/H-017180

# EXHIBIT 8

**From:** Kavita Gupta
**To:** Joshua Teeple; Ben Howard
**Cc:** Kevin Meacham; Chris Hart; Kevin Coleman
**Subject:** Re: Desert Land Intercompany Analysis
**Date:** Tuesday, June 11, 2019 10:44:58 AM
**Attachments:** image001.png

---

Josh and Ben –

Per our discussion this morning, you will reach out to the Debtor's former accountants, the Debtors' managers, and Brian Shapiro, the Skyvue Trustee, and specifically request the information/documents you need to complete the analysis. To the extent that you do not timely receive this information within the next 10 days, please let Kevin and I know asap so we can take the necessary steps to get the documents/information via turnover/Rule 2004/subpoena ect...

Thanks,

**Kavita Gupta**
GUPTA | FERRER LLP
1300 Bristol Street North, Suite 100
Newport Beach, CA 92660
Tel: 949.387.4470
Fax: 949.258.9786
www.guptaferrer.com
vCard Bio

**Confidentiality Notice**: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure**: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Joshua Teeple <jteeple@gtllp.com>
**Date:** Tuesday, June 11, 2019 at 9:11 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Kavita Gupta <kgupta@guptaferrer.com>, Ben Howard <bhoward@gtllp.com>, Kevin Meacham <kmeacham@gtllp.com>, Chris Hart <chart@nutihart.com>
**Subject:** RE: Desert Land Intercompany Analysis

Hi Kevin.

That is correct.

I did not have that discussion. Did you Ben? We have not seen any documentation regarding the basis of the debt.

JOSHUA TEEPLE | Partner
www.gtllp.com | jteeple@gtllp.com | Linkedin
MAIN 949.381.5655 | FAX 949.381.5665
DIRECT 949.381.5656 | MOBILE 949.614.3435

SEND DOCUMENTS TO ME SECURELY USING THIS LINK

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Tuesday, June 11, 2019 9:04 AM
**To:** Joshua Teeple <jteeple@gtllp.com>
**Cc:** Kavita Gupta <kgupta@guptaferrer.com>; Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Chris Hart <chart@nutihart.com>
**Subject:** Re: Desert Land Intercompany Analysis

Thanks Joshua.

So if I am interpreting this analysis correctly, Desert Oasis Apartments owed Desert Land approx. $4.5M as of Dec. 31, 2017.

Desert Oasis Apartments also paid $87K to Desert Land in 2017.

Did you have any discussion with the Debtors' management or accountant to validate what is showing on the tax returns, and what is the basis for the underlying obligation?

Best regards,

—Kevin

Sent from my iPhone

On Jun 11, 2019, at 8:41 AM, Joshua Teeple <jteeple@gtllp.com> wrote:

> Kavita – attached is a draft of the intercompany analysis we discussed. We based it off the income tax returns for the Debtors as that was the most complete and reliable

information available to us.  Please let us know if you have any questions or would like to discuss in more detail.

Thanks.

Josh

JOSHUA TEEPLE | Partner
www.gtllp.com | jteeple@gtllp.com | Linkedin
MAIN 949.381.5655 | FAX 949.381.5665
DIRECT 949.381.5656 | MOBILE 949.614.3435

<image001.png>

**SEND DOCUMENTS TO ME SECURELY USING THIS LINK**

<Intercompany Analysis.pdf>

# EXHIBIT 9

| | |
|---|---|
| **From:** | Kevin Coleman |
| **To:** | Kavita Gupta |
| **Cc:** | Greg Nuti; Chris Hart; Kim Fineman |
| **Subject:** | FW: Desert Land, et al *** Potential Inter-Company Claims |
| **Date:** | Thursday, June 27, 2019 1:07:00 PM |
| **Attachments:** | Desert Land 2002 YE JOURNAL ENTRY.PDF<br>Desert Entities Diagram.pdf<br>BH & P , Inc., In re, 949 F.2d 1300 (3rd Cir., 1991) (1).docx<br>In re Afi Holding, Inc., 530 F.3d 832 (9th Cir., 2008) (1).docx<br>image002.png |
| **Importance:** | High |

Hi Kavita,

Further to our conversation this morning, as you know, the Schedule F filed by Desert Oasis Apartments indicates that it owed Desert Land, LLC $4.5M. That obligation was not scheduled as disputed, contingent, or unliquidated. Desert Land, LLC's Schedule B, however, stated that it had no accounts receivable, and there was nothing otherwise to indicate that one of its assets was a sum of money owed to it by Desert Oasis Apartments. Grobstein Teeple, LLP investigated by among other things, reviewing tax returns, the Debtors' accounting records, and interviewing the Debtors' management. As noted in my email below to Lenard Schwartzer, the intercompany obligation appears to have its origins in a year end adjustment booked on December 31, 2002. No backup is available to establish the basis for this accounting entry.

I am assuming that the Debtors will confirm that they do not have any other documentation or remember anything else about the apparent inter-company obligation between Desert Oasis Apartments and Desert Land. The upshot is that:

1. We cannot reliably determine the basis for the purported debt.
2. The Debtors, however, have treated the liability as legitimate, and do not dispute it.
3. There are grounds upon which a creditor might challenge the validity and enforceability of the debt, including but not limited to:
    a. The claim is unenforceable on statute of limitations grounds;
    b. The claim is subject to re-characterization as an equity contribution;
    c. The claim is subject to disallowance because the estate of Desert Land is unable to sustain its burden to demonstrate the validity of the debt.
4. If a court were to conclude that the obligation should be treated as an equity contribution rather than a debt, the estate of Desert Oasis Apartments may have a claim against the Desert Land estate for recovery of the payments made pre-bankruptcy.
5. If a court were to conclude a valid indebtedness exists, the estate of Desert Oasis Apartments may have a claim against Desert Land for recovery of an insider preference.
6. The circumstances described in ¶4 and ¶5 could give Desert Oasis Apartments a defense to the Desert Land claim under Bankruptcy Code section 502(h). (Any affirmative claim by Apartments against Desert Land appears to be subject to the bar date for filing claims, however, leave to file a late-claim could be permitted under *Pioneer*.)

The estate of Desert Oasis Apartments has $33,433.15 in total non-insider unsecured non-priority debt. (That number could increase if the apartment parcel is sold for less an amount sufficient to

pay Northern Trust and the Gonzales judgment lien – which would leave a deficiency.) Insider unsecured claims total $6.172 million. Hence, in circumstances where the apartment parcel generated $21 million (enough to pay Northern Trust, Gonzales), it would be necessary to examine the validity of the Desert Land claim and possibly object to it. Conversely, Desert Land has non-insider unsecured non-priority claims of between $9-10M (assuming the compromise with the Sher creditors is approved). Unless the Desert Land parcels are sold for enough to pay all creditors in full, that estate has an interest in maximizing its recovery from the estate of Desert Oasis Apartments.

Hence, circumstances could materialize in the future that make the interests of the two estates adverse. Whether those circumstances materialize hinges on whether the parcels can be sold for enough to pay all creditors in full.

Under the Third Circuit's BH&P case (attached) – which the Ninth Circuit's AFI Holding case follows – we need to bring the facts and circumstances surrounding the intercompany obligations and potential for two of your estates to have adverse interests to the court's attention, and let the court decide whether you should continue to serve as trustee in all three cases. The potential options are:

A. Allow you to continue as trustee in all three cases until the Desert Oasis Apartments property is sold, at which point we will know whether there is an actual conflict;
B. Have you resign as trustee in the Apartments case; or
C. Allow you to continue as trustee in all three cases but designate a third party to assert any objections to the purported Desert Land claim. (Since SkyVue Las Vegas, LLC is the holder of 99.5% of the equity in Desert Oasis Apartments, Brian Shapiro might be the right candidate if elimination of the debt would make a distribution to equity possible.)

We will get started on drafting the motion, but let me know if you have questions or want to discuss any modifications to the approach outlined above.

Best regards,

--Kevin

---

**From:** Kevin Coleman
**Sent:** Tuesday, June 18, 2019 5:29 PM
**To:** 'Lenard Schwartzer' <LSchwartzer@s-mlaw.com>
**Cc:** 'Joshua Teeple' <jteeple@gtllp.com>; Ben Howard <bhoward@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Chris Hart <chart@nutihart.com>
**Subject:** Desert Land, et al *** Potential Inter-Company Claims
**Importance:** High

Hi Lenard,

As I think you know, the Trustee's financial advisors have been trying to determine if intercompany claims exist. According to tax returns and Quickbooks records, Desert Oasis Apartments, LLC owed Desert Land, LLC $4,499,329.00 as of December 31, 2017.

As far as they have been able to determine, the potential intercompany obligation to Desert Land was created by a journal entry in Quickbooks in 2002, which is attached. As you can see, it was apparently booked as a year-end adjustment on December 31, 2002. My understanding is that the Trustee's financial advisors have asked for documentation to validate the journal entry, but the Debtor's management has been unable to provide it. I also understand that the financial advisors have asked management for an explanation of what gave rise to the obligation (was it a loan or other cash infusion, allocation of expenses, etc.) and for copies of any agreements memorializing the advance, but they have been unable to provide those either.

We will be filing a motion in order to bring the potential inter-estate conflict of interest to the attention of the Court, creditors, and the UST, and am therefore asking you to confirm with your clients whether they disagree with any of the following statements:

1. The oldest financial records referencing the intercompany obligation from Desert Oasis Apartments, LLC to Desert Land, LLC go back to 2002, and no prior records relating to this transaction are available;
2. It is unclear whether the intercompany obligation arose in 2002 or at an earlier date;
3. The Debtors management does not recall the underlying reasons for why Desert Oasis Apartments is reflected as having a liability to Desert Land, LLC; and
4. No written agreement between Desert Oasis Apartments, LLC and Desert Land, LLC (or other writing signed by Desert Oasis Apartments, LLC) can be located that memorializes the reasons an intercompany debt is reflected on the Debtors' books and records and tax returns.

If any of these statements are inaccurate, or if you have any other information concerning the purported intercompany debt from Desert Oasis Apartments to Desert Land, please let us know by the end of this week.

If you have any questions or wish to discuss, please feel free to contact me.

Best regards,

--Kevin

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com



NUTI HART
LLP

56
N/H-017195

**DESERT LAND, LLC**

**Detail of Journal Entry "2002 YE adj" booked into QuickBooks as of 12/31/2002**

| ACCT | Date | Transaction Type | Memo/Description | Account | Debit | Credit |
|---|---|---|---|---|---|---|
| 1000000 Petty Cash | 12/31/2002 | Journal Entry | 2002 YE adj | 1000000 Petty Cash | 1,200.00 | |
| 1012900 Cash - Olympus Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1012900 Cash - Olympus Inn | 403.54 | |
| 1013900 Cash - Desert Oasis Motel | 12/31/2002 | Journal Entry | 2002 YE adj | 1013900 Cash - Desert Oasis Motel | 15,913.34 | |
| 1014900 Cash - Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1014900 Cash - Happi Inn | 11,350.23 | |
| 1110003 Casa Malaga Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 1110003 Due From Affiliates:Casa Malaga Motel, Inc. | 257,544.03 | |
| 1110007 Desert Oasis Apartments, LLC | 12/31/2002 | Journal Entry | 2002 YE adj | 1110007 Due From Affiliates:Desert Oasis Apartments, LLC | 7,218,823.56 | |
| 1110009 The Ranch, LLC | 12/31/2002 | Journal Entry | 2002 YE adj | 1110009 Due From Affiliates:The Ranch, LLC | 103,153.03 | |
| 1110012 Glass Pool | 12/31/2002 | Journal Entry | 2002 YE adj | 1110012 Due From Affiliates:Glass Pool | 1,100.81 | |
| 1110018 Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1110018 Due From Affiliates:Happi Inn | 5,475.24 | |
| 1110019 Olympus Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1110019 Due From Affiliates:Olympus Inn | 10,954.33 | |
| 1110020 Desert Oasis Motel | 12/31/2002 | Journal Entry | 2002 YE adj | 1110020 Due From Affiliates:Desert Oasis Motel | 60.70 | |
| 1110021 Desert Ranch | 12/31/2002 | Journal Entry | 2002 YE adj | 1110021 Due From Affiliates:Desert Ranch | 1,657.00 | |
| 1310000 Payroll Asset | 12/31/2002 | Journal Entry | 2002 YE adj | 1310000 Payroll Asset | 85.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-08-601-003 | 1505000 Fixed Assets:Land | 631,649.69 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Adj. Basis Desert Ranch LLC | 1505000 Fixed Assets:Land | | 18,665,123.39 |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-024 | 1505000 Fixed Assets:Land | 640,760.35 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 162-28-301-011 | 1505000 Fixed Assets:Land | 2,832,598.24 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 162-33-101-002 | 1505000 Fixed Assets:Land | 5,000.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 162-28-301-007,008,012 | 1505000 Fixed Assets:Land | 25,848,089.25 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Desert Oasis Motel Land | 1505000 Fixed Assets:Land | 9,632,834.20 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Tivoli Motel Land | 1505000 Fixed Assets:Land | 1,001,954.23 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Sov. Bank Enfield Land | 1505000 Fixed Assets:Land | 167,682.45 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Sov. Bank Farmington Land | 1505000 Fixed Assets:Land | 134,145.76 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-012 | 1505000 Fixed Assets:Land | 419,567.34 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Pt Gov Lots 164,166,175 | 1505000 Fixed Assets:Land | 1,106,103.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Mandalay Haven Site | 1505000 Fixed Assets:Land | 4,246,965.93 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-025 | 1505000 Fixed Assets:Land | 571,940.53 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-011 | 1505000 Fixed Assets:Land | 417,833.60 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-08-601-001 | 1505000 Fixed Assets:Land | 1,305,273.39 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-027 | 1505000 Fixed Assets:Land | 1,132,266.58 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-003 | 1505000 Fixed Assets:Land | 886,522.19 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Tivoli Motel | 1510000 Fixed Assets:Building | 3,992,816.91 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Sov. Bank Farmington | 1510000 Fixed Assets:Building | 536,583.02 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Sov. Bank Enfield | 1510000 Fixed Assets:Building | 706,250.61 | |
| 1520000 Furniture and Fixtures | 12/31/2002 | Journal Entry | 2002 YE adj | 1520000 Fixed Assets:Furniture and Fixtures | 7,938.00 | |
| 1610000 Building | 12/31/2002 | Journal Entry | 2002 YE adj | 1610000 Fixed Assets:Accumulated Depreciation:Building | | 201,371.00 |
| 1350000 Refundable Deposits | 12/31/2002 | Journal Entry | 2002 YE adj | 1350000 Refundable Deposits | 400,000.00 | |
| 1711801 Capital Invested | 12/31/2002 | Journal Entry | 2002 YE adj | 1711801 Notes Receivable - External:[Borrower Name]:[Specific Note (if applicable)]:Capital:Capital Invested | 25,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Keating - 2002 YE adj | 1800000 Equity Investments | 25,475.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Airport - 2002 YE adj | 1800000 Equity Investments | 7,500.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | 70LP - 2002 YE adj | 1800000 Equity Investments | 35,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Cedar Mountain - 2002 YE adj | 1800000 Equity Investments | 52,030.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Lewis - 2002 YE adj | 1800000 Equity Investments | 236,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Frias - 2002 YE adj | 1800000 Equity Investments | 25,000.00 | |
| 1999000 Suspense | 12/31/2002 | Journal Entry | 2002 YE adj | 1999000 Suspense | 307,650.14 | |
| 2000000 Accounts Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2000000 Accounts Payable | | 113.28 |
| 2010900 Credit Card Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2010900 Credit Card Payable | | 9,252.51 |
| 2100003 Casa Malaga Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 2100003 Due To Affiliates:Casa Malaga Motel, Inc. | | 150.00 |
| 2100010 Tivoli Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 2100010 Due To Affiliates:Tivoli Motel, Inc. | | 4,994,601.14 |
| 2100013 Miami Beach | 12/31/2002 | Journal Entry | 2002 YE adj | 2100013 Due To Affiliates:Miami Beach | | 1,695.76 |
| 2100018 Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 2100018 Due To Affiliates:Happi Inn | | 825.31 |
| 2100022 Sovereign Bank - Enfield | 12/31/2002 | Journal Entry | 2002 YE adj | 2100022 Due To Affiliates:Sovereign Bank - Enfield | | 104,584.22 |
| 2100023 Sovereign Bank - Farmington | 12/31/2002 | Journal Entry | 2002 YE adj | 2100023 Due To Affiliates:Sovereign Bank - Farmington | | 83,667.41 |
| 2210000 Refundable Depositss | 12/31/2002 | Journal Entry | 2002 YE adj | 2210000 Refundable Depositss | | 19,694.00 |
| 2240000 Sales Tax Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2240000 Sales Tax Payable | | 4,023.00 |
| 2400001 T Gonzales | 12/31/2002 | Journal Entry | 2002 YE adj | 2400001 Notes Payable - External:T Gonzales | | 41,500,000.00 |
| 2400002 Aspen Financial | 12/31/2002 | Journal Entry | 2002 YE adj | 2400002 Notes Payable - External:Aspen Financial | | 16,082,000.00 |
| 2400003 Consolidated Mortgage | 12/31/2002 | Journal Entry | 2002 YE adj | 2400003 Notes Payable - External:Consolidated Mortgage | | 7,835,706.00 |
| 2400004 First Security - Enfield | 12/31/2002 | Journal Entry | 2002 YE adj | 2400004 Notes Payable - External:First Security - Enfield | | 528,288.60 |
| 2400005 First Security - Farmington | 12/31/2002 | Journal Entry | 2002 YE adj | 2400005 Notes Payable - External:First Security - Farmington | | 422,630.64 |
| 2610000 Deferred Installment Gain | 12/31/2002 | Journal Entry | 2002 YE adj | 2610000 Deferred Installment Gain | | 13,499,972.44 |
| 3000000 Opening Balance Equity (3) | 12/31/2002 | Journal Entry | 2002 YE adj | 3000000 Opening Balance Equity (3) | 38,987,547.48 | |
| | | | | | 103,953,698.70 | 103,953,698.70 |

**SKYVUE LAS VEGAS, LLC**
($84M Debt)

99.5%

**DESERT OASIS APARTMENTS, LLC**
($25M Debt)

99.5%

**DESERT LAND, LLC**
($85M Debt)

- Desert Oasis Motel ($13M)

**$14.5M Offer**

**20 Acres**

- Hacienda/Mandalay Bay ($230M)

**6.4 Acres**
- 128-unit Apartments ($80M)

100%

**DESERT OASIS INVESTMENTS**
($30M Debt)

**9 Acres Vacant Lot**
- Ninja Warrior Lease ($58M)

**$360.5M Offer**

Page 1300

**949 F.2d 1300**
**60 USLW 2403, 26 Collier Bankr.Cas.2d 37,**
**22 Bankr.Ct.Dec. 541,**
**Bankr. L. Rep. P 74,356**
**In re BH & P INC., A New Jersey Corporation; Philip Alan Herman, Bruce Berkow, Debtors.**
**Appeal of Carmen J. MAGGIO, Individually and as Trustee for BH & P Inc., Debtor; and Ravin, Greenberg & Marks, P.A., (formerly Ravin, Greenberg & Zackin, P.A.) Appellants.**
**No. 90-5877.**
**United States Court of Appeals, Third Circuit.**
**Submitted Under Third Circuit Rule 12(6)**
**June 7, 1991.**
**Decided Dec. 5, 1991.**

Page 1302

Gary N. Marks, Ravin, Greenberg & Marks, Roseland, N.J., for appellants.

Thomas E. Ross, U.S. Trustee, Martha L. Davis, Gen. Counsel, T. Patrick Tinker, Executive Office for United States Trustees, Dept. of Justice, Washington, D.C., for amicus curiae.

Before: MANSMANN and HUTCHINSON, Circuit Judges, and O'NEILL, District Judge. *

OPINION OF THE COURT

MANSMANN, Circuit Judge.

This appeal requires that we consider issues relating to an alleged "conflict of interest" of a trustee and his counsel arising in the context of bankruptcy proceedings involving a corporation and two of its principals. The core issue is the test to be applied in determining a disqualifying conflict where a single trustee and trustee's counsel represented the corporation and the principals in three related Chapter 7 proceedings. The bankruptcy court held that the trustee's filing of a claim on behalf of the corporation's bankruptcy estate against the estates of the principals created a conflict of interest requiring that the trustee be removed and trustee's counsel be disqualified from performing services on behalf of the principals; the district court affirmed. Although the reasoning underlying our decision differs from that applied by the district court, we conclude that the district court reached the proper result. We will, therefore, affirm the order of the district court.

I.

The historical facts are not in dispute. This matter grows out of the Chapter 11 filing in April, 1986 on behalf of BH & P, Inc., a concern engaged primarily in the manufacture of credit cards. A substantial portion of BH & P's business during the relevant period was conducted pursuant to a contract with AT & T. During the period of its relationship with AT & T, BH & P was extremely profitable.

Page 1303

During the period of its operation, BH & P was organized as a subchapter S corporation whose principals were Philip Alan Herman and Bruce Berkow. With income generated by BH & P in 1984, Herman and Berkow invested in a number of real estate limited partnerships designed to serve as tax shelters for the income which the two received as shareholders of BH & P. Under the terms of these partnership agreements, the two were required to and did transfer substantial sums of money into these tax shelters.

In July, 1985, BH & P, Herman and Berkow suffered a devastating reversal of fortune when AT & T announced plans to

terminate its contract with BH & P. As a result of financial difficulties flowing from the termination of the AT & T relationship, BH & P sought Chapter 11 protection in April, 1986. The firm of Ravin, Greenberg & Zackin ("RGZ") was retained as counsel to the Official Creditors' Committee.

In October 1986, because BH & P closed its business operations and sold a significant portion of its assets, the United States Trustee filed a motion to convert the BH & P proceedings to a Chapter 7 liquidation. This motion was granted.

The United States Trustee appointed Carmen Maggio as the interim trustee in the BH & P Chapter 7 proceeding. [1] Maggio's application to retain RGZ as counsel for the trustee was approved by the bankruptcy court.

During the pendency of the BH & P proceedings, BH & P principal Herman filed a voluntary Chapter 7 petition. [2] The United States Trustee appointed Maggio as trustee for Herman and recommended to the bankruptcy court that RGZ be appointed to serve as counsel to Maggio in the Herman matter as well as in the BH & P matter. [3] His recommendation was approved.

In July, 1987, the bankruptcy court entered an order authorizing joint administration of the BH & P and Herman proceedings. Shortly thereafter, Berkow, the remaining BH & P principal, also filed a Chapter 7 petition. [4] The United States Trustee again appointed Maggio as trustee of Berkow's estate and upon the United States Trustee's recommendation, the bankruptcy court entered an order authorizing RGZ to act as counsel to Maggio in this proceeding as well. [5] The Trustee sought and the bankruptcy court granted joint administration of the BH & P, Herman, and Berkow estates.

Because the financial affairs of these entities were so closely intertwined, Maggio elected to administer the three estates as though they were a single entity. Thus, Maggio attempted to secure for all of the estates whatever assets might be available as a result of his powers of avoidance; a decision was made to defer any consideration of the claims of one estate over the claims of another until some point in the future. This approach was consistent with advice given to RGZ by the United States Trustee at the time that RGZ applied to become counsel to the trustee in the Herman

Page 1304

proceedings. [6]

Action on behalf of the BH & P estate, alone, became necessary as a result of the bankruptcy court's establishing deadlines or bar dates applicable to the filing of proofs of claim and nondischargeability complaints in the Herman and Berkow proceedings. In order to avoid forfeiting BH & P's right to assert a claim against the other estates arising from potentially voidable transfers to the real estate tax shelters, Maggio filed proofs of claim on behalf of BH & P. Maggio also filed nondischargeability complaints pursuant to 11 U.S.C. § 523(a)(4), charging Herman and Berkow personally with "fraud or defalcation while acting in a fiduciary capacity." The purpose of these complaints was to secure a declaration that any claim that BH & P might have against Herman or Berkow would not be discharged in the related proceedings.

In February, 1989, Maggio and RGZ filed applications seeking interim fees in the BH & P proceeding. The Bank of New York, BH & P's primary secured lender, objected to the payment of any compensation to Maggio or RGZ on the ground that the trustee and the professionals representing him were guilty of a conflict of interest. [7] In order to investigate these allegations, the bankruptcy court denied the interim fee applications without prejudice, ordered that the issue be briefed, and scheduled oral argument.

Following the submission of briefs and certifications of fact relating to the alleged conflict of interest and three days of hearing, the bankruptcy court, on July 19, 1989, issued an order from the bench disqualifying and removing Maggio and RGZ from further involvement in the Herman and Berkow proceedings. The order also contained provisions vacating the orders which had consolidated the BH & P, Herman, and Berkow proceedings, directing that new trustees be appointed in the Herman and Berkow matters, denying compensation and reimbursement to Maggio, RGZ, and the other professionals for services rendered in the Herman and Berkow matters, and staying further fee applications in the BH & P matter for ninety days following the hiring of new trustees in the Herman and Berkow proceedings. Both Maggio and RGZ appealed from this order.

On August 11, 1989, the bankruptcy court filed a memorandum opinion in which it held that Maggio and Berkow had knowingly and intentionally failed to make required disclosures in the Herman and Berkow matters; that Maggio, as a "creditor," had failed to meet the requirement of disinterest established by the terms of 11 U.S.C. § 701(a)(1) and was, therefore, removable for "cause" pursuant to 11 U.S.C. § 324. The court held that RGZ and the other professionals assisting Maggio should also be disqualified in the Herman and Berkow cases, reasoning that these professionals also failed to qualify as "disinterested persons" in that they represented both a debtor corporation and the individual shareholder against whom the corporation had asserted claims. The bankruptcy court also denied interim fees to Maggio on the ground that Maggio had failed to disclose

Page 1305

to the court his status as creditor and failed to comply with the court's order to disclose communications with others regarding conflicts at the commencement of the Herman and Berkow cases. The court held that "[e]ach of these facts is in itself sufficient cause to deny Maggio compensation...." In re BH & P, Inc., 103 B.R. 556, 568 (Bankr.D.N.J.1989). RGZ was denied compensation on similar grounds. Because the bankruptcy court concluded that full disclosure of all facts relevant to the conflict of interest had not been made, the court also vacated the orders authorizing joint administration of the three estates.

