# EXHIBIT D

Inter-Company Debt Investigation

General Timeline

| Fact | Source |
| --- | --- |
| Desert Oasis Apartments acquired the apartments property in 1999 | DOA Disclosure Statement, p. 4 |
| DOA's obligation to DL arose in 1999-2000 | Gaffin Answers, ¶5. |
| "During early years (around 2000), cash was borrowed by Desert Land to cover capital and operating needs of other entities.  These amounts were advanced by related entities as valid due to/due from amounts on the books of both entities." | Gaffin Answers, ¶6. |
| The obligation of DOA to DL was not memorialized in a loan agreement, however "there are company records including schedules and ledgers, bank records, records held by management company and records held by accountants" | Gaffin Answers, ¶7. |
| Desert Land borrowed money prior to 2002 "which it used for Desert Oasis Apartments, LLC" | Gaffin Answers, ¶9. |
|  |  |
| DL Working Trial Balance reflects an Escrow #933078, and on the same line as "Due From Desert Oasis Motel"<br><br>DB  $6,750,000<br>CR  $4,884,543<br><br>Hand written notation "2000 $1,865,457 Due from DO Apts.?"<br><br>$6,750,000 - $4,884,543 = $1,865,457 | SW0089 |
| DL trial balance dated 12-31-00 reflects a "Due From Desert Oasis Apartments" of $1,865,456.91 as of 12-31-99 | SW0091<br><br>wecker Documents pp. 7, 12, 13 |
| Hand written notation on DL 12-31-00 trial balance says "2000 refi escrow #684232 + $5,008,060.83, Adj. <52,721.19> | SW0091 |

| | |
|---|---|
| Balance of Due from DO Apts @ 12/31/00 = $6,820,796.55" | |
| On December 7, 2000, Tom Gonzales ("Gonzales") loaned $41.5 million ("Gonzales Loan") to Desert Land, LLC ("Desert Land") and Desert Oasis [Apartments] to finance Desert Land and Desert Oasis's acquisition of certain property in Las Vegas, Nevada | DOA Disclosure Statement, p. 7 |
| Worksheet for DL 2001 tax return (balance sheet) reflects a "Due From Desert Oasis Apartments of $6,820,797 at the beginning of 2001, and that the amount is $6,811,321 at the end of the period<br><br>Hand written notation says "2001 -reduction $9,476" | SW0094 |
| Hand written notation on worksheet "No accounting information in file – these are computer input sheets for 2001" | SW0095 |
| Desert Land and Desert Oasis Apartments file Chapter 11 cases on May 31, 2002 | Desert Land Petition and Schedules (2002 case)<br>Desert Oasis Apartments Petition and Schedules (2002 case) |
| Desert Land's Schedule B filed 5/31/20002 makes no reference to a debt owed to it by Desert Oasis Apartments | Desert Land Petition and Schedules (2002 case), pdf pp. 6-8. |
| Desert Land's liabilities as of 5/31/2002 are listed on the Amendment to Petition filed 6/28/2002, none of which appear to relate to Desert Oasis Apartments.  (DOA's schedules A and B do not reflect interests in any of the properties or investments listed by DL.) | Desert Land Amendment to Petition (2002 case), pdf pp. 3 of 21 |
| Desert Land filed an Amendment to its petition on 6/28/2002<br>-Financial Statement lists no obligation owed by Desert Oasis Apartments<br>-SOFA ¶10 discloses no other transfers within one year prior to 5/31/2002 | Desert Land Amendment to Petition (2002 case), pdf pp. 3 of 21 |

| | |
|---|---|
| Desert Oasis Apartments' Schedules do not list any liability owed to Desert Land.  Desert Land is not listed on the Creditor Matrix | |
| Desert Oasis Apartments filed an amendment to its petition on 6/27/2002<br>-no amendment to Sch. F included<br>-Financial Statement makes no reference to an obligation owed to Desert Land | |
| DL General Ledger for the period ending 12-31-02 indicates that the beginning balance of account 124 "Due from Desert Oasis Apartments" was $6,811,321.31. | SW0096 |
| DL General Ledger for the period ending 12-31-02 indicates that the following transactions affecting account 124 occurred:<br><br>LOAN-DESERT OASIS APARTMENTS      -25,000<br>3/5/02 INT - PD D O APTS            -70,949.92<br>2002 DESERT OASIS INT-GONZALES   480,016.82<br>NV SEC OF STATE-DESERT OASIS INV      275.00<br>NV SEC OF STATE-DESERT OASIS INV      165.00<br>ASPEN MORTGAGE                      22,995.35<br>                              --------------------<br>                                   407,502.25*<br><br>ending balance $7,218,823.56 | SW0096-97 |
| On December 31, 2002, a journal entry in the amount of $7,218,823.56 was created in Quickbooks, indicating an intercompany obligation by Desert Apartments to Desert Land | |
| Oral settlement of Gonzales Tr. Objections to plan confirmation in 2002 cases announced 1/29/2003. | DOA Disclosure Statement, p. 8 |
| Gonzalez released his lien pursuant to the settlement, and remaining 5.5% ownership interest in property transferred to DOA by Gonzales and Fieldman | DOA Disclosure Statement, p. 9 |
| Pursuant to the settlement, Gonzales agreed to subordinate its lien on the DOA property to a | BAP decision, p. 5 (pdf p. 117 of 139 of the DOA Disclosure Statement) |

| | |
|---|---|
| loan of up to $5M [which seems inconsistent with the idea that the lien was released] | |
| The bankruptcy court later approved the debtors' requested loan on that property through Eagle Mortgage Company for $2 million. | BAP decision, p. 5 (pdf p. 117 of 139 of the DOA Disclosure Statement) |
| DL-DOA joint plan confirmed 4/21/2003. | DOA Disclosure Statement, p. 10 |
| Second Amended Plan in the 2002 cases provided for dismissal of DOA case. | |
| DOA 2002 case dismissed pursuant to confirmation order<br><br>IT IS ORDERED that except as otherwise provided in this Confirmation Order, immediately upon the entry of this Confirmation Order, the terms of the Plan shall be, and hereby are, deemed binding upon Reorganized Desert Land and the other Debtors, any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are impaired under the Plan or whether the holders of such Claims or Equity Interests accepted, rejected or are deemed to have accepted or rejected the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with Reorganized Desert Land and any and all entities who are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan and the respective heirs, executors, administrators, successors or assigns, if any, of any of the foregoing; and | April 21, 2003 confirmation order, p. 5 |
| | |
| | |
| DL general ledger for the period ending 02-14-03 indicates no change to the balance in account 124 | SW0098 |
| DL general ledger for the period ending 03-28-03 indicates no change to the balance in account 124 | SW0099 |

| | |
|---|---|
| DL General Ledger for the period ending 12-31-03 indicates that the following transactions affecting account 124 occurred:<br><br>4/11/03 Eagle Mortgage     -350,000.00<br>4/11/03 Eagle Mortgage     -175,000.00<br>6/10/03 Deposit     -150,000.00<br>Int to Aspen DO Apts Loan   -768,124.98<br>Desert Oasis Apts     2,000.00<br>        --------------------<br>        1,441,124.98*<br><br>ending balance $5,777,698.58 | SW0100 |
| DL General Ledger for the period ending 12-31-04 indicates that the following transactions affecting account 124 occurred:<br><br>2004 Lease paid by DO Apts   -150,000.00<br><br>ending balance $5,627,698.58 | SW0101 |
| DL General Ledger for the period ending 12-31-05 indicates that the following transactions affecting account 124 occurred:<br><br>2005 expenses paid by DO Apts   -797,812.49<br><br>ending balance $4,829,886.09 | SW0102 |
| DL general ledger for the period ending 12-31-06 indicates no change to the balance in account 124 | SW0103 |
| DL General Ledger for the period ending 12-31-07 indicates that the following transactions affecting account 124 occurred:<br><br>Midland Loan Services,<br>JP Morgan, DO     349,587.50<br><br>ending balance $5,179,473.59 | SW0104 |

| | |
|---|---|
| DL general ledger for the period ending 12-31-08 indicates no change to the balance in account 124 | SW0105 |
| DL general ledger for the period ending 12—31-09 references multiple additions to account 124 totaling $193K (vague descriptions)<br><br>Ending balance $5,372,471.18 | SW0106-07 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| DOA filed for Chapter 11 on 5/10/2011 | |
| WFB scheduled as holding a secured claim for approx. $3.1M.  It is the only scheduled secured claim. | |
| Desert Land scheduled as holding an undisputed, non-contingent and liquidated unsecured non-priority claim in the amount of $5,468,103.96 | Schedules-SOFA (pdf p. 20 of 43) |
| SOFA indicates that no payments were made to insiders in 1-year prior to bankruptcy (5/10/2010 to 5/9/2011) | SOFA (pdf p. 29 of 43) |
| SOFA indicates no withdrawals or distributions to insiders within 1-year prior to bankruptcy | SOFA (pdf p. 35 of 43) |
| Article IV of the DOA plan filed 8/16/2011 provides that by agreement, the DL claim will be subordinated to other unsecured claim holders | DOA Disclosure Statement, p. 4 |
| Cash flow projections attached as Exh. F to the 2011 disclosure statement indicate that DOA would make "debt-service payments" of | DOA Disclosure Statement, pdf p. 139 of 139 |

| | |
|---|---|
| $219,000 per year, and $36,000 per year in payments to unsecured creditors.<br><br>Net income was projected to range between $156K and $205K per month | |
| | |
| | |
| | |
| | |
| DOA made payments to DL from 2012 to 2017. "These amounts were made in monthly payments from the cash flow from the Desert Oasis Apartments to Desert Land, LLC" | Gaffin Answers, ¶10. |
| | |
| | |

# EXHIBIT E

**Kevin Coleman**

| | |
|---|---|
| **From:** | Kevin Coleman |
| **Sent:** | Wednesday, June 10, 2020 10:51 AM |
| **To:** | 'McDonald Jr, Edward M.  (USTP)' |
| **Cc:** | 'kgupta@guptaferrer.com'; Greg Nuti; Chris Hart; Kim Fineman; 'Talitha Gray' |
| **Subject:** | RE: Desert Land Cases |
| **Attachments:** | DesertLand_Letter.pdf |

Hi Ed,

I am resending the attached letter with two corrections.  First, on p. 22, we changed the date Ms. Gupta received the preliminary transfer analysis.  Yesterday's draft indicated May 26, when in fact that was June 1, 2020.  Second, on p. 1, we changed the reference to the statute of limitations from 326 to 546.

Best regards,

--Kevin

**From:** Kevin Coleman
**Sent:** Tuesday, June 9, 2020 4:45 PM
**To:** McDonald Jr, Edward M. (USTP) <Edward.M.McDonald@usdoj.gov>
**Cc:** kgupta@guptaferrer.com; Greg Nuti <gnuti@nutihart.com>; Chris Hart <chart@nutihart.com>; Kim Fineman <kfineman@nutihart.com>; 'Talitha Gray' <tgray@Gtg.legal>
**Subject:** Desert Land Cases
**Importance:** High

Hello Ed,

Attached is a letter from Kavita Gupta, Chapter 11 trustee for the estates of Desert Land and related debtors.  As you will see, it explains the circumstances under which she believes it necessary to resign as trustee in the Desert Land LLC case.  Let me know if you would like to have a call to discuss.