Finally, the bankruptcy court held that in related cases it is presumptively improper to appoint a single trustee or creditors' committee, appoint the same counsel for a trustee, creditors' committee or debtor in possession, or to permit the same management for two or more debtors in possession in any of the following circumstances where:

(a) creditors of the debtors have dealt with debtors as an economic unit;

(b) the affairs of the debtors are substantially entangled;

(c) assets have been transferred from one debtor to another in transactions that are not at arms length;

(d) piercing the corporate veil of one of the debtors may be necessary or advisable; or

(e) one estate has claims against the other.

Id. at 574. This presumption was held to be rebuttable only in the case of "a potential conflict of interest, [where] no other competent fiduciary or professional is available, or the possibility that the conflict will become actual is remote and circumstances make use of a common fiduciary and professionals particularly compelling." Id.

On September 13, 1990, the district court filed an order and opinion affirming in part, and reversing and remanding in part, the

order of the bankruptcy court. 119 B.R. 350. While the district court declined to adopt the bankruptcy court's conclusion that Maggio held the status of a "creditor" as defined in 11 U.S.C. § 101(13)(A), it affirmed the bankruptcy court's conclusion that Maggio was not a disinterested party because he held a "materially adverse" interest within the meaning of 11 U.S.C. § 101(13)(E). [8] The district court also affirmed the bankruptcy court's conclusion that RGZ, too, failed to qualify as a disinterested party within the meaning of 11 U.S.C. §§ 101(13) and 327 due to the presence of an actual conflict of interest.

The district court's only major departure from the bankruptcy court's analysis involved the bankruptcy court's finding that Maggio and RGZ had "knowingly and intentionally" breached a duty of disclosure. While the district court agreed that Maggio and RGZ had breached a duty to disclose, it reversed the bankruptcy court's finding that the breach had been knowing and intentional. Because of this difference with respect to disclosure, the district court remanded the matter to the bankruptcy court for a reevaluation of the issue of interim compensation. The district court reasoned that the bankruptcy court might have awarded compensation in connection with the Herman and Berkow proceedings had it found that the duty to disclose had been breached unintentionally.

This timely appeal followed. On appeal, Maggio and RGZ challenge their respective removal and disqualification from the Herman and Berkow matters, arguing that the district court erred in finding that an "actual conflict of interest" arose when BH & P filed claims against the individual bankruptcy estates. Maggio and RGZ also challenge as clearly erroneous the district court's finding that Maggio and RGZ breached a duty to disclose with respect to the alleged conflict of interest.

"As an appellate court twice removed from the primary tribunal, we review both the factual and the legal determinations of the district court for error." Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir.1981). Our vantage point is identical to that of

Page 1306

the district court, "so we review the bankruptcy court's findings by the standards the district court should employ to determine whether the district court erred in its review." Id. at 102. Thus, in reviewing the district court's review of the bankruptcy court's factual findings, we, like the district court, employ the "clearly erroneous" standard.... [T]he district court's legal determinations receive no presumption of correctness.

Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir.1988) (citations omitted), quoted in In re Marcus Hook Development Park, Inc., 943 F.2d 261, 263 (3d Cir.1991). We will refer to the appellants (Maggio and RGZ) as "the trustees."

II.

In order for us to reach the merits of the issues raised on appeal, the procedural posture of this case requires that we resolve a threshold jurisdictional question.

28 U.S.C. § 158(d) provides that courts of appeals have jurisdiction over appeals in bankruptcy matters where the district courts have entered "final decisions, judgments, orders, and decrees." In this case, the district court, in resolving the conflict of interest issue with respect to Maggio and RGZ, remanded the issue of interim compensation to the bankruptcy court. We must determine whether this remand renders non-final the order appealed from, depriving us of jurisdiction.

In approaching this finality question, we recognize that "[t]he unique characteristics of bankruptcy cases have led us to 'consistently consider[ ] finality in a more pragmatic and

less technical way in bankruptcy cases than in other situations.' " F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 103 (3d Cir.1988), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988) (quoting In re Amatex Corp., 755 F.2d 1034, 1039 (3d Cir.1985)). "Bankruptcy cases frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory." In re Amatex, 755 F.2d at 1039.

In F/S Airlease, we enunciated several factors to be analyzed in determining the finality of a district court's order in bankruptcy proceedings. These factors "included the impact of the matter on the assets of the bankruptcy estate, the preclusive effect of a decision on the merits, and whether the interests of judicial economy will be furthered." F/S Airlease, 844 F.2d at 104.

We then applied those factors to a case which is, in many respects, similar to the one now before us. In the bankruptcy proceedings involving F/S Airlease, objection was made to a broker's application for payment of administrative expenses on the grounds that the broker was not a qualified professional whose employment had been approved by the court in a timely manner and that the amount of compensation sought was unreasonable. The bankruptcy court approved the broker's employment nunc pro tunc, concluding that the broker was a disinterested party within the meaning of 11 U.S.C. § 327, that circumstances warranted approval of the appointment, and that the compensation requested was reasonable and necessary. The district court affirmed the findings of the bankruptcy court but remanded the question of the amount of compensation to that court for a more thorough assessment.

On appeal, we held that the district court's remand of that portion of the bankruptcy court's order which addressed broker compensation did not affect appellate jurisdiction over the remaining portion of the order approving the nunc pro tunc order. We reasoned that prompt consideration of the employment issue would further judicial economy by potentially eliminating the need for the bankruptcy court to consider the matter further. We also noted that the order had a significant impact on the assets of the bankruptcy estate as a compensation award to the broker would affect the rights of other creditors and could require that the proceeding be converted from one under Chapter 11 to one

Page 1307

under Chapter 7. Finally, the judgment of the district court was held to have "conclusively determined the question presented by this appeal." 844 F.2d at 105 (quoting Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101 (3d Cir.1981)). [9]

We recognize that the issues in F/S Airlease are not identical to those before us now. Nonetheless, our reasoning in F/S Airlease, that a district court's remand for further inquiry into allowable compensation does not affect the finality of that portion of its order addressing the qualifications of an applicant for employment, applies here and dictates that the district court order in this matter be considered final for purposes of appeal.

First, the issues centering upon the bankruptcy court's disqualification and removal of Maggio and RGZ could well affect assets in the three on-going Chapter 7 proceedings. The disqualification and removal were imposed, in part, in order to ensure that conflicts of interest would not affect the viability of BH & P's contested claims against Herman and Berkow. Furthermore, the court's ruling has the more remote but no less real

effect of increasing the estates' administrative costs by requiring that separate trustees and professionals be retained in each case.

The remaining F/S Airlease factor favoring a finding of finality, the preclusive effect of a decision on the merits and furtherance of judicial economy, are also present in this case. Resolution of the issues raised on appeal will eliminate the need for further consideration of conflict of interest issues, freeing the bankruptcy court to adjudicate the more substantive issues relating to the estates in question. Further delay attendant to the conflict of interest dispute will be curtailed.

In this matter, as in F/S Airlease, In re Meyertech Corp., and Universal Minerals, we are satisfied that "the judgment of the district court conclusively determined the question presented by this appeal." Universal Minerals, 669 F.2d at 101. Based upon the foregoing analysis, we conclude that the district court's order removing Maggio as trustee and disqualifying RGZ as counsel in the Herman and Berkow matters due to an actual conflict of interest was final. We turn, therefore, to the merits of this appeal.

III.

The trustees urge that we reverse the district court's decision removing Maggio as trustee from the Herman and Berkow estates. They argue that the district court's finding of a conflict of interest requiring Maggio's removal is unsupported by the facts of this case or under applicable caselaw.

A.

An interim trustee appointed by the United States Trustee must, under the terms of the Bankruptcy Code, be a "disinterested person." 11 U.S.C. § 101(14). [10]

Page 1308

For purposes of this appeal, we are concerned only with those disinterest provisions set forth in sections 101(14)(A) and 101(14)(E). The bankruptcy court found that Maggio failed to qualify as a "disinterested person" under each of these provisions.

With respect to Section 101(14)(A), the bankruptcy court reasoned that

[i]f an estate holds a claim against another person, such claim is an asset of the estate under [Bankruptcy] Code § 541(a)(1), and the trustee is the person who holds it as the estate's representative and is authorized to prosecute it. A trustee of an estate which holds a claim against another estate is therefore a "creditor" of the latter estate as defined by Code § 101(9). See In re Enercons Virginia, Inc., 812 F.2d 1469, 1472 (4th Cir.1987).

103 B.R. at 561.

The bankruptcy court also found that Maggio failed to meet the requirements for a "disinterested person" set forth in section 101(14)(E). In making this finding, the court relied upon the fact that in his capacity as trustee for BH & P, Maggio was obligated to pursue the claims of BH & P against Herman and Berkow: "Unless all creditors are paid in full, such claims are materially adverse to those of the other unsecured creditors of Herman and Berkow, because all allowed unsecured claims will share pro rata in any dividend from the estates of Herman and Berkow...." Id.

Having concluded that Maggio failed to meet the "disinterested person" requirements of section 101(14), the bankruptcy court turned to 11 U.S.C. § 324(a), which provides that "[t]he court, after notice and a hearing, may remove a trustee, other than the United States Trustee, or an examiner, for cause." While "cause" is not defined in the Code, the bankruptcy court concluded that Maggio's failure to qualify as a "disinterested person"

constituted cause for his removal as trustee in the BH & P matter. 103 B.R. at 561.

In reviewing these findings and conclusion of the bankruptcy court, the district court rejected the bankruptcy court's characterization of Maggio, as legal representative of the BH & P estate, as a "creditor" of the Herman and Berkow estates for purposes of the "disinterested person standard" set forth in section 101(14)(A). The district court, however, found it unnecessary to consider this issue in depth as it concluded that Maggio clearly was not a "disinterested person" within the meaning of section 101(14)(E).

This provision, commonly known as the "catch-all" clause, has been held "broad enough to include anyone who 'in the slightest degree might have some interest or relationship that would even faintly color the independence and impartial attitude required by the Code and the Bankruptcy Rules.' "

The bankruptcy court therefore properly found that Maggio's dual role as trustee for Herman and Berkow and for one of their creditors--the BH & P estate--constituted an impermissible conflict of interest.

In re BH & P, Inc., 119 B.R. 35, 42 (D.N.J.1990) (citations omitted).

While the district court did not refer to the removal for cause provision of 11 U.S.C. § 324(a), it seems implicitly to have adopted the bankruptcy court's conclusion that a finding that a trustee is not disinterested within the meaning of section 101(14)(E) automatically satisfies the "cause" requirements of section 324(a).

We agree that the district court properly rejected the bankruptcy court's conclusion that Maggio was not disinterested due to his status as a creditor under section 101(13)(A). We find that the bankruptcy court erred in holding that a person who, as trustee, asserts a claim on behalf

Page 1309

of the estate that he serves, and, therefore, acts in a representational capacity, becomes a "creditor" for purposes of section 101(14)(A).

Just as a trustee who succeeds by operation of law to a debtor's title to stock in a creditor bank does not, himself, become a "creditor," In re Hartley, 50 B.R. 852, 861-62 (Bankr.N.D.Ohio 1985), or as two trustees' "nominal ownership" of a wholly-owned subsidiary's stock arising solely from their representing the parent corporation in reorganization proceedings did not confer upon them the status of "interested person," In re Realty Associates Securities Corp., 56 F.Supp. 1007 (E.D.N.Y.1944), Maggio cannot be considered a creditor within the meaning of section 101(14)(A) simply because he asserted a claim in his fiduciary capacity on behalf of BH & P against the Herman and Berkow estates. Like the trustees in Hartley and Realty Associates who were found not have any personal interest in the stocks to which they succeeded as fiduciaries, Maggio had no "personal interest" as a "personal creditor of the Herman and Berkow estates when he filed proofs of claim against them." In re Hartley, 50 B.R. at 861; In re Realty Associates, 56 F.Supp. at 1007.

If we were to hold that the trustee, who succeeds to a debtor's property interests by operation of law, thereby becomes a "creditor," every trustee who files a proof of claim on behalf of a creditor, a practice specifically allowed by 11 U.S.C. § 501(c), would automatically be disqualified from serving. We do not believe that section 101(14) can or should be read to disqualify trustees because of action taken in a representative capacity. [11] That section was, in our view, intended to mandate disqualification based on personal status, e.g., where those implicated are themselves creditors of the debtor or where

they personally "have an interest" which is "materially adverse" under subparagraph (E).

We turn to the more general disinterest provisions of section 101(14)(E). We are reluctant to endorse the view taken by the bankruptcy court, and by the district court as well, that a finding of a lack of disinterest within the meaning of section 101(14)(E) automatically mandates removal of a trustee for cause under section 324(a). This is especially true where, as here, disinterest requirements have been liberally construed. We believe that linking these sections in the manner suggested by the bankruptcy and district courts may result in an unwarranted narrowing of the circumstances in which a single trustee may serve related bankruptcy estates.

The law regarding the standards to be applied in removing a trustee in bankruptcy is not well-developed and does not always rest on consistent theoretical underpinnings. While the approach taken by the district court in this matter does find some support in the caselaw, we are troubled by its implications for the efficient and economical functioning of the system developed for administering related bankruptcy estates.

As the district court noted, section 101(14)(E), the so-called "catch-all clause" governing lack of disinterest, has been held "broad enough to include anyone who 'in the slightest degree might have some interest or relationship that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.' " In re Glenn Electric Sales Corp., 99 B.R. 596, 601 (D.N.J.1988) (quoting In re Roberts, 46 B.R. 815, 828 n. 26 (D.Utah 1985)). Relying on this language, the district court concluded that "[t]he bankruptcy court therefore properly found that Maggio's dual role as trustee for Herman and Berkow and for one of their creditors--the BH & P estate--constituted an

Page 1310

impermissible conflict of interest" and that Maggio's removal was warranted. 119 B.R. at 42. The district court reached this conclusion despite the fact that no harm arising from Maggio's dual role was apparent.

This approach has its origin in a line of cases which base the standard for removal of a bankruptcy trustee upon the need to "avoid even the appearance of impropriety." Courts adopting this approach have concluded that

[g]iven the definition of "disinterested" in section [101(14)(E) ], ... a trustee ... must be disqualified where it holds an interest adverse to the estate whether or not it acts to advance that interest. The definition of disinterestedness in the Code covers not only actual impropriety but the appearance of impropriety as well.

In re Paolino, 80 B.R. 341, 345 (Bankr.E.D.Pa.1987). For similar statements of the removal standard, see also In re Micro-Time Management Systems, 102 B.R. 602, 605 (Bankr.E.D.Mich.1989) (that trustee actually be disinterested is insufficient; the appearance of interest must also be avoided and thus this appearance may constitute grounds for removal); In re O.P.M. Leasing Services, Inc., 16 B.R. 932, 937 (Bankr.S.D.N.Y.1982) (lack of disinterestedness is cause for removal of a trustee pursuant to 11 U.S.C. § 324).

While we do not ignore the statements of the law set forth in those cases which interpret lack of disinterest or the mere appearance of lack of disinterest as grounds for removal of a trustee, we are not convinced that they do or should govern this case.

A closer reading of the cases cited reveals that section 101(14)(E), like 101(14)(A), [12] may be read to implicate only the personal interests of the trustee. In O.P.M. Leasing Services, after stating that lack of disinterestedness on the part of an appointed trustee would be sufficient cause for removal, the bankruptcy court clarified that "it is 'personal interests'

that are forbidden" and declined to remove a trustee whose alleged lack of disinterest stemmed from actions which he undertook as a fiduciary. 16 B.R. at 938.

In re Micro-time Management Systems also arose in the context of the personal interests of a trustee. There, the claim of lack of disinterest was based upon the trustee's alleged desire to solicit additional accounting work from a major creditor of the debtor. Another creditor argued that the trustee's desire for additional work caused him to agree to a settlement which favored the major creditor. 102 B.R. at 603. In re Paolino, too, while disagreeing in dicta with the proposition that "grounds for ... removal of a trustee in bankruptcy are not to be found in his formal relationships," involved disqualification of a trustee when he became affiliated with a law firm which represented interests adverse to those of the estate. Each of these cases discussing the disinterest requirement embodied in section 101(14)(E) as grounds for disqualification of a trustee presents a situation fundamentally different from that presented by the filing of interdebtor claims alleged here.

A standard for removal based on section 101(14))(E), that automatically disqualifies a trustee from serving in jointly administered cases where there are interdebtor claims, is overbroad. While we recognize that cases involving multiple debtors served by a single trustee present special concerns requiring the trustee to balance competing interests with vigilance and guard against conflicts, we also recognize the reality that a single trustee is often able to maximize the return to jointly administered estates through increased economy and efficiency. Joint administration by a single trustee is commonplace in the

Page 1311

scheme of bankruptcy administration and its positives often outweigh any negatives. Furthermore, as the trustees recognize in their

brief before us here, "if there is a presumption that can be stated with certitude regarding jointly administered estates, it is that there will be interdebtor claims or potential claims."

Given these realities, the district court's interpretation of the "disinterested person" requirement to encompass a trustee who files interdebtor claims in jointly administered cases and its conclusion that lack of disinterest premised on the existence of interdebtor claims invariably constitutes grounds for removal of the trustee are problematic. Were we to endorse this interpretation, the use of single trustees in jointly administered cases, in fact joint administration itself, would become a rarity, exposing untold numbers of bankruptcy estates to the potential for increased costs and inefficiency.

Most of the cases which have addressed the removal of a trustee do not rely on section 101(14)(E) or on any analysis of the disinterest requirement but approach the issue instead in terms of whether there is a "conflict of interest" which constitutes cause for removal. In most of these cases, something beyond a finding of lack of disinterest is required.

A majority of courts evaluating an alleged conflict of interest has adhered to the principle that before a trustee may be removed, some actual injury must be shown. This standard was articulated first in In re Freeport Italian Bakery, Inc., 340 F.2d 50, 54 (2d Cir.1965). There, the court stated that "[g]rounds for disapproval or removal of a trustee in bankruptcy are not to be found in his formal relationships. 'We have traditionally stressed the elements of fraud and actual injury to the debtors' interests.' " Id. (citation omitted). This standard has been adopted by courts in In re Acadiana Electrical Service, Inc., 66 B.R. 164, 165 (Bankr.W.D.La.1986) (removal of trustee proper only where fraud or actual injury to the estate exists or where the estate will suffer more from discord created by retention of the trustee than it would from a change in administration); In re University



Ave. Properties, 55 B.R. 986, 991 (Bankr.E.D.Wis.1986) (court properly denied application to remove trustee where trustee did not wilfully and deliberately breach fiduciary duty to the estate; no evidence existed to substantiate fraud or other improper conduct); In re Peckinpaugh, 50 B.R. 865 (Bankr.N.D.Ohio 1985) (in a case for removal of a trustee, court demands that actual fraud or harm to the estate be shown); In re Hartley, 50 B.R. 852, 859 (Bankr.N.D.Ohio 1985) (same); In re Microdisk, Inc., 33 B.R. 817 (Bankr.D.Nev.1983) (conflict of interest would arise only if a trustee acted for the benefit of certain creditors to the detriment of the bankrupt estate); In re O.P.M. Leasing Services, Inc., 16 B.R. 932 (Bankr.S.D.N.Y.1982) (doubtful that a court will sever established trusteeship over multiple related estates in cases that are well-progressed absent showing of actual present conflict incapable of any other equitable resolution); In re Concept Packaging Corp., 7 B.R. 607 (Bankr.S.D.N.Y.1980) (specifically adopting Freeport Italian Bakery standard); In re Rea Holding Corp., 2 B.R. 733, 735 (S.D.N.Y.1980) (elements of fraud and actual injury must be stressed in determining grounds for disapproval or removal of a trustee).

The benefits of the Freeport Italian Bakery standard for removal of trustees alleged to have conflicts of interest have been summarized as follows. [13]

In the court's opinion, nebulous accusations such as that the Trustee's actions were not in the "best interests of the estate" or had the "appearance of impropriety" do not constitute sufficient cause to remove the Trustee. Instead, in a case for removal this court demands that

Page 1312

actual fraud or harm to the estate be proven....

[F]orcing accusers to quickly come forward with evidence which proves fraud or actual harm to the estate protects Trustees from the threat of specious and tenuous claims for removal which are merely part of a tactical maneuver to force the Trustee not to perform his statutory duties. A more concrete standard also has the benefit of preserving the orderly administration of the estate by not allowing creditors to remove a Trustee who has merely made them unhappy.

In re Peckinpaugh, 50 B.R. at 867.

While this second line of cases preserves the possibility of joint administration of estates by multiple trustees through adoption of a bright-line rule for disqualification of trustees, it is, nonetheless, imperfect. Strict application of this standard would not permit the bankruptcy court to remove a trustee from service where the circumstances presented do not implicate fraud or result in actual injury to the estate but are, nonetheless, highly suggestive of irregularity. Arguably, the standard also prevents a court from taking prophylactic action where the likelihood of injury is great but no harm is manifest.

Having considered both the per se rule adopted by the bankruptcy court and district court in this matter and the opposite-end-of-the-spectrum approach embodied in Freeport Italian Bakery, Inc., we are convinced that the best approach to trustee disqualification lies somewhere in the middle. In mapping out this middle-ground rule, we have derived substantial guidance from the approach taken by the Court of Appeals for the First Circuit in In re Martin, 817 F.2d 175 (1st Cir.1987). The court there considered allegations of a conflict of interest where a lawyer, prior to submitting a client's Chapter 11 petition, took security for the payment of attorney's fees to be incurred in connection with the bankruptcy proceedings. While the court's discussion centered on the propriety of that particular arrangement, much of what it had to say is helpful in

articulating the rule which we conclude should govern the matter now before us.

Considering the advantages of joint administration and the place for single trustees in that process, we are not prepared to say that interdebtor claims mandate disqualification of the trustee in every instance.

In the final analysis ... it is the bankruptcy court--not the debtor and his counsel--which must separate good from bad, which must determine the propriety of permitting a [single trustee to serve in jointly administered cases where there are interdebtor claims.] The naked existence of a potential for conflict of interest does not render the [arrangement] nugatory, but makes it voidable as the facts may warrant. It is for the court to decide whether the [arrangement] carries with it a sufficient threat of material adversity to warrant prophylactic action.... The test must be an objective one. The question is not necessarily whether a conflict exists--although an actual conflict of any degree of seriousness will obviously present a towering obstacle--but whether a potential conflict, or the perception of one renders the [trustee's] interest materially adverse to the estate of the creditors.

This inquiry is of necessity case-specific. There must be at a minimum full and timely disclosure of the details of any given arrangement. Armed with knowledge of all of the relevant facts, the bankruptcy court must determine, case by case, whether [a situation such as the presence of a single trustee in jointly administered cases where there are interdebtor claims] can be tolerated under the particular circumstances. In so doing, the court should consider the full panoply of events and elements.... The nature and extent of the conflict must be assayed, along with the likelihood that a potential conflict might turn into an actual one. An effort should be made to measure the influence the putative conflict may have in subsequent decisionmaking. Perceptions are important; how the matter likely appears to creditors

Page 1313

and to other parties in legitimate interest should be taken into account....

What counts is that the matter not be left either to hindsight or the unfettered desires of the [parties involved], but that the bankruptcy judge be given an immediate opportunity to make an intelligent appraisal of the situation and to apply his experience, common sense, and knowledge of the particular proceeding to the request....

Historically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals. The bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails. If he perceives a materially adverse interest, he has at his disposal an armamentarium of permissible remedies, including ... disqualification [and] disallowance of all or some fees....

In re Martin, 817 F.2d at 181-83 (citations omitted).

It is important that each case involving a single trustee in jointly administered estates with interdebtor claims be evaluated prospectively on a case-by-case basis. The retention of a trustee "should not be upheld simply because, after the fact, no harm appears to have been done." Id. at 183. In some circumstances, the potential for conflict and the appearance of conflict may, without more, justify removing a trustee from service. At the same time, however, it must be made clear that

[h]orrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending [the trustee] away to

lick his wounds. And, when all is said and done, doubts are to be resolved in favor of invalidation.

Id.

B.

Recognizing that the disqualification of a trustee must be a matter committed to the sound discretion of the bankruptcy court with that discretion bounded by the principles announced here today, we turn to the facts of this case. In addressing the disinterest requirement of 101(14)(E) as it applied to Maggio, the bankruptcy court wrote:

As trustee of BH & P, Maggio has the right and duty to pursue the claims of BH & P against Herman and Berkow. Unless all creditors are paid in full, such claims are materially adverse to those of the other unsecured creditors of Herman and Berkow, because all allowed unsecured claims will share pro rata in any dividend from the estates of Herman and Berkow....

103 B.R. at 561. The bankruptcy court appears to have concluded that Maggio's obligation to BH & P to pursue claims against Herman and Berkow created an interest materially adverse to the interests of other unsecured creditors of Herman and Berkow. This conclusion rested particularly on the disputed nature of the claims against Herman and Berkow and the need for advocacy of competing interests. When the bankruptcy court converted the BH & P proceedings from Chapter 11 to Chapter 7, it recognized, as one ground for the conversion, the need for an independent fiduciary--a Chapter 7 trustee--to pursue the claims against Herman and Berkow. Pursuit of these claims was seen as vital to the continuation of BH & P's case. The court's subsequent determination that the same claims justified the appointment of separate trustees was based upon the conclusion that Maggio's removal was necessitated by conflicts which were or would become detrimental to at least one of the three jointly-administered estates.

Although we cannot say that the bankruptcy court's finding of material adversity on the part of the trustee would apply to every case involving interdebtor claims or that we certainly would have reached the same result in reviewing the facts of this case, neither can we say that the bankruptcy court abused its discretion in disqualifying Maggio as trustee in the Herman and Berkow proceedings. We find no error,

Page 1314

therefore, in the district court's affirmance of the disqualification.

IV.