Best regards,

--Kevin

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com

1

N/H-019214



N/H-019215



1300 Bristol Street North, Suite
100 Newport Beach, CA 92660
Tel: 949.387.4470
Fax: 949.258.9786
www.guptaferrer.com

June 9, 2020

**CONFIDENTIAL[1]**

Mr. Edward M. McDonald, Esq.
Trial Attorney
Office of the United States Trustee
300 Las Vegas Boulevard South, Suite 4300
Las Vegas, NV 89101

      Re:    <u>In re Desert Land, LLC, Desert Oasis Apartments, LLC and Desert Oasis</u>
                  <u>Investments, LLC, jointly administered under Case No. 18-12454-GS</u>

Dear Mr. McDonald:

      I was appointed as the Chapter 11 Trustee for the jointly administered cases of Desert Land, LLC ("Desert Land"), Desert Oasis Apartments, LLC ("Desert Apartments") and Desert Oasis Investments, LLC ("Desert Investments") (collectively, the "Debtors") on April 3, 2019. (Dkt. No. 530.)

      I am writing to advise you that I will be resigning as the Chapter 11 Trustee for Desert Land due to a recently discovered conflicts of interest – specifically, the existence of claims between Desert Land and Desert Apartments and between Desert Land and Desert Investment, which are described in more detail in Section VI(B) below.   However, I would like to coordinate the timing of my resignation with your office in order to minimize the disruption to the Desert Land case.  I note that any subsequent Chapter 11 Trustee will have to address the following issues:

      1.     the Section 546 statute of limitations will expire on or about June 27, 2020;

      2.     The auction of Desert Land's real property was concluded on June 5, 2020.  The secured creditors for Desert Land, DLLA and the Shotgun Entities, purchased the properties via credit bid.   The sale orders will be entered shortly and the transfer of the properties should occur by the end of the month.  In the interim, I am continuing to operate and/or administer the Desert Oasis Motel and the two commercial buildings located on the Desert Land property; and

      3.     Desert Land Loan Acquisition, LLC, an entity owned by David Gaffin and Howard Bulloch ("DLLA"), the Debtors' managers, appealed the Bankruptcy Court's April 23, 2020 order denying their motion to suspend the Debtors' cases and/or extend the auction.  The appeal is pending

---

[1] This letter contains confidential information from pleadings filed under seal and/or memorandums of decision issued by the Bankruptcy Court and District Court under seal.

Mr. Edward M. McDonald
June 9, 2020
Page 2 of 23

before the Hon. James C. Mahan, the Nevada District Court (Case No. 2:20-cv000844). Per the docket and as of the date of this letter, no briefing schedule has been set; and

In order to provide context to my decision and analysis, I have also provided an executive summary of the status of the Debtors' cases in Section I below and a summary of my administration in Sections II-V.

## I.    Executive Summary of the Status of the Debtors' Cases

The Debtors collectively owned a total of 38.5 acres of real property on or around the Las Vegas Blvd. (colloquially known as the "Las Vegas Strip"), Las Vegas, Nevada, the majority of which is unimproved land (the "Aggregate"). This is the Debtors' third Chapter 11 bankruptcy case since 2002. Messrs. Gaffin and Bulloch have been attempting to sell or develop the Aggregate for over 17 years. They not only failed to do so, Messrs. Gaffin and Bulloch encumbered the Aggregate with over $250 million in secured debt as of June 5, 2020[2]. They also took undocumented "loans" from the Debtors for themselves and related entities and relatives.

On April 13, 2018, a judgment creditor filed an involuntary petition against each of the Debtors. The Debtors' cases were converted to Chapter 11 cases on June 28, 2018. Post-petition, Messrs. Gaffin and Bulloch were still unable to sell the Aggregate from June 2018 to April 2019. The Bankruptcy Court subsequently appointed a Chapter 11 trustee after it found that Messrs. Gaffin and Bulloch were elevating their own self-interest above that of the creditors of the Debtors' estates.

### A.    Desert Land

Desert Land owns approximately 23 acres of real property, of which approximately 16 acres is vacant land and the remaining 7 acres are improved with a motel, a vacant two-story commercial building and a one-story commercial building. The secured creditors are: (1) Clark County Treasurer ($1.2 million); (2) the Shotgun Entities ($185 million); and DLLA ($16.50 million).

On June 5, 20120, the Bankruptcy Court conducted an auction and the Shotgun Entities and DLLA each credit bid for the property encumbered by their respective liens. The Bankruptcy Court approved the sale to these entities, subject to the priority property tax liens of Clark County Treasurer. The order approving the sales should be final by the end of June 2020.

Therefore, Desert Land's sole remaining assets are approximately $24,000 of unencumbered cash and potential litigation claims.

### B.    Desert Apartments

Desert Apartments owns a 6.286 acre parcel located at 5316 Danville Land, Las Vegas, Nevada, which is improved with a 128 unit apartment building. The secured creditors are: (1) The Northern Trust Company ("Northern Trust") ($5 million); and (2) Bradley J. Busbin, as trustee of the Gonzales

---

[2] This amount includes post-petition interest.

Mr. Edward M. McDonald
June 9, 2020
Page 3 of 23

Charitable Remainder Unitrust One ("Busbin") ($13.78 judgment lien).  However, Busbin has conceded to the Estate's counsel that his claim is in fact unsecured because it is an avoidable preference.  Consequently, the Estate's counsel will either file a preference action against Busbin or enter into a consensual agreement with him as to the priority of his claim.

Busbin filed an adversary action against Northern Trust seeking declaratory relief to determine the priority of his lien vis-à-vis Northern Trust (Adv. No. 19-1108.)  On April 22, 2020, the Bankruptcy Court granted Northern Trust's motion for summary judgment finding that Northern Trust's lien had priority over Busbin's judgment lien.  (Adv. Dkt. No. 38.)  Northern Trust has filed a motion under FRCP 54(b) to deem that judgment to be final which is scheduled for hearing on June 16, 2020.

On June 5, 20120, the Bankruptcy Court conducted an auction and approved the sale of the property to ED-DEN Investment Co. LLC for $15.6 million with a back-up bid from Stone Street Capital of $15.25 million.  I anticipate that the sale will close by the end of June 2020.  The net sale proceeds of approximately $10 million will be sufficient to make a meaningful distribution to unsecured creditors.  However, because of the pending adversary proceeding between Busbin and Northern Trust, I have asked the Bankruptcy Court to hold the sale proceeds in escrow.  In the interim, I will continue to administer the Desert Apartments' estate including reviewing claims and the Estate's counsel will file avoidance actions and draft a liquidating plan.

C.     **Desert Investments**

Desert Investments' sole asset is a vacant 8.965 acre parcel of real property located at 95 East Ali Baba Lane, Las Vegas, NV.  The secured creditors are: (1) Clark County Treasurer's Office ($337,991); (2) Juniper Loan Servicing ("Juniper") ($28.65 million); and (3) Busbin ($13.78 million).  As stated above, Busbin has conceded to the Estate's counsel that his claim is in fact unsecured because it is an avoidable preference.

On May 1, 2020, I, on behalf of the Estate, entered into a sale agreement with The Three Affiliated Tribes of the Fort Berthold Indian Reservation (the "MHA Nation") pursuant to which the MHA Nation agreed to purchase the property for $17.90 million.  The sale agreement contained a due diligence contingency which allowed the MHA Nation to terminate the agreement if it could not construct a hotel and casino up to 30 stories.  On June 4, 2020, the MHA Nation terminated the agreement pursuant to the due diligence contingency but indicated that it was still willing to purchase the property albeit on different economic terms.  On June 5, 2020, I continued the auction so that I could continue to negotiate with the MHA Nation.  I have now entered into an agreement to sell the property to MHA Nation for $12 million.  Because the sale price is less than the amount of the secured debt, I obtained entered into an agreement with Juniper to provide a carveout for professionals' fees, UST quarterly fees, and unsecured creditors.

Other than the real property, Desert Investments has approximately $28,000 cash on hand (which may be Juniper's cash collateral) and possible litigation claims.

N/H-019218

Mr. Edward M. McDonald
June 9, 2020
Page 4 of 23

## II.    Statement of Relevant Background Facts

### A.    The Debtors and their Ownership Structure

(i)    *Desert Land*

Desert Land is a Nevada limited-liability company managed by Messrs. Gaffin and Bulloch. It is owned by Skyvue (99.5%) and Bruce Bulloch, Howard Bulloch's brother (.05%).

Desert Land's primary assets consist of real property totaling approximately 23.22 acres. Of that total, approximately 16.617 acres is vacant land. The remaining 6.607 acres are improved with: (1) the Desert Oasis Motel (the "Motel") — a complex of three buildings (one of which is vacant) that contain 100 motel apartments — located at 3965 S. Las Vegas Blvd.; (2) two commercial buildings located at 3951 S. Las Vegas Blvd. (vacant) and 3953 S. Las Vegas Blvd., the latter of which is 50% occupied by one tenant, Psychic Sessions (collectively, the "Commercial Buildings"). The Motel was managed by Hospitality Associates ("HA") since at least 2008. As noted in the April 2020 monthly operating report ("MOR"), Desert Land's operations have not generated any profit since the petition date. (Dkt. No. 1176.)

(ii)    *Desert Apartments*

Desert Apartments is a Nevada limited-liability company that is also managed by Messrs. Gaffin and Bulloch. It is also owned by Skyvue (99.5%) and Bruce Bulloch, Howard Bulloch's brother (.05%). Desert Apartments' primary asset is a 6.286 acre parcel located at 5316 Danville Land and 5333 Bethel Lane, Las Vegas, NV. Located on the property is the Desert Oasis Apartments (the "Apartments"), a 128-unit apartment complex managed by Westcorp Management Company ("Westcorp"). According to the Desert Apartments' last MOR, it has been generating profits since the petition date. (Dkt. No. 1177.)

(iii)    *Desert Investments*

Desert Investments is a Nevada limited-liability company that, like the other two Debtors, is managed by Messrs. Gaffin and Bulloch. Desert Investments is 100% owned by Desert Land and it was incorporated in 2014. Desert Investments' primary asset is an unimproved vacant 8.965 acre parcel located at 95 East Ali Baba Lane, Las Vegas, Nevada. At the time of my appointment, Desert Investments had entered into a lease with Canam Productions, which produces the *American Ninja Warrior* television show on the property. Other than that lease, Desert Investments had no operations. Pursuant to Desert Investments' last MOR, it has generated little to no income since the petition date. (Dkt. No. 1178.)

(iv)    *Skyvue*

Skyvue has no assets other than its ownership interest in the Debtors. It is owned in the following approximate percentages: 61.7% by Compass Investments, LLC (Compass), 30.2% by Citation Financial, 5.36% by Shotgun Creek Investments, LLC and 2.68% by Shotgun Creek Family

Mr. Edward M. McDonald
June 9, 2020
Page 5 of 23

Investments, LLC. (Bankruptcy Court's March 11, 2019 Oral Ruling.) Compass "is owned by the Bulloch and Gaffin Trust, The Bulloch Family Limited Partnership, and a trust of Clyde Turner … and Bruce Bulloch." (Bankruptcy Court's March 11, 2019 Oral Ruling.) Brian Shapiro was appointed as the Chapter 11 Trustee for Skyvue Las Vegas, LLC ("Trustee Shapiro").

**B.     The Debtors' Failed Attempts to Sell or Develop the Real Property, the Prior Bankruptcy Cases and the Filing of the Involuntary Petitions**

The Debtors began acquiring their real property prior to 2000. (Dkt. No. 455.) Since that time, Messrs. Gaffin and Bulloch have tried to sell the Aggregate with some of the most respected firms in commercial real estate including Merrill Lynch, Goldman Sachs, CB Richardson, d Cantor Fitzgerald and Cushman & Wakefield, Colliers, iCore and Capital Markets (Dkt. No. 151) and/or to develop them with a large scale hospitality project. (Dkt. No. 455.) Both efforts failed.