We turn next to the allegation that the district court erred in affirming the bankruptcy court's determination that RGZ, the attorneys representing Maggio in the three related proceedings, should be removed as counsel in the Herman and Berkow matters. The statutory provisions governing the removal of professionals from serving in connection with bankruptcy matters differ in some respects from those applicable to the removal of trustees.

The qualifications prerequisite to employment of professionals are set forth in 11 U.S.C. § 327. Section 327(a) provides that

[t]he trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

This section creates a two-part requirement for retention of counsel: "Counsel must 'not hold or represent an interest adverse

to the estate' and must be a 'disinterested person.' " In re Star Broadcasting, Inc., 81 B.R. 835, 838 (Bankr.D.N.J.1988). As is the case in evaluating the status of a trustee, the applicable disinterest requirement is set forth in 101(14)(E). As we have noted, this section defines a disinterested person as one who "does not have an interest materially adverse to the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to ... the debtor ... or for any other reason." There is, indisputably, some overlap between the section 327(a) standard and section 101(14)(E) disinterest requirement. See In re Martin, 817 F.2d 175, 179 n. 4 (1st Cir.1987) ("something of a redundancy" exists between section 101 and section 327(a)); Roger J. Au & Son, Inc. v. Aetna Ins. Co., 64 B.R. 600, 604 (N.D.Ohio 1986) (each prong of section 327(a) is satisfied when a person is found to be disinterested under section [101(14) ].

The Bankruptcy Code also clarifies that despite the strictures of sections 327(a) and 101(14)(e), a professional is not necessarily disqualified from employment based upon his representation of both the trustee and a creditor. Section 327(c) provides that

a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case, the court shall disapprove such employment if there is an actual conflict of interest.

(Emphasis added.)

That portion of section 327 dealing with "actual conflict of interest" was added by the 1984 amendments to the Bankruptcy Code. As is reflected in the opinion of the bankruptcy court, prior to the 1984 amendments, the Code made no provision for counsel's simultaneous representation of a debtor and a creditor. The 1984 amendments represent a return to the pre-Code rule which provided that a trustee was authorized to retain counsel who also represented a creditor, but only in circumstances where it was absolutely necessary. [14] The existence of interdebtor claims is, therefore, no longer an automatic ground for disqualification of counsel for the trustee. Section 327 focuses the inquiry upon whether there is an actual conflict of interest.

Page 1315

The term "actual conflict of interest" is not defined in the Code and has been given meaning largely through a case-by-case evaluation of particular situations arising in the bankruptcy context. Courts have been accorded considerable latitude in using their judgment and discretion in determining whether an actual conflict exists "in light of the particular facts of each case." In re Star Broadcasting, Inc., 81 B.R. 835, 844 (Bankr.D.N.J.1988); In re Hoffman, 53 B.R. 564, 566 (Bankr.W.D.Ark.1985).

The bankruptcy court in the matter now before us concluded that, given the interdebtor claims filed, an actual conflict of interest was created by RGZ's continued representation of the trustee in the Herman and Berkow proceedings. The court summarized its views with respect to the conflict of interest issue as follows:

[RGZ] has had to assert claims on behalf of Maggio as trustee of BH & P, against Maggio as trustee of Herman and Berkow. If there are sufficient assets in the estates of Herman and Berkow, [RGZ] will have to form an opinion on behalf of those estates as to the merits of those claims. It is also conceivable that the estates of Herman and Berkow might have claims against each other, or against BH & P....

An argument could be made that there is only a potential conflict until it is certain that the estates of Herman and Berkow have sufficient funds to pay a dividend. However, the more the trustee and professionals succeed

in increasing the size of the Herman and Berkow estates, the greater the likelihood that they would be in the impossible position of having to review their own claims on behalf BH & P.

103 B.R. at 565. The court also stated that "[t]here are assets in the Herman and Berkow estates, which may ultimately be sufficient to pay a dividend to unsecured creditors," and concluded that "[u]nder these circumstances, [RGZ] ... [has] an actual conflict of interest...." Id. at 566. The district court affirmed this view, writing that "[t]his court can find no error in that determination." 119 B.R. at 43.

We, too, do not find error in the bankruptcy court's characterization of the conflict created by RGZ's representation of Maggio in the three proceedings as "actual." With respect to RGZ's argument that any conflict posed by the multiple representations is merely "potential" due to the uncertainty as to whether there will be assets in the Herman and Berkow estates sufficient to satisfy the BH & P claims, we take the view adopted by the district court:

The Court cannot agree that [the multiple representation] constitutes merely a "potential" conflict or that Congress intended § 327(c) to be subject to such fine distinctions. Rather, the "actuality" of the conflict, as the bankruptcy court held, was the possibility that the parties would favor one estate over the other in their attempt to serve all of them. See In re Michigan General, 78 B.R. at 483-84 ("The 'actuality' of the conflict is not per se that counsel might hold a preference [under § 547], rather it is that counsel will be tempted to neglect its duties to the estate by being less than zealous in its investigation of the preference.").

Id.

According to RGZ, the finding of an "actual" conflict in these circumstances obliterates the distinction mandated by section 327(c) between "actual" and other conflicts and creates what amounts to a per se rule which would operate to prevent multiple representation in virtually all cases. We cannot agree.

The caselaw generated in connection with multiple representation of related bankruptcy estates establishes that courts have generally declined to formulate bright-line rules concerning the criteria for disqualification but have favored instead an approach which gives the bankruptcy court discretion to evaluate each case on its facts, taking all circumstances into account. See, e.g., In re International Oil Company, 427 F.2d 186, 187 (2d Cir.1970) (record which showed existence of intercompany claims was not "sufficient to saddle ... estates [of four affiliated corporations] with the expense of separate ... trustees' attorneys at the present time");

Page 1316

In re Star Broadcasting, 81 B.R. 835, 844 (Bankr.D.N.J.1988) (invariably requiring different counsel in related Chapter 11 proceedings would be unreasonable and unnecessarily cumbersome; whether a disqualifying conflict exists must be considered in light of the particular facts of each case); In re Roberts, 75 B.R. 402, 405-06 (D.Utah 1987) (since interdebtor claims were neither disputed nor priority claims, simultaneous representation of the debtor was not a conflict per se ); In re N.S. Garrott & Sons, 63 B.R. 189, 192 (Bankr.E.D.Ark.1986) ("attorneys may have conflicts which are technical and nondisqualifying"); In re Hoffman, 53 B.R. 564, 566 (Bankr.W.D.Ark.1985) ("Whether ... an actual disqualifying conflict exists must be considered in light of the particular facts of each case."); In re Guy Apple Masonry Contractor, Inc., 45 B.R. 160, 166 (Bankr.D.Ariz.1984) ("question is not whether a conflict exists but whether that conflict is materially adverse to the estate, creditors, or equity security holders"); In re Global Marine,

Inc., 108 B.R. 998, 1004 (Bankr.S.D.Tex.1987) ("mere existence of an intercompany claim does not in and of itself constitute an impermissible conflict of interest that would justify disqualification or denial of compensation").

Despite the bankruptcy court's reference to such decisions as In re Kendavis Industries International, Inc., 91 B.R. 742 (Bankr.N.D.Tex.1988), which have adopted a per se rule explicitly eliminating the statutorily imposed distinction between actual and other conflict, the court in this case did not hinge its decision on such a per se approach. [15] While the bankruptcy court recognized that by the terms of section 327(c) "disapproval of employment is mandatory where there is an actual conflict," it does not follow "that there is no discretion to disapprove employment when the conflict is 'potential' ". 103 B.R. at 564 (emphasis added). The court then held that

[t]he court should generally disapprove employment of a professional with a potential conflict, with certain possible exceptions. First of all, ... there may occasionally be large cases where every competent professional in a particular field is already employed by a creditor or a party in interest....

The other exception is where the possibility that the potential conflict will become actual is remote, and the reasons for employing the professional in question are particularly compelling. This court will not attempt here to define the parameters of this exception, which necessarily will depend upon the facts of a particular case. I will, however, note that even in such situations, employment of a professional with a potential conflict is disfavored.

Id.

We do not find error in the bankruptcy court's articulation of the standard governing conflict of interest applicable to professionals. In this context, as in the case of removal of a trustee, we reiterate that "historically, bankruptcy courts have been accorded wide discretion in connection with ... the terms and conditions of the employment of professionals," In re Martin, 817 F.2d at 182, and affirm that the conflict of interest principles which we have adopted regarding disqualification of trustees apply with equal force in those situations involving employment of professionals. This flexible approach will require the bankruptcy courts to analyze the factors present in any given case in order to determine whether the efficiency and economy which may favor multiple representation must yield to competing concerns affecting fairness to all parties involved and protection of the integrity of the bankruptcy process. Factors to be considered include, but are not limited to, the nature of disclosure of the conflict made at the time of appointment, whether the interests of the related estates are parallel or conflicting, and the nature of the interdebtor claims made. As we have said, denomination

Page 1317

of a conflict as "potential" or "actual" and the decision concerning whether to disqualify a professional based upon that determination in situations not yet rising to the level of an actual conflict are matters committed to the bankruptcy court's sound exercise of discretion. In order to ensure proper review in these cases, those factors underlying the exercise of discretion "must be factually substantiated upon the evidentiary record." In re Global Marine, Inc., 108 B.R. at 1002.

In sum, we find that the bankruptcy court exercised sound discretion in its characterization of the conflict presented here and note that even if we were to conclude that any conflict were "potential" only, we still could not conclude that, based upon the totality of the circumstances, the bankruptcy court abused its discretion in disqualifying RGZ from serving in the Herman and Berkow matters.

V.

We turn to the trustee's allegation that the district court erred in affirming the bankruptcy court's determination that Maggio and RGZ failed to make adequate disclosure of those facts underlying the conflict of interest.

In its opinion, the bankruptcy court found that Maggio and RGZ

knowingly and intentionally withheld disclosure in the applications to retain the professionals in the Herman and Berkow cases of the fact that BH & P, and Maggio as its trustee, had claims against Herman and Berkow, that Maggio and [the professionals] had discussed the question of conflicts with the United States Trustee, and that they all knew of the claims.

103 B.R. at 560. While the district court concluded that "nothing in the record supports the bankruptcy court's finding that Maggio and the professionals 'knowingly and intentionally' withheld information from the bankruptcy court" and reversed that finding as clearly erroneous, it concluded, nonetheless, that there had been an unintentional breach of the duty to disclose. The district court wrote:

One of the more salient principles of bankruptcy law is that trustees and professionals who request court approval of employment have "a duty to disclose actual or potential conflicts of interest which may bear upon their qualification...." In re Roberts, 75 B.R. 402, 410 (D. Utah 1987) (emphasis added)....

Because of the broad contours of this duty of disclosure, the bankruptcy court's determination that Maggio [and RGZ] had breached it was not clearly erroneous, and therefore must be upheld. Although the parties argue that they acted in good faith in applying for employment, and believed that they disclosed all that was necessary for the bankruptcy court to assess the propriety of their retention, such is not the measure of the duty of disclosure. The "subjective good faith efforts" of the parties are "irrelevant." In re Glenn Electric, 99 B.R. at 600. Rather, once a potential conflict is identified, as it was here, it must be disclosed to the bankruptcy court.

119 B.R. at 44.

Maggio and RGZ argue that various documents filed during the course of proceedings spoke of the "intertwined financial affairs" of the debtors and made reference to the fact that Herman and Berkow had interests in entities which were involved in questionable business transactions with BH & P. They also contend that allegations made during the January 19, 1989 pre-trial conference and the record made in the case as a whole from April, 1986 through the summer of 1987 contained further evidence of "the alleged self-dealing between BH & P and its principals." In disposing of this argument, we adopt the statement of the district court:

It is not ... the obligation of the bankruptcy court to search the record for possible conflicts of interest. That obligation belongs to the party who seeks employment by the estate, and although it may not be so onerous as to require the party to raise with the court every imaginable conflict which may occur in a bankruptcy, it certainly compels disclosure where, as here, the party had contemplated

Page 1318

and discussed a specific situation involving a potentiality for conflict. Accordingly, this Court can find no error in the bankruptcy court's determination that Maggio [and RGZ] breached the duty of disclosure. This breach may have been the product of negligence, but "[n]egligence does not excuse the failure to disclose a possible conflict of interests."

Id. (citations omitted).

VI.

In conclusion, we find that Maggio and RGZ were properly disqualified from serving in the Herman and Berkow matters as trustee and counsel, respectively. Furthermore, we find that the district court did not err in concluding that Maggio and RGZ did, in fact, breach a duty of disclosure and that the breach was, contrary to the finding of the bankruptcy court, unintentional. We agree therefore, that this matter should be remanded to the bankruptcy court for the limited purpose of reassessing the award of interim fees and will affirm the order of the district court.

O'NEILL, District Judge, concurring.

As trustee of BH & P, Maggio filed proofs of claim against the Herman and Berkow estates and complaints alleging fraud and defalcation against Herman and Berkow personally. The complaint against Herman alleges that, within one year of the filing of BH & P's Chapter 11 Petition, BH & P, on behalf of a general partnership called Hermkow, transferred $1,758,250 to certain limited partnerships organized for the purpose of investing in Texas real estate. The complaint alleges that 10% of Hermkow was owned by Herman and 90% by Berkow, and that of the aforesaid amount $1,458,250 (almost 83%) was transferred after BH & P learned that the AT & T contract was being terminated. The complaint also alleges that Herman breached his fiduciary duty while he was president, a member of the Board of Directors and a 10% stockholder of BH & P. Finally, the complaint seeks judgment against Herman personally in the amount of $1,758,250, and alleges that this debt is non-dischargeable under the Bankruptcy Code. Although the appendix does not include the complaint against Berkow, counsel represents that it contains similar allegations.

Given the gravity of these claims and the obligation of the trustee to pursue them diligently, I am unable to conclude that the bankruptcy court abused its discretion when it removed the trustee and his counsel because of a conflict of interest.

HUTCHINSON, Circuit Judge, concurring and dissenting.

In accord with what I believe is controlling Circuit precedent, I concur with the Court's holding that our appellate jurisdiction is unaffected by that portion of the district court's order remanding the case to the bankruptcy court for further reconsideration of the issue of whether the trustee and his counsel are entitled to compensation for their work prior to removal. I write separately on the jurisdictional issues to express my unease with certain aspects of this Circuit's jurisprudence on the appealability of orders entered by district courts that affect ongoing bankruptcy cases.

On the merits, I respectfully disagree with the Court's conclusion that the bankruptcy court's removal of the interim trustee and his counsel was a proper exercise of discretion. Therefore, I respectfully dissent from that aspect of the Court's opinion.

I.

My concurrence on the jurisdictional issue is compelled by the cases this Court has decided on appellate jurisdiction under 28 U.S.C.A. § 158(d) (West Supp.1991). See In re Colon, 941 F.2d 242, 244-45 (3d Cir.1991); F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 103 (3d Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); Wheeling-Pittsburgh Steel Corp. v. McCune, 836 F.2d 153, 157-58 (3d Cir.1987); In re Meyertech Corp., 831 F.2d 410, 414 (3d Cir.1987); In re Christian, 804 F.2d 46, 47-48 (3d Cir.1986); see also In re Amatex Corp., 755 F.2d 1034, 1036-41 (3d

Page 1319

Cir.1985) (utilizing similar finality analysis in deciding 28 U.S.C.A. § 1291 provided jurisdiction where district court had original



jurisdiction over bankruptcy matter); In re Comer, 716 F.2d 168, 171-74 (3d Cir.1983) (utilizing similar finality analysis in deciding jurisdiction question under 28 U.S.C.A. § 1293, predecessor to section 158(d)); In re Marin Motor Oil, Inc., 689 F.2d 445, 447-449 (3d Cir.1982) (same), cert. denied, 459 U.S. 1207, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 100-01 (3d Cir.1981) (same). But see In re Brown, 803 F.2d 120, 121-23 (3d Cir.1986) (remand order not final under section 158(d) even though hearing the appeal would end the litigation because the order did not affect the distribution of assets or the relationship among creditors). The Court cites some of these cases in support of its holding that the district court's order is a final one under the flexible test we apply in bankruptcy and so is appealable as a final order under section 158(d). See Majority Opinion, at 1306-07. Since I too believe those cases control the issue of appellate jurisdiction, I am bound to follow them under our Internal Operating Procedures. Internal Operating Procedure of the U.S. Ct. of App. for the 3d Cir. 9.1 (July, 1991).

Nevertheless I have an uneasy feeling that our case law on the concept of finality under section 158(d) incorrectly equates efficiency in the administration of a particular estate with over-all efficiency in the operation of our bankruptcy system. In applying the efficiency factor to decisions concerning the finality and appealability of orders of our district courts, I think more consideration should be given to the effect a particular decision will have on efficient functioning of the bankruptcy system than on the efficient disposition of the particular bankruptcy case under consideration. If we become mesmerized by the impact a merits decision has on the administration of the case before us, it is all too easy to decide that appellate treatment of the merits serves the goal of efficiency. See, e.g., In re Brown, 803 F.2d at 122 ("By allowing parties to appeal discrete issues within a single bankruptcy proceeding, we have sought to avoid the waste of resources that would result from insisting upon the completion of proceedings prior to any appeal.").

In serving the immediate desire to expedite the case, we may sometimes undervalue the need for overall efficiency that lies at the core of the finality principle. When decisions to advance the immediate cause unduly increase the number of appeals, the system's efficiency suffers. See Flanagan v. United States, 465 U.S. 259, 264, 104 S.Ct. 1051, 1054, 79 L.Ed.2d 288 (1984) (Finality "reduces the ability of litigants to harass opponents and to clog the courts through a succession of costly and time-consuming appeals."). [1] Since "justice delayed" is indeed all too often "justice denied," its efficient administration in the immediate particular can thus sometimes lead to generalized injustice.

Here the district court order appealed from remands the dispute over interim compensation to the bankruptcy court for reconsideration of its decision not to award fees for work on the Herman and Berkow estates. On remand, the bankruptcy court may affirm its earlier decision not to award any fees or it may award fees in an amount less than that sought by BH & P. In either case, Maggio and his counsel or any other aggrieved party could again appeal to the district court and to us in turn. This multiplication of the possibilities for appeal leaves me unsure that our jurisprudence on finality under section 158(d) has struck the right balance between overall efficiency and case-oriented flexibility.

In F/S Airlease, we stressed that immediate resolution of the issue involved "could obviate the need for further action by the bankruptcy court." F/S Airlease, 844 F.2d at 104. Here, in contrast, the bankruptcy

Page 1320

court will have to take further action regardless of our determination. If we affirm,

the bankruptcy court will reconsider its ruling pursuant to the district court's decision that the failure to disclose was not willful; if we reverse, the bankruptcy court will have to decide whether the amount of interim compensation requested was reasonable; if we vacate and remand, the bankruptcy court will have to consider the removal and fee issues under a proper legal standard.

Thus, these appeals do little to advance even the efficient administration of this case. Without them, present counsel and the trustee could still have appealed the bankruptcy court's decision to deny them compensation under section 158(d) at the end of the proceeding, and so seek appellate correction of any error the bankruptcy court might have made in denying them compensation for services already rendered. Moreover, the immediate replacement of Maggio and his counsel may have mooted the removal issue. [2]

Despite these concerns, I have concluded that F/S Airlease and the other cases the Court cites on the flexible concept of finality section 158(d) implies control the issue of appellate jurisdiction. Thus, I concur in the holding that we have appellate jurisdiction. [3]

II.

I agree with much of the Court's reasoning on the merits of the bankruptcy court's decision to remove the interim trustee and his counsel because the interim trustee is not a disinterested person under 11 U.S.C.A. § 101(14)(E) (West Supp.1991) and his counsel is likewise not a disinterested person who "hold[s] or represent[s] an interest adverse to the estate" within the meaning of 11 U.S.C.A. § 327(a) (West 1979). I am in especially strong agreement with the Court's conclusion that the rebuttable presumption the bankruptcy court relied on to disqualify a trustee from serving in jointly administered cases where there are interdebtor claims is so "overbroad" that it would drastically curtail, if not eliminate the efficiencies of joint administration. See Majority Opinion, at 1311. I also find no fault with the Court's analysis of the applicable statutory law and its conclusion that the question of whether an interim trustee and his counsel should be disqualified from representing some estates that are being jointly administered because the estate of one has claims against the estate of one or more related entities or individuals

Page 1321

rests within the sound discretion of the bankruptcy court. Id. at 1313. On the merits, my disagreement with the Court is limited to its conclusion that the bankruptcy court, on the facts of this case, did not abuse its discretion when it removed Maggio and his counsel for conflicts of interest.

As the majority has demonstrated, the bankruptcy court's presumption against appointment of a single trustee for joint administration of related estates whenever one estate has claims against the other is legally incorrect. Accordingly, the bankruptcy court's exercise of its discretion to remove Maggio and his counsel was made in consideration of an improper factor. Therefore, we should vacate the district court's order affirming the bankruptcy court's disqualification order, with instructions to vacate the bankruptcy court's order and remand the case to the bankruptcy court for an exercise of discretion under correct legal standards. See Universal Minerals, Inc., 669 F.2d at 102 ("[t]o the extent the parties challenge the choice ... of legal precepts, we always employ the fullest scope of review").

I also disagree with the majority's holding there was no abuse of discretion because I think that even absent the presumption created by the bankruptcy court the present record cannot support a finding that either Maggio or his counsel had presently existing conflicts of interest that could have affected their status as disinterested persons in any material way. Thus, I think the bankruptcy

court's finding that an actual conflict existed in this case is clearly erroneous. See Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir.1988) ("in reviewing the district court's review of the bankruptcy court's factual findings, we, like the district court, employ the 'clearly erroneous' standard"). If so, the district court's affirmance of that finding, see Matter of BH & P, Inc., 119 B.R. 35, 43 (D.N.J.1990), is therefore legally incorrect.

In either case, the district court should have vacated the bankruptcy court's removal order and remanded that issue to the bankruptcy court. There the record could be further developed as to whether the putative conflict of interest facing the trustee and his counsel with respect to the BH & P estate's claims against the bankrupt estates of its individual stockholders was "material." My more detailed reasoning follows.

The bankruptcy court held that its overbroad presumption can be rebutted when "the possibility that the conflict will become actual is remote and circumstances make use of a common fiduciary and professional particularly compelling." In re BH & P, Inc., 103 B.R. 556, 572 (Bankr.D.N.J.1989), aff'd in part and vacated in part, 119 B.R. 35. [4] It went on, however, to find an actual conflict saying:

> An argument could be made that there is only a potential conflict until it is certain that the estates of Herman and Berkow have sufficient funds to pay a dividend. However, the more the trustee and professional succeed in increasing the size of the Herman and Berkow estates, the greater the likelihood that they would be in the impossible position of having to review their own claims on behalf of BH & P. That problem certainly does not appear conducive to putting forth one's best efforts on behalf of the Herman and Berkow estates, if success ultimately means disqualification. The court does not have any evidence at this point that the trustee or professional have failed to pursue all assets of the Herman and Berkow estate [sic] vigorously.
>
> Id. at 565-66.

Because the bankruptcy court employed the phrases "actual conflict" and "potential conflict" I too use them despite my agreement with those cases that hold there is no meaningful distinction between "actual" and "potential" conflicts of interest. See, e.g., id. (distinction is "elusive and perhaps illusory"); In re Kendavis Indus. Int'l, Inc., 91 B.R. 742, 754 (Bankr.N.D.Tex.1988).

Page 1322

I think we could more accurately refer to "present" or "existing" conflicts of interest as opposed to those conflicts that may or are likely to arise as events unfold. Whatever terms we use, I believe that "materiality" adequately distinguishes those cases in which disqualification is appropriate from those in which it is not.

On the issue of materiality, we know from this record that the bankruptcy court established deadlines applicable to filing both proofs of claim and nondischargeability complaints in the Herman and Berkow proceedings. Maggio was forced to file proofs of claim against the Herman and Berkow estates to preserve any claim BH & P might have against those estates for potentially voidable transfers of assets to various real estate tax shelters. Aside from their filing, decisions on the validity and amount of BH & P's claims was deferred. [5]

As pointed out by the trustee and his counsel, the future disposition of these claims was likely to be no more than "academic" because the Herman and Berkow estates had no funds to pay unsecured creditors. An examination of the schedules filed in the individual debtors' estates shows that Herman has scheduled liabilities, including contingent liabilities on his guaranties of BH & P's



obligations, that total more than $40,000,000.00, but has only about $3,000.00 in unencumbered assets. His schedules also list monthly income of about $8,300.00 and expenses of about $8,500.00. The schedules filed by Berkow are similar. Although I realize that additional assets may be uncovered, the remaining factual background of these estates, as recited by the Court, convinces me that at this point in the proceedings the possibility of uncovering or recovering into the Berkow and Herman estates sufficient assets to permit any significant recovery on the BH & P estate's claims against those two estates is so unlikely and remote as to be "[im]material" within the meaning of section 101(14)(E).

The joint administration of all three estates had continued in an orderly manner for almost one year after the trustee filed the protective proofs of claim and nondischargeability complaints against the Herman and Berkow estates. Then, the trustee and his counsel, just before the removal proceedings began, filed an adversary proceeding on behalf of BH & P. By it, they sought to avoid, to the extent of $1,300,000.00, the secured status of the Bank of New York's lien on BH & P's assets for a debt said to be in excess of $10,000,000.00. [6] Even if only the remaining $8,700,000.00 of the $10,000,000.00 debt the Bank of New York claims is secured by its lien on BH & P's assets, the liquidation of the Bank's lien is likely to exhaust all the known assets of the three estates. [7] Accordingly, any conflict between the three estates that might be occasioned by the claims Maggio and his counsel filed for BH & P against the Herman and Berkow estates has not yet arisen and it is unlikely that it ever will. At best, the filing of the claims creates a future, not a present, conflict of interest, and the facts, as known at this time, are simply not sufficient to warrant a conclusion that this future conflict is material enough to warrant disqualification of either the trustee or his counsel or a denial of

Page 1323

fees for work performed on the Herman and Berkow estates before disqualification. Considering the likelihood, or rather the lack of likelihood, that any BH & P recovery from the Herman and Berkow estates could significantly affect the rights of other creditors of the three estates, I think that the bankruptcy court's finding of an existing material conflict requiring removal is clearly erroneous.