During that time period, Messrs. Gaffin and Bulloch, on behalf of the Debtors: (1) filed two Chapter 11 bankruptcy cases in 2002 (Case No. 02-16202-BAM) and 2011 (Case No. 11-17208-BAM); (2) encumbered the Debtors' real property with over $250 million of debt, some of which was interest at rates as high as 20% compounding monthly; (3) took over $50 million of undocumented "loans" from Desert Land and Desert Apartments on behalf of themselves, their relatives and entities in which they have an interest; and (4) engaged in litigation with numerous creditors and vendors. (Dkt. No. 455.)

In July 2017, the Shotgun Entities recorded the foreclosure notice of default for the real property which secured their loans. The foreclosure was set for May 1, 2018. On April 30, 2018, Busbin filed involuntary Chapter 7 petitions against each of the Debtors. (Dkt. No. 1.) The cases were subsequently converted to Chapter 11 cases (Dkt. No. 79), the Bankruptcy Court denied the Debtors' motion to substantively consolidate the cases but granted the motion to jointly administer them. (Dkt. No. 89.)

**C.     The Debtors' Real Property and Its Declining Appraised Value**

At the beginning of these cases, the Debtors submitted an appraisal performed by Keith Harper, MAI valuing the Assemblage at $460 million as of October 2017. (ECF No. 254.) In January 2019, they submitted another appraisal from Mr. Harper, which listed the value of the Assemblage at $385 million as of December 2018, a $75 million decrease. (ECF No. 455.) Busbin submitted a competing appraisal which valued the Assemblage at $307 million less the cost of removing improvements and a $9.3 million reduction in value for an easement. (ECF No. 455) That said, the true fair market value of any real property is the price that a willing buyer will pay for it.

**D.     The Debtors' Scheduled Assets and Liabilities**

     (i)     *Desert Land*

Desert Land scheduled assets and liabilities totaling $333.52 million and $84.86 million, respectively. (Dkt. No. 102.) The assets consisted primarily of Desert Land's real property ($243.50

N/H-019220

Mr. Edward M. McDonald
June 9, 2020
Page 6 of 23

million) and its investment interest in Desert Investments ($90 million). (Dkt. No. 102.) As to the debt, approximately $80 million (or 94% of the debt) is secured debt and the remaining $4.90 million is general unsecured debt. (Dkt. No. 102.)

      (ii)    *Desert Apartments*

Desert Apartments scheduled assets and liabilities totaling $80.34 million and $24.70 million, respectively. (Dkt. No. 96.) The assets consisted primarily of Desert Apartments real property ($76.80 million). (Dkt. No. 96.) As to the debt, approximately $18.52 million (or 75% of the debt) is secured debt and the remaining $6.18 million is general unsecured debt. (Dkt. No. 102.) Mr. Gaffin scheduled a $4.5 million unsecured debt owed to Desert Land. (Dkt. No. 102.) As discussed below in Section VI(A), Mr. Gaffin subsequently amended the schedules to delete that debt. (Dkt. No. 1080.)

      (iii)    *Desert Investments*

Desert Investments scheduled assets and liabilities totaling $58.28 million and $30.20 million, respectively. (Dkt. Nos. 66, 69.) The assets consisted solely of Desert Investments' real property ($76.80 million). (Dkt. Nos. 66, 69.) Desert Investments had no scheduled unsecured debt. (Dkt. Nos. 66, 69.)

**E.**    **The Debtors' Secured Debt as of June 5, 2020**

The Estates' counsel and accountants created a spreadsheet of the total secured and unsecured debt owed by the Debtors. As evidenced by the spreadsheet, the Debtors' collectively owed approximately $250 million as of June 5, 2020.

| Debtor | Secured Creditor | Projected Secured Claims |
|---|---|---|
| All Debtors (except Desert Apartments) | Clark County Treasurer | $1,495,196 |
| Desert Land | Shotgun Entities | $186,442,339 |
| Desert Land | DLLA | $16,500,000 |
| Desert Apartments | The Northern Trust Company | $5,093,955 |
| Desert Investments | Juniper Loan Servicing | $28,650,606 |
| All Debtors | Gonzales | $13,781,377 |
| | **TOTAL** | **$251,963,473** |

Dkt. No. 1221.

**F.**    **The Claims Bar Date**

The claims bar date expired on November 20, 2018.

Mr. Edward M. McDonald
June 9, 2020
Page 7 of 23

### G.    My Appointment and Retention of Professionals

The Court found "cause" under Section 104 to appoint a Chapter 11 trustee, finding, in pertinent part:

> "Bulloch and Gaffin have had the benefit of 16 years, two [prior] confirmed plans, and more than nine months in this bankruptcy to effectuate a sale, yet the only offer that they formally presented to the Court was [that of LVB] in which they did minimal due diligence, never received earnest money, and had all the makings of everything … they appeared to want: substantial payout, a continuing equity interest, and a sale format which would protect them from tax liability.  The Courts finds that Bulloch and Gaffin are elevating their own self-interest about the interest of the creditors and parties in interest." (March 11, 2019 Oral Ruling at 52:24-53:7.)

I was appointed the Chapter 11 Trustee on April 2, 2019. (ECF No. 529.)  I filed a notice of acceptance on April 3, 2019.  (ECF  No. 530.)

On or about March 9, 2019, I retained the following professionals: (1) Kevin Coleman and Chris Hart of NutiHart  LLP as the Estates' lead bankruptcy counsel (Dkt. No. 679); (2) Talitha Gray Kozlowski and Joe Kozlowski at GTG, LLP as the Estates' local bankruptcy counsel and real estate counsel (Dkt. No. 678); (3) Howard Grobstein and Joshua Teeple of Grobstein Teeple as the Estates' accountants (Dkt. No. 681) and (4) Aviva Gordon of Gordan Law as Desert Land Estate's employment counsel (Dkt. No. 800).

### H.    The Expiration of the Statute of Limitations Under Section 546

The statute of limitations for filing actions under Section 546 will expire on or about June 27, 2020.

## III.    The Debtors' Serious Operational Deficiencies

Beginning from the date of my appointment, I, along with the Estates' accountants, spent two weeks inspecting the Debtors' properties and reviewing their insurance, daily operations and cash controls, financial records, security issues and environmental issues.

Our preliminary inspection revealed that the Debtors had serious operational deficiencies. First, the Debtors' real property was not properly or adequately insured.  Second, HA, the management company for the Motel, was neglecting that property, and third, the Debtors had not addressed the environmental issues at the Motel or the Commercial Buildings.  In addition, homeless people were using some of the properties for housing and illegal activity.  Finally, with the exception of Desert Apartments,  there were substantial quantities of trash, human waste, overgrown vegetation and graffiti present on all of the properties.  *See* Exhibit A.

Therefore, my professionals and I had, and continue to, expend considerable time addressing these various deficiencies and operational issues.  The Governor recently issued the *Declaration of*

Mr. Edward M. McDonald
June 9, 2020
Page 8 of 23

*Emergency Directive 008*, which imposed a moratorium on the evictions and collection of rents due to the COVID 19 pandemic effective as of March 29, 2020.  The moratorium on evictions coupled with the significant job losses in Nevada has made the operation of the Motel on at least a "break-even" basis even more challenging.

**A.    Insurance Deficiencies Addressed Since My Appointment**

I reviewed the Debtor's insurance policies and addressed the following deficiencies in the Debtors' insurance coverage.

1.    *The Vacant Land owned by Desert Land and Desert Investments Had No General Liability Insurance Coverage*

At the time of my appointment, neither Desert Land nor Desert Investments had any general liability insurance for their vacant land.  Although Mr. Gaffin claimed that the insurance policy for the Commercial Buildings included general liability coverage for the adjacent vacant parcels, his claim was contradicted by the express terms of the insurance policy for those buildings.  Specifically, every insurance policy has a "Designated Premises or Operation" section which lists the exact property covered by the policy.  Here, Desert Land had two separate policies for the Motel and the Commercial Buildings.  Neither of these policies included the vacant land as designated premises.  Moreover, the insurance brokers who produced the policies advised me that the policies did not cover the vacant parcels and/or the insurance companies who issued the policies refused to add coverage for the vacant parcels without an additional premium.  Therefore, I obtained general liability insurance coverage for these parcels.  After the current insurance policy expired on April 2, 2020, I obtained a new insurance policy for these lots which expires on April 2, 2021.

2.    *The Desert Oasis Motel Had No Dog Liability Insurance*

At the time of my appointment, I reviewed the insurance policy for the Motel and determined that it contained an exclusion for liability arising from dog bites.  That was problematic since there were eight dogs residing with tenants on the premises, two of which were 100-pound plus pit bulls.  After the insurer declined my request to waive that exclusion, I sought and obtained advice from the Estates' counsel who advised me that Desert Land's estate faced potential liability for any dog bite claim.  Because the Motel had limited cash on hand and/or positive cash flow and the average dog bite claim is approximately $37,000[3], I, after substantial research and effort, obtained a canine liability insurance policy with an aggregate coverage limit of $100,000.  I recently renewed that policy.

3.    *The Insurance Policy for One of the Commercial Buildings Located at 3951 S. Las Vegas Blvd. Had a Vacant Building Exclusion*

Desert Land's insurance policy for the Commercial Buildings excluded coverage for property damage to any building that is vacant for more than 90 days.   Therefore, I obtained a vacant building

---

[3] According to the Insurance Information Institute, the average cost for a dog bite claim is $37,000.

Mr. Edward M. McDonald
June 9, 2020
Page 9 of 23

policy for one of the Commercial Buildings that became vacant. It took considerable effort to find such a policy because of the limited number of insurers willing to issue such a policy due to Desert Land's bankruptcy filing and the increased property risk for a vacant building.

> 4.    *Renewal of the Motel's General Liability and Property Insurance Policy*

The Motel's general liability and property policy expired on April 2, 2020. After the insurer declined to renew the policy due to Desert Land's bankruptcy, the nature of the operations and high crime area in which the Motel was located, I was able to bind another policy with a different carrier. Like the vacant policy for one of the Commercial Buildings, it took considerable effort to find such a policy because of the limited number of insurers willing to issue such a policy.

**B.    Management of the Motel After the Management Company Terminated Its Contract**

> 1.    *Assumption of the Management of Desert Oasis Motel*

HA had served as the management company for the Motel since 2008, providing management services and leased employees responsible for the Motel's operation. Shortly after my appointment, the Estates' accountants and I met with Tonya Dundas, HA's Vice-President of Operations and Larry Pittman, the Motel's manager and an HA employee. During our meeting, Ms. Dundas advised us that HA had managed the Motel as a "favor" to Messrs. Gaffin and Bulloch and that she spent little to no time on the property. Ms. Dundas' admitted lack of oversight of the Motel and HA's employees was clearly evidenced by the facts that: (a) there were no cash controls for the rents; (b) the manager was paying operating expenses with pre-signed blank checks and using a credit card issued to Desert Land; (c) the Motel's vacant building was occupied by homeless people and filled with trash; and (d) Messrs. Gaffin was using the Motel's operating funds to pay bills for a non-debtor entity.[4]

On April 15, 2019, within two weeks of my appointment, Ms. Dundas informed me that HA wished to terminate its management contract. The Estates' counsel reviewed HA's management contract and advised me that Desert Land had no viable defenses to the termination of the contract because the term had expired in 2008. Therefore, I entered into a stipulation with HA for relief from the automatic stay. (Dkt. No. 792.)