Finally, I note that this Court's opinion on the merits of this appeal sets forth a new standard for evaluating the effect of conflicts of interest on the joint administration of related bankruptcy estates. It gleans that standard from the decision of the United States Court of Appeals for the First Circuit in In re Martin, 817 F.2d 175 (1st Cir.1987). Under that newly announced standard, I would remand this case to the bankruptcy court for careful consideration of the following principle:

The naked existence of a potential for conflict of interest does not render the [arrangement] nugatory, but makes it voidable as the facts may warrant. It is for the [bankruptcy] court to decide whether the [arrangement] carries with it a sufficient threat of material adversity to warrant prophylactic action....

....

[H]orrible imaginings alone cannot be allowed to carry the day.

In re Martin, 817 F.2d at 182-83, quoted in Majority Opinion, at 1312-13.

In considering this standard, I think the bankruptcy court might well conclude that the requisite "threat of material adversity" is absent from this record. Indeed, the bankruptcy court specifically found that there was no evidence that the interim trustee or his counsel failed to vigorously pursue the interests of all three estates. If sufficient assets



are recovered, other steps such as the appointment of special counsel could resolve any conflict at that time. See In re O.P.M. Leasing Servs., Inc., 16 B.R. 932, 939-40 (Bankr.S.D.N.Y.1982). "To act earlier in a preemptive manner could result in confusion and interruption of the orderly administration of ... bankruptcy proceedings and cause ... unnecessary great expense." Id. at 939. The bankruptcy court's finding of an actual conflict also ignores the legislative history of the Bankruptcy Code which shows that joint administration of estates is preferred whenever it is cost efficient. See 13A Collier on Bankruptcy p 10-115.04 (14th ed. 1977). Joint administration serves to ameliorate proliferation of trustees and attorneys whose separate fees can inflate administrative expenses to the detriment of other creditors.

For these reasons, I respectfully dissent from the Court's ruling on the merits. Instead, I would vacate the order of the district court and remand the case to it with instructions to remand in turn to the bankruptcy court for the purpose of examining the removal question under the legal standard set forth by the Court.

---------------

* Honorable Thomas N. O'Neill, Jr. of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1 Maggio later became the permanent Chapter 7 trustee as BH & P creditors did not elect to replace him with another trustee.

2 At the time of Herman's Chapter 7 filing, his Schedules and Statement of Financial Affairs revealed liabilities totalling more than $40,000,000 and only $3,000 in unencumbered assets.

3 In the application for retention of counsel, Maggio notified the Bankruptcy Court that RGZ served as attorneys to the Official Creditors' Committee during the Chapter 11 proceeding BH & P, Inc. ..., and currently represents me as Trustee of BH & P, Inc. in Chapter 7. The Debtor herein was a principal of BH & P, Inc. As a result of [RGZ]'s involvement in these related matters, it is conversant with many of the issues which will require the attention of the Trustee and his counsel during the within Chapter 7 proceeding.

4 The Schedules and Statement of Financial Affairs filed by Berkow were similar to Herman's in that they disclosed that liabilities far outstripped unencumbered assets.

5 In the application for retention of counsel, Maggio included a statement virtually identical to that set forth at n. 3 which informed the bankruptcy court that he and RGZ were involved in administering the bankruptcy estates of BH & P and Herman.

6 The affidavit of Gary N. Marks, a member of the firm of RGZ, filed with the bankruptcy court in connection with the investigation of alleged conflicts of interest, provides, in part, as follows:

[P]rior to our retention as counsel to the Trustee in the Herman matter, I had a telephone conversation with the Honorable Hugh M. Leonard, United States Trustee, with respect to potential conflicts of interest which might arise during the administration of the Herman and BH & P estates. Mr. Leonard advised me that this situation had arisen numerous times in the past and that it was the policy of his office to move forward with a single trustee and counsel until such time as an actual conflict presented itself. If and when such a situation developed, a decision would be made with respect to appointing a substitute trustee with new counsel.... In reliance on this policy, the Trustee and his professionals moved forward with the administration of these estates.

7 An application for interim fees was also filed by Bederson & Company, accountants retained

to represent Maggio in each of the three on-going bankruptcy proceedings. While the Bank of New York also objected to the payment of fees to Bederson, no issue relating to the accounting firm is raised in this appeal. We will, therefore, confine the conflict of interest discussion to Maggio and RGZ.

8 While the parties refer to Section 101(13) as embodying the "disinterested person" requirement, that standard is now codified at 11 U.S.C. § 101(14).

9 We applied similar reasoning in two other cases involving the effect of a remand on the finality of the district court's order in bankruptcy proceedings. See In re Meyertech Corp., 831 F.2d 410, 414 (3d Cir.1987) (district court's remand for clarification of a setoff issue did not affect finality of issues raised on appeal where disposition of those issues would "preclude the necessity of further activity by the factfinding tribunal, will obliterate the need for more litigation and serves the ever-prevailing interest of judicial economy"); Universal Minerals, Inc., 669 F.2d at 101 (requisite finality exists in bankruptcy where "the judgment of the district court conclusively determined the question presented [on] appeal"); see also In re Colon, 941 F.2d 242, 244 (3d Cir.1991) (holding bankruptcy court's order "was a final disposition of plaintiffs' adversary proceedings because [apart from an issue regarding attorney's fees] the bankruptcy court resolved all outstanding issues").

10 11 U.S.C. § 101(14) provides in full as follows:

(14) "disinterested person" means person that--

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such investment banker in connection with the offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason[.]

11 In re Enercons Virginia, Inc., 812 F.2d 1469, 1472 (4th Cir.1987), upon which the bankruptcy court relied, does not dictate a different conclusion. In Enercons, the Court of Appeals for the Fourth Circuit considered whether the trustee of a foreign bankrupt creditor could pursue that creditor's claim against the debtor. The court held that the trustee was authorized by 11 U.S.C. § 101(9) to file a proof of claim as a "creditor." This conclusion does not, however, compel a finding that a trustee, asserting a claim in a representative capacity, becomes a "creditor" for purposes of section 101(14)(A).

12 This reading of section 101(14)(E) is supported by section 327(a). Section 327(a) authorizes the trustee to employ professionals "that do not hold or represent an interest adverse to the estate and that are disinterested persons...." Where section 327 explicitly applies to persons who hold or represent adverse interests, disqualifying both, section 101(14)(E) refers only to those who have disqualifying interests. We do not think that this difference in terminology was accidental.

13 The Freeport Italian Bakery rule is consistent with Bankruptcy Rule 2009(d) which requires appointment of multiple

trustees in jointly administered cases upon a showing that a conflict of interest will prejudice creditors or equity security holders. As the United States Trustee notes, "the predicate for application of Rule 2009(d) is not that a common trustee is 'disinterested' but that prejudice will occur as a result of the trustee's dual representation."

14 Collier explains that

[f]ormer Rule 10-202(c)(2) provided that representation of a creditor or stockholder in a matter which might not become involved in the chapter X case "need not in itself" be deemed to affect the "disinterestedness" of an attorney. The Advisory Committee's Note to former Rule 10-206 stated that the exception contained in Rule 10-202(c)(2) "is not meant to encourage the appointment of attorneys who represent a creditor or stockholder. If other competent attorneys are available, the trustee's attorney should be selected from that group. This exception should be utilized only in the case where there is real need."

2 Collier on Bankruptcy, p 327.03, at 327-65 (15th ed.) (citation omitted).

15 In In re Kendavis, the bankruptcy court rejected any distinction between potential and actual conflict. "The concept of potential conflicts is a contraction in terms. Once there is a conflict, it is actual--not potential." 91 B.R. at 754. For a similar bright-line approach to conflicts of interest, see In re Paolino, 80 B.R. 341, 345 (E.D.Pa.1987).

1 Outside the field of bankruptcy, the disruptive effect of appeals from decisions determining whether counsel is to be disqualified for conflict of interest provides the rationale for the firm rule in federal jurisprudence that orders relating to counsel's disqualification are interlocutory and so unappealable. See Flanagan, 465 U.S. at 260, 104 S.Ct. at 1052.

2 In this connection I note several developments in the bankruptcy court that the parties did not refer to on this appeal. Maggio was replaced in both the Herman and Berkow proceedings before the bankruptcy court's August 23, 1989 order disqualifying him. Maggio was replaced in the Herman proceeding on August 7, 1989 and at some point before July 31, 1989 in the Berkow proceeding. Maggio's counsel was replaced in the Berkow proceeding on July 31, 1989 and, after the disqualification order, in the Herman proceeding. The Bank of New York, after it succeeded in securing an order from the bankruptcy court removing the interim trustee and his counsel and denying them compensation for work on the Herman and Berkow estates, decided not to participate in this appeal despite this Court's request that it consider filing a brief. Its non-participation required the Court to secure the services of an amicus in order to obtain adversary briefing of the important issues this case presents. Ultimately, the adversary proceeding Maggio filed against the Bank of New York was dismissed by a consent order on December 11, 1989.

3 Although neither this Court nor the district court examined the finality of the bankruptcy court's order removing the trustee and his counsel and denying them compensation under 11 U.S.C.A. § 158(a), this area of our jurisprudence may also warrant re-examination as to whether such orders are properly classified as final or interlocutory. If interlocutory, the district court's subject matter jurisdiction over the appeals of the trustee and his counsel would be discretionary. Particular orders removing or retaining experts that do seriously affect the rights of parties interested in the administration of a bankrupt's or a debtor's estate and are so beyond the bounds of propriety as to constitute an abuse of discretion may be subject to adequate control under the discretionary power section 158(a) gives a district court to hear and decide appeals from interlocutory orders of bankruptcy courts. An appeal of such orders by grace of the district court could arguably be more efficient than the

present practice of granting any aggrieved party who wishes to attack the bankruptcy court's discretion in selecting or retaining experts an immediate appeal as of right.

4 Thus, the effect of the improper presumption cannot be isolated from the discretionary result the bankruptcy court reached in this case. At the very least, it may have improperly shifted the burden of proof from the party seeking disqualification to the trustee and his counsel.

5 After instructing the trustee and his counsel to employ a "wait and see" approach regarding any potential conflicts, see Affidavit of Gary N. Marks, Esq., reprinted in Appendix (App.) at 287, the United States trustee now argues as amicus that the trustee and his counsel should be disqualified on the basis of an actual conflict of interest.

6 About two months after the trustee filed this adversary complaint, the Bank of New York objected to the interim trustee's and his counsel's petition for interim compensation, asserting the conflict of interest that ultimately led the bankruptcy court to remove the trustee and his counsel and finally deny them the interim compensation they sought for their work on the Herman and Berkow estates. Even the bankruptcy court, which ruled against the trustee and his counsel, "recognize[d] that the timing of th[e] objection has a peculiar smell to it." Id. at 275.

7 This would almost certainly be the case in the event the three estates were consolidated. The record indicates consolidation is a possibility. The Bank of New York also has a contingent unsecured claim against the Herman and Berkow estates since the individual debtors personally guaranteed BH & P's $10,000,000.00 indebtedness to it.

**530 F.3d 832**
**In the Matter of AFI HOLDING, INC., Debtor,**
**Carolyn A. Dye, Former Chapter 7 Trustee, Appellant,**
**v.**
**J. Gregory Brown; Cecilia A. Brown; Louis Carfora; Martin Cohen; Dennis Eisenberg; Dorothy Fielding; Marjorie Warren Goldstein; Joel Gotler; Beth Broday; Patricia Lynn Leroy; Jeanne Leytus; William Mack; Joan M. Mack; Gary Musser; Janet Richmond; Adelaida San Diego; Thaddeus Stanecki; Ranette Stanecki; AFI Holding, Inc., Appellees.**
**No. 06-56621.**
**United States Court of Appeals, Ninth Circuit.**
**Argued and Submitted May 8, 2008.**
**Filed June 17, 2008.**

[530 F.3d 836]

Joseph A. Dumas, Jr., Dumas & Associates, Los Angeles, CA, for the appellant.

Paul J. Laurin, Werner & Laurin, Encino, CA, LLP, for the appellees.

Appeal from the Ninth Circuit Bankruptcy Appellate Panel Pappas, Klein, and Marlar, Bankruptcy Judges, Presiding. BAP No. CC-05-01247-MaPaK.

Before: KIM McLANE WARDLAW and SANDRA S. IKUTA, Circuit Judges, and RALPH R. BEISTLINE,* District Judge.

**ORDER**

WARDLAW, Circuit Judge:

Carolyn A. Dye appeals from a decision of the United States Bankruptcy Appellate Panel ("BAP") for the Ninth Circuit affirming the order of the bankruptcy judge removing her as Trustee for cause pursuant to 11 U.S.C. § 324 in this Chapter 7 proceeding.

I. Jurisdiction

We must first address the question whether we have jurisdiction over an order removing a trustee from an ongoing bankruptcy proceeding, a question of first impression in our circuit. The BAP concluded, and the parties agree, that the removal of a Bankruptcy Trustee is a final, appealable order. Our consideration of our jurisdiction does not rest there, however, as we must consider the question of our own jurisdiction. 28 U.S.C. § 158(d) vests jurisdiction in the Courts of Appeals over appeals only from all "final decisions, judgments, orders, and decrees entered" either by the district courts or the BAP.

We have "adopted a pragmatic approach to finality in bankruptcy cases." *In re Lazar*, 237 F.3d 967, 985 (9th Cir. 2001) (internal quotation marks and citation omitted). "[A] bankruptcy court order is final and thus appealable where it 1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed." *Id.* (quoting *In re Lewis*, 113 F.3d 1040, 1043 (9th Cir.1997) (internal quotation marks omitted).

The Eleventh Circuit has recently considered, also for the first time, whether the removal of a trustee is a final order over which the courts of appeals have jurisdiction. The Eleventh Circuit explained that "[i]n the bankruptcy context, this Court has concluded that it is generally the particular adversary proceeding or controversy that must have been finally resolved rather than the entire bankruptcy litigation," and concluded that the "removal of a bankruptcy trustee is a 'final' order appealable to this Court." *In re Walker*, 515 F.3d 1204, 1210-11 (11th Cir.2008) (internal quotation marks and citation omitted).

In so concluding, the Eleventh Circuit relied heavily upon the Third Circuit's reasoning in *In re Marvel Entm't Group, Inc.*,

140 F.3d 463, 470-71 (3d Cir.1998). There, the Third Circuit considered the finality of an order appointing a trustee. The Third Circuit reasoned that "[w]ere we to put off hearing an appeal of the district court's order appointing a trustee until after the entire bankruptcy proceeding, allowing the possibility of an order returning this bankruptcy to its very beginning for a second round, the concept of judicial efficiency would be effectively turned on its head." It also noted that "[l]iberal finality considerations

[530 F.3d 837]

in orders appointing bankruptcy trustees are necessary because these orders cannot be meaningfully postponed to the bankruptcy's conclusion." *Id.* at 470. The Third Circuit therefore held that the order appointing a bankruptcy trustee is a final order vesting it with jurisdiction.

Similar finality considerations apply to an order removing the trustee. Although the bankruptcy proceedings may continue, and here, in fact they have, the removal order resolves and seriously affects the substantive rights of the parties to a disinterested trustee and finally determines the discrete issue to which it is addressed-whether the bankruptcy court's finding of a lack of disinterestedness was cause for the trustee's removal under § 324.

Thus we, like our sister circuits, conclude that an order removing a bankruptcy trustee is a "final order" over which we have jurisdiction pursuant to § 158(d). *See In re BH & P, Inc.,* 949 F.2d 1300, 1307 (3d Cir.1991) (concluding that the district court's order removing the trustee due to a conflict of interest is "final"); *Turshen v. Chapman,* 823 F.2d 836, 839-40 (4th Cir.1987) (holding that removal order is "final" because "[f]inality in the sense of 28 U.S.C. § 1291 is not required either for purposes of appeal or for the application of collateral estoppel to unappealed bankruptcy court rulings"); *Matter of Schultz Mfg. Fabricating Co.,* 956 F.2d 686, 691-92 (7th Cir.1992) (treating the denial of a motion to remove a trustee as a final order).

While we have found some decisions to the effect that *appointment* of a Trustee is not a "final order," *In re Delta Servs. Indus.,* 782 F.2d 1267, 1272 (5th Cir.1986); *Matter of Cash Currency Exch., Inc.,* 762 F.2d 542, 546 (7th Cir.1985); *but see Matter of Cajun Elec. Power Co-op., Inc.,* 69 F.3d 746, 748 (5th Cir.1995), we have found no decision that holds that an order *removing* a trustee for cause under § 324 is not final.

Here it appears that a remaining issue to be determined in the proceedings is the trustee's entitlement to fees.[1] That decision is necessarily affected by the outcome of this appeal. This only further demonstrates the efficiency and necessity for a final determination as to the propriety of the removal. A similar situation existed in *In re BH & P, Inc.,* where the district court had issued an order removing for cause the trustee while remanding the issue of interim compensation to the bankruptcy court. "In approaching this finality question," the Third Circuit recognized that "[t]he unique characteristics of bankruptcy cases have led us to consistently consider finality in a more pragmatic and less technical way in bankruptcy cases than in other situations" and concluded that the district court's order removing the trustee due to a conflict of interest was final, despite the necessity to consider fees on the earlier remand. 949 F.2d at 1306 (internal quotation marks and alteration omitted).

II. Merits

We have not previously addressed the standard for removal of a trustee due to a conflict of interest under § 324. The BAP thoroughly and carefully considered what constitutes cause for removal under § 324

[530 F.3d 838]

in its well-reasoned opinion published at 355 B.R. 139 (9th Cir. BAP 2006). The BAP held that (1) "cause" may include a lack of disinterestedness; (2) the catch-all provision of 11 U.S.C. § 101(14)(E) defining a "disinterested person" is "broad enough to exclude a trustee with some interest or relationship that `would even faintly color the independence and impartial attitude required by the Code,'" *Id.* at 149 (quoting *In re Crivello,* 134 F.3d 831, 835 (7th Cir.1998)); (3) the First Circuit's "full panoply of events and elements" test or "totality of the circumstances" to determine whether a particular conflict is "materially adverse" to the estate sufficient to find a lack of disinterestedness is the appropriate standard, *id.* at 151; *see In re Martin,* 817 F.2d 175, 182 (1st Cir.1987); and (4) the bankruptcy court did not abuse its discretion in concluding removal was proper due to the Trustee's past affiliations with insiders that created a potential for a materially adverse effect on the estate and an appearance of impropriety resulting in ongoing disharmony in the estate's administration. The BAP also concluded that the bankruptcy court properly considered the trustee's failure to disclose these prior affiliations to the U.S. Trustee. We are persuaded by the BAP's analysis, adopt it as our own, and attached it as Appendix A. *In re Peters,* 101 F.3d 618, 619 (9th Cir.1996).

As the BAP noted in its opinion, our circuit has not previously ruled on the standard to determine cause for removal, and three divergent approaches to the standard for removal existed nationwide. That there was no clear standard articulated in our jurisprudence either at the time the Trustee filed her statement of disinter estedness or when she was removed for cause is a factor that should bear on the question whether she is entitled to fees for the time she served as Trustee, and as to the amount of any such fees awarded. Our holding does not address the issue of fees; we merely hold that on the question of first impression before us the Trustee's removal for an appearance of conflict of interest was proper and remand to the bankruptcy court for a determination of the related issues as to fees.

**Affirmed, remanded** for further proceedings.

**APPENDIX A***

United States Bankruptcy Appellate Panel of the Ninth Circuit.

In re AFI HOLDING, INC., Debtor.

Carolyn A. Dye, Chapter 7 Trustee, Appellant,

v.

J. Gregory Brown; Cecilia A. Brown, et al, Appellees.

BAP No. CC-05-1247-MaPaK.

Bankruptcy No. LA 01-41567-VZ.

Argued and Submitted March 23, 2006.

Filed Oct. 25, 2006.

James A. Dumas, Jr., Dumas & Associates, Deborah H. Eisen, Weinstein, Eisen & Weiss LLP., Los Angeles, CA, for Appellant.

Richard L. Weiner, Weiner & Laurin, LLP, Encino, CA, for Appellees.

[530 F.3d 839]

Michael Jay Berger, Law Offices of Michael J. Berger, Beverly Hills, CA, for AFI Holding, Inc.

Before: MARLAR, PAPPAS and KLEIN, Bankruptcy Judges.

***OPINION***

MARLAR, Bankruptcy Judge.

***INTRODUCTION***

The chapter 7[1] trustee has appealed the bankruptcy court's order of removal, which found that she was not disinterested due to a material conflict of interest She contends that the bankruptcy court applied an incorrect legal standard under § 324, and challenges the court's findings.

We hold that the bankruptcy court properly applied a totality-of-circumstances test in making its determination that the trustee's prior connections with insiders negatively impacted the administration of the estate. Since disinterestedness is a requirement for service as an appointed trustee, *see* §§ 321(a)(1) and 701(a)(1), the court's determination that lack of such disinterestedness was a "cause" for her removal was a proper exercise of its broad discretion under § 324. In addition, the evidence of an "appearance of impropriety," as well as the trustee's failure to disclose all of her connections, were factors contributing to a lack of creditor confidence and, thus, supported the bankruptcy court's conclusion that cause for removal existed under § 324. Therefore, we AFFIRM.

### *FACTS*

This case was commenced on October 21, 2001, by the simultaneous filing of six chapter 11 bankruptcy petitions. Advance Finance, Inc. and AFI Holding, Inc. were the general partners (together "AFI") of four limited partnerships (together "AFI Entities"). The bankruptcy cases were consolidated, with AFI Holding as the consolidated debtor.

Richard Cohen ("Cohen") was AFI's president from 1994 to 1996. In July of 1996, Gary A. Eisenberg ("Eisenberg") was chairman of AFI and formed" AFI Holding. The AFI Entities had been involved in a "Ponzi" scheme, specifically a "factoring" business whereby they would make loans to clients (borrowers) using the clients' accounts receivable as collateral. Then, instead of paying the investors with the profits, they paid the old investors purported interest payments using the new investors' money. Cohen left AFI in 1996, was criminally prosecuted, and went to prison. After filing the chapter 11 petitions, Eisenberg relinquished control of the AFI Entities and was convicted of securities violations.

The bankruptcy court ordered that a chapter 11 trustee be appointed for each case, and the U.S. Trustee selected Carolyn A. Dye ("Dye"). Since 1998, Dye had been "Of Counsel" to Weinstein, Eisen & Weiss, P.C. Some of Dye's prepetition services are pertinent to this appeal, including her representation of and acquaintance with James Meister ("Meister") and Alan Eriksen ("Eriksen").

[530 F.3d 840]

### *Dye's Representation of Meister*

In 1995, while Meister was employed as the controller of AFI, he hired Dye to represent him in a personal bankruptcy case. After that, Meister and Dye occasionally saw each other at social events but were not "close friends." Dep. of Dye 89, Feb. 11, 2005.

When Eisenberg formed AFI Holding, Meister was named its chief financial officer, secretary, and director, but he was never an investor, creditor or equity share-holder in any AFI Entity. During Meister's employment with AFI, his domestic partner, Eriksen, invested money in an AFI entity.

Between 1996 and 1997, Meister became aware of fraudulent activities by Cohen and the complicity of Eisenberg. Specifically, he realized that his financial statements were inaccurate because they were based on forged documents, that money was being embezzled by Cohen, that Cohen was directing him to prepare false reports under threat of loss of his job, and that Eisenberg was requiring him to participate in new investment activities-"new money to pay repay the old money." Dep. of Meister 56, Feb. 24, 2005.

Eisenberg, on the other hand, believed that Meister was intentionally engaged in corporate misconduct. See Dep. of Eisenberg 24, Feb. 15, 2005. In a 1998 state court action against it, AFI filed a cross-complaint against

Meister, which was subsequently dismissed. See Decl. of Loeb ¶ 3-4, Apr. 14, 2005.

Meister testified that his next communication with Dye, following his bankruptcy case, was in 1997 when he sought her advice concerning his decision to resign from AFI However, he rescinded that testimony in a declaration dated April 13, 2005, in which he averred that his discussion with Dye had actually taken place in 1999, and concerned a termination notice which he had received from his subsequent employer, Tri-Capital Finance Corp. ("Tri-Capital").[2] Meister resigned from AFI in June, 1997, but remained in a consulting role for another month.

In mid-1998, Meister referred Eriksen to Dye to represent him in seeking a withdrawal of his investment monies from AFI. Both Meister and Dye testified that they did not speak to each other about either Ericksen's legal matters or AFI.

Then, in September, 1999, Meister sought Dye's legal advice regarding the Tri-Capital termination notice. Dye testified that she "looked [the notice] over only briefly, found it unremarkable, and had no other involvement with Meister." Decl. of Dye 27, ¶ 9, Apr. 13, 2005.

***Dye's Representation of Eriksen***

As a result of his investment, Eriksen was a limited partner in an AFI entity. Eriksen was privy to the misconduct at AFI because Meister had told him about it. *See* Dep. of Meister 63, Feb. 24, 2005. (Eriksen's deposition testimony was stricken by the bankruptcy court as untimely, and that ruling has not been challenged in this appeal.)

In June, 1998, Eriksen hired Dye to assist him in his efforts to withdraw his investment monies—Eisenberg allegedly had told Eriksen that AFI needed to obtain new investor money in order to pay

[530 F.3d 841]

him. *See* Dep. of Meister 57-60. Eisenberg also testified that he told Dye that Meister's alleged misconduct was a reason not to pay Eriksen. Dep. of Eisenberg 40-41.

However, when Dye was questioned as to whether Eisenberg had ever implicated Meister to her in regards to operational misconduct, she stated that "he never mentioned Mr. Meister as being involved." Dep. of Dye 94. And, when Dye was asked whether Eriksen had said anything to her "indicating that he thought there was financial misconduct" at AFI, Dye gave a cautious response:

Mr. Eriksen was a limited partner. He had no knowledge of what was going on in the office, particularly as it related to Mr. Eisenberg's dealings with limited partners.