I then consulted with the Estates' accountants to obtain an analysis as to whether to close the Motel and/or to keep operating it while it was being marketed for sale. Their analysis indicated that continuing to operate the Motel was substantially more cost efficient than closing it and evicting over 60 tenants, and then obtaining 24-hour security and vacant building insurance for the property. Moreover, the continued operation of the Motel would make the property easier to sell because even

---

[4] The Desert Land estate had apparently been paying two electrical bills for 10181 Park Run Drive, Las Vegas Nevada 89145 for approximately four years. Messrs. Gaffin and Bulloch are the managers of 10181 Park Run Drive, LLC, which owns an office building located at 10181 Park Run Drive, Las Vegas, NV. *See* Exhibit B.

N/H-019224

Mr. Edward M. McDonald
June 9, 2020
Page 10 of 23

though the Motel was operating on a "break-even" basis, a prospective buyer would at least not incur ongoing losses during the development phase of any future project.

Therefore, I decided to continue operating the Motel. Unfortunately, no management company and/or employee leasing company was willing to operate the Motel due to Desert Land's pending bankruptcy case, the high crime rate in the area[5] and the fact that the property was for sale. Messrs. Gaffin and Bulloch, either individually or through their numerous entities, also declined to manage the Motel despite their 20-year history with the property. Therefore, I started operating the Motel in mid-July 2019 with the assistance of the Estates' counsel and accountants. The operations required me to retain employment counsel to prepare an employee handbook, and provide advice relating to compliance with applicable labor laws and employment law issues relating to the Motel's three employees. I also obtained the necessary worker's compensation and employee practices liability insurance policies and an employee dishonesty bond. I also tasked the Estate's accountants with handling the Motel's payroll and prepare the payroll tax returns because payroll companies such as PayChex refused to provide services due to Desert Land's pending bankruptcy case.

I currently manage the employees, review and pay all of the operating expenses, ensure that necessary repairs are made, monitor the reports provided by the company I retained to provide security on the Motel's property, maintain the insurance and take any other actions necessary for the Motel's continued operation.

2.    *Implementation of Cash Controls and Vacancy Checks at the Desert Oasis Motel*

As the Motel receives a substantial portion of its rental income in cash, I purchased a "letter box" safe for the Motel manager's office and had it bolted to the ground, changed the locks on the manager's office door and implemented cash control procedures for rent collection. Rents are now only collected during office hours,[6] and any employee collecting rent deposits the cash and/or checks into the safe via the "letter box" slot opening. The Motel's manager is the only employee with the combination to the safe. At the end of every day, the manager deposits the rent at Wells Fargo Bank, N.A. and emails me copies of the daily rent receipts and monthly tenant payment log, and I then confirm that the rent collected has been deposited into the bank account. I then review the delinquent rents with the manager who then send delinquency notices to any tenant that owes rent and/or initiates an eviction proceeding. Periodically, either the Estates' accountants or I perform an on-site inspection at the Motel to verify operations, address security issues and ensure that no unit that is listed as vacant is occupied.

More recently, I established a cash vault account at Wells Fargo Bank and retained Brink's Inc., an armored car service, to pick up the rent collected at the Motel and deposit the Motel's rents directly at Wells Fargo Bank. Given the small monthly charge for these services, I believe it was prudent

---

[5] Per City-Data.com crime index, the city of Las Vegas has a crime rate which is which was 1.3 times greater than the U.S. average. In other words, it is higher than in 89.4% of U.S. cities.

[6] The manager advised me that he was collecting rents during off hours and weekends, which necessarily meant that he was keeping the rents in his apartment adjoining the Motel's office.

Mr. Edward M. McDonald
June 9, 2020
Page 11 of 23

**C.**    **Addressed the Environmental Issues for the Desert Land Property**

1.    *Commissioned An Asbestos Survey at Desert Oasis Motel and the Commercial Buildings and Implemented an Asbestos Operations and Maintenance Plan for the Motel*

In its Statement of Financial Affairs, Desert Land stated that it received an environmental notice from a government agency - specifically, asbestos.  (Dkt. No. 102.)  However, during my initial meeting with Messrs. Gaffin and Bulloch, they stated that they had never received a notice from any governmental agency.  Rather, they had been advised by the Las Vegas Fire Department that the fire department could not use one of the vacant buildings at the Motel  for training purposes because it contained asbestos.

On April 5, 2019, immediately after my appointment, I reviewed the potential environmental issues with the Estates' counsel, who reviewed all of the Phase I and Phase II reports that had been provided to the real estate brokers by Messrs. Gaffin and Bulloch.  They also obtained a copy of the prior limited asbestos report prepared by Western Technology, Inc. ("Western Technologies") in May 2004 for the Motel and one of the Commercial Buildings.  The Estate's real estate counsel reviewed the report, advised that it was inconclusive as to any asbestos issues and recommended that I obtain an updated asbestos survey.

I then retained Western Technologies to conduct an asbestos survey for the buildings on Desert Land's property.  I personally met with Western Technology when they inspected the buildings to coordinate access and explain the condition and usage of the various buildings.  Western Technology issued a 130-page *Limited National Emission Standards for Hazardous Air Pollutants (NESHPA) Asbestos Surveys*  in which it confirmed that there was asbestos in the certain parts of the Motel and one of the  Commercial Buildings.  Western Technology recommended a two hour training class for the Motel employees, an Asbestos Operations and Maintenance Plan for the Motel and written notifications of the same to the tenants of the Motel and the Commercial Building.  I complied with each of these requirements and the Motel is now operating under an Asbestos Operations and Maintenance Plan.  The tenants received written notification of the environmental issues and as well as the prohibitions against performing any work in any areas that contain asbestos containing materials.

2.    *Remediated a Mold Problem in Unit B8 at Desert Oasis Motel*

During a vacancy check of the Motel, the Estates' accountants advised me that one of the units had black coloring on the walls and floor and there was strong "sewage" stench in the unit.  *See* Exhibit C.  I retained Western Technologies to inspect the unit and they advised me that there was in fact a severe mold problem in the entire unit.  I retained Construction Group International, an environmental firm, to remediate the mold problem and Western Technology to test the air after the remediation which was required as the unit had asbestos.  The unit has now been remediated.

Mr. Edward M. McDonald
June 9, 2020
Page 12 of 23

**D.     Obtained Orders Approving Cash Collateral Stipulations for the Debtors**

At the time of my employment, Desert Land and Desert Investments were operating without cash collateral stipulations with the secured creditors, the Shotgun Entities, DLLA and Juniper. Through the Estates' counsel, I obtained cash collateral stipulations for all three Debtors.  (Dkt Nos. 676, 701, 731.)   I also obtained orders extending and/or amending these stipulations as well as the cash collateral stipulation with Northern Trust.  (Dkt. Nos. 866, 942.)

**E.     Obtained An Order Authorizing Maintenance and Use of Certain of the Debtor Land and Desert Apartments' Bank Accounts**

I also  obtained an order authorizing the maintenance and use of four DIP accounts utilized by Desert Land and Desert Apartments for the Motel and the Apartments to avoid any disruption in their operations.  (Dkt. No. 675.)

**F.     Addressed the Security and Premises Liability Issues at the Desert Land and Desert Apartment Properties**

     1.     *Desert Land*

As discussed above, the city of Las Vegas has a serious homeless[7] and crime problem.   Shortly after my appointment, I met with an officer of the Las Vegas Metropolitan Police Department who advised me that the vacant building at the Motel, the Commercial Buildings and the vacant parcels had an ongoing problem with homeless people and he and his fellow officers "swept" these properties regularly to remove them.  The officer was concerned about the ongoing problem and asked me to take proactive action.  Therefore, I retained a firm to board up the vacant building at the Motel and the garages located at one of the Commercial Buildings.  I also retained a security guard to patrol the properties; but she resigned in November 2019 due to concerns about her safety.  Thereafter, I retained Acme Security & Investigations, Inc. ("Acme"), a security company, which provided an armed security guard to patrol all of the Desert Land parcels up to four times a day.  I continually receive and review Acme's daily patrol reports so I can timely address any security issues.

Despite this high level of security, homeless people and/or criminals continue to vandalize the property by frequently removing boards from and/or starting fires in, the vacant units at the Motel, damaging windows and doors, painting graffiti on the buildings, leaving trash and human waste on the property.  Some have even physically attacked and/or threatened the armed security guards.  *See* Exhibit D.  I have continued to follow up with Acme and/or the Las Vegas Police Department  to monitor the custody status of those homeless people who have been serially arrested on the property.

---

[7] Safety.org conducted a study using data from the U.S. Department of Housing and Urban Development's Point in Time (PIT) count, which calculates national, state and local numbers related to homelessness.  It determined that the city of Las Vegas ranked seventh among the cities with the highest homeless rates.

N/H-019227

Mr. Edward M. McDonald
June 9, 2020
Page 13 of 23

With respect to the one of the Commercial Buildings, I retained an electrical contractor to repair the broken and/or nonworking outdoor lighting and had a timer installed so that the vacant building and adjoining parking lot would be sufficiently lit to reduce criminal activity and/or premise liability.[8] I also addressed an underground water leak at the same property.

> 2.    *Desert Apartments*

In October 2019, I was advised by Westcorp that homeless people were using the Apartments' pool area and adjoining bathrooms and digging through the trash bins and that the residents were concerned for their safety. I reviewed the situation with Westcorp and requested that it change the locks on the pool gate and adjoining bathrooms and issue new keys to the residents; strictly enforce the pool hours and lock the pool gate with a chain. I also reviewed the lighting to ensure the property was properly lit. After obtaining consent from Northern Trust to use its cash collateral, I retained Acme to patrol the Desert Apartment property four times a day and I review its daily patrol reports so I can timely address any security issues.

### G.    Resolved the Notices of Abatement Issued by Clark County for Desert Land Various Parcels and the Desert Oasis Motel

In November 2019, I received Notices of Abatement from Clark County's Code Enforcement Unit stating that certain parcel of vacant land had been declared public nuisances in violations of 11.06.020 of the Clark County Code, and that I was required to abate the violation by December 11, 2020. Specifically, the nature of the nuisance violation was illegal, unsafe and unsightly maintenance of the property due to the homeless camps, trash, graffiti and overgrown vegetation. See Exhibit E.

The Estates' bankruptcy counsel obtained an order amending the existing cash collateral stipulation with the Shotgun Entities so that I could use cash collateral to address the nuisance violation. I subsequently interviewed and obtained quotes from two construction companies to remediate the properties. Because the enforcement officer for Clark County Code Enforcement Unit was also in charge of all the Desert Land property, he requested that I prophylactically remediate the Motel to avoid another notice of abatement for that property. I timely remediated all three parcels, thereby avoiding any civil penalties and/or fines for Civil Administration Citations. See Exhibit F.

### H.    Resolved the Illegal Parking Issues on Desert Land's Vacant Land

In January 2020, Acme advised me that it discovered a large number of vehicles using some of the vacant parcels as parking lots. My investigation revealed that a third party and/or a company holding an event on Las Vegas Blvd. had put up a sign on the parcels purporting to sell parking spots to people attending events at other venues on Las Vegas Blvd. See Exhibit G. Therefore, to avoid any potential liability to the Estate, I had Acme remove the signs and advise all those parking on the vacant lots that they were trespassing and that their vehicles would be towed. I also entered into a contract with Tow Guys, a towing company, to post no parking signs on the vacant lots, monitor the lots and

---

[8] The tenant for one of the Commercial Buildings informed me that the parking lot was dark and she was concerned about her safety.