*Id.*

Dye then negotiated a deal with Eisenberg to convert Eriksen's equity to debt,[3] and Eriksen was given a promissory note, dated August 31, 1998, for $52,327.29 payable from AFI. This amount was compromised and satisfied in May 1999, at which time a "Release Agreement" was purportedly signed. (Dye provided a copy of an unsigned, undated "release agreement" but the signed document was never produced.) However, a letter from Dye to Eisenberg, dated May 18,1999, was admitted into evidence, in which she stated:

Mr. Eriksen will accept your settlement figure. However, he has asked that you issue two checks, one to his IRA Trustee for $12,697.66 and the second to my law firm for $1,250.

Dye has not disputed the fact that those monies were paid, as indicated. *See also* Dye's Dep. Tr. Corr. [to p. 121], Feb. 28, 2005 (stating that the lump-sum payoff was performed).



***Dye's Declaration of Disinterestedness in Chapter 11***

In connection with her unopposed appointment as trustee in the consolidated chapter 11 case, Dye filed her "Declaration of Disinterestedness." She stated:

> 4. There is one other matter which I must disclose, not because I believe it presents a conflict, but for informational purposes.
>
> 5. In mid-June, 1998, I was engaged to represent an individual who had made an investment in an entity called Advance Finance Partnership. In that capacity I negotiated a settlement for my client for the withdrawal of his capital contribution. (The settlement reached resulted in a compromised payment and mutual releases.) That matter has been concluded since mid-1999 and I do not have any continuing client relationship with the individual I represented.
>
> 6. I was in an adverse relationship with the Debtor entities and did not learn anything as a result of my own client relationship which would place me in a present conflict, I do not believe this would present any issue in my appointment in this case.

Decl. of Disinterestedness of Dye 2-3, Nov. 14, 2001.

Dye's declaration did not mention her representation of Meister, identify Eriksen, or explain the connection between Meister and Eriksen.

[530 F.3d 842]

***The Chapter 7 Case and Dye's Supplemental Declaration***

The consolidated chapter 11 case was converted to chapter 7 on July 29, 2002, and Dye was appointed its trustee without objection.

In July, 2003, Dye initiated litigation to recover about $10 million from more than 150 potential defendants, including investors and parties-in-interest who had received payments under the Ponzi scheme, in an effort to liquidate Debtor's equity. Dye did not sue Eriksen, based on her decision that his claim against the estate had been settled and released and that he was judgment-proof. Nor did she sue Meister for any alleged wrongdoing, indicating that any claims of AFI against him were time-barred and had expired prepetition.

Discovery proceeded in the adversary actions, including the taking of depositions of Eisenberg, Meister, Eriksen, and Dye. Being aware of Meister's testimony, Dye filed a "Supplement to Declaration of Disinterestedness," on March 14, 2005, in which she belatedly disclosed her relationship with Meister and his relationship to both Eriksen and AFI. She stated that her failure to disclose these facts sooner was due to inadvertence.

At the same time, AFI investors, including the appellees herein ("Appellees"), filed a motion to remove Dye as trustee, pursuant to § 324. They alleged, among other things, that she was not disinterested, had failed to disclose material facts revealing a conflict of interest, and had injured the estate by failing to bring adversary proceedings against either Meister or Eriksen.[4]

Dye and the U.S. Trustee opposed the motion. Dye maintained that Appellees failed to show that she was not disinterested because: (1) "disinterestedness" is defined as having an adverse interest, not as "representing" an adverse interest, and (2) her representation of Meister and Eriksen was not materially adverse to the estate or a class of creditors.

The U.S. Trustee maintained that there was insufficient evidence to support removal in light of a trustee's discretion to make

business judgments. He further stated that Dye's inadvertent failure to disclose her representation of Meister was not cause for removal.

Appellees replied with accusations that Dye's nondisclosure was intentional, and that she gave false and misleading testimony regarding the extent of her relationship with Meister and Eriksen, as well as failing to produce Ericksen's release agreement. Moreover, Appellees argued that Dye's letter instruction to Eisenberg to pay her $1,250 in attorney's fees made her a direct transferee of payments from AFI, in 1999.

***The Bankruptcy Court's Ruling***

On May 3, 2005, the bankruptcy court heard argument on the motion for removal of Dye. Considering the standard for removal under § 324, the court held that tack of disinterestedness, standing alone, sufficed as "cause" for removal.

It then looked at all of the events and circumstances to determine that Dye was not disinterested. It found that Meister was an insider of the AFI Entities at the time Dye represented him; that Dye then represented Ericksen, who was referred to her by Meister and who was an investor in

[530 F.3d 843]

the AFI Entities. It found that Dye had reached a settlement for Ericksen with AFI which included payment of her attorney's fees, and such payment "could possibly be materially adverse to the interest of the bankruptcy estate." It found and concluded that

Carolyn Dye indeed had an interest that was materially adverse to the interest of the estate. Why? Because when you know when you have represented someone who had claims against that entity and you represented, albeit in an unrelated context, an individual who was an insider of that entity and that insider referred an investor to you to represent [its] claims against that entity, you are representing an interest-you represent an interest which was adverse to this estate.

Tr. of Proceeding 72:10-18, May 5, 2005.

The court described this adverse interest in terms of a potential[5] conflict of interest, when it ruled:

Whether or not, ultimately we'll never know, the estate would have had any claims against Meister and against Eriksen or-in the form of a claim to undue [sic] or attack the agreement and the release as in and of itself an avoidable transfer or to pursue claims against Meister for his role in the conduct of business by the AFI entities, the fiduciary of the bankruptcy estate who has to make business decisions about whether of not to pursue those claims and-investigate those claims should be completely free of any possible influence with regard to making decisions against parties that she represented as counsel pre-petition, and that was not the case here. Both clients had a direct interest in the debtor and this indeed created a material conflict of interest for Dye.

On a subsidiary level there was also a direction made by her apparently at ... her client's insistence, that a transfer of money as part of the Ericksen settlement be made directly to her law offices which creates an interest in herself directly that is material-that could possibly be materially adverse to the interest of the bankruptcy estate.

*Id.* at 72:19-25 to 73:1-12.

In addition to lack of disinterestedness, the court also found that Dye had failed "to disclose a material conflict of interest in a timely manner," albeit inadvertently. *Id.* at 73:25 to 74:1. In Dye's favor, the bankruptcy court found that she had not interfered with discovery, nor acted, except for the nondisclosure, in any way "other than doing

her best with regards to being a fiduciary of the estate ..." *Id.* at 73:23-24.

The order granting removal was entered on May 20, 2005, and Dye timely appealed.[6]

[530 F.3d 844]

***ISSUE***

The sole issue is whether the bankruptcy court erred in removing Trustee Dye for "cause."

***STANDARD OF REVIEW***

Removal of a trustee under § 324 is left to the sound discretion of the bankruptcy court. *BH & P, Inc.*, 949 F.2d at 1313; *Miller v. Miller (In re Miller)*, 302 B.R. 705, 709 (10th Cir. BAP 2003). A bankruptcy court necessarily abuses its discretion if it bases its decision on an erroneous view of the law or on clearly erroneous factual findings. *Warrick v. Birdsell (In re Warrick)*, 278 B.R. 182, 184 (9th Cir. BAP 2002). It also abuses its discretion if it applies an incorrect legal rule. *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 287 (9th Cir. BAP 2005).

***DISCUSSION***
***A Trustee Lack of Disinterestedness as § 324 "Cause"***

A chapter 7 panel trustee is appointed by the U.S. Trustee. Section 321 provides that a person is eligible to serve as a bankruptcy trustee if such individual "is competent to perform the duties of trustee," 11 U.S.C. § 321(a)(*l*). In regards to chapter 7, § 701(a)(1) provides that the U.S. Trustee "shall appoint *one disinterested person* ... to serve as interim trustee in the case." 11 U.S.C. § 70(a)(1) (emphasis added). If creditors do not elect a chapter 7 trustee pursuant to § 702, then the interim trustee continues to serve as trustee in the case. See § 702(d). The plain language of the statute requires that the appointed interim trustee be "disinterested" in order to be eligible to serve. See *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290. 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Dye was the appointed chapter 7 trustee and thus was required to be disinterested.[7]

A trustee is the "legal representative" and "fiduciary" of the estate. *See U.S. Trustee v. Joseph (In re Joseph)*, 208 B.R. 55, 60 (9th Cir. BAP 1997); *United States ex rel Block v. Aldrich (In re Rigden)*, 795 F.2d 727, 730 (9th Cir.1986); *In re Mehr*, 153 B.R. 430, 439 (Bankr.D.N.J. 1993); 11 U.S.C. §§ 323 (providing that the trustee is the representative of the estate).

The title "trustee" has "fiduciary significance in the equity sense," and thus the trustee "may not be the representative of any particular creditor, but must represent all creditors without partiality." *Gross v. Russo (In re Russo)*, 18 B.R. 257, 270-71 (Bankr.E.D.N.Y.1982) (under Bankruptcy Act) (citing 2 Remington on Bankruptcy § 1117, at 580 (1956)). "Equity tolerates in bankruptcy trustees no interest adverse to the trust." *Mosser v. Darrow*, 341 U.S. 267, 271, 71 S.Ct. 680, 95 L.Ed. 927 (1951). The chapter 7 trustee's role facilitates one of the Bankruptcy Code's fundamental concepts of "equitable distribution." *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005), *cert. denied*, 546 U.S. 927, 126 S.Ct. 397, 163 L.Ed.2d 275 (2005). *See generally, Dept. of Justice, U.S. Trustee Program, Annual Report of Significant Accomplishments, Fiscal Year 2004, ch. 6: Trustee Oversight*, at 39 (bankruptcy trustees have "the legal duty to act in the best interest of creditors and the estate").

[530 F.3d 845]

It follows that a bankruptcy trustee must have no interest adverse to the estate, nor profit from her handling of the estate. She "is an independent person with no prior connection to either the debtor or the

In re AH Holding, Inc., 530 F.3d 832 (9th Cir., 2008)

creditors. [Her] primary job is to marshal and sell assets, so that those assets can be distributed to the estate's creditors and then close the estate." *Joseph,* 208 B.R. at 60 (quoting *In re Reed,* 178 B.R. 817, 821 (Bankr.D.Ariz.1995)); *see also* 11 U.S.C. § 704 (duties of trustee).

Once assigned to a particular case, a panel trustee can be removed from a pending case only if the bankruptcy court finds "cause" after notice and a hearing. *Brooks v. United States,* 127 F.3d 1192, 1193 (9th Cir.1997); 11 U.S.C. § 324(a). "[Although sufficient cause is not defined in the Bankruptcy Code, it is left for the courts to determine on a case by case basis." 3 *Collier on Bankruptcy* ¶ 324, 02, at 324-3 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2006).

It is well established that "cause" may include trustee incompetence, violation of the trustee's fiduciary duties, misconduct or failure to perform the trustee's duties, or lack of disinterestedness or holding an interest adverse to the estate. *Id.* at 324-3 to 324-4. Such cause must be supported by specific facts, *Schultz Mfg. Fabricating Co.,* 956 F.2d at 692, and the party seeking removal has the burden to prove them. *Alexander v. Jensen-Carter (In re Alexander),* 289 B.R. 711, 714 (8th Cir.BAP2003), *aff'd,* 80 Fed.Appx. 540 (8th Cir.2003). This listing is illustrative, "but not exhaustive.

In relevant part, the Code defines a "disinterested person" as one that:

> (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ..., *or for any other reason.*

11 U.S.C § 101(14)(E).[8] (Emphasis supplied.)

A generally accepted definition of "adverse interest" is the (1) possession or assertion of an economic interest that would tend to lessen the value of the bankruptcy estate; or (2) possession or assertion of an economic interest that would create either an actual or potential dispute in which the estate is a rival claimant; or (3) possession of a predisposition under circumstances that create a bias against the estate. *See Rome v. Braunstein,* 19 F.3d 54, 58 n. 1 (1st Cir.1994); *In re Roberts,* 46 B.R. 815, 826-27 (Bankr. D.Utah 1985) *aff'd in part, rev'd and remanded in part on other grounds,* 75 B.R. 402 (D.Utah 1987).[9]

Such an adverse interest is "material" if it exists "by reason of any direct or indirect

[530 F.3d 846]

relationship to, connection with, or interest in, the debtor ..., or for any other reason." 11 U.S.C. § 101(14)(E). *See also Black's Law Dictionary* 998 (8th ed.2004) (defining "material" as "[h]aving some logical connection with the consequential facts" or being "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential....").

This so-called "catch all" provision is broad enough to exclude a trustee with some interest or relationship that "would even faintly color the independence and impartial attitude required by the Code." *Kravit, Gass & Weber, S.C. v. Michel (In re Crivello),* 134 F.3d 831, 835 (7th Cir. 1998) (citation omitted); 3 *Collier, supra,* ¶ 327.04[2][a][E], at 327-41.

A frequent setting for disputes over trustee removal (as it also is for attorney disqualification) is an alleged conflict of interest, and the instant case is no exception. The bankruptcy court found that Dye had a potential conflict of interest or lack of disinterestedness due to her connections with insiders Meister and Eriksen.

Dye counters that her former representation of Meister and Eriksen, in unrelated matters, did not present an *actual* conflict of interest, let alone injury or fraud, which she maintains is the required standard for her removal under § 324. Dye maintains that the bankruptcy court applied a punitive "*per se*" rule improperly based on either an appearance of impropriety or a potential conflict of interest.

### *B. The Legal Standard for Removal of Trustees*

The standard for removal of a trustee due to a conflict of interest under *§ 324* has not been formalized in the Ninth Circuit. Nationally, there are three approaches in the case law to which we will look for guidance. As noted, some of these cases involve attorneys and other professionals, not trustees.

Some courts will not remove the trustee unless there is actual injury to the estate or fraud. See *In re Freeport Italian Bakery, Inc.*, 340 F.2d 50, 54 (2d Cir.1965) (actual conflict of interest and fraud). Such harm may simply be the loss of creditor confidence to the point that "discord threatens the estate." 3 *Collier, supra,* ¶ 324.02, at 324-5. Thus, these courts will consider the best interests of the bankruptcy estate. If it "would suffer more from the discord created by the present trustee than would be suffered from a change of administration, the removal of the trustee is necessarily the better solution." *Baker v. Seeber (In re Baker),* 38 B.R. 705, 708 (D.Md.1983) (quoting *Freeport Italian Bakery,* 340 F.2d at 55); *see also In re Microdisk Inc.,* 33 B.R. 817, 819 (D.Nev.1983).

Another approach is *per se* disqualification if an individual is determined to be not disinterested, typically under the plain terms of §§ 101(14)(A)-(D), without analyzing the effect of any such conflict on the estate. The majority of courts applying this standard do so on the theory that the court cannot use its equitable powers to

[530 F.3d 847]

disregard unambiguous statutory language. *See, e.g., Michel v. Fed'd Dep't Stores, Inc. (In re Fed'd Dep't Stores, Inc.),* 44 F.3d 1310, 1318-19 (6th Cir.1995), Cf. *Movitz v. Baker (In re Triple Star Welding, Inc.),* 324 B.R. 778, 790 (9th Cir. BAP 2005) (noting, in a case involving the attorney for the estate, that the court cannot approve employment of a person who is not disinterested); *First Interstate Bank of Nev., N.A. v. CIC Inv. Corp. (In re CIC Inv. Corp.),* 175 B.R. 52, 56 & n. 4 (9th Cir. BAP 1994) (holding, in a case involving professionals but not a trustee, that a court must follow the unambiguous language of §§ 327(a) and 101(14). but reserving judgment in regards to an attorney with a claim arising solely from services rendered in the bankruptcy case). The Fourth, Sixth and Eighth Circuits have adopted a per se rule in disqualifying attorneys who are not disinterested. *See Harold & Williams Dev. Co. v. U.S. Trustee (In re Harold & Williams Dev. Co.),* 977 F.2d 906, 909-10 (4th Cir.1992) (but holding that the congressionally established per se rules are "carefully delineated and narrowly tailored"); *Childress v. Middleton Arms, L.P. (In re Middleton Arms., L.P.),* 934 F.2d 723, 725 (6th Cir. 1991); and *Pierce v. Aetna Life Ins. Co. (In re Pierce),* 809 F.2d 1356, 1362-63 (8th Cir.1987).

The last approach, formulated by the First and Third Circuits, holds that there is no bright-line rule, but that each case "must be judged in the perspective of the particular case and the facts presented." 3 *Collier, supra,* ¶ 327.04[2][a][I], at 327-35. These courts apply a non-exhaustive list of factors to determine whether a conflict of interest, even if it arises under § 101(14), is sufficient for removal or disqualification because of a potential for a materially adverse effect upon the estate. See *In re Martin,* 817 F.2d 175, 182 (1st Cir.1987) and *BH & P Inc.,* 949 F.2d at 1313, as clarified in *In re Marvel Entm't Group, Inc.,* 140 F.3d 463, 476-77 (3d Cir. 1998). Both of these cases,



which are relied upon by Dye, deserve closer scrutiny.

Martin involved a debtor's attorney who duly disclosed that he had taken a mortgage in the chapter 11 debtor's real property, prepetition, in order to secure his fees. The case was then converted to chapter 7 and the attorney sought to enforce the mortgage. The bankruptcy court denied his motion because, according to the plain language of § 101(14)(A) and the disinterested requirement of § 327(a), the attorney was a "creditor," and therefore not disinterested. *Id.* at 177.

On appeal, the First Circuit rejected this par se approach as "a literalistic reading [which] defies common sense and must be discarded as grossly overbroad." *Martin,* 817 F.2d at 180. It adopted a "full panoply of events and elements" test to determine whether such conflict of. interest was materially adverse to the estate and creditors, and elucidated a non-exhaustive list of factors to consider. *Id.* at 182. The First Circuit then remanded the case for such an analysis.

Some of those factors, which are relevant to our case, include the likelihood that a potential conflict might turn into an actual one, the influence the conflict might have in subsequent decisionmaking, and how the matter is perceived by creditors and other parties in interest. *Id.*

In a 1991 case, the Third Circuit was similarly faced with making a per se decision, viz., the removal of a trustee because he represented multiple debtors and therefore was a "creditor," under § 101(14)(A) by virtue of having filed claims against the related estates. *See BH & P,* 949 F.2d at 1310. It opined that it would be unfair and unsound from a standpoint of administrative

[530 F.3d 848]

efficiency and economy to disqualify a trustee on that basis alone, and that such an interpretation of the Code was "overbroad." *Id.* at 1310.

First, the Third Circuit correctly reasoned that § 101(14)(A) was inapplicable because it was intended to disqualify only creditors with personal claims and those "holding" prepetition adverse interests, not trustees having claims against the estate solely in a representative capacity. *See Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis),* 347 B.R. 679, 688 (9th Cir.BAP2006) ("To represent an adverse interest means to serve as an attorney for an entity holding such an adverse interest.")

Second, it adopted *Martin* and held that the inquiry as to whether the "single trustee in jointly administered estates with interdebtor claims" had a materially adverse interest should be "evaluated prospectively on a case-by-case basis," by an examination of "the full panoply of events and elements." *BH & P,* 949 F.2d at 1312-13. The Third Circuit concluded that the disputed nature of the proofs of claim and the need for advocacy of the competing interests was a materially adverse potential or actual conflict of interest. *Id.* at 1313. It therefore affirmed the bankruptcy court's removal of the trustee and his attorneys. *Id.* at 1313-14.

Appellees concede, in their responsive brief, that the proper analysis for our case is the *Martin* "full panoply of events and elements" or totality-of-circumstances test. In addition, Dye encourages the panel to adopt *BH & P's* approach, and suggests the use of several additional factors which she has gleaned from the case law.[10]

We agree with this approach to the extent that the question of materiality is addressed in the disinterestedness determination. Whether an interest is "materially adverse" necessarily requires an objective and fact-driven inquiry. *See Rus, Miliband & Smith, APC v. Yoo (In re Dick Cepek, Inc.),* 339 B.R. 730, 739-40 & n. 10 (9th Cir. BAP 2006) (holding that where no

per se disqualification exists, "the inquiry into whether the professional holds interests adverse to the estate, is disinterested or otherwise is impaired by conflict of interest (actual or potential) is necessarily case- and fact-specific."); *In re Guy Apple Masonry Contr'r, Inc.,* 45 B.R. 160, 166 (Bankr.D.Ariz.1984) (analyzing all the evidence to decide whether an actual conflict of interest due to dual representation was materially adverse).[11] We also generally agree that a court should apply a

[530 F.3d 849]

totality-of-circumstances analysis in determining other "causes" for removal under § 324. We do not subscribe to a rigid application of factors, however, but view them as aids for the court's discretionary review.

### *C. Application to Our Facts*

Having adopted the totality-of-circumstances approach to determine lack of disinterestedness under § 101(14)(E) as cause under § 324, we now examine the facts and procedure in our case.

Indeed, the bankruptcy court made the precise analysis. It found that Dye had certain social connections with Meister, whom she had represented when he was an insider of Debtor, and a past professional connection with Eriksen (Meister's domestic partner), who was an investor and limited partner in the AFI Entities (Dye described him as a "partner" in her letter to Eisenberg during the settlement negotiations). Both individuals had a direct interest in, or adverse interest to, Debtor at the time she represented them.

However, Dye argues that insider status must be a "present" one and maintains that such individuals were no longer affiliated with AFI at the time of the bankruptcy petition. Dye urges that whether circumstances exist as would create a conflict of interest must be considered as of the time of appointment. *In re Lee Way Holding, Co.,* 102 B.R. 616 (S.D.Ohio 1988).

The facts and law support the bankruptcy court's ruling and make practical sense. The definition of "insider" is open-ended because the term is not precise. 3 *Collier, supra,* ¶ 327.04[2][a][iii][C], at 327-36 to 327-37. "[I]nsider status may be based on a professional or business relationship with the debtor, in addition to the Code's per se classifications, [12] where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman),* 126 B.R. 63, 70 (9th Cir. BAP 1991).

The bankruptcy court properly considered the larger picture of these interrelationships

[530 F.3d 850]

in order to determine their materiality. At the time Dye formed business and social relationships with Meister and Eriksen, they were insiders. Dye claimed that she did not know about Meister's problems with AFI, but there was colorable evidence that she knew that Eriksen's reasons for wanting to withdraw his investment were closely tied to the fallout from the Ponzi scheme. Dye was in an adversarial position with AFI in representing Eriksen and negotiated a settlement for him which she could have believed would withstand scrutiny by any future bankruptcy trustee. As fate had it, she was that trustee.

In addition, the court correctly found that these associations could conceivably have influenced Dye's decision not to assert a recovery action against Eriksen[13] or litigation against Meister. Then, Dye received payment from AFI as part of the settlement. These relationships created suspicion and discord between Dye and the estate's creditors which

was detrimental to the administration of the estate.[14]

A trustee/fiduciary must be free from any hint of bias. All of this evidence fits within the parameters of a materially adverse interest based on either an appearance of impropriety or a potential conflict of interest. Either is a viable cause for removal.

The Code's definition of disinterestedness "covers not only actual impropriety, but the appearance of impropriety as well." *In re Paolino,* 80 B.R. 341, 345 (Bankr.E.D.Pa.1987); *see also Martin,* 817 F.2d at 180-81 ("Section 327 is intended, however, to address the appearance of impropriety as much as its substance, to remove the temptation and opportunity to do less than duty demands."); *In re Vebeliunas,* 231 B.R. 181, 191-92 (Bankr. S.D.N.Y.1999) ("[t]o be disinterested is `to prevent even the appearance of a conflict'" and a disinterested person "`should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters.'") (citations omitted).[15]

[530 F.3d 851]

Even if an appearance of impropriety is not an adequate basis upon which to disqualify an employed professional, *see Tevis,* 347 B.R. at 688 (stating that what constitutes material adversity for a lawyer is defined by neither bankruptcy law nor other federal law, but by California state law), it can be "cause" for a trustee's removal under § 324. Such a condition tends to create disharmony and lack of confidence among the creditor body.

Furthermore, courts which eschew the appearance of impropriety standard will authorize the bankruptcy court to remove a trustee or attorney with a potential conflict. The Third Circuit, with respect to attorney representation, held:

(I) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion-pursuant to § 327(a) and consistent with § 327(c)disqualify an attorney who has a *potential* conflict of interest and (3) the district court may not disqualify an attorney on the *appearance* of conflict alone.

*Marvel Entm't Group,* 140 F.3d at 476 (emphasis supplied).

The Ninth Circuit has held that disqualification is appropriate where trustee's counsel previously represented an electric company and had a potential conflict of interest in pursuing a cause of action against such company on behalf of the estate. *Chugach Elec. Ass'n v. U.S. Dist. Ct.,* 370 F.2d 441, 442-43 (9th Cir.1966). The court concluded:

A likelihood here exists which cannot be disregarded that [counsel's] knowledge of private matters gained in confidence would provide him with greater insight and understanding....

Where conflict of interest or abuse of professional confidence is asserted, the right of an attorney freely to practice his profession must, in the public interest, give way in cases of doubt.

*Id.* at 443-44.

Here, the loss of Appellees' confidence in Trustee Dye was not simply tactical, but was based on perceptions of partiality due to her prior connections with Meister and Eriksen and her receipt of the AFI payment.

The bankruptcy court also considered the factor of Dye's nondisclosure regarding a material conflict of interest. At the time of her appointment as chapter 11 trustee, Dye's Declaration of Disinterestedness merely referred to her previous representation of an unnamed investor. Dye did not mention her



representation of Meister, identify Eriksen, nor either explain the connection between Meister and Eriksen or Mister's connection to AFI.[16] She did not make full disclosure until four years later, prompted by the litigation with

[530 F.3d 852]

Appellees, after she had been appointed the chapter 7 trustee.