N/H-019228

Mr. Edward M. McDonald
June 9, 2020
Page 14 of 23

tow any illegally parked cars.  There is no charge for this service because Tow Guys receives its compensation from the owners of the towed vehicles.

> **I.**     **Reduced the Potential Premise Liability to Desert Investments By Renegotiating the Lease with Canam Productions**

Prior to my appointment, Mr. Gaffin, on behalf of Desert Investments, entered into a lease with Canam Productions ("Canam") pursuant to which Canam would film the *American Ninja Warrior* television show (the "ANW Event") on Parcel No. 12 in exchange for an $86,400 lease payment.  Mr. Gaffin did not obtain court approval for this lease based on his bankruptcy counsel's advice that the lease was within the ordinary course of business under Section 365.

After reviewing the lease, I concluded that it was not in the best interest of the Desert Investments' estate for the following reasons.  First, the lease exposed the estate to substantial potential liability for damages for premise liability if one or more of the contestants and/or audience attendees were injured or if a mass shooting occurred during the filming of the ANW Event.[9]  In either case, the estate's current general liability insurance, which had an aggregate policy limit of $1 million, provided insufficient coverage.  Moreover, the lease required the estate to indemnify Canam.  Second, the estate would not benefit from the lease because Canam's lease payment constituted Juniper's cash collateral.  Finally, if a premise liability claim was asserted against the estate, it could affect the sale of the real property, which in turn could detrimentally affect the likelihood that unsecured creditors would be paid.  In sum, Desert Investments' lease with Canam conferred no benefit whatsoever to the estate, but instead, created a substantial potential liability.  Therefore, counsel filed a motion to determine that the lease was void.

At the hearing on the motion, Canam and I agreed to settle the motion on the following terms, which substantially reduced the potential liability to the estate:

1.     Canam agreed to increase the liability coverage limits on its liability insurance policy for the ANW Event to $25 million and list the estate as an additional insured. It would also use its best efforts to cause the estate to be named as an additional insured to all of the insurance policies of Canam's third party vendors/contactors;

2.     Canam agreed to indemnify the estate for all claims arising from the ANW Event;

3.     Canam agreed to install two metal detectors and retain no less than four Las Vegas Metro Police Department officers to conduct security screening operations during all periods where spectators are allowed access to the property; and

4.     Canam agreed to delete the provision in the lease which required the Estate to indemnify Canam.

---

[9] MGM Resorts International entered into a up to $800 million settlement with victims of the 2017 mass shooting at its property which is directly adjacent to the Desert Investments property.

Mr. Edward M. McDonald
June 9, 2020
Page 15 of 23

(Dkt. No. 658.)

In addition, Juniper consented to the use of its cash collateral to allow the estate to purchase additional "special event" general liability insurance in the amount of $40 million dollars, which I obtained. Fortunately, the ANW Event proceeded without incident.

## IV.    The Resolution of the Litigation Filed by the Sher Group Against Desert Land

In 2007, Aspen Financial Services, LLC ("Aspen"), a lender that brokered and participated in multi-beneficiary real estate-secured loans, marketed a multi-beneficiary real estate-secured loan (the "Loan") to Desert Land as an investment to the general public. The Loan was in the principal amount of $25.9 million and guaranteed by Messrs. Gaffin and Bulloch and their various entities. The Sher Group participated in the Loan as lenders and beneficiaries under the deed of trust securing the Aspen Loan.

Desert Land paid interest on the note through August 1, 2008. As the August 1, 2008 maturity date approached, Desert Land requested, and received, an extension until February 2009 to pay off the Loan. Desert Land ultimately failed to perform under the forbearance agreements thereby defaulting on the Loan.

In January 2016, DLLA acquired over 51% of the beneficial interests of the Aspen Loan. Thereafter, Desert Land and DLLA proposed several modifications to the terms of the Loan to substantially reduce the Loan indebtedness pursuant to Nevada Revised Statutes ("NRS") 645B.340(1)(e). In response, certain of members of the Sher Group filed an action in the Eighth Judicial District Court in and for Clark County, Nevada, Case No. A-16- 743298-B captioned *Sher Development, LLC v. Desert Land, LLC, et al.* (the "State Court Action") against DLLA, Desert Land and the Guarantors.

The state district court conducted a trial and entered a judgment, *inter alia*:

1.    In favor of the Sher Group and against the Desert Land Parties on the Sher Group's claims for declaratory judgment, contractual breach of the implied covenant of good faith and fair dealing, and tortious breach of the implied covenant of good faith and fair dealing, permanently enjoining the first proposed modification and awarding the Sher Group damages in the amount of $453,101.59 and costs in the amount of $91,972.79 (a total of $545,074.38) against Desert Land, DLLA and the Guarantors, jointly and severally;

2.    In favor of the Sher Group and against the Desert Land Parties on the Sher Group's claim for declaratory relief permanently enjoining the second proposed modification; and

3.    In favor of the Desert Land Parties and against the Sher Group as to the proposed third modification determining that the third proposed modification was fair and commercially reasonable, thereby allowing the Desert Land Parties to proceed with the proposed third modification that, inter alia, reduced the principal loan balance from $25.9 million to $13.46 million, provided 6% interest and payment to be made upon sale of the Aspen Property, determined that DLLA had standing to pursue a

Mr. Edward M. McDonald
June 9, 2020
Page 16 of 23

modification of the Loan Documents, and dismissed the Sher Group's claims against the Guarantors relating to the third modification (collectively, the "Judgment").

Following the issuance of the Judgment, the Sher Group appealed the portions of the Judgment in favor of the Desert Land Parties, which appeal was pending at the time of my appointment.

In the event that the Sher Group had prevailed on the appeal, the amount of the Aspen Loan would have exceeded $76 million. Therefore, I, through my counsel, had settlement discussions with the Sher Group. We reached a proposed settlement and I filed a motion seeking approval of that settlement under Rule 9019. (Dkt. No. 693). DLLA objected to the proposed settlement arguing that the Sher Group has no standing to independently settle the Sher Group's claims related to the Aspen Loan. At a hearing on that motion, the Sher Group, DLLA, Desert Land, the Guarantors and I agreed to participate in settlement discussions.

Following two mediation sessions before the Hon. Jaime, I reached a settlement with the parties pursuant to which the parties (1) agree to the allowed amount of the Sher Group's secured and unsecured claims; (2) agree to the allowed amount of DLLA's secured and unsecured claims; and (3) resolved all issues as to the Aspen Loan and the pending litigation. In March 2020, the settlement was approved by the by the Court. (Dkt. No. 1035.)

## V.    The Marketing and Sale of the Property

### A.    The Debtors Failed to Sell or Develop the Aggregate Property since 2003

As discussed above, Messrs. Gaffin and Bulloch, as the Debtors' managers, had failed to sell and/or develop the Aggregate since 2002. The Debtors refused to sell the properties owned by the Debtors as separate parcels based on their belief that the Aggregate was worth more than the individual lots.

### B.    The Challenges in Selling the Estates' Properties

I faced the following challenges in selling the Debtors' properties:

1.    The majority of the Debtors' real property was vacant land. Therefore, any buyer would incur development costs, construction costs and would likely have to obtain several billion dollars in financing. I was advised by the brokers that financing for large scale real estate projects was difficult to obtain, as evidenced by the fact that there was limited new construction on the Las Vegas Strip since 2010;

2.    By the time of the auction of the auction on June 5, 2020, the total amount of the secured debt exceeded $250 million. Because the secured creditors had the right to credit bid, the Estates had to sell the property for a sale price that would either satisfy the secured debt or obtain the consent of the secured creditor(s). In addition, prospective buyers advised the Estates' brokers that they were reluctant to spend the very consideration about of time and expense to conduct the necessary due diligence if the secured creditors could simply credit bid on the property. My professionals and I

Mr. Edward M. McDonald
June 9, 2020
Page 17 of 23

advised the secured creditors of these challenges.  However, the secured creditors, with the exception of Juniper, refused to limit their credit bid rights to a "rational" number or to agree to provide a break-up fee or reimbursement of any expenses to potential buyers;

3.    There was fatigue in the market place for the Debtors' properties as Messrs. Gaffin and Bulloch had been trying to sell them for over 18 years with unrealistic valuations; and

4.    Each of the secured creditors had different agendas, some of which were directly conflicting and therefore, it was difficult to obtain a consensus on even the smallest matters.

### C.    The Retention of Brokers and Auction Process

At the time of my appointment, the Debtors had retained Colliers International to serve as the Estates' brokers for the sale of the Assemblage.  (Dkt No. 264.)  Based on my interview with Colliers and the secured creditors, I determined that Colliers was a well-qualified broker and none of the creditors questioned the efforts Colliers had made to find a buyer during its listing period that ran through October 2019.  Therefore, I continued to try to sell the Assemblage through Colliers.  However, despite reducing the sale price to $325 million and heavily marketing the Assemblage, I did not receive any viable offers through December 2020.

Therefore, in late 2019, I sought court approval to retain Colliers and Keen-Summit Capital Partners LLC (collectively, the "Estates' Brokers") to run an auction process.  I believed that an auction process would create certainty that a sale would occur and draw in more potential buyers, which was critical because the Assemblage had been on the market for over 18 years and the sales price for the Assemblage was perceived as unrealistically high.  I also determined that it was prudent and necessary to simultaneously seek buyers for the Assemblage as well as for the individual parcels of real property.  My reasoning was that the buyer pool for sale of the Assemblage is significantly smaller than the buyer pool for the individual parcels because of : (1) the high sale price; (2) the size (38.5 acres) of the Assemblage; (3) the different likely usage and deed restrictions for each of the various parcels within the Assemblage; (4) the varying locations of the parcels, some of which are not contiguous and/or located on South Las Vegas Boulevard; and (5) the very significant development costs for the majority of the parcels, which were unimproved real property.

However, because the Estates had no funds with which to pay marketing costs which I estimated to be approximately $125,000 in order to have a robust auction process, I was able to get Shotgun and Northern Trust to pay $100,000 of these costs and the Estates' Brokers to pay $25,000.  The negotiations with the secured lenders took a considerable amount of time because of their competing interests and/or unwillingness of certain secured lenders to fund the marketing costs.  In January 3, 2020, the Court approved bid procedures that *inter alia* set April 30, 2020 as the deadline for submission of offers and scheduled an auction for May 19, 2020.  The bid procedures contemplated simultaneously marketing the Assemblage and the individual lots for sale.

Mr. Edward M. McDonald
June 9, 2020
Page 18 of 23

**D.     The Due Diligence for the Properties**

I obtained updated Phase 1 reports for each of the Properties which were uploaded into the data room.

**E.     The Robust Marketing of the Debtors' Properties as an Assemblage and Separate Sales**

The Debtors' property and the bid process was advertised in international, national, and local publications, through proprietary databases maintained by the Estates' Brokers, and was discussed in television reports and stories in print media.

In addition, the Estates' Brokers also did direct outreach aimed among others at:

- Casino owners and operators
- Resort hotel REITS
- Gaming REITS
- Opportunity Zone Funds
- Retail/shopping center developers
- Other entities that had expressed interest in the Debtors' properties during the prior listing agreement with Colliers.

The response to the advertising campaign and outreach efforts was very positive.  By March 3, 2020, 214 entities had signed NDAs, and 53 had downloaded ten or more documents from the data room.  The Estates' Brokers had frequent discussions with parties expressing interest in the Debtors' assets about the Court-approved sale process, and how they valued the Debtors' properties.