It is axiomatic that a fiduciary has a duty to disclose any connections with the debtor, creditors, or any other party in interest. *See In re Haldeman Pipe & Supply Co.*, 417 F.2d 1302, 1304 (9th Cir. 1969); *Triple Star Welding*, 324 B.R. at 789. Failure to do so, even if inadvertent, can be a relevant factor for the bankruptcy court's consideration of "cause" for a panel trustee's removal Such nondisclosure could serve as a basis for the creditors to lose confidence in the trustee, which is precisely what the court found had occurred in this case. Therefore, the bankruptcy court did not abuse its discretion in finding that such nondisclosure supported the "cause" necessary to require removal under § 324.

Based on the foregoing analysis, we conclude that the bankruptcy court did not err in its determination that Dye was not disinterested because she had a materially adverse interest which created ongoing disharmony in the administration of the estate. Thus, these factors were sufficient to constitute cause for her removal under § 324.

***CONCLUSION***

Cause for removal of an appointed panel trustee under § 324(a) is not susceptible to sharp definition, but is determined on a case-by-case, totality-of-circumstances approach, subject to the bankruptcy court's broad discretion.

The bankruptcy court did not err in determining that Dye's lack of disinterestedness, as evidenced by having a "materially adverse interest to the interests of the estate or any class of creditors or equity security holders," was cause for her removal. Lack of disinterestedness, as § 324 cause, may also consist of an appearance of impropriety or the trustee's failure to make disclosures of connections, factors which were also properly considered by the bankruptcy court under its totality-of-circumstances approach.

We conclude that the bankruptcy court neither erred nor abused its discretion in determining that cause existed to remove Dye as trustee. Therefore, we **AFFIRM.**

---------------

Notes:

* The Honorable Ralph R. Beistline, United States District Judge for the District of Alaska, sitting by designation.

1. Among the factors considered in the allocation of fees is "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title." 11 U.S.C. § 330(a)(3)(C). Services that were, among other things, not "reasonably likely to benefit the debtor's estate" or not "necessary to the administration of the case" will not be compensated. *Id.* at § 330(a)(4)(A).

*

*9th Cir. BAP (Cal.), 2006 In re AFI Holding, Inc. 355 B.R. 139, 47 Bankr.Ct.Dec. 92, Bankr.L Rep. P 97,104, 06 Cal. Daily Op. Serv. 10,575, 2006 Daily Journal D.A.R. 15,028

1. Unless otherwise indicated, all code, section, and chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 prior to its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of

2005, Pub.L. 109-8, 119 Stat 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), Rules 1001-9036.

2. This change was interesting in that Meister's deposition contained two and one-half pages of testimony concerning his alleged 1997 contact with Dye, and the new declaration was filed along with Dye's declaration in opposition to the motion to remove her as trustee, in which she denied having advised Meister concerning his termination from AFI. *See* Decl. of Dye 27, ¶ 8, Apr. 13, 2005.

3. Nonetheless, in the subsequent compromise negotiations, Dye insisted that Eriksen had a partner's right to inspect the partnership's tax return. See Letter from Dye to Eisenberg, May 4, 1999, Exh. 5 to Reply to Trustee's Opposition to Motion for Removal.

4. Appellees also alleged that Dye had blocked and frustrated discovery. However, the bankruptcy court found no improprieties, and Appellees have not filed a cross-appeal. Therefore, we will not address the issue.

5. There is a trend to make no distinction between potential and actual conflicts. See generally 1 *Norton Bankr.L. & Prac.2d* § 25:5 (2006). That topic is beyond the scope of our decision.

6. Dye's counsel informed the Panel at oral argument that she will not return as trustee no matter the outcome of this appeal. The matter is not moot, however, because her standing is an issue for her compensation. Additionally, this order is final and appealable. *See Matter of Schultz Mfg. Fabricating Co.*, 956 F.2d 686, 691-92 (7th Cir.1992.); *In re BH & P, Inc.*, 949 F.2d 1300, 1306 (3rd Cir.1991) (order removing chapter 7 trustee was final); *cf. Richman v. Straley*, 48 F.3d 1139, 1143 (10th Cir.1995) (court assumed that appeal from an order which claimed to be a de facto removal of a chapter 13 trustee was a final order).

7. We do not decide whether an elected chapter 7 trustee must also be disinterested. See § 702(a) (silent on topic of disinterestedness).

8. Section 101(14) also provides that a "disinterested person":

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; ...

11 U.S.C § 101(14).

9. It is also well established that professionals employed by the estate and approved by the bankruptcy court must be disinterested. Section 327(a) provides:

Except as otherwise provided in this section the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).

It would be an odd rule, indeed, if a trustee's professional must be disinterested, while the trustee need not.

10. Dye recommends an 11-point test including the following factors: (1) the seriousness of a potential adverse interest; (2) whether the potential conflict ever ripened into a materially adverse interest; (3) whether the estate suffered injury as a consequence of any materially adverse interest; (4) the extent to which, if at all, the potentially adverse interest was disclosed and when it was disclosed; (5) the extent that the potential conflict was not disclosed for some period of time, the extent to which, if at all, the trustee was culpable with regard to the nondisclosure; (6) the extent to which, if at all, the trustee's conduct "was suggestive of irregularity"; (7) the extent to which, if at all, the moving party was dilatory in seeking removal; (8) the effect of removal on estate administration, including a consideration of whether the movant is adverse to the trustee in litigation and may be motivated by litigation tactics; (9) whether a prophylactic purpose could be served by removing the trustee; (10) the position of the U.S. Trustee regarding the motion; and (11) the fairness of removal to the trustee under the circumstances.

11. Moreover, because our facts only implicate the "catch-all" provision of § 101(14)(E), we do not need to "throw out the baby with the bath water." In other words, we do not need to decide whether or not a per se rule should be applied to a lack of disinterestedness based on §§ 101(14)(A)-(D).

In fact, the Third Circuit later circumscribed its holding in *BH & P* in a case where the professional was clearly a creditor of the debtor and thus not disinterested under the plain terms of § 101(14)(A). It stated:

We similarly reject the argument that our decision in *In re BH & P* authorizes bankruptcy courts to take a "flexible approach" in determining whether a professional who is not "disinterested" under the statutory definition may nevertheless be employed pursuant to Section 327(a). In *In re BH & P*, we were required to interpret the phrase "actual conflict of interest" in Section 327(c). We found this phrase to be ambiguous and thus held that a bankruptcy court should have discretion "in determining whether an actual conflict exists `in light of the particular facts of each case.'" *In re BH & P*, 949 F.2d at 1315 (citations omitted). In the current case, we must interpret and apply Section 327(a), not Section 327(c). and as we have explained, we find no ambiguity in the relevant language of Section 327(a).

*U.S. Trustee v. Price Waterhouse*, 19 F.3d 138, 142 (3d Cir.1994). The court then reversed the order of employment.

12. Section 101(31)(B) provides that insiders of a corporate debtor include:

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B).

13. Dye maintains that the release made Eriksen judgment proof. However, the court found that no signed release had been put into evidence. Nor does the record reflect that any judgment against Eriksen would be uncollectible.

14. Dye further argues that "adverse interest" in § 101(14)(E) only refers to personally adverse interests and does not encompass her past representational interests. She misapplies *BH & P*, which opined that § 327(a) prohibits conflicts created by concurrent adverse legal representation, *See* § 327(a) (authorizing employment of professionals "that do not *hold or represent* an interest adverse to the estate,

and that are disinterested persons....") (emphasis added).

Dye was not an employed professional, but an appointed trustee. Her interests were past personal as well as professional relationships which could have predisposed her under circumstances that created a bias against the estate in her present trusteeship. *See Roberts*, 46 B.R. at 827.

15. Historically, in view of the strict impartiality requirement, some courts presumptively disqualified trustees based on any "prejudicial association" with interests adverse to those of the estate. 6 *Collier, supra*, ¶ 702.08[1], at 702-18 to 702-19. This strict standard was reinforced in state ethics rules, particularly Canon 9 of the American Bar Association ("ABA") Model Code of Professional Responsibility ("A lawyer should avoid even the appearance of professional impropriety.")

Although the ABA Code has been replaced by the ABA Rules of Professional Conduct, which expressly eliminates the "appearance of impropriety" standard (see ABA Rule 1, 9, comment [5]), and although California has neither adopted the ABA Code or Rules nor has its own such standard, the Code and case law illustrates that federal courts have the inherent power to apply it. *See In re Glenn Elec. Sales Corp.*, 99 B.R. 596, 598-99 (D.N.J.1988); *In re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985) (holding that the state code of professional responsibility did not by its own terms apply to attorney sanctions in the federal courts, but that federal courts in exercising their inherent power under the standards imposed by federal law may charge attorneys with the knowledge of, and conformity to, the state codes); *see also U.S. Trustee v. S.S. Retail Stores Corp. (In re S.S. Retail Stores Corp.)*, 211 B.R. 699, 703 (9th Cir.BAP1997) (although California law provides for a waiver of a conflict, the Bankruptcy Code does not allow for such waiver under §§ 101(14) or 327(a)); *Jin re Granite Partners, L.P.*, 219 B.R. 22, 34 (Bankr.S.D.N.Y.1998) (same).

16. Section 1104 provides that the chapter 11 trustee must be a "disinterested person." *See* 11 U.S.C. § 1104(b) and (d); 7 *Collier, supra*, ¶ 1104.02[7][a] at 1104-27.

---------------

# EXHIBIT 10

**From:** Kevin Coleman
**To:** Kavita Gupta
**Cc:** Chris Hart; Greg Nuti; Kim Fineman; Joshua Teeple; Howard Grobstein; Ben Howard
**Subject:** RE: Desert Land *** motion to address inter-company claim issue
**Date:** Wednesday, July 10, 2019 9:07:00 PM

---

I was suggesting that two different parties be designated, one to act for Desert Land, the other for Desert Apartments. An examiner might be another option, let me think about that a little more.

I did not look into whether bank records are available prior to 2002. Lenny never responded to our request to identify which bank(s) the debtors used, so I was never in a position to figure out who to contact.

Best regards,

--Kevin

---

**From:** Kavita Gupta [mailto:kgupta@guptaferrer.com]
**Sent:** Wednesday, July 10, 2019 8:35 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Chris Hart <chart@nutihart.com>; Greg Nuti <gnuti@nutihart.com>; Kim Fineman <kfineman@nutihart.com>; Joshua Teeple <jteeple@gtllp.com>; Howard Grobstein <hgrobstein@gtllp.com>; Ben Howard <bhoward@gtllp.com>
**Subject:** Re: Desert Land *** motion to address inter-company claim issue

Kevin -

I don't follow your reasoning. Why wouldn't a single person have the same conflict of interest if she is representing both estates in a dispute? For example, would she file a claim objection on behalf of DOAPT and then defend it on behalf of DL? Or are you proposing two people be appointed.

I wonder if an examiner with a limited role would make sense - that is, to determine if there even is a claim. The managers don't seem to know anything about the purported claim even though they filed the schedules under penalty of perjury. Is it even possible to get bank records from 2002? Did you verify that?

Anyway, we can discuss tomorrow if you wish.

Thanks for all your help.

Sent from my iPhone

On Jul 10, 2019, at 7:48 PM, Kevin Coleman <kcoleman@nutihart.com> wrote:

> Thanks Kavita. I will incorporate your changes, but I do think we should have the court designate some other interested party in both the Desert Land and Desert Oasis

Apartments cases to act on behalf of the estates in any dispute over the inter-company claims. My thinking is that if you take Desert Land's "side" in the controversy over the intercompany claim it still creates an appearance of impropriety from the perspective of the Desert Oasis Apartments creditors. Seems to me that if you stay completely out of the litigation it would be better.

Are you OK with me keeping that in?

Best regards,

--Kevin

---

**From:** Kavita Gupta [mailto:kgupta@guptaferrer.com]
**Sent:** Wednesday, July 10, 2019 6:03 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Chris Hart <chart@nutihart.com>; Greg Nuti <gnuti@nutihart.com>; Kim Fineman <kfineman@nutihart.com>; Joshua Teeple <jteeple@gtllp.com>; Howard Grobstein <hgrobstein@gtllp.com>; Ben Howard <bhoward@gtllp.com>
**Subject:** Re: Desert Land *** motion to address inter-company claim issue

Kevin – attached is a redlined revised draft with minor changes for your consideration.
Best,

**Kavita Gupta**
GUPTA | FERRER LLP
1300 Bristol Street North, Suite 100
Newport Beach, CA 92660
Tel: 949.387.4470
Fax: 949.258.9786
*www.guptaferrer.com*
vCard Bio

**Confidentiality Notice**: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure**: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Kevin Coleman <kcoleman@nutihart.com>

**Date:** Wednesday, July 10, 2019 at 5:28 PM
**To:** Kavita Gupta <kgupta@guptaferrer.com>
**Cc:** Chris Hart <chart@nutihart.com>, Greg Nuti <gnuti@nutihart.com>, Kim Fineman <kfineman@nutihart.com>, Joshua Teeple <jteeple@gtllp.com>, Howard Grobstein <hgrobstein@gtllp.com>, Ben Howard <bhoward@gtllp.com>
**Subject:** Desert Land *** motion to address inter-company claim issue

Hi Kavita,

Attached is a draft of the motion seeking guidance from the court as to the inter-company claim issue. As you will see, it essentially tries to disclose as much as we know about the inter-company claims, outlines three options:

1. order that you continue in all three cases until a sale at which time we can re-evaluate,
2. accept your offer to resign from Desert Apartments, and
3. order that you continue as trustee until all cases are closed but designate other parties to investigate/prosecute any necessary actions.

It does not attempt to advocate for one or the other option, but rather invites the court to make the call.

Let me know if you have any comments or wish to discuss. Once we finalize the motion, I will turn to drafting the supporting declaration.

Best regards,

--Kevin

PS: John/Howard/Ben, could you please also look at how I describe your inquiry and investigation into the inter-company claim and let me know if anything should be changed?

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com

<image002.png>

# EXHIBIT 11

**From:** Kavita Gupta
**To:** Kevin Coleman
**Subject:** Re: Desert Land - Colliers Listing Agreement
**Date:** Friday, August 9, 2019 10:52:50 AM

---

Yes. Thanks.

We need to the withdrawal of the conflicts and 2014 disclosures today. The last thing we need is an early opp filed, which means we can't withdraw.

Sent from my iPhone

> On Aug 9, 2019, at 10:45 AM, Kevin Coleman <kcoleman@nutihart.com> wrote:
>
> Hi Kavita- can I call you around 11:30am to discuss?
>
> —Kevin
>
> Sent from my iPhone
>
>> On Aug 8, 2019, at 6:47 PM, Kavita Gupta <kgupta@guptaferrer.com> wrote:
>>
>> I agree this is a tough issue. However, I think Colliers will go pens down on us with this agreement and we don't have time to recover.
>>
>> What about a provision that provides a joint commission for Colliers/Keen Summit if we have to go to an auction? That way, Colliers is motivated to get its full 1% but if we have to go to an auction, it will still participate in the auction process and get some commission. Perhaps 1.25% or 1.50%, which each firm getting half. Keen-Summit offered .75% but wants an advance of marketing costs (which we don't have funds to do) so it's no too far off. See attached. Per Joe, 1%-2% is the normal commission for transactions of this size. While I think highly of the Keen-Summit folks, their weakness is that they don't know the LV market, the players, and they are not on the ground to meet with people. Could we file the application under seal so no one sees our strategy? I think the judge would understand.
>>
>> Lets also discuss whether we can sell the DO APT separately since Shotgun doesn't want it.
>>
>> I'm around all day tomorrow.
>> Best,
>>
>> Kavita Gupta
>> GUPTA | FERRER LLP
>> 1300 Bristol Street North, Suite 100
>> Newport Beach, CA 92660
>> Tel: 949.387.4470
>> Fax: 949.258.9786
>> www.g<http://www.guptaferrer.com>uptaferrer.com<http://www.guptaferrer.com>
>> vCard<http://www.guptaferrer.com/guptaferrer/Gupta.vcf> Bio<http://www.linkedin.com/pub/kavita-gupta/28/329/27a/>
>>
>> Confidentiality Notice: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.
>> IRS Circular 230 Disclosure: To ensure compliance with IRS's requirements, please be advised that any tax

advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
>>
>> From: Kevin Coleman <kcoleman@nutihart.com>
>> Date: Thursday, August 8, 2019 at 6:30 PM
>> To: Kavita Gupta <kgupta@guptaferrer.com>
>> Subject: RE: Desert Land - Colliers Listing Agreement
>>
>> Hi Kavita,
>>
>> Attached is a revised listing agreement. It grants you the right to terminate the exclusive listing on 7-days' notice, which is the only solution I could come up with that did not draw a lot of attention to the fact that we might have to go into auction mode.
>>
>> Candidly, I was not certain how to handle the commission if the property is sold to someone brought in by/through Colliers after the listing is terminated or expires. Odds are we will have to pay an additional commission to Keen-Summit (or other broker) if we are forced into an auction process.
>>
>> Do you have time in the late morning tomorrow to discuss?
>>
>> Best regards,
>>
>> --Kevin
>>
>> From: Kavita Gupta [mailto:kgupta@guptaferrer.com]
>> Sent: Thursday, August 8, 2019 1:55 PM
>> To: Kevin Coleman <kcoleman@nutihart.com>
>> Subject: Desert Land - Colliers Listing Agreement
>>
>> Hi Kevin – the listing is expiring on 8/17; we need to discuss whether we are going to build in a contingency for hiring an auctioneer, if necessary. Let me know your thoughts. I'm in the office the rest of the week. Best,
>>
>> Kavita Gupta
>> GUPTA | FERRER LLP
>> 1300 Bristol Street North, Suite 100
>> Newport Beach, CA 92660
>> Tel: 949.387.4470
>> Fax: 949.258.9786
>> www.g<http://www.guptaferrer.com>uptaferrer.com<http://www.guptaferrer.com>
>> vCard<http://www.guptaferrer.com/guptaferrer/Gupta.vcf> Bio<http://www.linkedin.com/pub/kavita-gupta/28/329/27a/>
>>
>> Confidentiality Notice: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.
>> IRS Circular 230 Disclosure: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
>> <Trustee Kavita Gupta - Desert Land - Keen-Summit Capital Partners 6-28-2019[1].pdf>

# EXHIBIT 12

**Kevin Coleman**

| | |
|---|---|
| **From:** | Kevin Coleman |
| **Sent:** | Wednesday, March 25, 2020 4:07 PM |
| **To:** | 'Gina Shelton' |
| **Cc:** | Ben Howard; Kevin Meacham; Kavita Gupta; Talitha Gray; wswecker@aol.com |
| **Subject:** | RE: Desert Land - Interview |
| **Attachments:** | 2020-03-23 Shelton Decl. re Scheduled Intercompany Claim.docx |

Hi Gina,

Attached is a draft of the declaration for you that I prepared based on our conversation. Please take a look and let me know if there is anything you would like to correct, change, or add.

Best regards,

--Kevin

---

**From:** Gina Shelton [mailto:gina@smmcpas.com]
**Sent:** Monday, March 23, 2020 10:28 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Kevin,

Based on the information presented to me within the last few weeks, we agree that the loan payable was to Tom Gonzales.
Gina

**We have moved our office down the hall to Suite 105 (same building)!!**

**Gina Shelton**
**Staff Accountant**
**Swecker, Moloney & Moir CPA's**
**2451 S. Buffalo Drive Ste. 105**
**Las Vegas, Nevada 89117**
Gina@smmcpas.com
**702.877.9351 office | 702.877 2731 fax**

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or you've received this e-mail message in error, please notify the sender.

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Monday, March 23, 2020 10:11 AM

**To:** Gina Shelton <gina@smmcpas.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Thank you Gina. Yes, I understand that you input the information on the general ledger based on the documents that were provided to you and that at the time it appeared entirely proper to do so. But knowing now that Desert Oasis Apartments borrowed the $5M from Tom Gonzales and not Desert Land, do you agree that this item should not have been entered on the general ledger as an amount "due to" Desert Land?

Best regards,

--Kevin

---

**From:** Gina Shelton [mailto:gina@smmcpas.com]
**Sent:** Monday, March 23, 2020 7:11 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Hi Kevin,

Larry Swecker and I have reviewed the documents and this email and discussed my phone interview at great length. We are in agreement that we recorded the transactions in accordance with the documents provided to us by the client.

Gina

**We have moved our office down the hall to Suite 105 (same building)!!**

**Gina Shelton**
**Staff Accountant**
**Swecker, Moloney & Moir CPA's**
**2451 S. Buffalo Drive Ste. 105**
**Las Vegas, Nevada 89117**
**Gina@smmcpas.com**
**702.877.9351 office | 702.877 2731 fax**

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or you've received this e-mail message in error, please notify the sender.

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 20, 2020 3:13 PM
**To:** Gina Shelton <gina@smmcpas.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta

<kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>
**Subject:** RE: Desert Land - Interview

Hi Gina,

Hope you are managing OK in the midst of this coronavirus craziness. (At least tax day has been pushed to July!)

As I recall when we spoke last week, you speculated that you might have booked the $5,028,400.56 amount as "due to" Desert Land from Desert Oasis Apartments if the closing statement for the Gonzales loan reflected Desert Land as the only borrower and $5,028,400.56 as going to pay off the existing mortgage on the Desert Oasis Apartments property.

Attached is the closing statement for the Gonzales loan escrow we obtained from David Gaffin, which shows exactly that.

If I also recall correctly, you indicated that had you known at the time that Desert Oasis Apartments was in fact a borrower on the Gonzales loan, it would have been an error to record the item as due to Desert Land. (The loan came from Tom Gonzales, not Desert Land- something the escrow statement did not make clear.) I previously sent you the Petition and Schedules of Assets/Liabilities Desert Oasis Apartments filed in its 2002 bankruptcy case, which are also attached here. As we discussed last week, on p. 11 of 19, Desert Oasis Apartments stated that it owed Tom Gonzales $41.5M. No one disputes that Desert Oasis Apartments and Desert Land jointly borrowed the $41.5M from Mr. Gonzales. This fact is also is confirmed by information obtained from the Clark County Recorder, which indicates that Gonzales recorded a deed of trust against the Desert Oasis Apartments property on December 15, 2000, followed shortly thereafter by a re-conveyance of the Heller Financial mortgage.

The above, in my view, establish that Desert Oasis Apartments borrowed the funds used to pay the Heller Financial mortgage from Mr. Gonzales, not Desert Land. But please take a look at these documents and let me know if you concur that it was a mistake to reflect on the general ledger that Desert Oasis Apartments had an amount due to Desert Land of $5,028,400.56 back in 2000. If you agree, I would ask you to sign a declaration so stating, which of course would explain why it appears the error was made. If you think you need to review anything else in order to come to a conclusion, let me know and I will try to track it down.

Best regards,

--Kevin

---

**From:** Gina Shelton [mailto:gina@smmcpas.com]
**Sent:** Friday, March 13, 2020 12:05 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Subject:** RE: Desert Land - Interview

Thank you!!
Gina

**<u>We have moved our office down the hall to Suite 105 (same building)!!</u>**

**Gina Shelton**
**Staff Accountant**
**Swecker, Moloney & Moir CPA's**
**2451 S. Buffalo Drive Ste. 105**
**Las Vegas, Nevada 89117**

Gina@smmcpas.com
**702.877.9351 office | 702.877 2731 fax**

---

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or you've received this e-mail message in error, please notify the sender.

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 13, 2020 11:51 AM
**To:** Gina Shelton <gina@smmcpas.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Vicki DiMaio <vdimaio@Gtg.legal>
**Subject:** Desert Land - Interview

Hi Gina,

I am co-counsel with Talitha Gray in the Desert Land cases. Attached are copies of the documents you provided to Talitha in response to the document subpoena, marked at the bottom with a bates stamp. I'm also attaching copies of the bankruptcy petition and schedules of assets/liabilities filed by Desert Land and Desert Oasis Apartments when they were in Chapter 11 back in 2002.

Many of the questions we'll be going over involve these documents so it would be helpful if you could have them open or have hard copies printed when we speak.

Looking forward to talking with you at 1pm.

Best regards,

--Kevin

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com



Kevin W. Coleman (CA SBN 168538)
Christopher H. Hart (CA SBN 184117)
NUTI HART LLP
411 30TH Street, Suite 408
Oakland, CA 94609-3311
Telephone: 510-506-7152
Email: kcoleman@nutihart.com
chart@nutihart.com

Talitha Gray Kozlowski (NV SBN 9040)
GARMAN TURNER GORDON LLP
650 White Drive, Suite 100
Las Vegas, NV 89119
Telephone: 725-777-3000
Email: tgray@gtg.legal

Counsel for Kavita Gupta,
Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>DESERT LAND, LLC<br><br>Debtor. | Case No.: BK-S-18-12454-GS<br><br>Chapter 11 |
| In re:<br><br>DESERT OASIS APARTMENTS, LLC,<br><br>Debtor. | Case No.: BK-S-18-12456-GS<br><br>Chapter 11 |
| In re:<br><br>DESERT OASIS INVESTMENTS, LLC,<br><br>Debtor. | Case No.: BK-S-18-12457-GS<br><br>Chapter 11<br><br>**DECLARATION OF GINA SHELTON RE INTERCOMPANY CLAIM** |

I, Gina Shelton, declare as follows:

1. I am a senior staff accountant and bookkeeper with Swecker, Moloney & Moir CPA's ("SMM"), and have held this position continuously for approximately 30 years. My business address is 2451 S. Buffalo Drive Ste. 105, Las Vegas, Nevada 89117. Except as otherwise noted, all statements in this declaration are based on my own personal knowledge and if called to testify on this matter, I could and would competently testify thereto.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

2. From approximately 1996-97 through approximately 2010-2011, SMM provided bookkeeping and tax preparation services to Desert Land LLC ("DL") and Desert Oasis Apartments LLC ("DOA"). I was the person at SMM who was primarily responsible for inputting entries into the general ledgers maintained for DL and DOA and producing the other accounting documentation referenced below. All of the accounting records discussed (excluding Exhibits B and C) herein were prepared by me or others working under my direction in the ordinary course of providing bookkeeping and tax preparation services to DL and DOA.

3. With limited exceptions not relevant here, journal entries made in DL and DOA's general ledgers were based on source documentation such as checks and escrow statements provided to SMM by David Gaffin. After SMM's bookkeeping and tax preparation services for a given period were completed, the source documentation would be returned to DL and DOA.