**F.     DLLA, the Shotgun Entities, Aspen and Trustee Shapiro Filed a Motion to Suspend the Cases and/or Extend the Auction Date to Continue the Marketing and Sale of the Assemblage**

In April 2020, DLLA, the Shotgun Entities, Aspen, and Trustee Shapiro filed a joint motion to indefinitely suspend the cases and/or extend the auction deadlines for a minimum of at least 90 days due to the disruption caused by COVID-19 pandemic.  (Dkt. No. 1039.)  I opposed the motion for the following reasons. First,  the Assemblage had been heavily marketed for one year since my appointment but I had not received any credible offers for the Assemblage that would result in a distribution to unsecured creditors.  Second, I had or was negotiating offers to for the separate sale of Desert Apartments and Desert Oasis that would likely be lost if the auction was continued.  (Dkt. No. 1052.)

The Bankruptcy Court denied the motion and issued a memorandum of decision filed under seal in which it made the following findings of fact:

1.     The Debtors had tried and failed to sell the Assemblage since 2003;

Mr. Edward M. McDonald
June 9, 2020
Page 19 of 23

2.     Messrs. Gaffin and Bulloch rejected offers for the Assemblage prior to my appointment that, if consummated, would have paid creditors in full;

3.     The Court appointed a Chapter 11 trustee to independently evaluate the sale process, develop a sale process and to exercise her business judgement and the record demonstrates that Trustee Gupta had done exactly that.

4.     The "significant hiccups" that Trustee Gupta experienced in trying to sell the Assemblage was the "culmination of almost two decades worth of delay and missed opportunities in the sale of the Assemblage."

5.     Trustee Gupta properly concluded that she could not administer property solely for the benefit of secured creditors, especially where a significant amount of administrative expense has and will continue to accrue until the properties are sold;

6.     Trustee Gupta's reasons against suspending and/or continuing the auction was a sound and reasonable exercise of her business judgment.

(Dkt. No. 1075.)

DLLA and certain related entities filed appealed the Bankruptcy Court's April 23, 2020 order denying their motion to suspend the Debtors' cases and/or extend the auction. DLLA then sought a stay pending appeal which was also denied by the Bankruptcy Court. The appeal of the suspension order is pending before the Hon. James C. Mahan, the Nevada District Court (Case No. 2:20-cv000844). The District Court denied DLLA's two emergency motions to stay the auction finding, among other things, that DLLA was unlikely to succeed on the merits. The decision was filed under seal. Per the docket, no briefing schedule has been set.

**G.     The Auction of the Debtors' Properties Held on June 5, 2020**

1.     *Desert Land*

The Bankruptcy Court conducted an auction and the Shotgun Entities and DLLA each credit bid for their property. The Bankruptcy Court approved the sale to these entities, subject to the priority property tax lien of Clark County Treasurer. The order approving the sales should be final by the end of June 2020.

2.     *Desert Apartments*

The Bankruptcy Court approved the sale of the property to ED-DEN Investment Co. LLC for $15.6 million with a back-up bid of $15.25 million to Stone Street Capital. I anticipate that the sale will close by the end of June 2020. After paying Northern Trust's approximately $5 million claim in full, the net sale proceeds of approximately $10,600,000 will be sufficient to make a meaningful distribution to unsecured creditors. However, because of the pending adversary proceeding between Busbin and Northern Trust, I have asked the Bankruptcy Court to hold the sale proceeds in escrow. In the interim,

N/H-019234

Mr. Edward M. McDonald
June 9, 2020
Page 20 of 23

I will continue to administer the Estate including the analysis and review of claim objections, and the Estate's counsel will file avoidance actions and other claims and draft a liquidating plan.

        3.    *Desert Investments*

    The Bankruptcy Court approved my request to continue the auction as to Desert Investments.  I have now entered into an agreement to sell the property to MHA Nation for $12 million.

## VI.    The Potential and Actual Conflicts Between the Estates

### A.    The Resolution of the Potential Conflict of Interest Due to the Purported Inter-Debtor Debt Owed by Desert Apartments to Desert Land

    During my preliminary review of these cases, I noted that there was a potential conflict of interest between the estates of Desert Land and Desert Apartments because Desert Apartments' schedules listed Desert Land as an unsecured creditor with a $4.5 million claim.  (Dkt. No. 96).  I raised that issue in my initial interview with your office as well as the case status reports with Bankruptcy Court.  (Dkt. Nos. 538, 659, 772.)   The Estates' counsel and accountants and I also filed a supplemental Rule 2014 disclosure disclosing the potential conflict and the status of our investigation of the same.  (Dkt. No. 824.)

    Initially, the fact that Desert Apartments purportedly owed $4.5 million to Desert Land seemed to be highly unlikely since Desert Land had **limited to no operating income** whereas Desert Apartment was operating on a cash flow positive bases and timely paying its debts.  In economic terms, how could Desert Land loan $4.5 million to Desert Apartments and why would Desert Apartments need a loan?  Moreover, Desert Land's schedules appeared to be unreliable and/or erroneous because they  included a $4.5 million debt to itself – Desert Land cannot owe itself money.  (Dkt. No. 102, page 20).

    Therefore, shortly after my appointment in April 2019, I asked Messrs. Gaffin and Bulloch to explain the bases of the $4.5 million purported claim owed by Desert Apartments to Desert Land.  They claimed that they did not recall the underlying reason nor did they have any written documentation evidencing that the debt in fact existed.  In addition, the Debtors' counsel did not respond to repeated emails from the Estates' counsel seeking confirmation of any documentation or information regarding the debt.

    Therefore, I sent Mr. Gaffin a written list of questions.  On or about October 1, 2019, Mr. Gaffin provided the following written answers to some of my questions:

    Question:  What is the basis for the debt owed by Desert Oasis Apartments, LLC to Desert Land, LLC debt?

    Mr.  Gaffin's response:  The basis of the debt owed by Desert Oasis Apartments, LLC to Desert Land, LLC was its face amount.  During the early years (around 2000), cash was borrowed by Desert Land to cover capital and operating needs of other entities.  These amounts were advance by related entities as valid due to/due from amounts on the books of both entities.

Mr. Edward M. McDonald
June 9, 2020
Page 21 of 23

Question: Do you have any written documentation – e.g., a loan agreement - to support the $4.5 million scheduled debt owed by Desert Oasis Apartments, LLC to Desert Land, LLC?

Mr. Gaffin's response:  Although there is no loan agreement, there are company records including schedules and ledgers, bank records, records held by management company and records held by accountants.

The Estates' accountants then analyzed the Debtors' tax returns and other financial records, requested the turnover of financial documents and interviewed the Debtors' management, former accountants and other related parties to investigate the existence of any claim between Desert Land and Desert Apartments.  Based thereon, the Estates' accountants determined that whenever Desert Land made an advance of funds to or for the benefit of Desert Apartments (and vice-versa), the transaction was booked on the general ledger as a "due to" "due from" amount.  They were also advised that the purported debts were not memorialized in any other agreements or documentation aside from the general ledger entries.

In December 2002, Ms. Shelton, the Debtors' external tax accountant, created by a journal entry in QuickBooks described as a year-end adjustment in the amount of $5,008,060.83.  This entry credited an account to recording amounts payable to Desert Land.  A notation indicated that the transaction related to "DL escrow #684232."  Ms. Shelton advised the Estates' professionals that she did not have a copy of the escrow statement #684232, nor could she provide any information relating to the escrow statement because Mr. Gaffin had the sole copy of the escrow statement.

The Estates' counsel obtained documents from the Debtors' prior bankruptcy cases to see whether the claim had been previously scheduled, and settlement agreements between the Debtors and Mr. Gonzales, issued subpoenas to various banks, obtained orders authorizing Rule 2004 examinations for Mr. Gaffin, Ms. Shelton (former accountant) and Bruce Bulloch (former accountant and brother of Howard Bulloch), and checked Clark County records for deeds recorded against the Desert Apartments' property.

Mr. Gaffin finally produced a copy of the closing statement for escrow # 684232 to the Estates' counsel.  After carefully reviewing all of these documents, it became apparent that the journal entry stating that Desert Apartments owed Desert Land $5,008,060.83 because of escrow #684232 was in error.  In fact, escrow #684232 related to a $41.5 million loan made by Tom Gonzales jointly to Desert Land and Desert Apartments.  Of that amount, $5 million of the loan proceeds were used to pay off an existing mortgage on Desert Apartments' property.   The closing statement provided to Ms. Shelton identified Desert Land as the only borrower, not both and Desert Land and Desert Apartments who were jointly liable for the loan to Mr. Gonzales.  It appeared that Ms. Shelton misinterpreted the closing statement to mean that Desert Land borrowed $41.5 million from Mr. Gonzales, and then paid off Desert Apartments' then-existing mortgage.

The Estates' counsel and accountants then interviewed Ms. Shelton again.  After reviewing the documents and closing statement again, Ms. Shelton confirmed that when making the $5,008,060.83 "due to" journal entry back in 2000, she mistakenly believed that Desert Apartments had borrowed the money from Desert Land.  Once she understood that the loan had been made by Mr. Gonzales, she

Mr. Edward M. McDonald
June 9, 2020
Page 22 of 23

admitted that this $5 million transaction should have been booked as an amount due to Mr. Gonzales, not Desert Land. The "error" went undetected and became the basis for the scheduled debt purportedly owed by Desert Apartments to Desert Land.[10] In late March, Ms. Shelton signed a declaration stating that Mr. Gaffin had provided her with an escrow closing statement that appeared to state that Desert Land was the sole borrower on the loan with Gonzales and she relied on that escrow closing statement in concluding that Desert Apartments owed a debt to Desert Land. She further stated that had she known that Desert Apartments and Desert Land had jointly borrowed money from Mr. Gonzales, she would not have made a journal entry indicating that Desert Apartments owed a debt to Desert Land.

The Estates' counsel then provided an executed copy of Ms. Shelton's declaration and the underlying documents to Mr. Gaffin and his counsel. When confronted with Ms. Shelton's declaration and other documentary evidence which clearly established that Desert Apartments' purported intercompany account balance had been overstated by $5 million, Mr. Gaffin **finally** conceded that Desert Apartments did not owe Desert Land $4.5 million as of the petition date.[11] On April 23, 2020, Mr. Gaffin filed an amendment to Desert Apartments' schedules to delete that debt. (Dkt No. 1080.)

**B.     The Potential Litigation Claims Between the Estates**

As noted in the Supplemental Rule 2014(a) Disclosures, Desert Land's ledgers reflected that Desert Apartments had made certain transfers totaling approximately $905,442 from 2012 to 2017 but that the Estates' accountants were unable to match these apparent transfers to Desert Apartments' banking records. Moreover, as evidenced in Section VII(A), Desert Land's ledgers were unreliable and/or inaccurate, the schedules filed by Desert Land and Desert Apartments were inaccurate and the investigation of the Debtors' claims have been seriously hampered and delayed by Messrs. Gaffin and Bulloch who have failed to fully cooperate with me and the Estates' professionals despite their statutory duty to do so.

Therefore, in order to review the Estates' potential litigation claim in advance of the bar date under Section 546, the Estates' counsel filed additional Rule 2004 examinations for U.S. Bank National Association, Mutual of Omaha Bank and Bank of America, N.A. (Dkt. Nos. 1067-1069.) The various banks provided the requested financial records on May 26, 2020. After reviewing those records, the Estates' accountants' provided a preliminary analysis of deposits and transfers made by the Debtors on June 1, 2020.