4. Counsel for Kavita Gupta, Chapter 11 trustee for the DL and DOA bankruptcy estates served a subpoena on SMM for the production of documents relating to the origins and basis for an $4.5 million debt DOA stated that it owed to DL in the schedule of liabilities filed in this bankruptcy case. SMM thereafter conducted a diligent search of its records, and to the best of its knowledge, produced all documents in SMM's possession, custody, and control sought in the subpoena. The documents produced totaled 107 pages. Attached hereto as **Exhibit A** is a true and correct copy of all of the documents produced in response to the Trustee's subpoena.

5. A working trial balance I prepared for DOA for the period ending December 31, 2000 is included in Exhibit A [at bates page SW0004]. The December 31, 2000 working trial balance indicates that as of December 31, 1999, DOA was obligated on a note payable to Heller Financial in the amount of $5,000,000.00. The amounts reflected as owing by DOA Heller Financial on the December 31, 2000 working trial balance was based on journal entries that I had previously made on DOA's general ledger.

6. DOA's December 31, 2000 working trial balance [SW0004] further indicates that as of December 31, 2000:

a. the amount owed by DOA to Heller Financial had been paid; and

b. a note payable to DL by DOA had increased by $5,008,060.83.

7. DOA's payment to Heller Financial and the increased liability to DL referenced in paragraph 6 were also reflected in journal entries entered on DOA's general ledger.

8. My hand written notation on the DOA December 31, 2000 working trial balance indicates that the $5,008,060.83 credit to the note payable to DL related to "DL escrow #684232."

9. I made the general ledger entries and prepared DOA's December 31, 2000 working trial balance after reviewing an escrow closing statement provided to SMM by Mr. Gaffin. Counsel for the Trustee has recently provided me with a copy of the Estimated Borrower's Closing Statement that is attached hereto as **Exhibit B**. I am advised by the Trustee's counsel that Exhibit B was among documents produced by Mr. Gaffin in response to a subpoena served by the Trustee.

10. To the best of my recollection, the closing statement I relied on at the time I made the journal entries and prepared DOA's December 31, 2000 working trial balance [SW0004] was either the same or substantially similar to the Estimated Borrower's Closing Statement attached hereto as Exhibit B. (My understanding is that a final closing statement for an escrow can differ in some respects from an estimated closing statement.)

11. DL is identified in Exhibit B as the borrower of the $41.5 million loaned by Tom Gonzales. DOA is not identified as a borrower on the Gonzales loan. Exhibit B also indicates that $5,028,400.56 of the Gonzales loan proceeds would be disbursed to Heller Financial, which as noted at that time held a $5 million loan secured by DOA's real property.

12. I interpreted the closing statement I relied on when entering the Heller Financial mortgage refinance transactions into DOA's general ledger to mean that DL, but not DOA, borrowed the $41.5 million from Tom Gonzales. I also interpreted the closing statement to mean that DOA borrowed the funds used to pay off the Heller Financial mortgage from DL. It was for that reason that I reflected an amount owing by DOA to DL on the general ledger relating to the payoff of the Heller Financial mortgage.

13. I recently have seen the petition, and schedules of assets and liabilities filed by DOA in its Chapter 11 bankruptcy case filed on May 31, 2002, Case No. 02-16204, which

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

indicate that DOA at that time owed Tom Gonzales $41.5 million. A true and correct copy of DOA's May 31, 2002 petition and schedules supplied to me by counsel for the Trustee are attached hereto as **Exhibit C**. I have also reviewed other documentation provided by counsel for the Trustee indicating that DOA was a co-borrower on the Gonzales loan.

14. Had I known when I made the general ledger entries referenced in paragraphs 5 through 7 above that DOA had borrowed the $5,008,060.83 used to pay off the Heller Financial mortgage from Tom Gonzales instead of DL, I would have reflected that liability as owing to Tom Gonzales. I would not have made a journal entry indicating that DOA owed that amount to DL.

15. Accordingly, the amount reflected on DOA and DL's general ledgers and the December 31, 2000 working trial balance as being owed by DOA to DL on December 31, 2000 was overstated by $5,008,060.83.

I declare under penalty of perjury of the laws of the United States and the State of Nevada that the foregoing is true and correct, and that this Declaration is executed this ___ day of March 2020.

/s/
Gina Shelton

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

# EXHIBIT 13

**Kevin Coleman**

**From:** Gina Shelton <gina@smmcpas.com>
**Sent:** Friday, March 27, 2020 6:08 AM
**To:** Kevin Coleman
**Cc:** Ben Howard; Kevin Meacham; Kavita Gupta; Talitha Gray; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Hi Kevin,

Larry and I have reviewed the declaration and we think it is a fair statement based on our conversations, backup documentation, etc.

Gina

**We have moved our office down the hall to Suite 105 (same building)!!**

**Gina Shelton**
**Staff Accountant**
**Swecker, Moloney & Moir CPA's**
**2451 S. Buffalo Drive Ste. 105**
**Las Vegas, Nevada 89117**
**Gina@smmcpas.com**
**702.877.9351 office | 702.877 2731 fax**

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or you've received this e-mail message in error, please notify the sender.

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Wednesday, March 25, 2020 4:07 PM
**To:** Gina Shelton <gina@smmcpas.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Hi Gina,

Attached is a draft of the declaration for you that I prepared based on our conversation. Please take a look and let me know if there is anything you would like to correct, change, or add.

Best regards,

--Kevin

**From:** Gina Shelton [mailto:gina@smmcpas.com]
**Sent:** Monday, March 23, 2020 10:28 AM

**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Kevin,

Based on the information presented to me within the last few weeks, we agree that the loan payable was to Tom Gonzales.
Gina

**We have moved our office down the hall to Suite 105 (same building)!!**

**Gina Shelton**
**Staff Accountant**
**Swecker, Moloney & Moir CPA's**
**2451 S. Buffalo Drive Ste. 105**
**Las Vegas, Nevada 89117**
**Gina@smmcpas.com**
**702.877.9351 office | 702.877 2731 fax**

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or you've received this e-mail message in error, please notify the sender.

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Monday, March 23, 2020 10:11 AM
**To:** Gina Shelton <gina@smmcpas.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Thank you Gina. Yes, I understand that you input the information on the general ledger based on the documents that were provided to you and that at the time it appeared entirely proper to do so. But knowing now that Desert Oasis Apartments borrowed the $5M from Tom Gonzales and not Desert Land, do you agree that this item should not have been entered on the general ledger as an amount "due to" Desert Land?

Best regards,

--Kevin

---

**From:** Gina Shelton [mailto:gina@smmcpas.com]
**Sent:** Monday, March 23, 2020 7:11 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Hi Kevin,

Larry Swecker and I have reviewed the documents and this email and discussed my phone interview at great length. We are in agreement that we recorded the transactions in accordance with the documents provided to us by the client.

Gina

**We have moved our office down the hall to Suite 105 (same building)!!**

**Gina Shelton**
**Staff Accountant**
**Swecker, Moloney & Moir CPA's**
**2451 S. Buffalo Drive Ste. 105**
**Las Vegas, Nevada 89117**
**Gina@smmcpas.com**
**702.877.9351 office | 702.877 2731 fax**

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or you've received this e-mail message in error, please notify the sender.

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 20, 2020 3:13 PM
**To:** Gina Shelton <gina@smmcpas.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>
**Subject:** RE: Desert Land - Interview

Hi Gina,

Hope you are managing OK in the midst of this coronavirus craziness. (At least tax day has been pushed to July!)

As I recall when we spoke last week, you speculated that you might have booked the $5,028,400.56 amount as "due to" Desert Land from Desert Oasis Apartments if the closing statement for the Gonzales loan reflected Desert Land as the only borrower and $5,028,400.56 as going to pay off the existing mortgage on the Desert Oasis Apartments property.

Attached is the closing statement for the Gonzales loan escrow we obtained from David Gaffin, which shows exactly that.

If I also recall correctly, you indicated that had you known at the time that Desert Oasis Apartments was in fact a borrower on the Gonzales loan, it would have been an error to record the item as due to Desert Land. (The loan came from Tom Gonzales, not Desert Land- something the escrow statement did not make clear.) I previously sent you the Petition and Schedules of Assets/Liabilities Desert Oasis Apartments filed in its 2002 bankruptcy case, which are also attached here. As we discussed last week, on p. 11 of 19, Desert Oasis Apartments stated that it owed Tom Gonzales $41.5M. No one disputes that Desert Oasis Apartments and Desert Land jointly borrowed the $41.5M from Mr. Gonzales. This fact is also is confirmed by information obtained from the Clark County Recorder, which indicates that Gonzales recorded a deed of trust against the Desert Oasis Apartments property on December 15, 2000, followed shortly thereafter by a re-conveyance of the Heller Financial mortgage.

The above, in my view, establish that Desert Oasis Apartments borrowed the funds used to pay the Heller Financial mortgage from Mr. Gonzales, not Desert Land. But please take a look at these documents and let me know if you concur that it was a mistake to reflect on the general ledger that Desert Oasis Apartments had an amount due to Desert Land of $5,028,400.56 back in 2000. If you agree, I would ask you to sign a declaration so stating, which of course would explain why it appears the error was made. If you think you need to review anything else in order to come to a conclusion, let me know and I will try to track it down.

Best regards,

--Kevin

---

**From:** Gina Shelton [mailto:gina@smmcpas.com]
**Sent:** Friday, March 13, 2020 12:05 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Subject:** RE: Desert Land - Interview

Thank you!!
Gina

**We have moved our office down the hall to Suite 105 (same building)!!**

**Gina Shelton**
**Staff Accountant**
**Swecker, Moloney & Moir CPA's**
**2451 S. Buffalo Drive Ste. 105**
**Las Vegas, Nevada 89117**
**Gina@smmcpas.com**
**702.877.9351 office | 702.877 2731 fax**

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or you've received this e-mail message in error, please notify the sender.

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 13, 2020 11:51 AM
**To:** Gina Shelton <gina@smmcpas.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Vicki DiMaio <vdimaio@Gtg.legal>
**Subject:** Desert Land - Interview

Hi Gina,

I am co-counsel with Talitha Gray in the Desert Land cases. Attached are copies of the documents you provided to Talitha in response to the document subpoena, marked at the bottom with a bates stamp. I'm also attaching copies of the bankruptcy petition and schedules of assets/liabilities filed by Desert Land and Desert Oasis Apartments when they were in Chapter 11 back in 2002.

Many of the questions we'll be going over involve these documents so it would be helpful if you could have them open or have hard copies printed when we speak.

Looking forward to talking with you at 1pm.

Best regards,

--Kevin

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com

# EXHIBIT 14

**Kevin Coleman**

---

**From:** Kevin Coleman
**Sent:** Monday, March 23, 2020 10:11 AM
**To:** 'Gina Shelton'
**Cc:** Ben Howard; Kevin Meacham; Kavita Gupta; Talitha Gray; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Thank you Gina. Yes, I understand that you input the information on the general ledger based on the documents that were provided to you and that at the time it appeared entirely proper to do so. But knowing now that Desert Oasis Apartments borrowed the $5M from Tom Gonzales and not Desert Land, do you agree that this item should not have been entered on the general ledger as an amount "due to" Desert Land?

Best regards,

--Kevin

---

**From:** Gina Shelton [mailto:gina@smmcpas.com]
**Sent:** Monday, March 23, 2020 7:11 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>; wswecker@aol.com
**Subject:** RE: Desert Land - Interview

Hi Kevin,

Larry Swecker and I have reviewed the documents and this email and discussed my phone interview at great length. We are in agreement that we recorded the transactions in accordance with the documents provided to us by the client.

Gina

**We have moved our office down the hall to Suite 105 (same building)!!**

**Gina Shelton**
**Staff Accountant**
**Swecker, Moloney & Moir CPA's**
**2451 S. Buffalo Drive Ste. 105**
**Las Vegas, Nevada 89117**
Gina@smmcpas.com
**702.877.9351 office | 702.877 2731 fax**

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or you've received this e-mail message in error, please notify the sender.

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 20, 2020 3:13 PM
**To:** Gina Shelton <gina@smmcpas.com>
**Cc:** Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Talitha Gray <tgray@Gtg.legal>
**Subject:** RE: Desert Land - Interview

Hi Gina,

Hope you are managing OK in the midst of this coronavirus craziness.  (At least tax day has been pushed to July!)

As I recall when we spoke last week, you speculated that you might have booked the $5,028,400.56 amount as "due to" Desert Land from Desert Oasis Apartments if the closing statement for the Gonzales loan reflected Desert Land as the only borrower and $5,028,400.56 as going to pay off the existing mortgage on the Desert Oasis Apartments property.

Attached is the closing statement for the Gonzales loan escrow we obtained from David Gaffin, which shows exactly that.

If I also recall correctly, you indicated that had you known at the time that Desert Oasis Apartments was in fact a borrower on the Gonzales loan, it would have been an error to record the item as due to Desert Land.  (The loan came from Tom Gonzales, not Desert Land- something the escrow statement did not make clear.)  I previously sent you the Petition and Schedules of Assets/Liabilities Desert Oasis Apartments filed in its 2002 bankruptcy case, which are also attached here.  As we discussed last week, on p. 11 of 19, Desert Oasis Apartments stated that it owed Tom Gonzales $41.5M.  No one disputes that Desert Oasis Apartments and Desert Land jointly borrowed the $41.5M from Mr. Gonzales.  This fact is also is confirmed by information obtained from the Clark County Recorder, which indicates that Gonzales recorded a deed of trust against the Desert Oasis Apartments property on December 15, 2000, followed shortly thereafter by a re-conveyance of the Heller Financial mortgage.

The above, in my view, establish that Desert Oasis Apartments borrowed the funds used to pay the Heller Financial mortgage from Mr. Gonzales, not Desert Land.  But please take a look at these documents and let me know if you concur that it was a mistake to reflect on the general ledger that Desert Oasis Apartments had an amount due to Desert Land of $5,028,400.56 back in 2000.  If you agree, I would ask you to sign a declaration so stating, which of course would explain why it appears the error was made.  If you think you need to review anything else in order to come to a conclusion, let me know and I will try to track it down.

Best regards,

--Kevin

**From:** Gina Shelton [mailto:gina@smmcpas.com]
**Sent:** Friday, March 13, 2020 12:05 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Subject:** RE: Desert Land - Interview

Thank you!!
Gina


**We have moved our office down the hall to Suite 105 (same building)!!**

**Gina Shelton**

**Staff Accountant**
**Swecker, Moloney & Moir CPA's**
**2451 S. Buffalo Drive Ste. 105**
**Las Vegas, Nevada 89117**
Gina@smmcpas.com
**702.877.9351 office | 702.877 2731 fax**

---

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or you've received this e-mail message in error, please notify the sender.

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 13, 2020 11:51 AM
**To:** Gina Shelton <gina@smmcpas.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Vicki DiMaio <vdimaio@Gtg.legal>
**Subject:** Desert Land - Interview

Hi Gina,

I am co-counsel with Talitha Gray in the Desert Land cases. Attached are copies of the documents you provided to Talitha in response to the document subpoena, marked at the bottom with a bates stamp. I'm also attaching copies of the bankruptcy petition and schedules of assets/liabilities filed by Desert Land and Desert Oasis Apartments when they were in Chapter 11 back in 2002.

Many of the questions we'll be going over involve these documents so it would be helpful if you could have them open or have hard copies printed when we speak.

Looking forward to talking with you at 1pm.

Best regards,

--Kevin

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com



NUTI HART
LLP

4

127
N/H-018602

# EXHIBIT 15

**Kevin Coleman**

| | |
|---|---|
| **From:** | Kevin Coleman |
| **Sent:** | Monday, March 30, 2020 5:33 PM |
| **To:** | 'Candace Carlyon' |
| **Cc:** | Dawn Cica; Talitha Gray; Kim Fineman; Kavita Gupta; REECE, CATHY; AUSTIN, ANTHONY; Michael N. Feder; Nancy Rodriguez; Cristina Robertson |
| **Subject:** | RE: Desert Land *** Gaffin/Bulloch 2004 Exams |
| **Attachments:** | Gonzales41.5Dec2000.pdf; 2020-03-27 Shelton Decl. re Scheduled Intercompany Claim [Executed Copy].pdf |

Candace,

First, I hope that you son's test comes back negative and that otherwise he is better soon.

I would suggest that we start with a phone interview with you and Mr. Gaffin, which depending on what he says, might help us short cut this process.

Gina Swecker, the debtors' accountant/bookkeeper at the time, has signed a declaration stating that she erroneously recorded a $5M liability from Desert Oasis Apartments to Desert Land back in 2000, and as a result, the intercompany obligation shown on the debtors' books was overstated by $5M starting as of December 31, 2000. I attach a copy of that declaration (without exhibits, because they are too voluminous to email).

Ms. Swecker based her entries into the general ledger on a closing statement for the $41.5M loan obtained from Tom Gonzales in December 2000. Ms. Swecker (incorrectly) interpreted the closing statement to mean that Desert Land was the only borrower on the Gonzales loan, and $5M of the loan proceeds paid of an existing mortgage on the apartments property owed to Heller Financial. (In other words, she booked the $5M as owed by Desert Oasis Apartments to Desert Land because it appeared as if Desert Oasis Apartments borrowed the money from Desert Land, not Gonazles.) Now realizing that Desert Oasis Apartments borrowed the money from Gonzales – a fact that no one disputes – she admits that this $5M debt should have been reflected as a liability owed to Gonazles, not Desert Land.

Our assumption is that the schedules filed by Desert Oasis Apartments were prepared based on the debtor's accounting records which showed a $4.5M intercompany balance owing to Desert Land in 2018. However, as noted, the erroneous entry from 2000 showing that Desert Oasis Apartments owed Desert Land $5M based on the payoff of the Heller Financial loan overstated the account balance, and that error was carried on the books for years because no one caught it. The bottom line is that since the amount owing to Desert Land was overstated by $5M back in 2000, it appears to us that Desert Oasis Apartments did not owe Desert Land $4.5M by the time these bankruptcy cases were filed. If Mr. Gaffin agrees that the scheduled debt was based on an accounting error, the Desert Oasis Apartments schedule F should be amended to eliminate the purported liability to Desert Land.

In addition, the general ledger also indicates that $470,000 was paid to Eagle Mortgage in April 2003, and this is reflected on the GL as a credit against the intercompany claim balance owed to Desert Land. However, based on our review of the dockets in the 2002 bankruptcy cases, it appears that Desert Oasis Apartments was the borrower under that Eagle Mortgage loan, and so it appears likely that this $470K credit was erroneous as well.

Please let me know if you and Mr. Gaffin are willing to discuss the foregoing, and if so, if there is a time when we can speak tomorrow afternoon or Wednesday.

Best regards,

--Kevin

---

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Monday, March 30, 2020 2:51 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

Kevin/Talitha, please see attached in furtherance of the request to defer the deposition.

We have moved!
Candace Carlyon
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577.3613 (direct)

---

**From:** Candace Carlyon
**Sent:** Monday, March 30, 2020 10:29 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

Kevin, my client wants me to be with him during his deposition. Given his age and the fact that I am awaiting test results for my quarantined son, let's put this off until an in person deposition is realistic, or proceed via written deposition questions.

We have moved!
Candace Carlyon
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577.3613 (direct)

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 27, 2020 4:28 PM
**To:** Candace Carlyon <ccarlyon@carlyoncica.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** Re: Desert Land *** Gaffin/Bulloch 2004 Exams

Candace,

If you want to be on the phone that's fine, you can listen I to the Zoom conference, but I want to be able to see Mr. Gaffin and make sure that if I am directing him to a place in an exhibit he is looking at the right thing.

Most laptops and tablets have cameras, which again is all you would need.

—Kevin

Sent from my iPhone

On Mar 27, 2020, at 4:20 PM, Candace Carlyon <ccarlyon@carlyoncica.com> wrote:

I don't have video or sound on my computer, we can do it telephonically.

Candace Carlyon
Carlyon Cica Chtd.
265 E. Warm Springs Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577-3613 (direct)
CarlyonCica.com

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 27, 2020 3:52 PM
**To:** Candace Carlyon <ccarlyon@carlyoncica.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

My understanding is that this is done through your computer or tablet.

--Kevin

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Friday, March 27, 2020 3:49 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** Re: Desert Land *** Gaffin/Bulloch 2004 Exams

We don't have video capability

Candace Carlyon
Carlyon Cica Chtd.
265 E. Warm Springs Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577-3613 (direct)
CarlyonCica.com

On Mar 27, 2020, at 3:48 PM, Kevin Coleman <kcoleman@nutihart.com> wrote:

OK/We'll make the Zoom video conference arrangements for Apr 2 at 1pm. I will send the exhibits ahead of time.

--Kevin

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Thursday, March 26, 2020 8:33 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** Re: Desert Land *** Gaffin/Bulloch 2004 Exams

April 2 works via telephone. Will you be sending the exhibits over beforehand?

Candace Carlyon
Carlyon Cica Chtd.
265 E. Warm Springs Suite 107
Las Vegas, NV 89119

702.685.4444 (office)
702.577-3613 (direct)
CarlyonCica.com

On Mar 24, 2020, at 5:05 PM, Kevin Coleman <kcoleman@nutihart.com> wrote:

Hi Candace,

Would you and Mr. Gaffin be available for his exam in the afternoon on either Thursday April 2 or Tuesday April7? Although not my preference, looks like we'll do this by video. If those dates don't work, please let me know a few around there that do.

I am now thinking that depending on what Mr. Gaffin says, we may not need to have an examination of Bruce Bulloch.

Best regards,

--Kevin

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Thursday, March 19, 2020 8:34 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>; Dawn Cica <Dcica@carlyoncica.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

I am not available April 8, and the Nevada lockdown is scheduled to run at least through April 17. I am available the 15th and 16th, and will check with Mr. Gaffin as to his availability. I can also reach out to Bruce Bulloch as a courtesy to you (although you are welcome to contact him directly, I do not represent him).

We have moved!
Candace Carlyon
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577.3613 (direct)
<image001.png>

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Wednesday, March 18, 2020 4:36 PM
**To:** Candace Carlyon <ccarlyon@carlyoncica.com>; Dawn Cica <Dcica@carlyoncica.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

Thanks Candace. It would be much less cumbersome to have the examinations in person, so I would prefer to stick with the April 8 and 16 dates in hopes that we can do them that way. But if it's clear we can't as we approach those dates, I will set them up through Zoom. Are the 8th and 16th going to work on your end?

--Kevin

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Wednesday, March 18, 2020 10:02 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>; Dawn Cica <Dcica@carlyoncica.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

Good morning. Hope you are all managing this crisis. If you want to go forward with the depositions remotely next week that works for us. I do not represent Bruce Bulloch (I represent his brother Howard), but I understand that he would be available for a remote link if that is available. I have not worked with "Zoom", but would agree to any reasonable method which permits everyone to be at their desks. Candace

We have moved!
Candace Carlyon
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577.3613 (direct)
<image002.png>

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Tuesday, March 17, 2020 2:30 PM
**To:** Candace Carlyon <ccarlyon@carlyoncica.com>; Dawn Cica <Dcica@carlyoncica.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>
**Subject:** Desert Land *** Gaffin/Bulloch 2004 Exams

Candace,

We will defer the Gaffin and Bulloch examinations currently scheduled for March 25 and 26. For Mr. Gaffin, I would request that we have Mr. Gaffin's on April 8 at 1pm, and Mr. Bulloch's on April 16 at 10:30am.

For now, I plan to do those in person in Las Vegas and Woodland Hills, CA, respectively. But if the coronavirus situation shows no signs of abating, I would do them by a Zoom teleconference. I would, however, need you to stipulate that the examinations can proceed in that manner.

If you are not available on Apr. 8 and 16, please let me know what earlier days are open.

Best regards,

--Kevin

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com

<image003.png>

First American Title Company of Nevada
3760 Pecos McLeod Interconnect, Suite 7 * Las Vegas, NV 89121-4253
(702) 731-4131

ESCROW NUMBER: 884232
PROPERTY: Vacant Land
026 and 162-28-302-001

TODAY'S DATE: 12/06/2000
CLOSING DATE: 12/06/2000

BORROWERS:
Desert Land LLC

ESTIMATED BORROWER'S CLOSING STATEMENT

| DESCRIPTION | | DEBITS | CREDITS |
|---|---|---|---|
| Loan from | Tom Gonzales | | 41,500,000.00 |
| Funds previously received from Tom Gonzalez on 11/22/00 | | 500,000.00 | |
| 190-99218 | Gonzo Financial | 1,867,994.03 | |
| #99-133/Oasis Apartments | Heller Financial | 5,028,400.56 | |
| Pay off to New World, LLC | | 5,000,000.00 | |
| Origination Fee 2.000% | Tom Gonzales | 830,000.00 | |
| Origination fee 1.000% | Barry Fieldman | 415,000.00 | |
| Interest - 1 yr in advance | Tom Gonzales | 5,397,493.26 | |
| Sammie Armstrong to | #889231 | 1,358,616.67 | |
| Interest from 11/22/2000 to 12/06/2000 @ $178.09000/day | | 2,493.26 | |
| To # 86015 Tivoli | | 5,219,472.00 | |
| To 833089 FLT Trust | | 15,852,120.22 | |
| Title Premium - Owners | First American Title Co/Nevada | 200.00 | |
| Alta Premium - Lenders | First American Title Co/Nevada | 16,340.00 | |
| County tax/stamps: Deed $ 6,750.00 Mtg $ | | 6,750.00 | |
| Recording fees: Deed$ | Mtg$ 250.00 Releases$ | 250.00 | |
| Recon Tracking Fee | First American Title | 400.00 | |
| Overnight Del/Handling Fee | First American Title | 95.00 | |
| Inspection Fee | First American Title | 1,120.00 | |
| Fax/Phone Charges | First American Title | 105.00 | |
| Escrow Fee | First American Title Co/Nevada | 2,650.00 | |
| Held For Misc | | 500.00 | |
| Subtotals | | 41,500,000.00 | 41,500,000.00 |
| Balance Due From Borrower | | | |
| TOTALS | | 41,500,000.00 | 41,500,000.00 |

Borrower understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accurancy thereof. The Lender involved may be furnished a copy of this Statement.