---

[10] Mr. Gaffin signed the schedules under penalty of perjury in Desert Apartments **2002** Chapter 11 case (Case No. 02-16204-BAM), in which he did **not** list a $4.5 million claim owed to Desert Land in those schedules. Instead, he listed a $10 million claim owed to Mr. Gonzales. (Dkt. No. 15.)

[11] A large number of other transactions were booked to this "due to/due from" account over the years, and so the amount stated as owing fluctuated.

N/H-019237

Mr. Edward M. McDonald
June 9, 2020
Page 23 of 23

        1.     *Claim Between Desert Land and Desert Apartments*

The analysis conducted by Estates accountants of Desert Apartment's bank statements and checks evidences that Desert Apartments did in fact transfer approximately $610,000 to Desert Land during 2014-2018. It is possible that a court would conclude that the amounts booked to the "due to/due from" intercompany account should be treated as equity contributions rather than true indebtedness. If that finding was made, and it was shown that Desert Apartments was insolvent, it could have a fraudulent conveyance claim against Desert Land. While further investigation would be warranted, it does appear appropriate for the Desert Apartments' estate to file a proof of claim in the Desert Land case for an amount up to $610,000.00. Similarly, if a valid debt was owed by Desert Apartments to Desert Land, $60,000.00 was transferred within one year prior to bankruptcy, and so Desert Apartments may have in insider preference claim against Desert Land. Should sufficient assets become available to pay unsecured creditors in the Desert Land case, grounds could exist to object to the claim I intend to file on behalf of Desert Apartments in the Desert Land case.[12] Consequently, because I am the Chapter 11 Trustee for both estates, I believe that there is an actual conflict of interest since I cannot simultaneously prosecute an action on behalf of Desert Apartments and defend that same action on behalf of Desert Land.

        2.     *Claim Between Desert Land and Desert Investments*

The Estates' accountants' analysis of Desert Land's bank records evidence that it deposited approximately $101,200 in funds received from Desert Investments' lease payments from Canan Productions into a bank account owned by Desert Land. Although Desert Investments is a wholly-owned subsidiary of Desert Land, Desert Investments is a separate legal entity that was formed in 2014. Therefore, it is unclear why Desert Investments' lease payments were deposited in Desert Land's bank account. Therefore, it appears to be appropriate for Desert Investments to file a claim in the Desert Land case. As noted above, because I am the Chapter 11 Trustee for both estates, I believe that there is an actual conflict of interest since I cannot simultaneously prosecute an action on behalf of Desert Investments and defend that same action on behalf of Desert Land.

If you have any further questions, please feel free to contact me.

                    Very truly yours,

                    *Kavita Gupta*

                    Kavita Gupta

---

[12] As you know, "if a purpose would be served" a trustee is required to review and object to claims. 11 U.S.C. §1106(a)(1) (incorporating the duties of a Chapter 7 trustee under 11 U.S.C. §704(a)(5).

N/H-019238

Exhibit A










N/H-019240






N/H-019241







N/H-019242

**Exhibit B**


**NV**Energy

B A15 B15 MS54ASD4

DESERT LAND LLC
10181 PARK RUN DR STE 2A
LAS VEGAS, NV 89145

## Electric Usage: Lgs - 1

**Average Daily Electric Usage**

This month your
average daily cost        **$5.99**



Usage in total electric kilowatt hours
☐ Last Year    ■ This Year

| | Please Pay By: | May 3, 2019 |
|---|---|---|

**$179.76**

Additional time is provided to pay this bill. Please
pay the amount due by May 13, 2019 to avoid a 1.50%
late fee or deposit.

| Account: | 3000100797819920460 |
|---|---|
| Customer Number: | 1007978 |
| Premises Number: | 1992046 |
| Billing Date: | Apr 17, 2019 |
| Next Read Date: | May 14, 2019 |

**Account Summary**

| Previous Account Balance | 151.88 |
|---|---|
| Payment - Mar 28, 2019 | 151.88 CR |
| Electric Charges | 179.76 |
| **Current Amount Due** | **$179.76** |

## Meter Information

| Meter# | Type | Service Period | Bill Days | Previous | | | Current | Multiplier | Usage |
|---|---|---|---|---|---|---|---|---|---|
| AA013718432 | kWh | Mar 13, 2019 to Apr 12, 2019 | 30 | 76,412 | | | 77,422 | 1 | 1,010 |

**Charge Details**

| | | | | | | |
|---|---|---|---|---|---|---|
| Electric Consumption (Prior Rate) | 528.000 | kWh | x | 0.06145 | | 32.45 |
| Electric Consumption (New Rate) | 482.000 | kWh | x | 0.06321 | | 30.47 |
| Demand Charge | 10.000 | kW | x | 4.35000 | | 43.50 |
| Facility Charge | 10.000 | kW | x | 4.22000 | | 42.20 |
| Deferred Energy Adjustment (New Rate) | 482.000 | kWh | x | 0.00229 | | 1.10 |
| Temp. Green Power Financing | 1,010.000 | kWh | x | 0.00067 | | 0.68 |
| Renewable Energy Program | 1,010.000 | kWh | x | 0.00077 | | 0.78 |
| Energy Efficiency Charge | 1,010.000 | kWh | x | 0.00121 | | 1.22 |
| Tax Reduction | 1,010.000 | kWh | x | 0.00264 CR | | 2.67 CR |
| Basic Service Charge | | | | | | 21.10 |
| Local Government Fee | | | | 5% | | 8.54 |
| Universal Energy Charge | 1,010.000 | kWh | x | 0.00039 | | 0.39 |

**Total Electric Service Amount**                                **$179.76**

**New and improved graph!**

Improving the quality of information we
provide each month is important to helping
you save money and conserve energy. The
graph on your bill now provides 12 months of
historical usage and the current year's usage
side by side for comparison.

Thank you for your payment. We look
forward to serving you in the future.

- Continued on the back of this page -

**Customer Service:** (702) 402-5555 or (800) 331-3103  Toll Free 24/7, excluding holidays  **Emergencies:** (702) 402-2900

Please return this portion with payment - to ensure timely processing do not use staples or tape


**NV**Energy

ACCOUNT NUMBER:  3000100797819920460

Customer Number: 1007978

| Please Pay By: | May 3, 2019 |
|---|---|
| | **$179.76** |

Service     **10181 PARK RUN DR STE 2A**
Address:    **LAS VEGAS, NV 89145**

**Enter Amount
Enclosed:**        $

**Payment Options:**
Online at nvenergy.com or call (844) 343-3719
At any of our authorized Shop & Pay locations
By phone: (800) 253-8084 (debit/credit card)
By mail: PO Box 30150, Reno, NV 89520-3150

4/17/19 11:32 AM 0  002531E 20190417 OOSTF3 NDPRINT 1 sa 1 COSTF90000* 161538 BC

DESERT LAND LLC
ATTN:KAVITA GUPTA
1300 BRISTOL ST N
NEWPORT BEACH CA 92660-2951



89520



3000100797819920460  0000017976  0000017976  0  008

3000100797820026778     DESERT LAND LLC                    10181 PARK RUN DR STE 250                                    04-17-2019
PAGE 1 OF 2

 **NV**Energy

E A15 B15

DESERT LAND LLC
10181 PARK RUN DR STE 250
LAS VEGAS, NV 89145

## Electric Usage: General Service

**Average Daily Electric Usage**

This month your
average daily cost      **$2.28**

Usage in total electric kilowatt hours
■ Last Year   ■ This Year



### Please Pay By:    **May 3, 2019**
**$68.34**
Additional time is provided to pay this bill. Please
pay the amount due by May 13, 2019 to avoid a 1.50%
late fee or deposit.

| Account: | **3000100797820026778** |
|---|---|
| Customer Number: | **1007978** |
| Premises Number: | **2002677** |
| Billing Date: | Apr 17, 2019 |
| Next Read Date: | May 14, 2019 |

**Account Summary**

| Previous Account Balance | 63.70 |
|---|---|
| Payment - Mar 28, 2019 | 63.70 CR |
| Electric Charges | 68.34 |
| **Current Amount Due** | **$68.34** |

### Meter Information

| Meter# | Type | Service Period | Bill Days | Previous | | Current | Multiplier | Usage |
|---|---|---|---|---|---|---|---|---|
| AA013782090 | kWh | Mar 13, 2019 to Apr 12, 2019 | 30 | 71,474 | | 72,019 | 1 | 545 |

### Charge Details

| | | | | | |
|---|---|---|---|---|---|
| Electric Consumption  (Prior Rate) | 272.000 | kWh | x | 0.06758 | 18.38 |
| Electric Consumption  (New Rate) | 273.000 | kWh | x | 0.06934 | 18.93 |
| Deferred Energy Adjustment  (New Rate) | 273.000 | kWh | x | 0.00229 | 0.63 |
| Temp. Green Power Financing | 545.000 | kWh | x | 0.00067 | 0.37 |
| Renewable Energy Program | 545.000 | kWh | x | 0.00077 | 0.42 |
| Energy Efficiency Charge | 545.000 | kWh | x | 0.00119 | 0.65 |
| Tax Reduction | 545.000 | kWh | x | 0.00319 CR | 1.74 CR |
| Basic Service Charge | | | | | 27.25 |
| Local Government Fee | | | | 5% | 3.24 |
| Universal Energy Charge | 545.000 | kWh | x | 0.00039 | 0.21 |

**Total Electric Service Amount**                                      **$68.34**

### New and improved graph!
Improving the quality of information we
provide each month is important to helping
you save money and conserve energy. The
graph on your bill now provides 12 months of
historical usage and the current year's usage
side by side for comparison.

Thank you for your payment. We look
forward to serving you in the future.

- Continued on the back of this page -

**Customer Service:** (702) 402-5555 or (800) 331-3103  Toll Free 24/7, excluding holidays **Emergencies:** (702) 402-2900

Please return this portion with payment - to ensure timely processing do not use staples or tape

 **NV**Energy

**ACCOUNT NUMBER:  3000100797820026778**

**Customer Number:  1007978**

Service      **10181 PARK RUN DR STE 250**
Address:    **LAS VEGAS, NV 89145**

### Please Pay By:    **May 3, 2019**
**$68.34**

**Enter Amount
Enclosed:**      $

**Payment Options:**
Online at nvenergy.com or call (844) 343-3719
At any of our authorized Shop & Pay locations
By phone: (800) 253-8084 (debit/credit card)
By mail: PO Box 30150, Reno, NV 89520-3150

4/17/19 11:37 AM 0  9/05508 20190417-00ETF5 NOPRINT 1 or 1 GE5TF56000* 161568 RC

DESERT LAND LLC
ATTN:KAVITA GUPTA
1300 BRISTOL ST N
NEWPORT BEACH CA 92660-2951



89520



3000100797820026778  0000006834  0000006834  0  008

N/H-019244

## Exhibit C

## Mold Damage at Motel










N/H-019246

Exhibit D

# HIT LOG

**Wed - 1/29/2020**



**Desert Land, LLC (Desert Oasis Motel)**
3965, 3951, 3953 S Las Vegas Blvd
Las Vegas   NV  89119

Officer **Hiram Wiggins**

Notes to Management                          ID# 479843

---

| Observation Time #1 | **5:19 PM** | Description / Observations |
| --- | --- | --- |

Officer          **Hiram Wiggins**    **Patrolled all properties and removed a black male adult vagrant from vacant H lot. There are a few vehicles still on property. All other lots are clear. Motel area is clear. Boards on doors and windows at building A is clear. No problems to report at this time.**

---

| Observation Time #2 | **9:26 PM** | Description / Observations |
| --- | --- | --- |

Officer          **Hiram Wiggins**    Patrolled all properties and found no vagrants or suspicious activity. There are a few vehicles on lot H. All other vacant lots are clear. Building 3951 is clear. Boards on doors and windows at building A are secure. Motel area and building B are secure. No problems to report at this time.