The undersigned hereby authorizes FIRST AMERICAN TITLE COMPANY to make expenditures and disbursements as shown and approves same for payment. The undersigned also acknowleges receipt of Loan Funds in the amount shown above and receipt of a copy of this Statement.

APPROVED AND ACCEPTED THIS 6th Day of December, 2000.

First American Title Company of Nevada

By: Sharon G. Silverberg

Desert Land LLC

Howard Bulloch

By: Howard Bulloch, Manager

SGS

N/H-018872

Kevin W. Coleman (CA SBN 168538)
Christopher H. Hart (CA SBN 184117)
NUTI HART LLP
411 30TH Street, Suite 408
Oakland, CA 94609-3311
Telephone: 510-506-7152
Email: kcoleman@nutihart.com
chart@nutihart.com

Talitha Gray Kozlowski (NV SBN 9040)
GARMAN TURNER GORDON LLP
650 White Drive, Suite 100
Las Vegas, NV 89119
Telephone: 725-777-3000
Email: tgray@gtg.legal

Counsel for Kavita Gupta,
Chapter 11 Trustee

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>DESERT LAND, LLC<br><br>Debtor. | Case No.: BK-S-18-12454-GS<br><br>Chapter 11 |
| In re:<br><br>DESERT OASIS APARTMENTS, LLC,<br><br>Debtor. | Case No.: BK-S-18-12456-GS<br><br>Chapter 11 |
| In re:<br><br>DESERT OASIS INVESTMENTS, LLC,<br><br>Debtor. | Case No.: BK-S-18-12457-GS<br><br>Chapter 11<br><br>**DECLARATION OF GINA SHELTON RE INTERCOMPANY CLAIM** |

I, Gina Shelton, declare as follows:

1. I am a senior staff accountant and bookkeeper with Swecker, Moloney & Moir CPA's ("SMM"), and have held this position continuously for approximately 30 years. My business address is 2451 S. Buffalo Drive Ste. 105, Las Vegas, Nevada 89117. Except as otherwise noted, all statements in this declaration are based on my own personal knowledge and if called to testify on this matter, I could and would competently testify thereto.

2. From approximately 1996-97 through approximately 2010-2011, SMM provided bookkeeping and tax preparation services to Desert Land LLC ("DL") and Desert Oasis Apartments LLC ("DOA"). I was the person at SMM who was primarily responsible for inputting entries into the general ledgers maintained for DL and DOA and producing the other accounting documentation referenced below. All of the accounting records discussed (excluding Exhibits B and C) herein were prepared by me or others working under my direction in the ordinary course of providing bookkeeping and tax preparation services to DL and DOA.

3. With limited exceptions not relevant here, journal entries made in DL and DOA's general ledgers were based on source documentation such as checks and escrow statements provided to SMM by David Gaffin. After SMM's bookkeeping and tax preparation services for a given period were completed, the source documentation would be returned to DL and DOA.

4. Counsel for Kavita Gupta, Chapter 11 trustee for the DL and DOA bankruptcy estates served a subpoena on SMM for the production of documents relating to the origins and basis for an $4.5 million debt DOA stated that it owed to DL in the schedule of liabilities filed in this bankruptcy case. SMM thereafter conducted a diligent search of its records, and to the best of its knowledge, produced all documents in SMM's possession, custody, and control sought in the subpoena. The documents produced totaled 107 pages. Attached hereto as **Exhibit A** is a true and correct copy of all of the documents produced in response to the Trustee's subpoena.

5. A working trial balance I prepared for DOA for the period ending December 31, 2000 is included in Exhibit A [at bates page SW0004]. The December 31, 2000 working trial balance indicates that as of December 31, 1999, DOA was obligated on a note payable to Heller Financial in the amount of $5,000,000.00. The amounts reflected as owing by DOA Heller Financial on the December 31, 2000 working trial balance was based on journal entries that I had previously made on DOA's general ledger.

6. DOA's December 31, 2000 working trial balance [SW0004] further indicates that as of December 31, 2000:

a. the amount owed by DOA to Heller Financial had been paid; and

b. a note payable to DL by DOA had increased by $5,008,060.83.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

7. DOA's payment to Heller Financial and the increased liability to DL referenced in paragraph 6 were also reflected in journal entries entered on DOA's general ledger.

8. My hand written notation on the DOA December 31, 2000 working trial balance indicates that the $5,008,060.83 credit to the note payable to DL related to "DL escrow #684232."

9. I made the general ledger entries and prepared DOA's December 31, 2000 working trial balance after reviewing an escrow closing statement provided to SMM by Mr. Gaffin. Counsel for the Trustee has recently provided me with a copy of the Estimated Borrower's Closing Statement that is attached hereto as **Exhibit B**. I am advised by the Trustee's counsel that Exhibit B was among documents produced by Mr. Gaffin in response to a subpoena served by the Trustee.

10. To the best of my recollection, the closing statement I relied on at the time I made the journal entries and prepared DOA's December 31, 2000 working trial balance [SW0004] was either the same or substantially similar to the Estimated Borrower's Closing Statement attached hereto as Exhibit B. (My understanding is that a final closing statement for an escrow can differ in some respects from an estimated closing statement.)

11. DL is identified in Exhibit B as the borrower of the $41.5 million loaned by Tom Gonzales. DOA is not identified as a borrower on the Gonzales loan. Exhibit B also indicates that $5,028,400.56 of the Gonzales loan proceeds would be disbursed to Heller Financial, which as noted at that time held a $5 million loan secured by DOA's real property.

12. I interpreted the closing statement I relied on when entering the Heller Financial mortgage refinance transactions into DOA's general ledger to mean that DL, but not DOA, borrowed the $41.5 million from Tom Gonzales. I also interpreted the closing statement to mean that DOA borrowed the funds used to pay off the Heller Financial mortgage from DL. It was for that reason that I reflected an amount owing by DOA to DL on the general ledger relating to the payoff of the Heller Financial mortgage.

13. I recently have seen the petition, and schedules of assets and liabilities filed by DOA in its Chapter 11 bankruptcy case filed on May 31, 2002, Case No. 02-16204, which

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

indicate that DOA at that time owed Tom Gonzales $41.5 million. A true and correct copy of DOA's May 31, 2002 petition and schedules supplied to me by counsel for the Trustee are attached hereto as **Exhibit C**. I have also reviewed other documentation provided by counsel for the Trustee indicating that DOA was a co-borrower on the Gonzales loan.

14. Had I known when I made the general ledger entries referenced in paragraphs 5 through 7 above that DOA had borrowed the $5,008,060.83 used to pay off the Heller Financial mortgage from Tom Gonzales instead of DL, I would have reflected that liability as owing to Tom Gonzales. I would not have made a journal entry indicating that DOA owed that amount to DL.

15. Accordingly, the amount reflected on DOA and DL's general ledgers and the December 31, 2000 working trial balance as being owed by DOA to DL on December 31, 2000 was overstated by $5,008,060.83.

I declare under penalty of perjury of the laws of the United States and the State of Nevada that the foregoing is true and correct, and that this Declaration is executed this 27th day of March 2020.

/s/ Gina Shelton
Gina Shelton

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

# EXHIBIT 16

**Kevin Coleman**

| | |
|---|---|
| **From:** | Candace Carlyon <ccarlyon@carlyoncica.com> |
| **Sent:** | Wednesday, April 1, 2020 11:35 AM |
| **To:** | Kevin Coleman |
| **Cc:** | Howard Bulloch; David Gaffin |
| **Subject:** | FW: Desert Land *** Gaffin/Bulloch 2004 Exams |
| **Attachments:** | Gonzales41.5Dec2000.pdf; 2020-03-27 Shelton Decl. re Scheduled Intercompany Claim [Executed Copy].pdf |

Kevin, we are available for a call early this afternoon or any time tomorrow to discuss the issues set forth in your email below. Generally, my client doesn't have any objection to the corrections you suggest.

We have moved!
Candace Carlyon
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577.3613 (direct)

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Monday, March 30, 2020 5:33 PM
**To:** Candace Carlyon <ccarlyon@carlyoncica.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

Candace,

First, I hope that you son's test comes back negative and that otherwise he is better soon.

I would suggest that we start with a phone interview with you and Mr. Gaffin, which depending on what he says, might help us short cut this process.

Gina Swecker, the debtors' accountant/bookkeeper at the time, has signed a declaration stating that she erroneously recorded a $5M liability from Desert Oasis Apartments to Desert Land back in 2000, and as a result, the intercompany obligation shown on the debtors' books was overstated by $5M starting as of December 31, 2000. I attach a copy of that declaration (without exhibits, because they are too voluminous to email).

Ms. Swecker based her entries into the general ledger on a closing statement for the $41.5M loan obtained from Tom Gonzales in December 2000. Ms. Swecker (incorrectly) interpreted the closing statement to mean that Desert Land was the only borrower on the Gonzales loan, and $5M of the loan proceeds paid of an existing mortgage on the apartments

property owed to Heller Financial. (In other words, she booked the $5M as owed by Desert Oasis Apartments to Desert Land because it appeared as if Desert Oasis Apartments borrowed the money from Desert Land, not Gonazles.) Now realizing that Desert Oasis Apartments borrowed the money from Gonzales – a fact that no one disputes – she admits that this $5M debt should have been reflected as a liability owed to Gonazles, not Desert Land.

Our assumption is that the schedules filed by Desert Oasis Apartments were prepared based on the debtor's accounting records which showed a $4.5M intercompany balance owing to Desert Land in 2018. However, as noted, the erroneous entry from 2000 showing that Desert Oasis Apartments owed Desert Land $5M based on the payoff of the Heller Financial loan overstated the account balance, and that error was carried on the books for years because no one caught it. The bottom line is that since the amount owing to Desert Land was overstated by $5M back in 2000, it appears to us that Desert Oasis Apartments did not owe Desert Land $4.5M by the time these bankruptcy cases were filed. If Mr. Gaffin agrees that the scheduled debt was based on an accounting error, the Desert Oasis Apartments schedule F should be amended to eliminate the purported liability to Desert Land.

In addition, the general ledger also indicates that $470,000 was paid to Eagle Mortgage in April 2003, and this is reflected on the GL as a credit against the intercompany claim balance owed to Desert Land. However, based on our review of the dockets in the 2002 bankruptcy cases, it appears that Desert Oasis Apartments was the borrower under that Eagle Mortgage loan, and so it appears likely that this $470K credit was erroneous as well.

Please let me know if you and Mr. Gaffin are willing to discuss the foregoing, and if so, if there is a time when we can speak tomorrow afternoon or Wednesday.

Best regards,

--Kevin

---

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Monday, March 30, 2020 2:51 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

Kevin/Talitha, please see attached in furtherance of the request to defer the deposition.

We have moved!
Candace Carlyon
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577.3613 (direct)

---

**From:** Candace Carlyon
**Sent:** Monday, March 30, 2020 10:29 AM

**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

Kevin, my client wants me to be with him during his deposition. Given his age and the fact that I am awaiting test results for my quarantined son, let's put this off until an in person deposition is realistic, or proceed via written deposition questions.

We have moved!
Candace Carlyon
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577.3613 (direct)

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 27, 2020 4:28 PM
**To:** Candace Carlyon <ccarlyon@carlyoncica.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** Re: Desert Land *** Gaffin/Bulloch 2004 Exams

Candace,

If you want to be on the phone that's fine, you can listen I to the Zoom conference, but I want to be able to see Mr. Gaffin and make sure that if I am directing him to a place in an exhibit he is looking at the right thing.

Most laptops and tablets have cameras, which again is all you would need.

—Kevin

Sent from my iPhone

> On Mar 27, 2020, at 4:20 PM, Candace Carlyon <ccarlyon@carlyoncica.com> wrote:
>
> I don't have video or sound on my computer, we can do it telephonically.
>
> Candace Carlyon
> Carlyon Cica Chtd.
> 265 E. Warm Springs Suite 107

Las Vegas, NV 89119
702.685.4444 (office)
702.577-3613 (direct)
CarlyonCica.com

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Friday, March 27, 2020 3:52 PM
**To:** Candace Carlyon <ccarlyon@carlyoncica.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

My understanding is that this is done through your computer or tablet.

--Kevin

---

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Friday, March 27, 2020 3:49 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** Re: Desert Land *** Gaffin/Bulloch 2004 Exams

We don't have video capability

Candace Carlyon
Carlyon Cica Chtd.
265 E. Warm Springs Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577-3613 (direct)
CarlyonCica.com

> On Mar 27, 2020, at 3:48 PM, Kevin Coleman <kcoleman@nutihart.com> wrote:
>
> OK/We'll make the Zoom video conference arrangements for Apr 2 at 1pm. I will send the exhibits ahead of time.
>
> --Kevin

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Thursday, March 26, 2020 8:33 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>; Talitha Gray <tgray@gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>; Nancy Rodriguez <nrodriguez@carlyoncica.com>; Cristina Robertson <crobertson@carlyoncica.com>
**Subject:** Re: Desert Land *** Gaffin/Bulloch 2004 Exams

April 2 works via telephone. Will you be sending the exhibits over beforehand?

Candace Carlyon
Carlyon Cica Chtd.
265 E. Warm Springs Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577-3613 (direct)
CarlyonCica.com

On Mar 24, 2020, at 5:05 PM, Kevin Coleman <kcoleman@nutihart.com> wrote:

Hi Candace,

Would you and Mr. Gaffin be available for his exam in the afternoon on either Thursday April 2 or Tuesday April7? Although not my preference, looks like we'll do this by video. If those dates don't work, please let me know a few around there that do.

I am now thinking that depending on what Mr. Gaffin says, we may not need to have an examination of Bruce Bulloch.

Best regards,

--Kevin

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Thursday, March 19, 2020 8:34 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>; Dawn Cica <Dcica@carlyoncica.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Kim Fineman

<kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

I am not available April 8, and the Nevada lockdown is scheduled to run at least through April 17. I am available the 15th and 16th, and will check with Mr. Gaffin as to his availability. I can also reach out to Bruce Bulloch as a courtesy to you (although you are welcome to contact him directly, I do not represent him).

We have moved!
Candace Carlyon
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577.3613 (direct)
<image001.png>

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Wednesday, March 18, 2020 4:36 PM
**To:** Candace Carlyon <ccarlyon@carlyoncica.com>; Dawn Cica <Dcica@carlyoncica.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

Thanks Candace. It would be much less cumbersome to have the examinations in person, so I would prefer to stick with the April 8 and 16 dates in hopes that we can do them that way. But if it's clear we can't as we approach those dates, I will set them up through Zoom. Are the 8th and 16th going to work on your end?

--Kevin

---

**From:** Candace Carlyon [mailto:ccarlyon@carlyoncica.com]
**Sent:** Wednesday, March 18, 2020 10:02 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>; Dawn Cica <Dcica@carlyoncica.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder

<MFeder@dickinson-wright.com>
**Subject:** RE: Desert Land *** Gaffin/Bulloch 2004 Exams

Good morning. Hope you are all managing this crisis. If you want to go forward with the depositions remotely next week that works for us. I do not represent Bruce Bulloch (I represent his brother Howard), but I understand that he would be available for a remote link if that is available. I have not worked with "Zoom", but would agree to any reasonable method which permits everyone to be at their desks. Candace

We have moved!
Candace Carlyon
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
702.685.4444 (office)
702.577.3613 (direct)
<image002.png>

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Tuesday, March 17, 2020 2:30 PM
**To:** Candace Carlyon <ccarlyon@carlyoncica.com>; Dawn Cica <Dcica@carlyoncica.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>; Kim Fineman <kfineman@nutihart.com>; Kavita Gupta <kgupta@guptaferrer.com>; REECE, CATHY <CREECE@fclaw.com>; AUSTIN, ANTHONY <AAUSTIN@fclaw.com>; Michael N. Feder <MFeder@dickinson-wright.com>
**Subject:** Desert Land *** Gaffin/Bulloch 2004 Exams

Candace,

We will defer the Gaffin and Bulloch examinations currently scheduled for March 25 and 26. For Mr. Gaffin, I would request that we have Mr. Gaffin's on April 8 at 1pm, and Mr. Bulloch's on April 16 at 10:30am.

For now, I plan to do those in person in Las Vegas and Woodland Hills, CA, respectively. But if the coronavirus situation shows no signs of abating, I would do them by a Zoom teleconference. I would, however, need you to stipulate that the examinations can proceed in that manner.

If you are not available on Apr. 8 and 16, please let me know what earlier days are open.

Best regards,

--Kevin

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com

<image003.png>

First American Title Company of Nevada
3760 Pecos McLeod Interconnect, Suite 7 * Las Vegas, NV 89121-4253
(702) 731-4131

ESCROW NUMBER: 884232
PROPERTY: Vacant Land
026 and 162-28-302-001

TODAY'S DATE: 12/06/2000
CLOSING DATE: 12/06/2000

BORROWERS:
Desert Land LLC

ESTIMATED BORROWER'S CLOSING STATEMENT

| DESCRIPTION | | DEBITS | CREDITS |
|---|---|---|---|
| Loan from | Tom Gonzales | | 41,500,000.00 |
| Funds previously received from Tom Gonzalez on 11/22/00 | | 500,000.00 | |
| 190-99218 | Gonzo Financial | 1,867,994.03 | |
| #99-133/Oasis Apartments | Heller Financial | 5,028,400.56 | |
| Pay off to New World, LLC | | 5,000,000.00 | |
| Origination Fee 2.000% | Tom Gonzales | 830,000.00 | |
| Origination fee 1.000% | Barry Fieldman | 415,000.00 | |
| Interest - 1 yr in advance | Tom Gonzales | 5,397,493.26 | |
| Sammie Armstrong to | #889231 | 1,358,616.67 | |
| Interest from 11/22/2000 to 12/06/2000 @ $178.09000/day | | 2,493.26 | |
| To # 86015 Tivoli | | 5,219,472.00 | |
| To 833089 FLT Trust | | 15,852,120.22 | |
| Title Premium - Owners | First American Title Co/Nevada | 200.00 | |
| Alta Premium - Lenders | First American Title Co/Nevada | 16,340.00 | |
| County tax/stamps: Deed $ 6,750.00 Mtg $ | | 6,750.00 | |
| Recording fees: Deed$ | Mtg$ 250.00 Releases$ | 250.00 | |
| Recon Tracking Fee | First American Title | 400.00 | |
| Overnight Del/Handling Fee | First American Title | 95.00 | |
| Inspection Fee | First American Title | 1,120.00 | |
| Fax/Phone Charges | First American Title | 105.00 | |
| Escrow Fee | First American Title Co/Nevada | 2,650.00 | |
| Held For Misc | | 500.00 | |
| Subtotals | | 41,500,000.00 | 41,500,000.00 |
| Balance Due From Borrower | | | |
| TOTALS | | 41,500,000.00 | 41,500,000.00 |

Borrower understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accurancy thereof. The Lender involved may be furnished a copy of this Statement.

The undersigned hereby authorizes FIRST AMERICAN TITLE COMPANY to make expenditures and disbursements as shown and approves same for payment. The undersigned also acknowleges receipt of Loan Funds in the amount shown above and receipt of a copy of this Statement.

APPROVED AND ACCEPTED THIS 6th Day of December, 2000.

First American Title Company of Nevada

By: Sharon G. Silverberg

Desert Land LLC

Howard Bulloch

By: Howard Bulloch, Manager

SGS

N/H-018893

Kevin W. Coleman (CA SBN 168538)
Christopher H. Hart (CA SBN 184117)
NUTI HART LLP
411 30TH Street, Suite 408
Oakland, CA 94609-3311
Telephone: 510-506-7152
Email: kcoleman@nutihart.com
chart@nutihart.com

Talitha Gray Kozlowski (NV SBN 9040)
GARMAN TURNER GORDON LLP
650 White Drive, Suite 100
Las Vegas, NV 89119
Telephone: 725-777-3000
Email: tgray@gtg.legal

Counsel for Kavita Gupta,
Chapter 11 Trustee

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>DESERT LAND, LLC<br><br>Debtor. | Case No.: BK-S-18-12454-GS<br><br>Chapter 11 |
| In re:<br><br>DESERT OASIS APARTMENTS, LLC,<br><br>Debtor. | Case No.: BK-S-18-12456-GS<br><br>Chapter 11 |
| In re:<br><br>DESERT OASIS INVESTMENTS, LLC,<br><br>Debtor. | Case No.: BK-S-18-12457-GS<br><br>Chapter 11<br><br>**DECLARATION OF GINA SHELTON RE INTERCOMPANY CLAIM** |

I, Gina Shelton, declare as follows:

1. I am a senior staff accountant and bookkeeper with Swecker, Moloney & Moir CPA's ("SMM"), and have held this position continuously for approximately 30 years. My business address is 2451 S. Buffalo Drive Ste. 105, Las Vegas, Nevada 89117. Except as otherwise noted, all statements in this declaration are based on my own personal knowledge and if called to testify on this matter, I could and would competently testify thereto.

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

2. From approximately 1996-97 through approximately 2010-2011, SMM provided bookkeeping and tax preparation services to Desert Land LLC ("DL") and Desert Oasis Apartments LLC ("DOA"). I was the person at SMM who was primarily responsible for inputting entries into the general ledgers maintained for DL and DOA and producing the other accounting documentation referenced below. All of the accounting records discussed (excluding Exhibits B and C) herein were prepared by me or others working under my direction in the ordinary course of providing bookkeeping and tax preparation services to DL and DOA.

3. With limited exceptions not relevant here, journal entries made in DL and DOA's general ledgers were based on source documentation such as checks and escrow statements provided to SMM by David Gaffin. After SMM's bookkeeping and tax preparation services for a given period were completed, the source documentation would be returned to DL and DOA.

4. Counsel for Kavita Gupta, Chapter 11 trustee for the DL and DOA bankruptcy estates served a subpoena on SMM for the production of documents relating to the origins and basis for an $4.5 million debt DOA stated that it owed to DL in the schedule of liabilities filed in this bankruptcy case. SMM thereafter conducted a diligent search of its records, and to the best of its knowledge, produced all documents in SMM's possession, custody, and control sought in the subpoena. The documents produced totaled 107 pages. Attached hereto as **Exhibit A** is a true and correct copy of all of the documents produced in response to the Trustee's subpoena.

5. A working trial balance I prepared for DOA for the period ending December 31, 2000 is included in Exhibit A [at bates page SW0004]. The December 31, 2000 working trial balance indicates that as of December 31, 1999, DOA was obligated on a note payable to Heller Financial in the amount of $5,000,000.00. The amounts reflected as owing by DOA Heller Financial on the December 31, 2000 working trial balance was based on journal entries that I had previously made on DOA's general ledger.

6. DOA's December 31, 2000 working trial balance [SW0004] further indicates that as of December 31, 2000:

a. the amount owed by DOA to Heller Financial had been paid; and

b. a note payable to DL by DOA had increased by $5,008,060.83.

7. DOA's payment to Heller Financial and the increased liability to DL referenced in paragraph 6 were also reflected in journal entries entered on DOA's general ledger.

8. My hand written notation on the DOA December 31, 2000 working trial balance indicates that the $5,008,060.83 credit to the note payable to DL related to "DL escrow #684232."

9. I made the general ledger entries and prepared DOA's December 31, 2000 working trial balance after reviewing an escrow closing statement provided to SMM by Mr. Gaffin. Counsel for the Trustee has recently provided me with a copy of the Estimated Borrower's Closing Statement that is attached hereto as **Exhibit B**. I am advised by the Trustee's counsel that Exhibit B was among documents produced by Mr. Gaffin in response to a subpoena served by the Trustee.

10. To the best of my recollection, the closing statement I relied on at the time I made the journal entries and prepared DOA's December 31, 2000 working trial balance [SW0004] was either the same or substantially similar to the Estimated Borrower's Closing Statement attached hereto as Exhibit B. (My understanding is that a final closing statement for an escrow can differ in some respects from an estimated closing statement.)

11. DL is identified in Exhibit B as the borrower of the $41.5 million loaned by Tom Gonzales. DOA is not identified as a borrower on the Gonzales loan. Exhibit B also indicates that $5,028,400.56 of the Gonzales loan proceeds would be disbursed to Heller Financial, which as noted at that time held a $5 million loan secured by DOA's real property.

12. I interpreted the closing statement I relied on when entering the Heller Financial mortgage refinance transactions into DOA's general ledger to mean that DL, but not DOA, borrowed the $41.5 million from Tom Gonzales. I also interpreted the closing statement to mean that DOA borrowed the funds used to pay off the Heller Financial mortgage from DL. It was for that reason that I reflected an amount owing by DOA to DL on the general ledger relating to the payoff of the Heller Financial mortgage.

13. I recently have seen the petition, and schedules of assets and liabilities filed by DOA in its Chapter 11 bankruptcy case filed on May 31, 2002, Case No. 02-16204, which

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152

indicate that DOA at that time owed Tom Gonzales $41.5 million. A true and correct copy of DOA's May 31, 2002 petition and schedules supplied to me by counsel for the Trustee are attached hereto as **Exhibit C**. I have also reviewed other documentation provided by counsel for the Trustee indicating that DOA was a co-borrower on the Gonzales loan.

14. Had I known when I made the general ledger entries referenced in paragraphs 5 through 7 above that DOA had borrowed the $5,008,060.83 used to pay off the Heller Financial mortgage from Tom Gonzales instead of DL, I would have reflected that liability as owing to Tom Gonzales. I would not have made a journal entry indicating that DOA owed that amount to DL.

15. Accordingly, the amount reflected on DOA and DL's general ledgers and the December 31, 2000 working trial balance as being owed by DOA to DL on December 31, 2000 was overstated by $5,008,060.83.

I declare under penalty of perjury of the laws of the United States and the State of Nevada that the foregoing is true and correct, and that this Declaration is executed this 27th day of March 2020.

/s/ Gina Shelton
Gina Shelton

NUTI HART LLP
411 30TH STREET, SUITE 408
OAKLAND, CA 94609-3311
TELEPHONE: 510-506-7152