---

| Observation Time #3 | **2:46 AM** | Description / Observations |
| --- | --- | --- |

Officer          **Michael A Phelps**    **Security observed white male camped out on one of the dirt lots. The subject was informed by security that he is on private property and needed to vacate premises immediately. The subject complied and departed without incident. Nothing further to report at this time**

---

| Observation Time #4 | **4:15 AM** | Description / Observations |
| --- | --- | --- |

Officer          **Michael A Phelps**    **Security observed a white male adult loitering on property the subject was very aggressive when asked to leave property as we were both walking down the stairs. The subject through his blanket at me and attacked me. The subject then forced me up against the wall trying to reach for my weapon as we were wrestling both myself and the subject started tumbling downstairs, I was able to pull out my cuffs and detain the subject and called metro the event number is 1993 the man was taken into custody by metro police no further issues to report.**

---

5841 E Charleston Blvd Ste 230 - 337  -  Las Vegas, NV 89142

Printed: 1/30/20  At: 12:45 PM

Page 1

N/H-019247

# HIT LOG

**Wed - 1/29/2020**



## Desert Land, LLC (Desert Oasis Motel)

3965, 3951, 3953 S Las Vegas Blvd
Las Vegas   NV   89119

Officer **Michael A Phelps**

Notes to Management                    ID# 479843

---



vagrant



vagrant



vagrant



vagrant



---

5841 E Charleston Blvd Ste 230 - 337  -  Las Vegas, NV 89142

N/H-019248

# HIT LOG

**Wed - 4/8/2020**



## Desert Land, LLC (Desert Oasis Motel)

3965, 3951, 3953 S Las Vegas Blvd
Las Vegas   NV   89119

Officer **Hiram Wiggins**

| Notes to Management | ID# 489185 |
| --- | --- |

---

Observation Time #1   **8:17 PM**

Officer   **Hiram Wiggins**

Description / Observations

**Patrolled property and removed a Caucasian male adult vagrant off property sleeping in stairwell at building 3951. Found board off unit at building A with a subject inside. Metro notified but subject fled building and was unable to be found. Motel area and building B are clear. All vacant lots are clear. No other problems to report.**

---

Observation Time #2   **10:22 PM**

Officer   **Hiram Wiggins**

Description / Observations

Patrolled all properties and found no vagrants or suspicious activity. Open unit at building A is clear. Buildings B and 3951 are clear and secure. Motel area is clear. All vacant lots are clear. No problems to report at this time.

---

Observation Time #3   **2:30 AM**

Officer   **Michael A Phelps**

Description / Observations

**Security did a follow up at the vacant building behind the motel there is vandalism to the property the board is down and there is easy access to the unit. At this time the unit is clear so signs of vagrants or anybody trespassing. Nothing further to report at this time**

---

Observation Time #4   **3:27 AM**

Officer   **Michael A Phelps**

Description / Observations

At this time there is no new vandalism graffiti property damage or vandalism to report. There is no foot or vehicle traffic entering or exiting the property. No vagrants on property trespassing or loitering. All dirt lots is clear. The vacant buildings are clear. The property is clear

---

N/H-019249

# HIT LOG

**Wed - 4/8/2020**



## Desert Land, LLC (Desert Oasis Motel)

3965, 3951, 3953 S Las Vegas Blvd
Las Vegas   NV   89119

Officer **Michael A Phelps**

Notes to Management                                    ID# 489185



loitering



board removed off of window



loitering

N/H-019250

Exhibit E



# Department of Administrative Services
## Code Enforcement Unit
## Public Response Office

2911 E. Sunset Rd • Las Vegas NV 89120-2707 • (702) 455-4191 • (702) 455-2080

Jeanine D'Errico, Assistant Director • Jim Andersen, Chief of Code Enforcement

DESERT LAND L L C                                          November 04, 2019
C/O K GUPTA
1300 BRISTOL ST N # 100
NEWPORT BEACH, CA 92660

## NOTICE OF ABATEMENT
## COUNTY OF CLARK - STATE OF NEVADA

OWNER: DESERT LAND L L C
C/O K GUPTA
OWNER ADDRESS: 1300 BRISTOL ST N # 100, NEWPORT BEACH, CA  92660
VIOLATION ADDRESS: 3941 LAS VEGAS BLVD
VIOLATION PARCEL : 162-28-301-036

### NATURE OF NUISANCE VIOLATION

**ILLEGAL, UNSAFE AND UNSIGHTLY MAINTENANCE OF A PROPERTY INCLUDING THE REMOVAL OF ALL ACCUMULATIONS AND STORAGE OF SOLID WASTE NOT LIMITED TO DISCARDED CLOTHING, CARDBOARD, WOOD, METAL, ALUMINUM, ABANDONED HOMELESS CAMPS AND ALL OTHER SOLID WASTE.  SECURE THE CONCRETE STRUCTURES ON THE PROPERTY TO ELIMINATE ILLEGAL ACTIVITY. VAGRANTS ARE OCCUPYING THE UNSECURED CONCRETE STRUCTURES AT THE BASE. REMOVE ALL GRAFFITI FROM THE ENTIRE PROPERTY INCLUDING THE CONCRETE STRUCTURES. REPAIR ALL FENCE SECTIONS AROUND THE ENTIRE PROPERTY THAT ARE IN DISREPAIR.  REMOVE ALL WEEDS, GRASS OVER FOUR INCHES IN HEIGHT, OR ANY VEGETATION THAT IS OVERGROWN, DEAD, DRY, DISEASED, OR NOXIOUS FROM THE ENTIRE PROPERTY.  POST THE ENTIRE PROPERTY WITH NO TRESPASSING N.R.S. 207-200 SIGNS.**

Property has been declared to be in violation and under 11.06.020 of the Clark County Code, Owner is required to abate the violations by **12/11/2019** by repairing, safeguarding, or eliminating any dangerous structure or condition and clearing from the property any solid waste, debris, rubbish, refuse, weed or noxious plant growth.  If the property is not voluntarily abated the County shall abate the violations & file a Special Assessment lien for the cost of the abatement against the property and collect the same as property taxes.  Abatements by the County shall be performed by approved contractors and awarded to the lowest responding responsible bidder following three solicitations.  Items abated shall be disposed of by contractors or their subcontractors only by removal to a lawful towing or wrecking company, whenever possible, or by removal to a lawful landfill.  Pending removal to a landfill, items abated shall be temporarily stored if the notice of abatement, or order on appeal, describes them as being a nuisance solely due to their location, but items may be stored in the public interest.  Written notice shall be provided for any storage terms and conditions, including fees and access, upon abatement.

Starting **12/12/2019** you shall be assessed a civil penalty for each day that you fail to abate the condition on this notice.  The civil penalty shall be **$100 PER DAY** for the first ten days, **$500 PER DAY** for the next twenty days, and **$1,000 PER DAY** thereafter.  The cumulative civil penalties shall not exceed the greater of **$10,000** of three times the cost of abatement. In addition, you may also be issued a Civil Administrative Citation which can incur fines ranging from $100 - $500 per count, per day that the violations continues.

**BOARD OF COUNTY COMMISSIONERS**
MARILYN KIRKPATRICK, Chair  LAWRENCE WEEKLY, Vice Chair
JUSTIN JONES  LARRY BROWN  TICK SEGERBLOM  JAMES B. GIBSON - MICHAEL NAFT
YOLANDA KING - County Manager



# Department of Administrative Services
## Code Enforcement Unit
## Public Response Office

2911 E. Sunset Rd • Las Vegas NV 89120-2707 • (702) 455-4191 • (702) 455-2080

Jeanine D'Errico, Assistant Director • Jim Andersen, Chief of Code Enforcement

DESERT LAND LLC
1300 BRISTOL STREET N STE100
NEWPORT BEACH, CA 92660

November 14, 2019

## NOTICE OF ABATEMENT
## COUNTY OF CLARK - STATE OF NEVADA

OWNER: DESERT LAND L L C
OWNER ADDRESS: 10181 PARK RUN DR # 200, LAS VEGAS, NV  89145--8873
VIOLATION ADDRESS: 162-28-301-033
VIOLATION PARCEL: 162-28-301-033

### NATURE OF NUISANCE VIOLATION

**ILLEGAL, UNSAFE AND UNSIGHTLY MAINTENANCE OF A PROPERTY INCLUDING THE REMOVAL OF ALL ACCUMULATIONS AND STORAGE OF SOLID WASTE NOT LIMITED TO DISCARDED CLOTHING, FURNITURE, CARDBOARD, METAL, WOOD, ALUMINUM, PLASTIC, MATTRESSES, HOUSEHOLD ITEMS, TREE DEBRIS, AND ALL OTHER SOLID WASTE.  REMOVE ALL WEEDS, GRASS OVER FOUR INCHES IN HEIGHT, OR ANY VEGETATION THAT IS OVERGROWN, DEAD, DRY, DISEASED, OR NOXIOUS FROM THE ENTIRE PROPERTY.  POST ENTIRE PROPERTY WITH NO TRESPASSING N.R.S. 207-200 SIGNS.**

Property has been declared to be in violation and under 11.06.020 of the Clark County Code, Owner is required to abate the violations by **12/18/2019** by repairing, safeguarding, or eliminating any dangerous structure or condition and clearing from the property any solid waste, debris, rubbish, refuse, weed or noxious plant growth.  If the property is not voluntarily abated the County shall abate the violations & file a Special Assessment lien for the cost of the abatement against the property and collect the same as property taxes.  Abatements by the County shall be performed by approved contractors and awarded to the lowest responding responsible bidder following three solicitations.  Items abated shall be disposed of by contractors or their subcontractors only by removal to a lawful towing or wrecking company, whenever possible, or by removal to a lawful landfill.  Pending removal to a landfill, items abated shall be temporarily stored if the notice of abatement, or order on appeal, describes them as being a nuisance solely due to their location, but items may be stored in the public interest.  Written notice shall be provided for any storage terms and conditions, including fees and access, upon abatement.

Starting **12/19/2019** you shall be assessed a civil penalty for each day that you fail to abate the condition on this notice.  The civil penalty shall be **$100 PER DAY** for the first ten days, **$500 PER DAY** for the next twenty days, and **$1,000 PER DAY** thereafter.  The cumulative civil penalties shall not exceed the greater of **$10,000** of three times the cost of abatement. In addition, you may also be issued a Civil Administrative Citation which can incur fines ranging from $100 - $500 per count, per day that the violations continues.

V. Rado
OFFICER
**Phone: (702) 455-7671**
Case: **CE19-17527**

BOARD OF COUNTY COMMISSIONERS
MARILYN KIRKPATRICK, Chair - LAWRENCE WEEKLY, Vice-Chair
JUSTIN JONES - LARRY BROWN - TICK SEGERBLOM - JAMES B. GIBSON - MICHAEL NAFT
YOLANDA KING - County Manager

N/H-019253





N/H-019254

# EXHIBIT F

N/H-019255



N/H-019256



N/H-019257



N/H-019258





N/H-019259



# EXHIBIT G

N/H-019261

N/H-019262

