# EXHIBIT F

## Kevin Coleman

| | |
|---|---|
| **From:** | Kavita Gupta <kgupta@guptaferrer.com> |
| **Sent:** | Thursday, March 28, 2019 4:33 PM |
| **To:** | Kevin Coleman; Chris Hart |
| **Cc:** | Greg Nuti |
| **Subject:** | Desert Land |
| **Attachments:** | SchwartzerEmail.pdf |

Dear all —

**Confidential bids**. Attached is the link for the confidential bids received by the Debtor. The password is 18-12454.

**Potential Conflict of Interest**. Attached is D's counsel's email regarding the $4.5M scheduled debt of Desert Land, LLC in Desert Oasis Apartments' schedules. Counsel for the secured creditor in the Desert Oasis Apartments had no insights as to this debt. In the interim, please research the question of whether this debt would constitute a conflict requiring my resignation. As we discussed, I have to accept my appointment by next Wednesday at the latest.

**Local Counsel**. Please provide the contact information for suggested local counsel.

Could you please forward to Kim; I don't have her email.

Thanks,

**From:** Angela Hosey <AFHosey@s-mlaw.com>
**Date:** Thursday, March 28, 2019 at 1:58 PM
**To:** Kavita Gupta <kgupta@guptaferrer.com>, Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Subject:** RE: Desert Land et al

Ms. Gupta:

Below is the DropBox link for the requested confidential documents.

https://www.dropbox.com/sh/jip898rj61itvh9/AAD9HqjFjCQ9szSZAgOlJZDRa?dl=0


**Angela Hosey**
**Office Manager**
Schwartzer & McPherson Law Firm
2850 S. Jones Boulevard, Suite 1
Las Vegas, NV  89146-5308

Telephone No.:  (702) 228-7590
Facsimile No.:  (702) 892-0122

E-Mail:  afhosey@s-mlaw.com

*This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail and delete all copies of this message.*

i

2

N/H-016822

**Thursday, March 28, 2019 at 4:19:54 PM Pacific Daylight Time**

**Subject:** Desert Land et al

**Date:** Thursday, March 28, 2019 at 1:44:21 PM Pacific Daylight Time

**From:** Lenard Schwartzer

**To:** Kavita Gupta

**CC:** Angela Hosey

Kavita-

I have to look it up and consult with my client.

Desert Land's assets consist of the property owned directly by Desert Land and its 100% subsidiary-Desert Oasis Investments.

Lenard E. Schwartzer, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
702-228-7590

**From:** Kavita Gupta <kgupta@guptaferrer.com>
**Sent:** Thursday, March 28, 2019 12:52 PM
**To:** Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Subject:** Re: Desert Land et al

Hi Lenard – Quick question on Desert Oasis Apartments.  The schedules list a $4.5M general unsecured debt owed by Desert Land.  Could you provide details on this debt?  Date incurred, basis for debt ect… Thank you, Kavita

### Kavita Gupta

GUPTA | FERRER LLP
1300 Bristol Street North, Suite 100
Newport Beach, CA 92660
Tel: 949.387.4470
Fax: 949.258.9786
*www.guptaferrer.com*
vCard Bio

**Confidentiality Notice**: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged.  If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure**: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Date:** Thursday, March 28, 2019 at 10:40 AM

N/H-016823

**To:** Kavita Gupta <kgupta@guptaferrer.com>
**Cc:** Angela Hosey <AFHosey@s-mlaw.com>, Taylor Jorgensen <TJorgensen@s-mlaw.com>
**Subject:** Desert Land et al

Kavita–

I will be in my office tomorrow and will call you tomorrow morning around 9 a.m. to set up a time for you to meet with the managers of the LLCs (Howard Bulloch and David Gaffin) and me and to view the properties. Next week, any day works for me except Wednesday.

We will gather the requested documents concerning insurance and licenses and email them to you. The Operating Reports are up to day. These reports show the various operations. The main business operation is the Desert Oasis Apartments which is managed by WestCorp. The income from the apartments is subject to a cash collateral stipulation with The Northern Trust Company. There is also a motel (mostly weekly/monthly tenants) managed by Hospitality Associates. There is a retail building with a month to month tenant which is managed by the Debtors

The insurance has been maintained. There is an insurance premium payment due by April 1, 2019. I will provide you with the invoice.

Lenard E. Schwartzer, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
702-228-7590

**From:** Kavita Gupta <kgupta@guptaferrer.com>
**Sent:** Thursday, March 28, 2019 10:09 AM
**To:** Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Cc:** Angela Hosey <AFHosey@s-mlaw.com>; Taylor Jorgensen <TJorgensen@s-mlaw.com>
**Subject:** Re: Desert Land et al

Hi Lenard –

Thank you for your email. I will be on site next week and I would be happy to meet with you and your clients.

Would you be available this afternoon or tomorrow morning for a call and if so, please let me know what time works for you. I'm available today any time after 2:15 and most of tomorrow. I had some questions about operational issues and would also like copies of certain documents – e.g., insurance policies, licenses ect.

Best,

**Kavita Gupta**
GUPTA | FERRER LLP
1300 Bristol Street North, Suite 100
Newport Beach, CA  92660
Tel:  949.387.4470
Fax: 949.258.9786
*www.guptaferrer.com*
vCard  Bio

Page 2 of 3

N/H-016824

**Confidentiality Notice**: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure**: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Lenard Schwartzer <LSchwartzer@s-mlaw.com>
**Date:** Thursday, March 28, 2019 at 9:59 AM
**To:** Kavita Gupta <kgupta@guptaferrer.com>
**Cc:** Angela Hosey <AFHosey@s-mlaw.com>, Taylor Jorgensen <TJorgensen@s-mlaw.com>
**Subject:** Desert Land et al

Ms. Gupta
Feel free to contact me regarding this case.
My clients and I are available to meet you in Las Vegas or telephone conference with you tomorrow or next week.


Lenard E. Schwartzer, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
702-228-7590

N/H-016825

# EXHIBIT G

| From: | Joshua Teeple |
|-------|---------------|
| To: | Kevin Coleman |
| Cc: | Kavita Gupta; Howard Grobstein; Kevin Meacham; Ben Howard |
| Subject: | Re: Desert Land Intercompany Analysis |
| Date: | Friday, June 14, 2019 1:06:41 PM |

Understood Kevin. We have received some additional information and will update our analysis and keep you updated if we need your assistance to obtain additional information.

JOSHUA TEEPLE | Partner
gtllp.com | jteeple@gtllp.com | Linkedin
MAIN 949.381.5655 |FAX 949.381.5665
DIRECT 949.381.5656 |MOBILE 949.614.3435

On Jun 14, 2019, at 1:03 PM, Kevin Coleman <kcoleman@nutihart.com> wrote:

Hi Joshua,

I really need to underscore how important it is to complete this analysis ASAP.

If there is actually an inter-estate claim, Kavita may need to resign from one of the cases, or at a minimum we will have to file a motion laying out all of the facts and circumstances relating to the inter-company debt so the court can decide whether Kavita should continue as trustee in all cases. If we appear to delay, there is a risk we could be accused of being inattentive or trying to sweep the issue under the rug. None of us (and it would be all of us) want to find ourselves in the horrible of position of being disqualified and denied compensation from all three cases – or suffer the attendant reputational damage.

Please copy Kavita and I on your attempts to get the underlying documents you need for the analysis so that we can act promptly to compel their production if the Debtors and/or its accountants fail to respond timely.

Best regards,

--Kevin

**From:** Joshua Teeple [mailto:jteeple@gtllp.com]
**Sent:** Thursday, June 13, 2019 1:21 PM
**To:** Kavita Gupta <kgupta@guptaferrer.com>; Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Howard Grobstein <hgrobstein@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>
**Subject:** Desert Land Intercompany Analysis

Hi Kavita. I had a deadline of tomorrow to get the intercompany analysis to you. We

have sent the preliminary analysis and have requested additional information.  We will update the analysis if that information changes the analysis, but let us know if you need anything else at this time.  Thank you.

Josh


JOSHUA TEEPLE | Partner
www.gtllp.com | jteeple@gtllp.com | Linkedin
MAIN 949.381.5655 | FAX 949.381.5665
DIRECT 949.381.5656 | MOBILE 949.614.3435

<image002.jpg>
**SEND DOCUMENTS TO ME SECURELY USING THIS LINK**

# EXHIBIT H

| | |
|---|---|
| **From:** | Kevin Coleman |
| **To:** | "Lenard Schwartzer" |
| **Cc:** | Joshua Teeple; Ben Howard; Kavita Gupta; Chris Hart |
| **Subject:** | Desert Land, et al *** Potential Inter-Company Claims |
| **Date:** | Tuesday, June 18, 2019 5:28:00 PM |
| **Attachments:** | Desert Land 2002 YE JOURNAL ENTRY.PDF |
| | image003.png |
| **Importance:** | High |

Hi Lenard,

As I think you know, the Trustee's financial advisors have been trying to determine if intercompany claims exist.  According to tax returns and Quickbooks records, Desert Oasis Apartments, LLC owed Desert Land, LLC $4,499,329.00 as of December 31, 2017.

As far as they have been able to determine, the potential intercompany obligation to Desert Land was created by a journal entry in Quickbooks in 2002, which is attached.  As you can see, it was apparently booked as a year-end adjustment on December 31, 2002.  My understanding is that the Trustee's financial advisors have asked for documentation to validate the journal entry, but the Debtor's management has been unable to provide it.  I also understand that the financial advisors have asked management for an explanation of what gave rise to the obligation (was it a loan or other cash infusion, allocation of expenses, etc.) and for copies of any agreements memorializing the advance, but they have been unable to provide those either.

We will be filing a motion in order to bring the potential inter-estate conflict of interest to the attention of the Court, creditors, and the UST, and am therefore asking you to confirm with your clients whether they disagree with any of the following statements:

1. The oldest financial records referencing the intercompany obligation from Desert Oasis Apartments, LLC to Desert Land, LLC go back to 2002, and no prior records relating to this transaction are available;
2. It is unclear whether the intercompany obligation arose in 2002 or at an earlier date;
3. The Debtors management does not recall the underlying reasons for why Desert Oasis Apartments is reflected as having a liability to Desert Land, LLC; and
4. No written agreement between Desert Oasis Apartments, LLC and Desert Land, LLC (or other writing signed by Desert Oasis Apartments, LLC) can be located that memorializes the reasons an intercompany debt is reflected on the Debtors' books and records and tax returns.

If any of these statements are inaccurate, or if you have any other information concerning the purported intercompany debt from Desert Oasis Apartments to Desert Land, please let us know by the end of this week.

If you have any questions or wish to discuss, please feel free to contact me.

Best regards,

N/H-017178

--Kevin

Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com



**DESERT LAND, LLC**
Detail of Journal Entry "2002 YE adj" booked into QuickBooks as of 12/31/2002

| ACCT | Date | Transaction Type | Memo/Description | Account | Debit | Credit |
|---|---|---|---|---|---|---|
| 1000000 Petty Cash | 12/31/2002 | Journal Entry | 2002 YE adj | 1000000 Petty Cash | 1,200.00 | |
| 1012900 Cash - Olympus Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1012900 Cash - Olympus Inn | 403.54 | |
| 1013900 Cash - Desert Oasis Motel | 12/31/2002 | Journal Entry | 2002 YE adj | 1013900 Cash - Desert Oasis Motel | 15,913.34 | |
| 1014900 Cash - Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1014900 Cash - Happi Inn | 11,350.23 | |
| 1110003 Casa Malaga Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 1110003 Due From Affiliates:Casa Malaga Motel, Inc. | 257,544.03 | |
| 1110007 Desert Oasis Apartments. LLC | 12/31/2002 | Journal Entry | 2002 YE adj | 1110007 Due From Affiliates:Desert Oasis Apartments, LLC | 7,218,823.56 | |
| 1110009 The Ranch, LLC | 12/31/2002 | Journal Entry | 2002 YE adj | 1110009 Due From Affiliates:The Ranch, LLC | 103,153.03 | |
| 1110012 Glass Pool | 12/31/2002 | Journal Entry | 2002 YE adj | 1110012 Due From Affiliates:Glass Pool | 1,100.81 | |
| 1110018 Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1110018 Due From Affiliates:Happi Inn | 5,475.24 | |
| 1110019 Olympus Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1110019 Due From Affiliates:Olympus Inn | 10,954.33 | |
| 1110020 Desert Oasis Motel | 12/31/2002 | Journal Entry | 2002 YE adj | 1110020 Due From Affiliates:Desert Oasis Motel | 60.70 | |
| 1110021 Desert Ranch | 12/31/2002 | Journal Entry | 2002 YE adj | 1110021 Due From Affiliates:Desert Ranch | 1,657.00 | |
| 1310000 Payroll Asset | 12/31/2002 | Journal Entry | 2002 YE adj | 1310000 Payroll Asset | 85.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-08-601-003 | 1505000 Fixed Assets:Land | 631,649.69 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Adj. Basis Desert Ranch LLC | 1505000 Fixed Assets:Land | | 18,665,123.39 |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-08-801-024 | 1505000 Fixed Assets:Land | 640,760.35 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 182-28-301-011 | 1505000 Fixed Assets:Land | 2,832,598.24 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 182-33-101-002 | 1505000 Fixed Assets:Land | 5,000.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 182-28-301-007,008,012 | 1505000 Fixed Assets:Land | 25,848,089.25 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Desert Oasis Motel Land | 1505000 Fixed Assets:Land | 9,632,834.20 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Tivoli Motel Land | 1505000 Fixed Assets:Land | 1,001,954.23 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Sov. Bank Enfield Land | 1505000 Fixed Assets:Land | 167,682.45 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Sov. Bank Farmington Land | 1505000 Fixed Assets:Land | 134,145.76 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-012 | 1505000 Fixed Assets:Land | 419,567.34 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Pt Gov Lots 164,166,175 | 1505000 Fixed Assets:Land | 1,106,103.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Mandalay Haven Site | 1505000 Fixed Assets:Land | 4,246,965.93 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-025 | 1505000 Fixed Assets:Land | 571,940.53 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-011 | 1505000 Fixed Assets:Land | 417,833.60 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-08-601-001 | 1505000 Fixed Assets:Land | 1,305,273.39 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-027 | 1505000 Fixed Assets:Land | 1,132,266.58 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-003 | 1505000 Fixed Assets:Land | 886,522.19 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Tivoli Motel | 1510000 Fixed Assets:Building | 3,992,816.91 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Sov. Bank Farmington | 1510000 Fixed Assets:Building | 536,583.02 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Sov. Bank Enfield | 1510000 Fixed Assets:Building | 706,250.61 | |
| 1520000 Furniture and Fixtures | 12/31/2002 | Journal Entry | 2002 YE adj | 1520000 Fixed Assets:Furniture and Fixtures | 7,938.00 | |
| 1610000 Building | 12/31/2002 | Journal Entry | 2002 YE adj | 1610000 Fixed Assets:Accumulated Depreciation:Building | | 201,371.00 |
| 1350000 Refundable Deposits | 12/31/2002 | Journal Entry | 2002 YE adj | 1350000 Refundable Deposits | 400,000.00 | |
| 1711801 Capital Invested | 12/31/2002 | Journal Entry | 2002 YE adj | 1711801 Notes Receivable - External:[Borrower Name]:[Specific Note (if applicable)]:Capital:Capital Invested | 25,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Keating - 2002 YE adj | 1800000 Equity Investments | 25,475.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Airport - 2002 YE adj | 1800000 Equity Investments | 7,500.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | 70LP - 2002 YE adj | 1800000 Equity Investments | 35,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Cedar Mountain - 2002 YE adj | 1800000 Equity Investments | 52,030.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Lewis - 2002 YE adj | 1800000 Equity Investments | 236,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Frias - 2002 YE adj | 1800000 Equity Investments | 25,000.00 | |
| 1989000 Suspense | 12/31/2002 | Journal Entry | 2002 YE adj | 1989000 Suspense | 307,650.14 | |
| 2000000 Accounts Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2000000 Accounts Payable | | 113.28 |
| 2010800 Credit Card Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2010800 Credit Card Payable | | 9,252.51 |
| 2100003 Casa Malaga Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 2100003 Due To Affiliates:Casa Malaga Motel, Inc. | | 150.00 |
| 2100010 Tivoli Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 2100010 Due To Affiliates:Tivoli Motel, Inc. | | 4,994,601.14 |
| 2100013 Miami Beach | 12/31/2002 | Journal Entry | 2002 YE adj | 2100013 Due To Affiliates:Miami Beach | | 1,695.76 |
| 2100018 Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 2100018 Due To Affiliates:Happi Inn | | 825.31 |
| 2100022 Sovereign Bank - Enfield | 12/31/2002 | Journal Entry | 2002 YE adj | 2100022 Due To Affiliates:Sovereign Bank - Enfield | | 104,584.22 |
| 2100023 Sovereign Bank - Farmington | 12/31/2002 | Journal Entry | 2002 YE adj | 2100023 Due To Affiliates:Sovereign Bank - Farmington | | 83,667.41 |
| 2210000 Refundable Deposits | 12/31/2002 | Journal Entry | 2002 YE adj | 2210000 Refundable Deposits | | 19,694.00 |
| 2240000 Sales Tax Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2240000 Sales Tax Payable | | 4,023.00 |
| 2400001 T Gonzales | 12/31/2002 | Journal Entry | 2002 YE adj | 2400001 Notes Payable - External:T Gonzales | | 41,500,000.00 |
| 2400002 Aspen Financial | 12/31/2002 | Journal Entry | 2002 YE adj | 2400002 Notes Payable - External:Aspen Financial | | 16,082,000.00 |
| 2400003 Consolidated Mortgage | 12/31/2002 | Journal Entry | 2002 YE adj | 2400003 Notes Payable - External:Consolidated Mortgage | | 7,835,706.00 |
| 2400004 First Security - Enfield | 12/31/2002 | Journal Entry | 2002 YE adj | 2400004 Notes Payable - External:First Security - Enfield | | 528,288.60 |
| 2400005 First Security - Farmington | 12/31/2002 | Journal Entry | 2002 YE adj | 2400005 Notes Payable - External:First Security - Farmington | | 422,630.64 |
| 2610000 Deferred Installment Gain | 12/31/2002 | Journal Entry | 2002 YE adj | 2610000 Deferred Installment Gain | | 13,499,972.44 |
| 3000000 Opening Balance Equity (3) | 12/31/2002 | Journal Entry | 2002 YE adj | 3000000 Opening Balance Equity (3) | 38,987,547.48 | |
| | | | | | 103,953,698.70 | 103,953,698.70 |

N/H-017180

# EXHIBIT I

| From: | Kavita Gupta |
|---|---|
| To: | Joshua Teeple; Ben Howard |
| Cc: | Kevin Meacham; Chris Hart; Kevin Coleman |
| Subject: | Re: Desert Land Intercompany Analysis |
| Date: | Tuesday, June 11, 2019 10:44:58 AM |
| Attachments: | image001.png |

Josh and Ben –

Per our discussion this morning, you will reach out to the Debtor's former accountants, the Debtors' managers, and Brian Shapiro, the Skyvue Trustee, and specifically request the information/documents you need to complete the analysis. To the extent that you do not timely receive this information within the next 10 days, please let Kevin and I know asap so we can take the necessary steps to get the documents/information via turnover/Rule 2004/subpoena ect…

Thanks,

**Kavita Gupta**

GUPTA | FERRER LLP

1300 Bristol Street North, Suite 100
Newport Beach, CA  92660
Tel:  949.387.4470
Fax: 949.258.9786
*www.guptaferrer.com*
vCard  Bio

**Confidentiality Notice**: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged.  If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure**: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Joshua Teeple <jteeple@gtllp.com>
**Date:** Tuesday, June 11, 2019 at 9:11 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Cc:** Kavita Gupta <kgupta@guptaferrer.com>, Ben Howard <bhoward@gtllp.com>, Kevin Meacham <kmeacham@gtllp.com>, Chris Hart <chart@nutihart.com>
**Subject:** RE: Desert Land Intercompany Analysis

Hi Kevin.

That is correct.

I did not have that discussion. Did you Ben? We have not seen any documentation regarding the basis of the debt.

JOSHUA TEEPLE | Partner
www.gtllp.com | jteeple@gtllp.com | Linkedin
MAIN 949.381.5655 | FAX 949.381.5665
DIRECT 949.381.5656 | MOBILE 949.614.3435



**SEND DOCUMENTS TO ME SECURELY USING THIS LINK**

---

**From:** Kevin Coleman <kcoleman@nutihart.com>
**Sent:** Tuesday, June 11, 2019 9:04 AM
**To:** Joshua Teeple <jteeple@gtllp.com>
**Cc:** Kavita Gupta <kgupta@guptaferrer.com>; Ben Howard <bhoward@gtllp.com>; Kevin Meacham <kmeacham@gtllp.com>; Chris Hart <chart@nutihart.com>
**Subject:** Re: Desert Land Intercompany Analysis

Thanks Joshua.

So if I am interpreting this analysis correctly, Desert Oasis Apartments owed Desert Land approx. $4.5M as of Dec. 31, 2017.

Desert Oasis Apartments also paid $87K to Desert Land in 2017.

Did you have any discussion with the Debtors' management or accountant to validate what is showing on the tax returns, and what is the basis for the underlying obligation?

Best regards,

—Kevin

Sent from my iPhone

On Jun 11, 2019, at 8:41 AM, Joshua Teeple <jteeple@gtllp.com> wrote:

> Kavita – attached is a draft of the intercompany analysis we discussed. We based it off
> the income tax returns for the Debtors as that was the most complete and reliable

information available to us.  Please let us know if you have any questions or would like to discuss in more detail.

Thanks.

Josh

JOSHUA TEEPLE | Partner
www.gtllp.com | jteeple@gtllp.com | Linkedin
MAIN 949.381.5655 | FAX 949.381.5665
DIRECT 949.381.5656 | MOBILE 949.614.3435

<image001.png>

SEND DOCUMENTS TO ME SECURELY USING THIS LINK

<Intercompany Analysis.pdf>

EXHIBIT J

| From: | Kevin Coleman |
|---|---|
| To: | Kavita Gupta |
| Cc: | Greg Nuti; Chris Hart; Kim Fineman |
| Subject: | FW: Desert Land, et al *** Potential Inter-Company Claims |
| Date: | Thursday, June 27, 2019 1:07:00 PM |
| Attachments: | Desert Land 2002 YE JOURNAL ENTRY.PDF |
| | Desert Entities Diagram.pdf |
| | BH & P , Inc., In re, 949 F.2d 1300 (3rd Cir., 1991) (1).docx |
| | In re Afi Holding, Inc., 530 F.3d 832 (9th Cir., 2008) (1).docx |
| | image002.png |
| Importance: | High |

Hi Kavita,

Further to our conversation this morning, as you know, the Schedule F filed by Desert Oasis Apartments indicates that it owed Desert Land, LLC $4.5M. That obligation was not scheduled as disputed, contingent, or unliquidated. Desert Land, LLC's Schedule B, however, stated that it had no accounts receivable, and there was nothing otherwise to indicate that one of its assets was a sum of money owed to it by Desert Oasis Apartments. Grobstein Teeple, LLP investigated by among other things, reviewing tax returns, the Debtors' accounting records, and interviewing the Debtors' management. As noted in my email below to Lenard Schwartzer, the intercompany obligation appears to have its origins in a year end adjustment booked on December 31, 2002. No backup is available to establish the basis for this accounting entry.

I am assuming that the Debtors will confirm that they do not have any other documentation or remember anything else about the apparent inter-company obligation between Desert Oasis Apartments and Desert Land. The upshot is that:

1. We cannot reliably determine the basis for the purported debt.
2. The Debtors, however, have treated the liability as legitimate, and do not dispute it.
3. There are grounds upon which a creditor might challenge the validity and enforceability of the debt, including but not limited to:
   a. The claim is unenforceable on statute of limitations grounds;
   b. The claim is subject to re-characterization as an equity contribution;
   c. The claim is subject to disallowance because the estate of Desert Land is unable to sustain its burden to demonstrate the validity of the debt.
4. If a court were to conclude that the obligation should be treated as an equity contribution rather than a debt, the estate of Desert Oasis Apartments may have a claim against the Desert Land estate for recovery of the payments made pre-bankruptcy.
5. If a court were to conclude a valid indebtedness exists, the estate of Desert Oasis Apartments may have a claim against Desert Land for recovery of an insider preference.
6. The circumstances described in ¶4 and ¶5 could give Desert Oasis Apartments a defense to the Desert Land claim under Bankruptcy Code section 502(h). (Any affirmative claim by Apartments against Desert Land appears to be subject to the bar date for filing claims, however, leave to file a late-claim could be permitted under *Pioneer*.)

The estate of Desert Oasis Apartments has $33,433.15 in total non-insider unsecured non-priority debt. (That number could increase if the apartment parcel is sold for less an amount sufficient to

pay Northern Trust and the Gonzales judgment lien – which would leave a deficiency.)  Insider unsecured claims total $6.172 million.  Hence, in circumstances where the apartment parcel generated $21 million (enough to pay Northern Trust, Gonzales), it would be necessary to examine the validity of the Desert Land claim and possibly object to it.  Conversely, Desert Land has non-insider unsecured non-priority claims of between $9-10M (assuming the compromise with the Sher creditors is approved).  Unless the Desert Land parcels are sold for enough to pay all creditors in full, that estate has an interest in maximizing its recovery from the estate of Desert Oasis Apartments.

Hence, circumstances could materialize in the future that make the interests of the two estates adverse.  Whether those circumstances materialize hinges on whether the parcels can be sold for enough to pay all creditors in full.

Under the Third Circuit's BH&P case (attached) – which the Ninth Circuit's AFI Holding case follows – we need to bring the facts and circumstances surrounding the intercompany obligations and potential for two of your estates to have adverse interests to the court's attention, and let the court decide whether you should continue to serve as trustee in all three cases.  The potential options are:

A. Allow you to continue as trustee in all three cases until the Desert Oasis Apartments property is sold, at which point we will know whether there is an actual conflict;
B. Have you resign as trustee in the Apartments case; or
C. Allow you to continue as trustee in all three cases but designate a third party to assert any objections to the purported Desert Land claim.  (Since SkyVue Las Vegas, LLC is the holder of 99.5% of the equity in Desert Oasis Apartments, Brian Shapiro might be the right candidate if elimination of the debt would make a distribution to equity possible.)

We will get started on drafting the motion, but let me know if you have questions or want to discuss any modifications to the approach outlined above.

Best regards,

--Kevin

**From:** Kevin Coleman
**Sent:** Tuesday, June 18, 2019 5:29 PM
**To:** 'Lenard Schwartzer' <LSchwartzer@s-mlaw.com>
**Cc:** 'Joshua Teeple' <jteeple@gtllp.com>; Ben Howard <bhoward@gtllp.com>; Kavita Gupta <kgupta@guptaferrer.com>; Chris Hart <chart@nutihart.com>
**Subject:** Desert Land, et al *** Potential Inter-Company Claims
**Importance:** High

Hi Lenard,

As I think you know, the Trustee's financial advisors have been trying to determine if intercompany claims exist.  According to tax returns and Quickbooks records, Desert Oasis Apartments, LLC owed Desert Land, LLC $4,499,329.00 as of December 31, 2017.

As far as they have been able to determine, the potential intercompany obligation to Desert Land was created by a journal entry in Quickbooks in 2002, which is attached.  As you can see, it was apparently booked as a year-end adjustment on December 31, 2002.  My understanding is that the Trustee's financial advisors have asked for documentation to validate the journal entry, but the Debtor's management has been unable to provide it.  I also understand that the financial advisors have asked management for an explanation of what gave rise to the obligation (was it a loan or other cash infusion, allocation of expenses, etc.) and for copies of any agreements memorializing the advance, but they have been unable to provide those either.

We will be filing a motion in order to bring the potential inter-estate conflict of interest to the attention of the Court, creditors, and the UST, and am therefore asking you to confirm with your clients whether they disagree with any of the following statements:

1. The oldest financial records referencing the intercompany obligation from Desert Oasis Apartments, LLC to Desert Land, LLC go back to 2002, and no prior records relating to this transaction are available;
2. It is unclear whether the intercompany obligation arose in 2002 or at an earlier date;
3. The Debtors management does not recall the underlying reasons for why Desert Oasis Apartments is reflected as having a liability to Desert Land, LLC; and
4. No written agreement between Desert Oasis Apartments, LLC and Desert Land, LLC (or other writing signed by Desert Oasis Apartments, LLC) can be located that memorializes the reasons an intercompany debt is reflected on the Debtors' books and records and tax returns.

If any of these statements are inaccurate, or if you have any other information concerning the purported intercompany debt from Desert Oasis Apartments to Desert Land, please let us know by the end of this week.

If you have any questions or wish to discuss, please feel free to contact me.

Best regards,

--Kevin


Kevin W. Coleman
**Nuti Hart LLP**
411 30th Street, Suite 408
Oakland, CA 94609
Cell: 415 533-2920
Office: 510 506-7155
kcoleman@nutihart.com

N/H-017194



N/H-017195

**DESERT LAND, LLC**
Detail of Journal Entry "2002 YE adj" booked into QuickBooks as of 12/31/2002

| ACCT | Date | Transaction Type | Memo/Description | Account | Debit | Credit |
|---|---|---|---|---|---|---|
| 1000000 Petty Cash | 12/31/2002 | Journal Entry | 2002 YE adj | 1000000 Petty Cash | 1,200.00 | |
| 1012900 Cash - Olympus Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1012900 Cash - Olympus Inn | 403.54 | |
| 1013900 Cash - Desert Oasis Motel | 12/31/2002 | Journal Entry | 2002 YE adj | 1013900 Cash - Desert Oasis Motel | 15,913.34 | |
| 1014900 Cash - Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1014900 Cash - Happi Inn | 11,350.23 | |
| 1110003 Casa Malaga Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 1110003 Due From Affiliates:Casa Malaga Motel, Inc. | 257,544.03 | |
| 1110007 Desert Oasis Apartments, LLC | 12/31/2002 | Journal Entry | 2002 YE adj | 1110007 Due From Affiliates:Desert Oasis Apartments, LLC | 7,218,823.56 | |
| 1110009 The Ranch, LLC | 12/31/2002 | Journal Entry | 2002 YE adj | 1110009 Due From Affiliates:The Ranch, LLC | 103,153.03 | |
| 1110012 Glass Pool | 12/31/2002 | Journal Entry | 2002 YE adj | 1110012 Due From Affiliates:Glass Pool | 1,100.81 | |
| 1110018 Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1110018 Due From Affiliates:Happi Inn | 5,475.24 | |
| 1110019 Olympus Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 1110019 Due From Affiliates:Olympus Inn | 10,954.33 | |
| 1110020 Desert Oasis Motel | 12/31/2002 | Journal Entry | 2002 YE adj | 1110020 Due From Affiliates:Desert Oasis Motel | 60.70 | |
| 1110021 Desert Ranch | 12/31/2002 | Journal Entry | 2002 YE adj | 1110021 Due From Affiliates:Desert Ranch | 1,657.00 | |
| 1310000 Payroll Asset | 12/31/2002 | Journal Entry | 2002 YE adj | 1310000 Payroll Asset | 85.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-08-601-003 | 1505000 Fixed Assets:Land | 631,649.69 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Adj. Basis Desert Ranch LLC | 1505000 Fixed Assets:Land | | 18,665,123.39 |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-024 | 1505000 Fixed Assets:Land | 640,760.35 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 182-28-301-011 | 1505000 Fixed Assets:Land | 2,832,598.24 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 182-33-101-002 | 1505000 Fixed Assets:Land | 5,000.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 182-28-301-007,008,012 | 1505000 Fixed Assets:Land | 25,848,089.25 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Desert Oasis Motel Land | 1505000 Fixed Assets:Land | 9,632,834.20 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Tivoli Motel Land | 1505000 Fixed Assets:Land | 1,001,954.23 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Sov. Bank Enfield Land | 1505000 Fixed Assets:Land | 167,682.45 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Sov. Bank Farmington Land | 1505000 Fixed Assets:Land | 134,145.76 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-012 | 1505000 Fixed Assets:Land | 419,567.34 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Pt Gov Lots 164,166,175 | 1505000 Fixed Assets:Land | 1,106,103.00 | |
| 1505000 Land | 12/31/2002 | Journal Entry | Mandalay Haven Site | 1505000 Fixed Assets:Land | 4,246,965.93 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-025 | 1505000 Fixed Assets:Land | 571,940.53 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-011 | 1505000 Fixed Assets:Land | 417,833.60 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-08-601-001 | 1505000 Fixed Assets:Land | 1,305,273.39 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-027 | 1505000 Fixed Assets:Land | 1,132,266.58 | |
| 1505000 Land | 12/31/2002 | Journal Entry | 177-05-801-003 | 1505000 Fixed Assets:Land | 886,522.19 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Tivoli Motel | 1510000 Fixed Assets:Building | 3,992,816.91 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Sov. Bank Farmington | 1510000 Fixed Assets:Building | 536,583.02 | |
| 1510000 Building | 12/31/2002 | Journal Entry | Sov. Bank Enfield | 1510000 Fixed Assets:Building | 706,250.61 | |
| 1520000 Furniture and Fixtures | 12/31/2002 | Journal Entry | 2002 YE adj | 1520000 Fixed Assets:Furniture and Fixtures | 7,938.00 | |
| 1610000 Building | 12/31/2002 | Journal Entry | 2002 YE adj | 1610000 Fixed Assets:Accumulated Depreciation:Building | | 201,371.00 |
| 1350000 Refundable Deposits | 12/31/2002 | Journal Entry | 2002 YE adj | 1350000 Refundable Deposits | 400,000.00 | |
| 1711801 Capital Invested | 12/31/2002 | Journal Entry | 2002 YE adj | 1711801 Notes Receivable - External:[Borrower Name]:[Specific Note (if applicable)]:Capital:Capital Invested | 25,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Keating - 2002 YE adj | 1800000 Equity Investments | 25,475.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Airport - 2002 YE adj | 1800000 Equity Investments | 7,500.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | 70LP - 2002 YE adj | 1800000 Equity Investments | 35,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Cedar Mountain - 2002 YE adj | 1800000 Equity Investments | 52,030.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Lewis - 2002 YE adj | 1800000 Equity Investments | 236,000.00 | |
| 1800000 Equity Investments | 12/31/2002 | Journal Entry | Frias - 2002 YE adj | 1800000 Equity Investments | 25,000.00 | |
| 1989000 Suspense | 12/31/2002 | Journal Entry | 2002 YE adj | 1989000 Suspense | 307,650.14 | |
| 2000000 Accounts Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2000000 Accounts Payable | | 113.28 |
| 2010800 Credit Card Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2010800 Credit Card Payable | | 9,252.51 |
| 2100003 Casa Malaga Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 2100003 Due To Affiliates:Casa Malaga Motel, Inc. | | 150.00 |
| 2100010 Tivoli Motel, Inc. | 12/31/2002 | Journal Entry | 2002 YE adj | 2100010 Due To Affiliates:Tivoli Motel, Inc. | | 4,994,601.14 |
| 2100013 Miami Beach | 12/31/2002 | Journal Entry | 2002 YE adj | 2100013 Due To Affiliates:Miami Beach | | 1,695.76 |
| 2100018 Happi Inn | 12/31/2002 | Journal Entry | 2002 YE adj | 2100018 Due To Affiliates:Happi Inn | | 825.31 |
| 2100022 Sovereign Bank - Enfield | 12/31/2002 | Journal Entry | 2002 YE adj | 2100022 Due To Affiliates:Sovereign Bank - Enfield | | 104,584.22 |
| 2100023 Sovereign Bank - Farmington | 12/31/2002 | Journal Entry | 2002 YE adj | 2100023 Due To Affiliates:Sovereign Bank - Farmington | | 83,667.41 |
| 2210000 Refundable Deposits | 12/31/2002 | Journal Entry | 2002 YE adj | 2210000 Refundable Deposits | | 19,694.00 |
| 2240000 Sales Tax Payable | 12/31/2002 | Journal Entry | 2002 YE adj | 2240000 Sales Tax Payable | | 4,023.00 |
| 2400001 T Gonzales | 12/31/2002 | Journal Entry | 2002 YE adj | 2400001 Notes Payable - External:T Gonzales | | 41,500,000.00 |
| 2400002 Aspen Financial | 12/31/2002 | Journal Entry | 2002 YE adj | 2400002 Notes Payable - External:Aspen Financial | | 16,082,000.00 |
| 2400003 Consolidated Mortgage | 12/31/2002 | Journal Entry | 2002 YE adj | 2400003 Notes Payable - External:Consolidated Mortgage | | 7,835,706.00 |
| 2400004 First Security - Enfield | 12/31/2002 | Journal Entry | 2002 YE adj | 2400004 Notes Payable - External:First Security - Enfield | | 528,288.60 |
| 2400005 First Security - Farmington | 12/31/2002 | Journal Entry | 2002 YE adj | 2400005 Notes Payable - External:First Security - Farmington | | 422,630.64 |
| 2610000 Deferred Installment Gain | 12/31/2002 | Journal Entry | 2002 YE adj | 2610000 Deferred Installment Gain | | 13,499,972.44 |
| 3000000 Opening Balance Equity (3) | 12/31/2002 | Journal Entry | 2002 YE adj | 3000000 Opening Balance Equity (3) | 38,987,547.48 | |
| | | | | | 103,953,698.70 | 103,953,698.70 |

DESERT OASIS APARTMENTS, LLC
($25M Debt)

6.4 Acres
• 128-unit Apartments ($80M)

$360.5M Offer

$14.5M Offer

• Desert Oasis Motel ($13M)

20 Acres

• Hacienda/Mandalay Bay ($230M)

9 Acres Vacant Lot
• Ninja Warrior Lease ($58M)

99.5%

SKYVUE LAS VEGAS, LLC
($84M Debt)

99.5%

DESERT LAND, LLC
($85M Debt)

100%

DESERT OASIS INVESTMENTS
($30M Debt)

BH & P, Inc., In re, 949 F.2d 1300 (3rd Cir., 1991)

Page 1300

**949 F.2d 1300**
**60 USLW 2403, 26 Collier**
**Bankr.Cas.2d 37,**
**22 Bankr.Ct.Dec. 541,**
**Bankr. L. Rep. P 74,356**
**In re BH & P INC., A New Jersey**
**Corporation; Philip Alan**
**Herman, Bruce Berkow, Debtors.**
**Appeal of Carmen J. MAGGIO,**
**Individually and as Trustee for**
**BH & P Inc., Debtor; and Ravin,**
**Greenberg &**
**Marks, P.A., (formerly Ravin,**
**Greenberg**
**& Zackin, P.A.) Appellants.**
**No. 90-5877.**
**United States Court of Appeals,**
**Third Circuit.**
**Submitted Under Third Circuit Rule**
**12(6)**
**June 7, 1991.**
**Decided Dec. 5, 1991.**

Page 1302

Gary N. Marks, Ravin, Greenberg & Marks, Roseland, N.J., for appellants.

Thomas E. Ross, U.S. Trustee, Martha L. Davis, Gen. Counsel, T. Patrick Tinker, Executive Office for United States Trustees, Dept. of Justice, Washington, D.C., for amicus curiae.

Before:        MANSMANN        and HUTCHINSON, Circuit Judges, and O'NEILL, District Judge. *

OPINION OF THE COURT

MANSMANN, Circuit Judge.

This appeal requires that we consider issues relating to an alleged "conflict of interest" of a trustee and his counsel arising in the context of bankruptcy proceedings involving a corporation and two of its

principals. The core issue is the test to be applied in determining a disqualifying conflict where a single trustee and trustee's counsel represented the corporation and the principals in three related Chapter 7 proceedings. The bankruptcy court held that the trustee's filing of a claim on behalf of the corporation's bankruptcy estate against the estates of the principals created a conflict of interest requiring that the trustee be removed and trustee's counsel be disqualified from performing services on behalf of the principals; the district court affirmed. Although the reasoning underlying our decision differs from that applied by the district court, we conclude that the district court reached the proper result. We will, therefore, affirm the order of the district court.

I.

The historical facts are not in dispute. This matter grows out of the Chapter 11 filing in April, 1986 on behalf of BH & P, Inc., a concern engaged primarily in the manufacture of credit cards. A substantial portion of BH & P's business during the relevant period was conducted pursuant to a contract with AT & T. During the period of its relationship with AT & T, BH & P was extremely profitable.

Page 1303

During the period of its operation, BH & P was organized as a subchapter S corporation whose principals were Philip Alan Herman and Bruce Berkow. With income generated by BH & P in 1984, Herman and Berkow invested in a number of real estate limited partnerships designed to serve as tax shelters for the income which the two received as shareholders of BH & P. Under the terms of these partnership agreements, the two were required to and did transfer substantial sums of money into these tax shelters.

In July, 1985, BH & P, Herman and Berkow suffered a devastating reversal of fortune when AT & T announced plans to



-1-

terminate its contract with BH & P. As a result of financial difficulties flowing from the termination of the AT & T relationship, BH & P sought Chapter 11 protection in April, 1986. The firm of Ravin, Greenberg & Zackin ("RGZ") was retained as counsel to the Official Creditors' Committee.

In October 1986, because BH & P closed its business operations and sold a significant portion of its assets, the United States Trustee filed a motion to convert the BH & P proceedings to a Chapter 7 liquidation. This motion was granted.

The United States Trustee appointed Carmen Maggio as the interim trustee in the BH & P Chapter 7 proceeding. [1] Maggio's application to retain RGZ as counsel for the trustee was approved by the bankruptcy court.

During the pendency of the BH & P proceedings, BH & P principal Herman filed a voluntary Chapter 7 petition. [2] The United States Trustee appointed Maggio as trustee for Herman and recommended to the bankruptcy court that RGZ be appointed to serve as counsel to Maggio in the Herman matter as well as in the BH & P matter. [3] His recommendation was approved.

In July, 1987, the bankruptcy court entered an order authorizing joint administration of the BH & P and Herman proceedings. Shortly thereafter, Berkow, the remaining BH & P principal, also filed a Chapter 7 petition. [4] The United States Trustee again appointed Maggio as trustee of Berkow's estate and upon the United States Trustee's recommendation, the bankruptcy court entered an order authorizing RGZ to act as counsel to Maggio in this proceeding as well. [5] The Trustee sought and the bankruptcy court granted joint administration of the BH & P, Herman, and Berkow estates.

Because the financial affairs of these entities were so closely intertwined, Maggio elected to administer the three estates as

though they were a single entity. Thus, Maggio attempted to secure for all of the estates whatever assets might be available as a result of his powers of avoidance; a decision was made to defer any consideration of the claims of one estate over the claims of another until some point in the future. This approach was consistent with advice given to RGZ by the United States Trustee at the time that RGZ applied to become counsel to the trustee in the Herman

Page 1304

proceedings. [6]

Action on behalf of the BH & P estate, alone, became necessary as a result of the bankruptcy court's establishing deadlines or bar dates applicable to the filing of proofs of claim and nondischargeability complaints in the Herman and Berkow proceedings. In order to avoid forfeiting BH & P's right to assert a claim against the other estates arising from potentially voidable transfers to the real estate tax shelters, Maggio filed proofs of claim on behalf of BH & P. Maggio also filed nondischargeability complaints pursuant to 11 U.S.C. § 523(a)(4), charging Herman and Berkow personally with "fraud or defalcation while acting in a fiduciary capacity." The purpose of these complaints was to secure a declaration that any claim that BH & P might have against Herman or Berkow would not be discharged in the related proceedings.

In February, 1989, Maggio and RGZ filed applications seeking interim fees in the BH & P proceeding. The Bank of New York, BH & P's primary secured lender, objected to the payment of any compensation to Maggio or RGZ on the ground that the trustee and the professionals representing him were guilty of a conflict of interest. [7] In order to investigate these allegations, the bankruptcy court denied the interim fee applications without prejudice, ordered that the issue be briefed, and scheduled oral argument.



-2-

Following the submission of briefs and certifications of fact relating to the alleged conflict of interest and three days of hearing, the bankruptcy court, on July 19, 1989, issued an order from the bench disqualifying and removing Maggio and RGZ from further involvement in the Herman and Berkow proceedings. The order also contained provisions vacating the orders which had consolidated the BH & P, Herman, and Berkow proceedings, directing that new trustees be appointed in the Herman and Berkow matters, denying compensation and reimbursement to Maggio, RGZ, and the other professionals for services rendered in the Herman and Berkow matters, and staying further fee applications in the BH & P matter for ninety days following the hiring of new trustees in the Herman and Berkow proceedings. Both Maggio and RGZ appealed from this order.

On August 11, 1989, the bankruptcy court filed a memorandum opinion in which it held that Maggio and Berkow had knowingly and intentionally failed to make required disclosures in the Herman and Berkow matters; that Maggio, as a "creditor," had failed to meet the requirement of disinterest established by the terms of 11 U.S.C. § 701(a)(1) and was, therefore, removable for "cause" pursuant to 11 U.S.C. § 324. The court held that RGZ and the other professionals assisting Maggio should also be disqualified in the Herman and Berkow cases, reasoning that these professionals also failed to qualify as "disinterested persons" in that they represented both a debtor corporation and the individual shareholder against whom the corporation had asserted claims. The bankruptcy court also denied interim fees to Maggio on the ground that Maggio had failed to disclose

Page 1305

to the court his status as creditor and failed to comply with the court's order to disclose communications with others regarding conflicts at the commencement of the Herman

and Berkow cases. The court held that "[e]ach of these facts is in itself sufficient cause to deny Maggio compensation...." In re BH & P, Inc., 103 B.R. 556, 568 (Bankr.D.N.J.1989). RGZ was denied compensation on similar grounds. Because the bankruptcy court concluded that full disclosure of all facts relevant to the conflict of interest had not been made, the court also vacated the orders authorizing joint administration of the three estates.

Finally, the bankruptcy court held that in related cases it is presumptively improper to appoint a single trustee or creditors' committee, appoint the same counsel for a trustee, creditors' committee or debtor in possession, or to permit the same management for two or more debtors in possession in any of the following circumstances where:

(a) creditors of the debtors have dealt with debtors as an economic unit;

(b) the affairs of the debtors are substantially entangled;

(c) assets have been transferred from one debtor to another in transactions that are not at arms length;

(d) piercing the corporate veil of one of the debtors may be necessary or advisable; or

(e) one estate has claims against the other.

Id. at 574. This presumption was held to be rebuttable only in the case of "a potential conflict of interest, [where] no other competent fiduciary or professional is available, or the possibility that the conflict will become actual is remote and circumstances make use of a common fiduciary and professionals particularly compelling." Id.

On September 13, 1990, the district court filed an order and opinion affirming in part, and reversing and remanding in part, the



N/H-017200

order of the bankruptcy court. 119 B.R. 350. While the district court declined to adopt the bankruptcy court's conclusion that Maggio held the status of a "creditor" as defined in 11 U.S.C. § 101(13)(A), it affirmed the bankruptcy court's conclusion that Maggio was not a disinterested party because he held a "materially adverse" interest within the meaning of 11 U.S.C. § 101(13)(E). [8] The district court also affirmed the bankruptcy court's conclusion that RGZ, too, failed to qualify as a disinterested party within the meaning of 11 U.S.C. §§ 101(13) and 327 due to the presence of an actual conflict of interest.

The district court's only major departure from the bankruptcy court's analysis involved the bankruptcy court's finding that Maggio and RGZ had "knowingly and intentionally" breached a duty of disclosure. While the district court agreed that Maggio and RGZ had breached a duty to disclose, it reversed the bankruptcy court's finding that the breach had been knowing and intentional. Because of this difference with respect to disclosure, the district court remanded the matter to the bankruptcy court for a reevaluation of the issue of interim compensation. The district court reasoned that the bankruptcy court might have awarded compensation in connection with the Herman and Berkow proceedings had it found that the duty to disclose had been breached unintentionally.

This timely appeal followed. On appeal, Maggio and RGZ challenge their respective removal and disqualification from the Herman and Berkow matters, arguing that the district court erred in finding that an "actual conflict of interest" arose when BH & P filed claims against the individual bankruptcy estates. Maggio and RGZ also challenge as clearly erroneous the district court's finding that Maggio and RGZ breached a duty to disclose with respect to the alleged conflict of interest.

"As an appellate court twice removed from the primary tribunal, we review both the factual and the legal determinations of the district court for error." Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir.1981). Our vantage point is identical to that of

Page 1306

the district court, "so we review the bankruptcy court's findings by the standards the district court should employ to determine whether the district court erred in its review." Id. at 102. Thus, in reviewing the district court's review of the bankruptcy court's factual findings, we, like the district court, employ the "clearly erroneous" standard.... [T]he district court's legal determinations receive no presumption of correctness.

Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir.1988) (citations omitted), quoted in In re Marcus Hook Development Park, Inc., 943 F.2d 261, 263 (3d Cir.1991). We will refer to the appellants (Maggio and RGZ) as "the trustees."

II.

In order for us to reach the merits of the issues raised on appeal, the procedural posture of this case requires that we resolve a threshold jurisdictional question.

28 U.S.C. § 158(d) provides that courts of appeals have jurisdiction over appeals in bankruptcy matters where the district courts have entered "final decisions, judgments, orders, and decrees." In this case, the district court, in resolving the conflict of interest issue with respect to Maggio and RGZ, remanded the issue of interim compensation to the bankruptcy court. We must determine whether this remand renders non-final the order appealed from, depriving us of jurisdiction.

In approaching this finality question, we recognize that "[t]he unique characteristics of bankruptcy cases have led us to 'consistently consider[ ] finality in a more pragmatic and



-4-

less technical way in bankruptcy cases than in other situations.' " F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 103 (3d Cir.1988), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988) (quoting In re Amatex Corp., 755 F.2d 1034, 1039 (3d Cir.1985)). "Bankruptcy cases frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory." In re Amatex, 755 F.2d at 1039.

In F/S Airlease, we enunciated several factors to be analyzed in determining the finality of a district court's order in bankruptcy proceedings. These factors "included the impact of the matter on the assets of the bankruptcy estate, the preclusive effect of a decision on the merits, and whether the interests of judicial economy will be furthered." F/S Airlease, 844 F.2d at 104.

We then applied those factors to a case which is, in many respects, similar to the one now before us. In the bankruptcy proceedings involving F/S Airlease, objection was made to a broker's application for payment of administrative expenses on the grounds that the broker was not a qualified professional whose employment had been approved by the court in a timely manner and that the amount of compensation sought was unreasonable. The bankruptcy court approved the broker's employment nunc pro tunc, concluding that the broker was a disinterested party within the meaning of 11 U.S.C. § 327, that circumstances warranted approval of the appointment, and that the compensation requested was reasonable and necessary. The district court affirmed the findings of the bankruptcy court but remanded the question of the amount of compensation to that court for a more thorough assessment.

On appeal, we held that the district court's remand of that portion of the bankruptcy court's order which addressed broker compensation did not affect appellate jurisdiction over the remaining portion of the order approving the nunc pro tunc order. We reasoned that prompt consideration of the employment issue would further judicial economy by potentially eliminating the need for the bankruptcy court to consider the matter further. We also noted that the order had a significant impact on the assets of the bankruptcy estate as a compensation award to the broker would affect the rights of other creditors and could require that the proceeding be converted from one under Chapter 11 to one

Page 1307

under Chapter 7. Finally, the judgment of the district court was held to have "conclusively determined the question presented by this appeal." 844 F.2d at 105 (quoting Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101 (3d Cir.1981)). [9]

We recognize that the issues in F/S Airlease are not identical to those before us now. Nonetheless, our reasoning in F/S Airlease, that a district court's remand for further inquiry into allowable compensation does not affect the finality of that portion of its order addressing the qualifications of an applicant for employment, applies here and dictates that the district court order in this matter be considered final for purposes of appeal.

First, the issues centering upon the bankruptcy court's disqualification and removal of Maggio and RGZ could well affect assets in the three on-going Chapter 7 proceedings. The disqualification and removal were imposed, in part, in order to ensure that conflicts of interest would not affect the viability of BH & P's contested claims against Herman and Berkow. Furthermore, the court's ruling has the more remote but no less real



N/H-017202

effect of increasing the estates' administrative costs by requiring that separate trustees and professionals be retained in each case.

The remaining F/S Airlease factor favoring a finding of finality, the preclusive effect of a decision on the merits and furtherance of judicial economy, are also present in this case. Resolution of the issues raised on appeal will eliminate the need for further consideration of conflict of interest issues, freeing the bankruptcy court to adjudicate the more substantive issues relating to the estates in question. Further delay attendant to the conflict of interest dispute will be curtailed.

In this matter, as in F/S Airlease, In re Meyertech Corp., and Universal Minerals, we are satisfied that "the judgment of the district court conclusively determined the question presented by this appeal." Universal Minerals, 669 F.2d at 101. Based upon the foregoing analysis, we conclude that the district court's order removing Maggio as trustee and disqualifying RGZ as counsel in the Herman and Berkow matters due to an actual conflict of interest was final. We turn, therefore, to the merits of this appeal.

III.

The trustees urge that we reverse the district court's decision removing Maggio as trustee from the Herman and Berkow estates. They argue that the district court's finding of a conflict of interest requiring Maggio's removal is unsupported by the facts of this case or under applicable caselaw.

A.

An interim trustee appointed by the United States Trustee must, under the terms of the Bankruptcy Code, be a "disinterested person." 11 U.S.C. § 101(14). [10]

Page 1308

For purposes of this appeal, we are concerned only with those disinterest provisions set forth in sections 101(14)(A) and 101(14)(E). The bankruptcy court found that Maggio failed to qualify as a "disinterested person" under each of these provisions.

With respect to Section 101(14)(A), the bankruptcy court reasoned that

[i]f an estate holds a claim against another person, such claim is an asset of the estate under [Bankruptcy] Code § 541(a)(1), and the trustee is the person who holds it as the estate's representative and is authorized to prosecute it. A trustee of an estate which holds a claim against another estate is therefore a "creditor" of the latter estate as defined by Code § 101(9). See In re Enercons Virginia, Inc., 812 F.2d 1469, 1472 (4th Cir.1987).

103 B.R. at 561.

The bankruptcy court also found that Maggio failed to meet the requirements for a "disinterested person" set forth in section 101(14)(E). In making this finding, the court relied upon the fact that in his capacity as trustee for BH & P, Maggio was obligated to pursue the claims of BH & P against Herman and Berkow: "Unless all creditors are paid in full, such claims are materially adverse to those of the other unsecured creditors of Herman and Berkow, because all allowed unsecured claims will share pro rata in any dividend from the estates of Herman and Berkow...." Id.

Having concluded that Maggio failed to meet the "disinterested person" requirements of section 101(14), the bankruptcy court turned to 11 U.S.C. § 324(a), which provides that "[t]he court, after notice and a hearing, may remove a trustee, other than the United States Trustee, or an examiner, for cause." While "cause" is not defined in the Code, the bankruptcy court concluded that Maggio's failure to qualify as a "disinterested person"



-6-

BH & P, Inc., In re, 949 F.2d 1300 (3rd Cir., 1991)

constituted cause for his removal as trustee in the BH & P matter. 103 B.R. at 561.

In reviewing these findings and conclusion of the bankruptcy court, the district court rejected the bankruptcy court's characterization of Maggio, as legal representative of the BH & P estate, as a "creditor" of the Herman and Berkow estates for purposes of the "disinterested person standard" set forth in section 101(14)(A). The district court, however, found it unnecessary to consider this issue in depth as it concluded that Maggio clearly was not a "disinterested person" within the meaning of section 101(14)(E).

This provision, commonly known as the "catch-all" clause, has been held "broad enough to include anyone who 'in the slightest degree might have some interest or relationship that would even faintly color the independence and impartial attitude required by the Code and the Bankruptcy Rules.' "

The bankruptcy court therefore properly found that Maggio's dual role as trustee for Herman and Berkow and for one of their creditors--the BH & P estate--constituted an impermissible conflict of interest.

In re BH & P, Inc., 119 B.R. 35, 42 (D.N.J.1990) (citations omitted).

While the district court did not refer to the removal for cause provision of 11 U.S.C. § 324(a), it seems implicitly to have adopted the bankruptcy court's conclusion that a finding that a trustee is not disinterested within the meaning of section 101(14)(E) automatically satisfies the "cause" requirements of section 324(a).

We agree that the district court properly rejected the bankruptcy court's conclusion that Maggio was not disinterested due to his status as a creditor under section 101(13)(A). We find that the bankruptcy court erred in

holding that a person who, as trustee, asserts a claim on behalf

Page 1309

of the estate that he serves, and, therefore, acts in a representational capacity, becomes a "creditor" for purposes of section 101(14)(A).

Just as a trustee who succeeds by operation of law to a debtor's title to stock in a creditor bank does not, himself, become a "creditor," In re Hartley, 50 B.R. 852, 861-62 (Bankr.N.D.Ohio 1985), or as two trustees' "nominal ownership" of a wholly-owned subsidiary's stock arising solely from their representing the parent corporation in reorganization proceedings did not confer upon them the status of "interested person," In re Realty Associates Securities Corp., 56 F.Supp. 1007 (E.D.N.Y.1944), Maggio cannot be considered a creditor within the meaning of section 101(14)(A) simply because he asserted a claim in his fiduciary capacity on behalf of BH & P against the Herman and Berkow estates. Like the trustees in Hartley and Realty Associates who were found not have any personal interest in the stocks to which they succeeded as fiduciaries, Maggio had no "personal interest" as a "personal creditor of the Herman and Berkow estates when he filed proofs of claim against them." In re Hartley, 50 B.R. at 861; In re Realty Associates, 56 F.Supp. at 1007.

If we were to hold that the trustee, who succeeds to a debtor's property interests by operation of law, thereby becomes a "creditor," every trustee who files a proof of claim on behalf of a creditor, a practice specifically allowed by 11 U.S.C. § 501(c), would automatically be disqualified from serving. We do not believe that section 101(14) can or should be read to disqualify trustees because of action taken in a representative capacity. [11] That section was, in our view, intended to mandate disqualification based on personal status, e.g., where those implicated are themselves creditors of the debtor or where

 fastcase

-7-

N/H-017204

they personally "have an interest" which is "materially adverse" under subparagraph (E).

We turn to the more general disinterest provisions of section 101(14)(E). We are reluctant to endorse the view taken by the bankruptcy court, and by the district court as well, that a finding of a lack of disinterest within the meaning of section 101(14)(E) automatically mandates removal of a trustee for cause under section 324(a). This is especially true where, as here, disinterest requirements have been liberally construed. We believe that linking these sections in the manner suggested by the bankruptcy and district courts may result in an unwarranted narrowing of the circumstances in which a single trustee may serve related bankruptcy estates.

The law regarding the standards to be applied in removing a trustee in bankruptcy is not well-developed and does not always rest on consistent theoretical underpinnings. While the approach taken by the district court in this matter does find some support in the caselaw, we are troubled by its implications for the efficient and economical functioning of the system developed for administering related bankruptcy estates.

As the district court noted, section 101(14)(E), the so-called "catch-all clause" governing lack of disinterest, has been held "broad enough to include anyone who 'in the slightest degree might have some interest or relationship that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.' " In re Glenn Electric Sales Corp., 99 B.R. 596, 601 (D.N.J.1988) (quoting In re Roberts, 46 B.R. 815, 828 n. 26 (D.Utah 1985)). Relying on this language, the district court concluded that "[t]he bankruptcy court therefore properly found that Maggio's dual role as trustee for Herman and Berkow and for one of their creditors--the BH & P estate--constituted an



impermissible conflict of interest" and that Maggio's removal was warranted. 119 B.R. at 42. The district court reached this conclusion despite the fact that no harm arising from Maggio's dual role was apparent.

This approach has its origin in a line of cases which base the standard for removal of a bankruptcy trustee upon the need to "avoid even the appearance of impropriety." Courts adopting this approach have concluded that

[g]iven the definition of "disinterested" in section [101(14)(E) ], ... a trustee ... must be disqualified where it holds an interest adverse to the estate whether or not it acts to advance that interest. The definition of disinterestedness in the Code covers not only actual impropriety but the appearance of impropriety as well.

In re Paolino, 80 B.R. 341, 345 (Bankr.E.D.Pa.1987). For similar statements of the removal standard, see also In re Micro-Time Management Systems, 102 B.R. 602, 605 (Bankr.E.D.Mich.1989) (that trustee actually be disinterested is insufficient; the appearance of interest must also be avoided and thus this appearance may constitute grounds for removal); In re O.P.M. Leasing Services, Inc., 16 B.R. 932, 937 (Bankr.S.D.N.Y.1982) (lack of disinterestedness is cause for removal of a trustee pursuant to 11 U.S.C. § 324).

While we do not ignore the statements of the law set forth in those cases which interpret lack of disinterest or the mere appearance of lack of disinterest as grounds for removal of a trustee, we are not convinced that they do or should govern this case.

A closer reading of the cases cited reveals that section 101(14)(E), like 101(14)(A), [12] may be read to implicate only the personal interests of the trustee. In O.P.M. Leasing Services, after stating that lack of disinterestedness on the part of an appointed trustee would be sufficient cause for removal, the bankruptcy court clarified that "it is 'personal interests'

BH & P, Inc., In re, 949 F.2d 1300 [3rd Cir., 1991]



that are forbidden" and declined to remove a trustee whose alleged lack of disinterest stemmed from actions which he undertook as a fiduciary. 16 B.R. at 938.

In re Micro-time Management Systems also arose in the context of the personal interests of a trustee. There, the claim of lack of disinterest was based upon the trustee's alleged desire to solicit additional accounting work from a major creditor of the debtor. Another creditor argued that the trustee's desire for additional work caused him to agree to a settlement which favored the major creditor. 102 B.R. at 603. In re Paolino, too, while disagreeing in dicta with the proposition that "grounds for ... removal of a trustee in bankruptcy are not to be found in his formal relationships," involved disqualification of a trustee when he became affiliated with a law firm which represented interests adverse to those of the estate. Each of these cases discussing the disinterest requirement embodied in section 101(14)(E) as grounds for disqualification of a trustee presents a situation fundamentally different from that presented by the filing of interdebtor claims alleged here.

A standard for removal based on section 101(14))(E), that automatically disqualifies a trustee from serving in jointly administered cases where there are interdebtor claims, is overbroad. While we recognize that cases involving multiple debtors served by a single trustee present special concerns requiring the trustee to balance competing interests with vigilance and guard against conflicts, we also recognize the reality that a single trustee is often able to maximize the return to jointly administered estates through increased economy and efficiency. Joint administration by a single trustee is commonplace in the

Page 1311

scheme of bankruptcy administration and its positives often outweigh any negatives. Furthermore, as the trustees recognize in their brief before us here, "if there is a presumption that can be stated with certitude regarding jointly administered estates, it is that there will be interdebtor claims or potential claims."

Given these realities, the district court's interpretation of the "disinterested person" requirement to encompass a trustee who files interdebtor claims in jointly administered cases and its conclusion that lack of disinterest premised on the existence of interdebtor claims invariably constitutes grounds for removal of the trustee are problematic. Were we to endorse this interpretation, the use of single trustees in jointly administered cases, in fact joint administration itself, would become a rarity, exposing untold numbers of bankruptcy estates to the potential for increased costs and inefficiency.

Most of the cases which have addressed the removal of a trustee do not rely on section 101(14)(E) or on any analysis of the disinterest requirement but approach the issue instead in terms of whether there is a "conflict of interest" which constitutes cause for removal. In most of these cases, something beyond a finding of lack of disinterest is required.

A majority of courts evaluating an alleged conflict of interest has adhered to the principle that before a trustee may be removed, some actual injury must be shown. This standard was articulated first in In re Freeport Italian Bakery, Inc., 340 F.2d 50, 54 (2d Cir.1965). There, the court stated that "[g]rounds for disapproval or removal of a trustee in bankruptcy are not to be found in his formal relationships. 'We have traditionally stressed the elements of fraud and actual injury to the debtors' interests.' " Id. (citation omitted). This standard has been adopted by courts in In re Acadiana Electrical Service, Inc., 66 B.R. 164, 165 (Bankr.W.D.La.1986) (removal of trustee proper only where fraud or actual injury to the estate exists or where the estate will suffer more from discord created by retention of the trustee than it would from a change in administration); In re University



-9-

N/H-017206

Ave. Properties, 55 B.R. 986, 991 (Bankr.E.D.Wis.1986) (court properly denied application to remove trustee where trustee did not wilfully and deliberately breach fiduciary duty to the estate; no evidence existed to substantiate fraud or other improper conduct); In re Peckinpaugh, 50 B.R. 865 (Bankr.N.D.Ohio 1985) (in a case for removal of a trustee, court demands that actual fraud or harm to the estate be shown); In re Hartley, 50 B.R. 852, 859 (Bankr.N.D.Ohio 1985) (same); In re Microdisk, Inc., 33 B.R. 817 (Bankr.D.Nev.1983) (conflict of interest would arise only if a trustee acted for the benefit of certain creditors to the detriment of the bankrupt estate); In re O.P.M. Leasing Services, Inc., 16 B.R. 932 (Bankr.S.D.N.Y.1982) (doubtful that a court will sever established trusteeship over multiple related estates in cases that are well-progressed absent showing of actual present conflict incapable of any other equitable resolution); In re Concept Packaging Corp., 7 B.R. 607 (Bankr.S.D.N.Y.1980) (specifically adopting Freeport Italian Bakery standard); In re Rea Holding Corp., 2 B.R. 733, 735 (S.D.N.Y.1980) (elements of fraud and actual injury must be stressed in determining grounds for disapproval or removal of a trustee).

The benefits of the Freeport Italian Bakery standard for removal of trustees alleged to have conflicts of interest have been summarized as follows. [13]

In the court's opinion, nebulous accusations such as that the Trustee's actions were not in the "best interests of the estate" or had the "appearance of impropriety" do not constitute sufficient cause to remove the Trustee. Instead, in a case for removal this court demands that

Page 1312

actual fraud or harm to the estate be proven....

[F]orcing accusers to quickly come forward with evidence which proves fraud or actual harm to the estate protects Trustees from the threat of specious and tenuous claims for removal which are merely part of a tactical maneuver to force the Trustee not to perform his statutory duties. A more concrete standard also has the benefit of preserving the orderly administration of the estate by not allowing creditors to remove a Trustee who has merely made them unhappy.

In re Peckinpaugh, 50 B.R. at 867.

While this second line of cases preserves the possibility of joint administration of estates by multiple trustees through adoption of a bright-line rule for disqualification of trustees, it is, nonetheless, imperfect. Strict application of this standard would not permit the bankruptcy court to remove a trustee from service where the circumstances presented do not implicate fraud or result in actual injury to the estate but are, nonetheless, highly suggestive of irregularity. Arguably, the standard also prevents a court from taking prophylactic action where the likelihood of injury is great but no harm is manifest.

Having considered both the per se rule adopted by the bankruptcy court and district court in this matter and the opposite-end-of-the-spectrum approach embodied in Freeport Italian Bakery, Inc., we are convinced that the best approach to trustee disqualification lies somewhere in the middle. In mapping out this middle-ground rule, we have derived substantial guidance from the approach taken by the Court of Appeals for the First Circuit in In re Martin, 817 F.2d 175 (1st Cir.1987). The court there considered allegations of a conflict of interest where a lawyer, prior to submitting a client's Chapter 11 petition, took security for the payment of attorney's fees to be incurred in connection with the bankruptcy proceedings. While the court's discussion centered on the propriety of that particular arrangement, much of what it had to say is helpful in



-10-

articulating the rule which we conclude should govern the matter now before us.

Considering the advantages of joint administration and the place for single trustees in that process, we are not prepared to say that interdebtor claims mandate disqualification of the trustee in every instance.

In the final analysis ... it is the bankruptcy court--not the debtor and his counsel--which must separate good from bad, which must determine the propriety of permitting a [single trustee to serve in jointly administered cases where there are interdebtor claims.] The naked existence of a potential for conflict of interest does not render the [arrangement] nugatory, but makes it voidable as the facts may warrant. It is for the court to decide whether the [arrangement] carries with it a sufficient threat of material adversity to warrant prophylactic action.... The test must be an objective one. The question is not necessarily whether a conflict exists--although an actual conflict of any degree of seriousness will obviously present a towering obstacle--but whether a potential conflict, or the perception of one renders the [trustee's] interest materially adverse to the estate of the creditors.

This inquiry is of necessity case-specific. There must be at a minimum full and timely disclosure of the details of any given arrangement. Armed with knowledge of all of the relevant facts, the bankruptcy court must determine, case by case, whether [a situation such as the presence of a single trustee in jointly administered cases where there are interdebtor claims] can be tolerated under the particular circumstances. In so doing, the court should consider the full panoply of events and elements.... The nature and extent of the conflict must be assayed, along with the likelihood that a potential conflict might turn into an actual one. An effort should be made to measure the influence the putative conflict may have in subsequent decisionmaking.

Perceptions are important; how the matter likely appears to creditors

Page 1313

and to other parties in legitimate interest should be taken into account....

What counts is that the matter not be left either to hindsight or the unfettered desires of the [parties involved], but that the bankruptcy judge be given an immediate opportunity to make an intelligent appraisal of the situation and to apply his experience, common sense, and knowledge of the particular proceeding to the request....

Historically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals. The bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails. If he perceives a materially adverse interest, he has at his disposal an armamentarium of permissible remedies, including ... disqualification [and] disallowance of all or some fees....

In re Martin, 817 F.2d at 181-83 (citations omitted).

It is important that each case involving a single trustee in jointly administered estates with interdebtor claims be evaluated prospectively on a case-by-case basis. The retention of a trustee "should not be upheld simply because, after the fact, no harm appears to have been done." Id. at 183. In some circumstances, the potential for conflict and the appearance of conflict may, without more, justify removing a trustee from service. At the same time, however, it must be made clear that

[h]orrible imaginings alone cannot be allowed to carry the day. Not every conceivable conflict must result in sending [the trustee] away to



-11-

N/H-017208

lick his wounds. And, when all is said and done, doubts are to be resolved in favor of invalidation.

Id.

B.

Recognizing that the disqualification of a trustee must be a matter committed to the sound discretion of the bankruptcy court with that discretion bounded by the principles announced here today, we turn to the facts of this case. In addressing the disinterest requirement of 101(14)(E) as it applied to Maggio, the bankruptcy court wrote:

As trustee of BH & P, Maggio has the right and duty to pursue the claims of BH & P against Herman and Berkow. Unless all creditors are paid in full, such claims are materially adverse to those of the other unsecured creditors of Herman and Berkow, because all allowed unsecured claims will share pro rata in any dividend from the estates of Herman and Berkow....

103 B.R. at 561. The bankruptcy court appears to have concluded that Maggio's obligation to BH & P to pursue claims against Herman and Berkow created an interest materially adverse to the interests of other unsecured creditors of Herman and Berkow. This conclusion rested particularly on the disputed nature of the claims against Herman and Berkow and the need for advocacy of competing interests. When the bankruptcy court converted the BH & P proceedings from Chapter 11 to Chapter 7, it recognized, as one ground for the conversion, the need for an independent fiduciary—a Chapter 7 trustee—to pursue the claims against Herman and Berkow. Pursuit of these claims was seen as vital to the continuation of BH & P's case. The court's subsequent determination that the same claims justified the appointment of separate trustees was based upon the conclusion that Maggio's removal was necessitated by conflicts which were or would

become detrimental to at least one of the three jointly-administered estates.

Although we cannot say that the bankruptcy court's finding of material adversity on the part of the trustee would apply to every case involving interdebtor claims or that we certainly would have reached the same result in reviewing the facts of this case, neither can we say that the bankruptcy court abused its discretion in disqualifying Maggio as trustee in the Herman and Berkow proceedings. We find no error,

Page 1314

therefore, in the district court's affirmance of the disqualification.

IV.

We turn next to the allegation that the district court erred in affirming the bankruptcy court's determination that RGZ, the attorneys representing Maggio in the three related proceedings, should be removed as counsel in the Herman and Berkow matters. The statutory provisions governing the removal of professionals from serving in connection with bankruptcy matters differ in some respects from those applicable to the removal of trustees.

The qualifications prerequisite to employment of professionals are set forth in 11 U.S.C. § 327. Section 327(a) provides that

[t]he trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

This section creates a two-part requirement for retention of counsel: "Counsel must 'not hold or represent an interest adverse



N/H-017209

to the estate' and must be a 'disinterested person.' " In re Star Broadcasting, Inc., 81 B.R. 835, 838 (Bankr.D.N.J.1988). As is the case in evaluating the status of a trustee, the applicable disinterest requirement is set forth in 101(14)(E). As we have noted, this section defines a disinterested person as one who "does not have an interest materially adverse to the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to ... the debtor ... or for any other reason." There is, indisputably, some overlap between the section 327(a) standard and section 101(14)(E) disinterest requirement. See In re Martin, 817 F.2d 175, 179 n. 4 (1st Cir.1987) ("something of a redundancy" exists between section 101 and section 327(a)); Roger J. Au & Son, Inc. v. Aetna Ins. Co., 64 B.R. 600, 604 (N.D.Ohio 1986) (each prong of section 327(a) is satisfied when a person is found to be disinterested under section [101(14) ].

The Bankruptcy Code also clarifies that despite the strictures of sections 327(a) and 101(14)(e), a professional is not necessarily disqualified from employment based upon his representation of both the trustee and a creditor. Section 327(c) provides that

a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case, the court shall disapprove such employment if there is an actual conflict of interest.

(Emphasis added.)

That portion of section 327 dealing with "actual conflict of interest" was added by the 1984 amendments to the Bankruptcy Code. As is reflected in the opinion of the bankruptcy court, prior to the 1984 amendments, the Code made no provision for counsel's simultaneous representation of a debtor and a creditor. The 1984 amendments represent a return to the

pre-Code rule which provided that a trustee was authorized to retain counsel who also represented a creditor, but only in circumstances where it was absolutely necessary. [14] The existence of interdebtor claims is, therefore, no longer an automatic ground for disqualification of counsel for the trustee. Section 327 focuses the inquiry upon whether there is an actual conflict of interest.

Page 1315

The term "actual conflict of interest" is not defined in the Code and has been given meaning largely through a case-by-case evaluation of particular situations arising in the bankruptcy context. Courts have been accorded considerable latitude in using their judgment and discretion in determining whether an actual conflict exists "in light of the particular facts of each case." In re Star Broadcasting, Inc., 81 B.R. 835, 844 (Bankr.D.N.J.1988); In re Hoffman, 53 B.R. 564, 566 (Bankr.W.D.Ark.1985).

The bankruptcy court in the matter now before us concluded that, given the interdebtor claims filed, an actual conflict of interest was created by RGZ's continued representation of the trustee in the Herman and Berkow proceedings. The court summarized its views with respect to the conflict of interest issue as follows:

[RGZ] has had to assert claims on behalf of Maggio as trustee of BH & P, against Maggio as trustee of Herman and Berkow. If there are sufficient assets in the estates of Herman and Berkow, [RGZ] will have to form an opinion on behalf of those estates as to the merits of those claims. It is also conceivable that the estates of Herman and Berkow might have claims against each other, or against BH & P....

An argument could be made that there is only a potential conflict until it is certain that the estates of Herman and Berkow have sufficient funds to pay a dividend. However, the more the trustee and professionals succeed



-13-

N/H-017210

in increasing the size of the Herman and Berkow estates, the greater the likelihood that they would be in the impossible position of having to review their own claims on behalf BH & P.

103 B.R. at 565. The court also stated that "[t]here are assets in the Herman and Berkow estates, which may ultimately be sufficient to pay a dividend to unsecured creditors," and concluded that "[u]nder these circumstances, [RGZ] ... [has] an actual conflict of interest...." Id. at 566. The district court affirmed this view, writing that "[t]his court can find no error in that determination." 119 B.R. at 43.

We, too, do not find error in the bankruptcy court's characterization of the conflict created by RGZ's representation of Maggio in the three proceedings as "actual." With respect to RGZ's argument that any conflict posed by the multiple representations is merely "potential" due to the uncertainty as to whether there will be assets in the Herman and Berkow estates sufficient to satisfy the BH & P claims, we take the view adopted by the district court:

The Court cannot agree that [the multiple representation] constitutes merely a "potential" conflict or that Congress intended § 327(c) to be subject to such fine distinctions. Rather, the "actuality" of the conflict, as the bankruptcy court held, was the possibility that the parties would favor one estate over the other in their attempt to serve all of them. See In re Michigan General, 78 B.R. at 483-84 ("The 'actuality' of the conflict is not per se that counsel might hold a preference [under § 547], rather it is that counsel will be tempted to neglect its duties to the estate by being less than zealous in its investigation of the preference.").

Id.

According to RGZ, the finding of an "actual" conflict in these circumstances obliterates the distinction mandated by section 327(c) between "actual" and other conflicts and creates what amounts to a per se rule which would operate to prevent multiple representation in virtually all cases. We cannot agree.

The caselaw generated in connection with multiple representation of related bankruptcy estates establishes that courts have generally declined to formulate bright-line rules concerning the criteria for disqualification but have favored instead an approach which gives the bankruptcy court discretion to evaluate each case on its facts, taking all circumstances into account. See, e.g., In re International Oil Company, 427 F.2d 186, 187 (2d Cir.1970) (record which showed existence of intercompany claims was not "sufficient to saddle ... estates [of four affiliated corporations] with the expense of separate ... trustees' attorneys at the present time");

Page 1316

In re Star Broadcasting, 81 B.R. 835, 844 (Bankr.D.N.J.1988) (invariably requiring different counsel in related Chapter 11 proceedings would be unreasonable and unnecessarily cumbersome; whether a disqualifying conflict exists must be considered in light of the particular facts of each case); In re Roberts, 75 B.R. 402, 405-06 (D.Utah 1987) (since interdebtor claims were neither disputed nor priority claims, simultaneous representation of the debtor was not a conflict per se ); In re N.S. Garrott & Sons, 63 B.R. 189, 192 (Bankr.E.D.Ark.1986) ("attorneys may have conflicts which are technical and nondisqualifying"); In re Hoffman, 53 B.R. 564, 566 (Bankr.W.D.Ark.1985) ("Whether ... an actual disqualifying conflict exists must be considered in light of the particular facts of each case."); In re Guy Apple Masonry Contractor, Inc., 45 B.R. 160, 166 (Bankr.D.Ariz.1984) ("question is not whether a conflict exists but whether that conflict is materially adverse to the estate, creditors, or equity security holders"); In re Global Marine,



Inc., 108 B.R. 998, 1004 (Bankr.S.D.Tex.1987) ("mere existence of an intercompany claim does not in and of itself constitute an impermissible conflict of interest that would justify disqualification or denial of compensation").

Despite the bankruptcy court's reference to such decisions as In re Kendavis Industries International, Inc., 91 B.R. 742 (Bankr.N.D.Tex.1988), which have adopted a per se rule explicitly eliminating the statutorily imposed distinction between actual and other conflict, the court in this case did not hinge its decision on such a per se approach. [15] While the bankruptcy court recognized that by the terms of section 327(c) "disapproval of employment is mandatory where there is an actual conflict," it does not follow "that there is no discretion to disapprove employment when the conflict is 'potential' ". 103 B.R. at 564 (emphasis added). The court then held that

[t]he court should generally disapprove employment of a professional with a potential conflict, with certain possible exceptions. First of all, ... there may occasionally be large cases where every competent professional in a particular field is already employed by a creditor or a party in interest....

The other exception is where the possibility that the potential conflict will become actual is remote, and the reasons for employing the professional in question are particularly compelling. This court will not attempt here to define the parameters of this exception, which necessarily will depend upon the facts of a particular case. I will, however, note that even in such situations, employment of a professional with a potential conflict is disfavored.

Id.

We do not find error in the bankruptcy court's articulation of the standard governing conflict of interest applicable to professionals. In this context, as in the case of removal of a

trustee, we reiterate that "historically, bankruptcy courts have been accorded wide discretion in connection with ... the terms and conditions of the employment of professionals," In re Martin, 817 F.2d at 182, and affirm that the conflict of interest principles which we have adopted regarding disqualification of trustees apply with equal force in those situations involving employment of professionals. This flexible approach will require the bankruptcy courts to analyze the factors present in any given case in order to determine whether the efficiency and economy which may favor multiple representation must yield to competing concerns affecting fairness to all parties involved and protection of the integrity of the bankruptcy process. Factors to be considered include, but are not limited to, the nature of disclosure of the conflict made at the time of appointment, whether the interests of the related estates are parallel or conflicting, and the nature of the interdebtor claims made. As we have said, denomination

Page 1317

of a conflict as "potential" or "actual" and the decision concerning whether to disqualify a professional based upon that determination in situations not yet rising to the level of an actual conflict are matters committed to the bankruptcy court's sound exercise of discretion. In order to ensure proper review in these cases, those factors underlying the exercise of discretion "must be factually substantiated upon the evidentiary record." In re Global Marine, Inc., 108 B.R. at 1002.

In sum, we find that the bankruptcy court exercised sound discretion in its characterization of the conflict presented here and note that even if we were to conclude that any conflict were "potential" only, we still could not conclude that, based upon the totality of the circumstances, the bankruptcy court abused its discretion in disqualifying RGZ from serving in the Herman and Berkow matters.



N/H-017212

V.

We turn to the trustee's allegation that the district court erred in affirming the bankruptcy court's determination that Maggio and RGZ failed to make adequate disclosure of those facts underlying the conflict of interest.

In its opinion, the bankruptcy court found that Maggio and RGZ

knowingly and intentionally withheld disclosure in the applications to retain the professionals in the Herman and Berkow cases of the fact that BH & P, and Maggio as its trustee, had claims against Herman and Berkow, that Maggio and [the professionals] had discussed the question of conflicts with the United States Trustee, and that they all knew of the claims.

103 B.R. at 560. While the district court concluded that "nothing in the record supports the bankruptcy court's finding that Maggio and the professionals 'knowingly and intentionally' withheld information from the bankruptcy court" and reversed that finding as clearly erroneous, it concluded, nonetheless, that there had been an unintentional breach of the duty to disclose. The district court wrote:

One of the more salient principles of bankruptcy law is that trustees and professionals who request court approval of employment have "a duty to disclose actual or potential conflicts of interest which may bear upon their qualification...." In re Roberts, 75 B.R. 402, 410 (D. Utah 1987) (emphasis added)....

Because of the broad contours of this duty of disclosure, the bankruptcy court's determination that Maggio [and RGZ] had breached it was not clearly erroneous, and therefore must be upheld. Although the parties argue that they acted in good faith in applying for employment, and believed that they disclosed all that was necessary for the bankruptcy court to assess the propriety of

their retention, such is not the measure of the duty of disclosure. The "subjective good faith efforts" of the parties are "irrelevant." In re Glenn Electric, 99 B.R. at 600. Rather, once a potential conflict is identified, as it was here, it must be disclosed to the bankruptcy court.

119 B.R. at 44.

Maggio and RGZ argue that various documents filed during the course of proceedings spoke of the "intertwined financial affairs" of the debtors and made reference to the fact that Herman and Berkow had interests in entities which were involved in questionable business transactions with BH & P. They also contend that allegations made during the January 19, 1989 pre-trial conference and the record made in the case as a whole from April, 1986 through the summer of 1987 contained further evidence of "the alleged self-dealing between BH & P and its principals." In disposing of this argument, we adopt the statement of the district court:

It is not ... the obligation of the bankruptcy court to search the record for possible conflicts of interest. That obligation belongs to the party who seeks employment by the estate, and although it may not be so onerous as to require the party to raise with the court every imaginable conflict which may occur in a bankruptcy, it certainly compels disclosure where, as here, the party had contemplated

Page 1318

and discussed a specific situation involving a potentiality for conflict. Accordingly, this Court can find no error in the bankruptcy court's determination that Maggio [and RGZ] breached the duty of disclosure. This breach may have been the product of negligence, but "[n]egligence does not excuse the failure to disclose a possible conflict of interests."

Id. (citations omitted).

VI.



N/H-017213

In conclusion, we find that Maggio and RGZ were properly disqualified from serving in the Herman and Berkow matters as trustee and counsel, respectively. Furthermore, we find that the district court did not err in concluding that Maggio and RGZ did, in fact, breach a duty of disclosure and that the breach was, contrary to the finding of the bankruptcy court, unintentional. We agree therefore, that this matter should be remanded to the bankruptcy court for the limited purpose of reassessing the award of interim fees and will affirm the order of the district court.

O'NEILL, District Judge, concurring.

As trustee of BH & P, Maggio filed proofs of claim against the Herman and Berkow estates and complaints alleging fraud and defalcation against Herman and Berkow personally. The complaint against Herman alleges that, within one year of the filing of BH & P's Chapter 11 Petition, BH & P, on behalf of a general partnership called Hermkow, transferred $1,758,250 to certain limited partnerships organized for the purpose of investing in Texas real estate. The complaint alleges that 10% of Hermkow was owned by Herman and 90% by Berkow, and that of the aforesaid amount $1,458,250 (almost 83%) was transferred after BH & P learned that the AT & T contract was being terminated. The complaint also alleges that Herman breached his fiduciary duty while he was president, a member of the Board of Directors and a 10% stockholder of BH & P. Finally, the complaint seeks judgment against Herman personally in the amount of $1,758,250, and alleges that this debt is non-dischargeable under the Bankruptcy Code. Although the appendix does not include the complaint against Berkow, counsel represents that it contains similar allegations.

Given the gravity of these claims and the obligation of the trustee to pursue them diligently, I am unable to conclude that the bankruptcy court abused its discretion when it

removed the trustee and his counsel because of a conflict of interest.

HUTCHINSON, Circuit Judge, concurring and dissenting.

In accord with what I believe is controlling Circuit precedent, I concur with the Court's holding that our appellate jurisdiction is unaffected by that portion of the district court's order remanding the case to the bankruptcy court for further reconsideration of the issue of whether the trustee and his counsel are entitled to compensation for their work prior to removal. I write separately on the jurisdictional issues to express my unease with certain aspects of this Circuit's jurisprudence on the appealability of orders entered by district courts that affect ongoing bankruptcy cases.

On the merits, I respectfully disagree with the Court's conclusion that the bankruptcy court's removal of the interim trustee and his counsel was a proper exercise of discretion. Therefore, I respectfully dissent from that aspect of the Court's opinion.

I.

My concurrence on the jurisdictional issue is compelled by the cases this Court has decided on appellate jurisdiction under 28 U.S.C.A. § 158(d) (West Supp.1991). See In re Colon, 941 F.2d 242, 244-45 (3d Cir.1991); F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 103 (3d Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); Wheeling-Pittsburgh Steel Corp. v. McCune, 836 F.2d 153, 157-58 (3d Cir.1987); In re Meyertech Corp., 831 F.2d 410, 414 (3d Cir.1987); In re Christian, 804 F.2d 46, 47-48 (3d Cir.1986); see also In re Amatex Corp., 755 F.2d 1034, 1036-41 (3d

Page 1319

Cir.1985) (utilizing similar finality analysis in deciding 28 U.S.C.A. § 1291 provided jurisdiction where district court had original



-17-

N/H-017214

jurisdiction over bankruptcy matter); In re Comer, 716 F.2d 168, 171-74 (3d Cir.1983) (utilizing similar finality analysis in deciding jurisdiction question under 28 U.S.C.A. § 1293, predecessor to section 158(d)); In re Marin Motor Oil, Inc., 689 F.2d 445, 447-449 (3d Cir.1982) (same), cert. denied, 459 U.S. 1207, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 100-01 (3d Cir.1981) (same). But see In re Brown, 803 F.2d 120, 121-23 (3d Cir.1986) (remand order not final under section 158(d) even though hearing the appeal would end the litigation because the order did not affect the distribution of assets or the relationship among creditors). The Court cites some of these cases in support of its holding that the district court's order is a final one under the flexible test we apply in bankruptcy and so is appealable as a final order under section 158(d). See Majority Opinion, at 1306-07. Since I too believe those cases control the issue of appellate jurisdiction, I am bound to follow them under our Internal Operating Procedures. Internal Operating Procedure of the U.S. Ct. of App. for the 3d Cir. 9.1 (July, 1991).

Nevertheless I have an uneasy feeling that our case law on the concept of finality under section 158(d) incorrectly equates efficiency in the administration of a particular estate with over-all efficiency in the operation of our bankruptcy system. In applying the efficiency factor to decisions concerning the finality and appealability of orders of our district courts, I think more consideration should be given to the effect a particular decision will have on efficient functioning of the bankruptcy system than on the efficient disposition of the particular bankruptcy case under consideration. If we become mesmerized by the impact a merits decision has on the administration of the case before us, it is all too easy to decide that appellate treatment of the merits serves the goal of efficiency. See, e.g., In re Brown, 803 F.2d at 122 ("By allowing parties to appeal discrete issues within a single bankruptcy proceeding, we have sought to

avoid the waste of resources that would result from insisting upon the completion of proceedings prior to any appeal.").

In serving the immediate desire to expedite the case, we may sometimes undervalue the need for overall efficiency that lies at the core of the finality principle. When decisions to advance the immediate cause unduly increase the number of appeals, the system's efficiency suffers. See Flanagan v. United States, 465 U.S. 259, 264, 104 S.Ct. 1051, 1054, 79 L.Ed.2d 288 (1984) (Finality "reduces the ability of litigants to harass opponents and to clog the courts through a succession of costly and time-consuming appeals."). [1] Since "justice delayed" is indeed all too often "justice denied," its efficient administration in the immediate particular can thus sometimes lead to generalized injustice.

Here the district court order appealed from remands the dispute over interim compensation to the bankruptcy court for reconsideration of its decision not to award fees for work on the Herman and Berkow estates. On remand, the bankruptcy court may affirm its earlier decision not to award any fees or it may award fees in an amount less than that sought by BH & P. In either case, Maggio and his counsel or any other aggrieved party could again appeal to the district court and to us in turn. This multiplication of the possibilities for appeal leaves me unsure that our jurisprudence on finality under section 158(d) has struck the right balance between overall efficiency and case-oriented flexibility.

In F/S Airlease, we stressed that immediate resolution of the issue involved "could obviate the need for further action by the bankruptcy court." F/S Airlease, 844 F.2d at 104. Here, in contrast, the bankruptcy

Page 1320

court will have to take further action regardless of our determination. If we affirm,


fastcase

-18-

the bankruptcy court will reconsider its ruling pursuant to the district court's decision that the failure to disclose was not willful; if we reverse, the bankruptcy court will have to decide whether the amount of interim compensation requested was reasonable; if we vacate and remand, the bankruptcy court will have to consider the removal and fee issues under a proper legal standard.

Thus, these appeals do little to advance even the efficient administration of this case. Without them, present counsel and the trustee could still have appealed the bankruptcy court's decision to deny them compensation under section 158(d) at the end of the proceeding, and so seek appellate correction of any error the bankruptcy court might have made in denying them compensation for services already rendered. Moreover, the immediate replacement of Maggio and his counsel may have mooted the removal issue. [2]

Despite these concerns, I have concluded that F/S Airlease and the other cases the Court cites on the flexible concept of finality section 158(d) implies control the issue of appellate jurisdiction. Thus, I concur in the holding that we have appellate jurisdiction. [3]

II.

I agree with much of the Court's reasoning on the merits of the bankruptcy court's decision to remove the interim trustee and his counsel because the interim trustee is not a disinterested person under 11 U.S.C.A. § 101(14)(E) (West Supp.1991) and his counsel is likewise not a disinterested person who "hold[s] or represent[s] an interest adverse to the estate" within the meaning of 11 U.S.C.A. § 327(a) (West 1979). I am in especially strong agreement with the Court's conclusion that the rebuttable presumption the bankruptcy court relied on to disqualify a trustee from serving in jointly administered cases where there are interdebtor claims is so "overbroad" that it would drastically curtail, if not eliminate, the efficiencies of joint administration. See

Majority Opinion, at 1311. I also find no fault with the Court's analysis of the applicable statutory law and its conclusion that the question of whether an interim trustee and his counsel should be disqualified from representing some estates that are being jointly administered because the estate of one has claims against the estate of one or more related entities or individuals

Page 1321

rests within the sound discretion of the bankruptcy court. Id. at 1313. On the merits, my disagreement with the Court is limited to its conclusion that the bankruptcy court, on the facts of this case, did not abuse its discretion when it removed Maggio and his counsel for conflicts of interest.

As the majority has demonstrated, the bankruptcy court's presumption against appointment of a single trustee for joint administration of related estates whenever one estate has claims against the other is legally incorrect. Accordingly, the bankruptcy court's exercise of its discretion to remove Maggio and his counsel was made in consideration of an improper factor. Therefore, we should vacate the district court's order affirming the bankruptcy court's disqualification order, with instructions to vacate the bankruptcy court's order and remand the case to the bankruptcy court for an exercise of discretion under correct legal standards. See Universal Minerals, Inc., 669 F.2d at 102 ("[t]o the extent the parties challenge the choice ... of legal precepts, we always employ the fullest scope of review").

I also disagree with the majority's holding there was no abuse of discretion because I think that even absent the presumption created by the bankruptcy court the present record cannot support a finding that either Maggio or his counsel had presently existing conflicts of interest that could have affected their status as disinterested persons in any material way. Thus, I think the bankruptcy



N/H-017216

court's finding that an actual conflict existed in this case is clearly erroneous. See Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir.1988) ("in reviewing the district court's review of the bankruptcy court's factual findings, we, like the district court, employ the 'clearly erroneous' standard"). If so, the district court's affirmance of that finding, see Matter of BH & P, Inc., 119 B.R. 35, 43 (D.N.J.1990), is therefore legally incorrect.

In either case, the district court should have vacated the bankruptcy court's removal order and remanded that issue to the bankruptcy court. There the record could be further developed as to whether the putative conflict of interest facing the trustee and his counsel with respect to the BH & P estate's claims against the bankrupt estates of its individual stockholders was "material." My more detailed reasoning follows.

The bankruptcy court held that its overbroad presumption can be rebutted when "the possibility that the conflict will become actual is remote and circumstances make use of a common fiduciary and professional particularly compelling." In re BH & P, Inc., 103 B.R. 556, 572 (Bankr.D.N.J.1989), aff'd in part and vacated in part, 119 B.R. 35. [4] It went on, however, to find an actual conflict saying:

An argument could be made that there is only a potential conflict until it is certain that the estates of Herman and Berkow have sufficient funds to pay a dividend. However, the more the trustee and professional succeed in increasing the size of the Herman and Berkow estates, the greater the likelihood that they would be in the impossible position of having to review their own claims on behalf of BH & P. That problem certainly does not appear conducive to putting forth one's best efforts on behalf of the Herman and Berkow estates, if success ultimately means disqualification. The court does not have any evidence at this point that the trustee or professional have failed to pursue all assets of

the Herman and Berkow estate [sic] vigorously.

Id. at 565-66.

Because the bankruptcy court employed the phrases "actual conflict" and "potential conflict" I too use them despite my agreement with those cases that hold there is no meaningful distinction between "actual" and "potential" conflicts of interest. See, e.g., id. (distinction is "elusive and perhaps illusory"); In re Kendavis Indus. Int'l, Inc., 91 B.R. 742, 754 (Bankr.N.D.Tex.1988).

Page 1322

I think we could more accurately refer to "present" or "existing" conflicts of interest as opposed to those conflicts that may or are likely to arise as events unfold. Whatever terms we use, I believe that "materiality" adequately distinguishes those cases in which disqualification is appropriate from those in which it is not.

On the issue of materiality, we know from this record that the bankruptcy court established deadlines applicable to filing both proofs of claim and nondischargeability complaints in the Herman and Berkow proceedings. Maggio was forced to file proofs of claim against the Herman and Berkow estates to preserve any claim BH & P might have against those estates for potentially voidable transfers of assets to various real estate tax shelters. Aside from their filing, decisions on the validity and amount of BH & P's claims was deferred. [5]

As pointed out by the trustee and his counsel, the future disposition of these claims was likely to be no more than "academic" because the Herman and Berkow estates had no funds to pay unsecured creditors. An examination of the schedules filed in the individual debtors' estates shows that Herman has scheduled liabilities, including contingent liabilities on his guaranties of BH & P's



N/H-017217

obligations, that total more than $40,000,000.00, but has only about $3,000.00 in unencumbered assets. His schedules also list monthly income of about $8,300.00 and expenses of about $8,500.00. The schedules filed by Berkow are similar. Although I realize that additional assets may be uncovered, the remaining factual background of these estates, as recited by the Court, convinces me that at this point in the proceedings the possibility of uncovering or recovering into the Berkow and Herman estates sufficient assets to permit any significant recovery on the BH & P estate's claims against those two estates is so unlikely and remote as to be "[im]material" within the meaning of section 101(14)(E).

The joint administration of all three estates had continued in an orderly manner for almost one year after the trustee filed the protective proofs of claim and nondischargeability complaints against the Herman and Berkow estates. Then, the trustee and his counsel, just before the removal proceedings began, filed an adversary proceeding on behalf of BH & P. By it, they sought to avoid, to the extent of $1,300,000.00, the secured status of the Bank of New York's lien on BH & P's assets for a debt said to be in excess of $10,000,000.00. [6] Even if only the remaining $8,700,000.00 of the $10,000,000.00 debt the Bank of New York claims is secured by its lien on BH & P's assets, the liquidation of the Bank's lien is likely to exhaust all the known assets of the three estates. [7] Accordingly, any conflict between the three estates that might be occasioned by the claims Maggio and his counsel filed for BH & P against the Herman and Berkow estates has not yet arisen and it is unlikely that it ever will. At best, the filing of the claims creates a future, not a present, conflict of interest, and the facts, as known at this time, are simply not sufficient to warrant a conclusion that this future conflict is material enough to warrant disqualification of either the trustee or his counsel or a denial of

Page 1323

fees for work performed on the Herman and Berkow estates before disqualification. Considering the likelihood, or rather the lack of likelihood, that any BH & P recovery from the Herman and Berkow estates could significantly affect the rights of other creditors of the three estates, I think that the bankruptcy court's finding of an existing material conflict requiring removal is clearly erroneous.

Finally, I note that this Court's opinion on the merits of this appeal sets forth a new standard for evaluating the effect of conflicts of interest on the joint administration of related bankruptcy estates. It gleans that standard from the decision of the United States Court of Appeals for the First Circuit in In re Martin, 817 F.2d 175 (1st Cir.1987). Under that newly announced standard, I would remand this case to the bankruptcy court for careful consideration of the following principle:

The naked existence of a potential for conflict of interest does not render the [arrangement] nugatory, but makes it voidable as the facts may warrant. It is for the [bankruptcy] court to decide whether the [arrangement] carries with it a sufficient threat of material adversity to warrant prophylactic action....

....

[H]orrible imaginings alone cannot be allowed to carry the day.

In re Martin, 817 F.2d at 182-83, quoted in Majority Opinion, at 1312-13.

In considering this standard, I think the bankruptcy court might well conclude that the requisite "threat of material adversity" is absent from this record. Indeed, the bankruptcy court specifically found that there was no evidence that the interim trustee or his counsel failed to vigorously pursue the interests of all three estates. If sufficient assets



N/H-017218

are recovered, other steps such as the appointment of special counsel could resolve any conflict at that time. See In re O.P.M. Leasing Servs., Inc., 16 B.R. 932, 939-40 (Bankr.S.D.N.Y.1982). "To act earlier in a preemptive manner could result in confusion and interruption of the orderly administration of ... bankruptcy proceedings and cause ... unnecessary great expense." Id. at 939. The bankruptcy court's finding of an actual conflict also ignores the legislative history of the Bankruptcy Code which shows that joint administration of estates is preferred whenever it is cost efficient. See 13A Collier on Bankruptcy p 10-115.04 (14th ed. 1977). Joint administration serves to ameliorate proliferation of trustees and attorneys whose separate fees can inflate administrative expenses to the detriment of other creditors.

For these reasons, I respectfully dissent from the Court's ruling on the merits. Instead, I would vacate the order of the district court and remand the case to it with instructions to remand in turn to the bankruptcy court for the purpose of examining the removal question under the legal standard set forth by the Court.

---------------

\* Honorable Thomas N. O'Neill, Jr. of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1 Maggio later became the permanent Chapter 7 trustee as BH & P creditors did not elect to replace him with another trustee.

2 At the time of Herman's Chapter 7 filing, his Schedules and Statement of Financial Affairs revealed liabilities totalling more than $40,000,000 and only $3,000 in unencumbered assets.

3 In the application for retention of counsel, Maggio notified the Bankruptcy Court that RGZ

served as attorneys to the Official Creditors' Committee during the Chapter 11 proceeding BH & P, Inc. ..., and currently represents me as Trustee of BH & P, Inc. in Chapter 7. The Debtor herein was a principal of BH & P, Inc. As a result of [RGZ]'s involvement in these related matters, it is conversant with many of the issues which will require the attention of the Trustee and his counsel during the within Chapter 7 proceeding.

4 The Schedules and Statement of Financial Affairs filed by Berkow were similar to Herman's in that they disclosed that liabilities far outstripped unencumbered assets.

5 In the application for retention of counsel, Maggio included a statement virtually identical to that set forth at n. 3 which informed the bankruptcy court that he and RGZ were involved in administering the bankruptcy estates of BH & P and Herman.

6 The affidavit of Gary N. Marks, a member of the firm of RGZ, filed with the bankruptcy court in connection with the investigation of alleged conflicts of interest, provides, in part, as follows:

[P]rior to our retention as counsel to the Trustee in the Herman matter, I had a telephone conversation with the Honorable Hugh M. Leonard, United States Trustee, with respect to potential conflicts of interest which might arise during the administration of the Herman and BH & P estates. Mr. Leonard advised me that this situation had arisen numerous times in the past and that it was the policy of his office to move forward with a single trustee and counsel until such time as an actual conflict presented itself. If and when such a situation developed, a decision would be made with respect to appointing a substitute trustee with new counsel.... In reliance on this policy, the Trustee and his professionals moved forward with the administration of these estates.

7 An application for interim fees was also filed by Bederson & Company, accountants retained



-22-

N/H-017219

to represent Maggio in each of the three on-going bankruptcy proceedings. While the Bank of New York also objected to the payment of fees to Bederson, no issue relating to the accounting firm is raised in this appeal. We will, therefore, confine the conflict of interest discussion to Maggio and RGZ.

8 While the parties refer to Section 101(13) as embodying the "disinterested person" requirement, that standard is now codified at 11 U.S.C. § 101(14).

9 We applied similar reasoning in two other cases involving the effect of a remand on the finality of the district court's order in bankruptcy proceedings. See In re Meyertech Corp., 831 F.2d 410, 414 (3d Cir.1987) (district court's remand for clarification of a setoff issue did not affect finality of issues raised on appeal where disposition of those issues would "preclude the necessity of further activity by the factfinding tribunal, will obliterate the need for more litigation and serves the ever-prevailing interest of judicial economy"); Universal Minerals, Inc., 669 F.2d at 101 (requisite finality exists in bankruptcy where "the judgment of the district court conclusively determined the question presented [on] appeal"); see also In re Colon, 941 F.2d 242, 244 (3d Cir.1991) (holding bankruptcy court's order "was a final disposition of plaintiffs' adversary proceedings because [apart from an issue regarding attorney's fees] the bankruptcy court resolved all outstanding issues").

10 11 U.S.C. § 101(14) provides in full as follows:

(14) "disinterested person" means person that--

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such investment banker in connection with the offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason[.]

11 In re Enercons Virginia, Inc., 812 F.2d 1469, 1472 (4th Cir.1987), upon which the bankruptcy court relied, does not dictate a different conclusion. In Enercons, the Court of Appeals for the Fourth Circuit considered whether the trustee of a foreign bankrupt creditor could pursue that creditor's claim against the debtor. The court held that the trustee was authorized by 11 U.S.C. § 101(9) to file a proof of claim as a "creditor." This conclusion does not, however, compel a finding that a trustee, asserting a claim in a representative capacity, becomes a "creditor" for purposes of section 101(14)(A).

12 This reading of section 101(14)(E) is supported by section 327(a). Section 327(a) authorizes the trustee to employ professionals "that do not hold or represent an interest adverse to the estate and that are disinterested persons...." Where section 327 explicitly applies to persons who hold or represent adverse interests, disqualifying both, section 101(14)(E) refers only to those who have disqualifying interests. We do not think that this difference in terminology was accidental.

13 The Freeport Italian Bakery rule is consistent with Bankruptcy Rule 2009(d) which requires appointment of multiple



N/H-017220

trustees in jointly administered cases upon a showing that a conflict of interest will prejudice creditors or equity security holders. As the United States Trustee notes, "the predicate for application of Rule 2009(d) is not that a common trustee is 'disinterested' but that prejudice will occur as a result of the trustee's dual representation."

14 Collier explains that

[f]ormer Rule 10-202(c)(2) provided that representation of a creditor or stockholder in a matter which might not become involved in the chapter X case "need not in itself" be deemed to affect the "disinterestedness" of an attorney. The Advisory Committee's Note to former Rule 10-206 stated that the exception contained in Rule 10-202(c)(2) "is not meant to encourage the appointment of attorneys who represent a creditor or stockholder. If other competent attorneys are available, the trustee's attorney should be selected from that group. This exception should be utilized only in the case where there is real need."

2 Collier on Bankruptcy, p 327.03, at 327-65 (15th ed.) (citation omitted).

15 In In re Kendavis, the bankruptcy court rejected any distinction between potential and actual conflict. "The concept of potential conflicts is a contraction in terms. Once there is a conflict, it is actual--not potential." 91 B.R. at 754. For a similar bright-line approach to conflicts of interest, see In re Paolino, 80 B.R. 341, 345 (E.D.Pa.1987).

1 Outside the field of bankruptcy, the disruptive effect of appeals from decisions determining whether counsel is to be disqualified for conflict of interest provides the rationale for the firm rule in federal jurisprudence that orders relating to counsel's disqualification are interlocutory and so unappealable. See Flanagan, 465 U.S. at 260, 104 S.Ct. at 1052.

2 In this connection I note several developments in the bankruptcy court that the

parties did not refer to on this appeal. Maggio was replaced in both the Herman and Berkow proceedings before the bankruptcy court's August 23, 1989 order disqualifying him. Maggio was replaced in the Herman proceeding on August 7, 1989 and at some point before July 31, 1989 in the Berkow proceeding. Maggio's counsel was replaced in the Berkow proceeding on July 31, 1989 and, after the disqualification order, in the Herman proceeding. The Bank of New York, after it succeeded in securing an order from the bankruptcy court removing the interim trustee and his counsel and denying them compensation for work on the Herman and Berkow estates, decided not to participate in this appeal despite this Court's request that it consider filing a brief. Its non-participation required the Court to secure the services of an amicus in order to obtain adversary briefing of the important issues this case presents. Ultimately, the adversary proceeding Maggio filed against the Bank of New York was dismissed by a consent order on December 11, 1989.

3 Although neither this Court nor the district court examined the finality of the bankruptcy court's order removing the trustee and his counsel and denying them compensation under 11 U.S.C.A. § 158(a), this area of our jurisprudence may also warrant re-examination as to whether such orders are properly classified as final or interlocutory. If interlocutory, the district court's subject matter jurisdiction over the appeals of the trustee and his counsel would be discretionary. Particular orders removing or retaining experts that do seriously affect the rights of parties interested in the administration of a bankrupt's or a debtor's estate and are so beyond the bounds of propriety as to constitute an abuse of discretion may be subject to adequate control under the discretionary power section 158(a) gives a district court to hear and decide appeals from interlocutory orders of bankruptcy courts. An appeal of such orders by grace of the district court could arguably be more efficient than the



N/H-017221

present practice of granting any aggrieved party who wishes to attack the bankruptcy court's discretion in selecting or retaining experts an immediate appeal as of right.

4 Thus, the effect of the improper presumption cannot be isolated from the discretionary result the bankruptcy court reached in this case. At the very least, it may have improperly shifted the burden of proof from the party seeking disqualification to the trustee and his counsel.

5 After instructing the trustee and his counsel to employ a "wait and see" approach regarding any potential conflicts, see Affidavit of Gary N. Marks, Esq., reprinted in Appendix (App.) at 287, the United States trustee now argues as amicus that the trustee and his counsel should be disqualified on the basis of an actual conflict of interest.

6 About two months after the trustee filed this adversary complaint, the Bank of New York objected to the interim trustee's and his counsel's petition for interim compensation, asserting the conflict of interest that ultimately led the bankruptcy court to remove the trustee and his counsel and finally deny them the interim compensation they sought for their work on the Herman and Berkow estates. Even the bankruptcy court, which ruled against the trustee and his counsel, "recognize[d] that the timing of th[e] objection has a peculiar smell to it." Id. at 275.

7 This would almost certainly be the case in the event the three estates were consolidated. The record indicates consolidation is a possibility. The Bank of New York also has a contingent unsecured claim against the Herman and Berkow estates since the individual debtors personally guaranteed BH & P's $10,000,000.00 indebtedness to it.



-25-

530 F.3d 832
**In the Matter of AFI HOLDING, INC.,
Debtor,
Carolyn A. Dye, Former Chapter 7
Trustee, Appellant,
v.
J. Gregory Brown; Cecilia A. Brown;
Louis Carfora; Martin Cohen; Dennis
Eisenberg; Dorothy Fielding; Marjorie
Warren Goldstein; Joel Gotler; Beth
Broday; Patricia Lynn Leroy; Jeanne
Leytus; William Mack; Joan M. Mack;
Gary Musser; Janet Richmond;
Adelaida San Diego; Thaddeus
Stanecki; Ranette Stanecki; AFI
Holding, Inc., Appellees.
No. 06-56621.
United States Court of Appeals, Ninth
Circuit.
Argued and Submitted May 8, 2008.
Filed June 17, 2008.**

[530 F.3d 836]

Joseph A. Dumas, Jr., Dumas & Associates, Los Angeles, CA, for the appellant.

Paul J. Laurin, Werner & Laurin, Encino, CA, LLP, for the appellees.

Appeal from the Ninth Circuit Bankruptcy Appellate Panel Pappas, Klein, and Marlar, Bankruptcy Judges, Presiding. BAP No. CC-05-01247-MaPaK.

Before: KIM McLANE WARDLAW and SANDRA S. IKUTA, Circuit Judges, and RALPH R. BEISTLINE,* District Judge.

**ORDER**

WARDLAW, Circuit Judge:

Carolyn A. Dye appeals from a decision of the United States Bankruptcy Appellate Panel ("BAP") for the Ninth Circuit affirming the order of the bankruptcy judge removing her as Trustee for cause pursuant to 11 U.S.C. § 324 in this Chapter 7 proceeding.

I. Jurisdiction

We must first address the question whether we have jurisdiction over an order removing a trustee from an ongoing bankruptcy proceeding, a question of first impression in our circuit. The BAP concluded, and the parties agree, that the removal of a Bankruptcy Trustee is a final, appealable order. Our consideration of our jurisdiction does not rest there, however, as we must consider the question of our own jurisdiction. 28 U.S.C. § 158(d) vests jurisdiction in the Courts of Appeals over appeals only from all "final decisions, judgments, orders, and decrees entered" either by the district courts or the BAP.

We have "adopted a pragmatic approach to finality in bankruptcy cases." *In re Lazar*, 237 F.3d 967, 985 (9th Cir. 2001) (internal quotation marks and citation omitted). "[A] bankruptcy court order is final and thus appealable where it 1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed." *Id.* (quoting *In re Lewis*, 113 F.3d 1040, 1043 (9th Cir.1997) (internal quotation marks omitted).

The Eleventh Circuit has recently considered, also for the first time, whether the removal of a trustee is a final order over which the courts of appeals have jurisdiction. The Eleventh Circuit explained that "[i]n the bankruptcy context, this Court has concluded that it is generally the particular adversary proceeding or controversy that must have been finally resolved rather than the entire bankruptcy litigation," and concluded that the "removal of a bankruptcy trustee is a `final' order appealable to this Court." *In re Walker*, 515 F.3d 1204, 1210-11 (11th Cir.2008) (internal quotation marks and citation omitted).

In so concluding, the Eleventh Circuit relied heavily upon the Third Circuit's reasoning in *In re Marvel Entm't Group, Inc.,*



N/H-017223

140 F.3d 463, 470-71 (3d Cir.1998). There, the Third Circuit considered the finality of an order appointing a trustee. The Third Circuit reasoned that "[w]ere we to put off hearing an appeal of the district court's order appointing a trustee until after the entire bankruptcy proceeding, allowing the possibility of an order returning this bankruptcy to its very beginning for a second round, the concept of judicial efficiency would be effectively turned on its head." It also noted that "[l]iberal finality considerations

[530 F.3d 837]

in orders appointing bankruptcy trustees are necessary because these orders cannot be meaningfully postponed to the bankruptcy's conclusion." *Id.* at 470. The Third Circuit therefore held that the order appointing a bankruptcy trustee is a final order vesting it with jurisdiction.

Similar finality considerations apply to an order removing the trustee. Although the bankruptcy proceedings may continue, and here, in fact they have, the removal order resolves and seriously affects the substantive rights of the parties to a disinterested trustee and finally determines the discrete issue to which it is addressed–whether the bankruptcy court's finding of a lack of disinterestedness was cause for the trustee's removal under § 324.

Thus we, like our sister circuits, conclude that an order removing a bankruptcy trustee is a "final order" over which we have jurisdiction pursuant to § 158(d). *See In re BH & P, Inc.,* 949 F.2d 1300, 1307 (3d Cir.1991) (concluding that the district court's order removing the trustee due to a conflict of interest is "final"); *Turshen v. Chapman,* 823 F.2d 836, 839-40 (4th Cir.1987) (holding that removal order is "final" because "[f]inality in the sense of 28 U.S.C. § 1291 is not required either for purposes of appeal or for the application of collateral estoppel to unappealed bankruptcy court rulings"); *Matter of Schultz Mfg.*

*Fabricating Co.,* 956 F.2d 686, 691-92 (7th Cir.1992) (treating the denial of a motion to remove a trustee as a final order).

While we have found some decisions to the effect that *appointment* of a Trustee is not a "final order," *In re Delta Servs. Indus.,* 782 F.2d 1267, 1272 (5th Cir.1986); *Matter of Cash Currency Exch., Inc.,* 762 F.2d 542, 546 (7th Cir.1985); *but see Matter of Cajun Elec. Power Co-op., Inc.,* 69 F.3d 746, 748 (5th Cir.1995), we have found no decision that holds that an order *removing* a trustee for cause under § 324 is not final.

Here it appears that a remaining issue to be determined in the proceedings is the trustee's entitlement to fees.[1] That decision is necessarily affected by the outcome of this appeal. This only further demonstrates the efficiency and necessity for a final determination as to the propriety of the removal. A similar situation existed in *In re BH & P, Inc.,* where the district court had issued an order removing for cause the trustee while remanding the issue of interim compensation to the bankruptcy court. "In approaching this finality question," the Third Circuit recognized that "[t]he unique characteristics of bankruptcy cases have led us to consistently consider finality in a more pragmatic and less technical way in bankruptcy cases than in other situations" and concluded that the district court's order removing the trustee due to a conflict of interest was final, despite the necessity to consider fees on the earlier remand. 949 F.2d at 1306 (internal quotation marks and alteration omitted).

## II. Merits

We have not previously addressed the standard for removal of a trustee due to a conflict of interest under § 324. The BAP thoroughly and carefully considered what constitutes cause for removal under § 324

[530 F.3d 838]



N/H-017224

in its well-reasoned opinion published at 355 B.R. 139 (9th Cir. BAP 2006). The BAP held that (1) "cause" may include a lack of disinterestedness; (2) the catch-all provision of 11 U.S.C. § 101(14)(E) defining a "disinterested person" is "broad enough to exclude a trustee with some interest or relationship that `would even faintly color the independence and impartial attitude required by the Code,'" *Id.* at 149 (quoting *In re Crivello,* 134 F.3d 831, 835 (7th Cir.1998)); (3) the First Circuit's "full panoply of events and elements" test or "totality of the circumstances" to determine whether a particular conflict is "materially adverse" to the estate sufficient to find a lack of disinterestedness is the appropriate standard, *id.* at 151; *see In re Martin,* 817 F.2d 175, 182 (1st Cir.1987); and (4) the bankruptcy court did not abuse its discretion in concluding removal was proper due to the Trustee's past affiliations with insiders that created a potential for a materially adverse effect on the estate and an appearance of impropriety resulting in ongoing disharmony in the estate's administration. The BAP also concluded that the bankruptcy court properly considered the trustee's failure to disclose these prior affiliations to the U.S. Trustee. We are persuaded by the BAP's analysis, adopt it as our own, and attached it as Appendix A. *In re Peters,* 101 F.3d 618, 619 (9th Cir.1996).

As the BAP noted in its opinion, our circuit has not previously ruled on the standard to determine cause for removal, and three divergent approaches to the standard for removal existed nationwide. That there was no clear standard articulated in our jurisprudence either at the time the Trustee filed her statement of disinterestedness or when she was removed for cause is a factor that should bear on the question whether she is entitled to fees for the time she served as Trustee, and as to the amount of any such fees awarded. Our holding does not address the issue of fees; we merely hold that on the question of first impression before us the Trustee's removal for an appearance of conflict of interest was

proper and remand to the bankruptcy court for a determination of the related issues as to fees.

**Affirmed, remanded** for further proceedings.

**APPENDIX A***
United States Bankruptcy Appellate Panel of the Ninth Circuit.
In re AFI HOLDING, INC., Debtor.
Carolyn A. Dye, Chapter 7 Trustee, Appellant, v.
J. Gregory Brown; Cecilia A. Brown, et al, Appellees.
BAP No. CC-05-1247-MaPaK.
Bankruptcy No. LA 01-41567-VZ.
Argued and Submitted March 23, 2006.
Filed Oct. 25, 2006.

James A. Dumas, Jr., Dumas & Associates, Deborah H. Eisen, Weinstein, Eisen & Weiss LLP., Los Angeles, CA, for Appellant.

Richard L. Weiner, Weiner & Laurin, LLP, Encino, CA, for Appellees.

[530 F.3d 839]

Michael Jay Berger, Law Offices of Michael J. Berger, Beverly Hills, CA, for AFI Holding, Inc.

Before: MARLAR, PAPPAS and KLEIN, Bankruptcy Judges.

## OPINION

MARLAR, Bankruptcy Judge.

### INTRODUCTION

The chapter 7[1] trustee has appealed the bankruptcy court's order of removal, which found that she was not disinterested due to a material conflict of interest She contends that the bankruptcy court applied an incorrect legal standard under § 324, and challenges the court's findings.



-3-

N/H-017225

We hold that the bankruptcy court properly applied a totality-of-circumstances test in making its determination that the trustee's prior connections with insiders negatively impacted the administration of the estate. Since disinterestedness is a requirement for service as an appointed trustee, *see* §§ 321(a)(1) and 701(a)(1), the court's determination that lack of such disinterestedness was a "cause" for her removal was a proper exercise of its broad discretion under § 324. In addition, the evidence of an "appearance of impropriety," as well as the trustee's failure to disclose all of her connections, were factors contributing to a lack of creditor confidence and, thus, supported the bankruptcy court's conclusion that cause for removal existed under § 324. Therefore, we AFFIRM.

### FACTS

This case was commenced on October 21, 2001, by the simultaneous filing of six chapter 11 bankruptcy petitions. Advance Finance, Inc. and AFI Holding, Inc. were the general partners (together "AFI") of four limited partnerships (together "AFI Entities"). The bankruptcy cases were consolidated, with AFI Holding as the consolidated debtor.

Richard Cohen ("Cohen") was AFI's president from 1994 to 1996. In July of 1996, Gary A. Eisenberg ("Eisenberg") was chairman of AFI and formed" AFI Holding. The AFI Entities had been involved in a "Ponzi" scheme, specifically a "factoring" business whereby they would make loans to clients (borrowers) using the clients' accounts receivable as collateral. Then, instead of paying the investors with the profits, they paid the old investors purported interest payments using the new investors' money. Cohen left AFI in 1996, was criminally prosecuted, and went to prison. After filing the chapter 11 petitions, Eisenberg relinquished control of the AFI Entities and was convicted of securities violations.

The bankruptcy court ordered that a chapter 11 trustee be appointed for each case, and the U.S. Trustee selected Carolyn A. Dye ("Dye"). Since 1998, Dye had been "Of Counsel" to Weinstein, Eisen & Weiss, P.C. Some of Dye's prepetition services are pertinent to this appeal, including her representation of and acquaintance with James Meister ("Meister") and Alan Eriksen ("Eriksen").

[530 F.3d 840]

### *Dye's Representation of Meister*

In 1995, while Meister was employed as the controller of AFI, he hired Dye to represent him in a personal bankruptcy case. After that, Meister and Dye occasionally saw each other at social events but were not "close friends." Dep. of Dye 89, Feb. 11, 2005.

When Eisenberg formed AFI Holding, Meister was named its chief financial officer, secretary, and director, but he was never an investor, creditor or equity share-holder in any AFI Entity. During Meister's employment with AFI, his domestic partner, Eriksen, invested money in an AFI entity.

Between 1996 and 1997, Meister became aware of fraudulent activities by Cohen and the complicity of Eisenberg. Specifically, he realized that his financial statements were inaccurate because they were based on forged documents, that money was being embezzled by Cohen, that Cohen was directing him to prepare false reports under threat of loss of his job, and that Eisenberg was requiring him to participate in new investment activities-"new money to pay repay the old money." Dep. of Meister 56, Feb. 24, 2005.

Eisenberg, on the other hand, believed that Meister was intentionally engaged in corporate misconduct. See Dep. of Eisenberg 24, Feb. 15, 2005. In a 1998 state court action against it, AFI filed a cross-complaint against



-4-

Meister, which was subsequently dismissed. See Decl. of Loeb ¶ 3-4, Apr. 14, 2005.

Meister testified that his next communication with Dye, following his bankruptcy case, was in 1997 when he sought her advice concerning his decision to resign from AFI However, he rescinded that testimony in a declaration dated April 13, 2005, in which he averred that his discussion with Dye had actually taken place in 1999, and concerned a termination notice which he had received from his subsequent employer, Tri-Capital Finance Corp. ("Tri-Capital").[2] Meister resigned from AFI in June, 1997, but remained in a consulting role for another month.

In mid-1998, Meister referred Eriksen to Dye to represent him in seeking a withdrawal of his investment monies from AFI. Both Meister and Dye testified that they did not speak to each other about either Ericksen's legal matters or AFI.

Then, in September, 1999, Meister sought Dye's legal advice regarding the Tri-Capital termination notice. Dye testified that she "looked [the notice] over only briefly, found it unremarkable, and had no other involvement with Meister." Decl. of Dye 27, ¶ 9, Apr. 13, 2005.

### Dye's Representation of Eriksen

As a result of his investment, Eriksen was a limited partner in an AFI entity. Eriksen was privy to the misconduct at AFI because Meister had told him about it. See Dep. of Meister 63, Feb. 24, 2005. (Eriksen's deposition testimony was stricken by the bankruptcy court as untimely, and that ruling has not been challenged in this appeal.)

In June, 1998, Eriksen hired Dye to assist him in his efforts to withdraw his investment monies—Eisenberg allegedly had told Eriksen that AFI needed to obtain new investor money in order to pay

[530 F.3d 841]

him. See Dep. of Meister 57-60. Eisenberg also testified that he told Dye that Meister's alleged misconduct was a reason not to pay Eriksen. Dep. of Eisenberg 40-41.

However, when Dye was questioned as to whether Eisenberg had ever implicated Meister to her in regards to operational misconduct, she stated that "he never mentioned Mr. Meister as being involved." Dep. of Dye 94. And, when Dye was asked whether Eriksen had said anything to her "indicating that he thought there was financial misconduct" at AFI, Dye gave a cautious response:

Mr. Eriksen was a limited partner. He had no knowledge of what was going on in the office, particularly as it related to Mr. Eisenberg's dealings with limited partners.

Id.

Dye then negotiated a deal with Eisenberg to convert Eriksen's equity to debt,[3] and Eriksen was given a promissory note, dated August 31, 1998, for $52,327.29 payable from AFI. This amount was compromised and satisfied in May 1999, at which time a "Release Agreement" was purportedly signed. (Dye provided a copy of an unsigned, undated "release agreement" but the signed document was never produced.) However, a letter from Dye to Eisenberg, dated May 18,1999, was admitted into evidence, in which she stated:

Mr. Eriksen will accept your settlement figure. However, he has asked that you issue two checks, one to his IRA Trustee for $12,697.66 and the second to my law firm for $1,250.

Dye has not disputed the fact that those monies were paid, as indicated. See also Dye's Dep. Tr. Corr. [to p. 121], Feb. 28, 2005 (stating that the lump-sum payoff was performed).



-5-

### *Dye's Declaration of Disinterestedness in Chapter 11*

In connection with her unopposed appointment as trustee in the consolidated chapter 11 case, Dye filed her "Declaration of Disinterestedness." She stated:

4. There is one other matter which I must disclose, not because I believe it presents a conflict, but for informational purposes.

5. In mid-June, 1998, I was engaged to represent an individual who had made an investment in an entity called Advance Finance Partnership. In that capacity I negotiated a settlement for my client for the withdrawal of his capital contribution. (The settlement reached resulted in a compromised payment and mutual releases.) That matter has been concluded since mid-1999 and I do not have any continuing client relationship with the individual I represented.

6. I was in an adverse relationship with the Debtor entities and did not learn anything as a result of my own client relationship which would place me in a present conflict, I do not believe this would present any issue in my appointment in this case.

Decl. of Disinterestedness of Dye 2-3, Nov. 14, 2001.

Dye's declaration did not mention her representation of Meister, identify Eriksen, or explain the connection between Meister and Eriksen.

[530 F.3d 842]

### *The Chapter 7 Case and Dye's Supplemental Declaration*

The consolidated chapter 11 case was converted to chapter 7 on July 29, 2002, and Dye was appointed its trustee without objection.

In July, 2003, Dye initiated litigation to recover about $10 million from more than 150 potential defendants, including investors and parties-in-interest who had received payments under the Ponzi scheme, in an effort to liquidate Debtor's equity. Dye did not sue Eriksen, based on her decision that his claim against the estate had been settled and released and that he was judgment-proof. Nor did she sue Meister for any alleged wrongdoing, indicating that any claims of AFI against him were time-barred and had expired prepetition.

Discovery proceeded in the adversary actions, including the taking of depositions of Eisenberg, Meister, Eriksen, and Dye. Being aware of Meister's testimony, Dye filed a "Supplement to Declaration of Disinterestedness," on March 14, 2005, in which she belatedly disclosed her relationship with Meister and his relationship to both Eriksen and AFI. She stated that her failure to disclose these facts sooner was due to inadvertence.

At the same time, AFI investors, including the appellees herein ("Appellees"), filed a motion to remove Dye as trustee, pursuant to § 324. They alleged, among other things, that she was not disinterested, had failed to disclose material facts revealing a conflict of interest, and had injured the estate by failing to bring adversary proceedings against either Meister or Eriksen.[4]

Dye and the U.S. Trustee opposed the motion. Dye maintained that Appellees failed to show that she was not disinterested because: (1) "disinterestedness" is defined as having an adverse interest, not as "representing" an adverse interest, and (2) her representation of Meister and Eriksen was not materially adverse to the estate or a class of creditors.

The U.S. Trustee maintained that there was insufficient evidence to support removal in light of a trustee's discretion to make



-6-

business judgments. He further stated that Dye's inadvertent failure to disclose her representation of Meister was not cause for removal.

Appellees replied with accusations that Dye's nondisclosure was intentional, and that she gave false and misleading testimony regarding the extent of her relationship with Meister and Eriksen, as well as failing to produce Eriksen's release agreement. Moreover, Appellees argued that Dye's letter instruction to Eisenberg to pay her $1,250 in attorney's fees made her a direct transferee of payments from AFI, in 1999.

### *The Bankruptcy Court's Ruling*

On May 3, 2005, the bankruptcy court heard argument on the motion for removal of Dye. Considering the standard for removal under § 324, the court held that tack of disinterestedness, standing alone, sufficed as "cause" for removal.

It then looked at all of the events and circumstances to determine that Dye was not disinterested. It found that Meister was an insider of the AFI Entities at the time Dye represented him; that Dye then represented Eriksen, who was referred to her by Meister and who was an investor in

[530 F.3d 843]

the AFI Entities. It found that Dye had reached a settlement for Eriksen with AFI which included payment of her attorney's fees, and such payment "could possibly be materially adverse to the interest of the bankruptcy estate." It found and concluded that

Carolyn Dye indeed had an interest that was materially adverse to the interest of the estate. Why? Because when you know when you have represented someone who had claims against that entity and you represented, albeit in an unrelated context, an individual who was an insider of that entity and that insider

referred an investor to you to represent [its] claims against that entity, you are representing an interest-you represent an interest which was adverse to this estate.

Tr. of Proceeding 72:10-18, May 5, 2005.

The court described this adverse interest in terms of a potential[5] conflict of interest, when it ruled:

Whether or not, ultimately we'll never know, the estate would have had any claims against Meister and against Eriksen or-in the form of a claim to undue [sic] or attack the agreement and the release as in and of itself an avoidable transfer or to pursue claims against Meister for his role in the conduct of business by the AFI entities, the fiduciary of the bankruptcy estate who has to make business decisions about whether of not to pursue those claims and-investigate those claims should be completely free of any possible influence with regard to making decisions against parties that she represented as counsel pre-petition, and that was not the case here. Both clients had a direct interest in the debtor and this indeed created a material conflict of interest for Dye.

On a subsidiary level there was also a direction made by her apparently at ... her client's insistence, that a transfer of money as part of the Eriksen settlement be made directly to her law offices which creates an interest in herself directly that is material-that could possibly be materially adverse to the interest of the bankruptcy estate.

*Id.* at 72:19-25 to 73:1-12.

In addition to lack of disinterestedness, the court also found that Dye had failed "to disclose a material conflict of interest in a timely manner," albeit inadvertently. *Id.* at 73:25 to 74:1. In Dye's favor, the bankruptcy court found that she had not interfered with discovery, nor acted, except for the nondisclosure, in any way "other than doing



-7-

her best with regards to being a fiduciary of the estate ..." *Id*. at 73:23-24.

The order granting removal was entered on May 20, 2005, and Dye timely appealed.[6]

[530 F.3d 844]

### ISSUE

The sole issue is whether the bankruptcy court erred in removing Trustee Dye for "cause."

### STANDARD OF REVIEW

Removal of a trustee under § 324 is left to the sound discretion of the bankruptcy court. *BH & P, Inc.*, 949 F.2d at 1313; *Miller v. Miller (In re Miller)*, 302 B.R. 705, 709 (10th Cir. BAP 2003). A bankruptcy court necessarily abuses its discretion if it bases its decision on an erroneous view of the law or on clearly erroneous factual findings. *Warrick v. Birdsell (In re Warrick)*, 278 B.R. 182, 184 (9th Cir. BAP 2002). It also abuses its discretion if it applies an incorrect legal rule. *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 287 (9th Cir. BAP 2005).

### DISCUSSION
### A Trustee Lack of Disinterestedness as § 324 "Cause"

A chapter 7 panel trustee is appointed by the U.S. Trustee. Section 321 provides that a person is eligible to serve as a bankruptcy trustee if such individual "is competent to perform the duties of trustee," 11 U.S.C. § 321(a)(*l*). In regards to chapter 7, § 701(a)(1) provides that the U.S. Trustee "shall appoint *one disinterested person* ... to serve as interim trustee in the case." 11 U.S.C. § 70(a)(1) (emphasis added). If creditors do not elect a chapter 7 trustee pursuant to § 702, then the interim trustee continues to serve as trustee in the case. See § 702(d). The plain language of the statute requires that the appointed interim trustee be "disinterested" in order to be

eligible to serve. See *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290. 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Dye was the appointed chapter 7 trustee and thus was required to be disinterested.[7]

A trustee is the "legal representative" and "fiduciary" of the estate. *See U.S. Trustee v. Joseph (In re Joseph)*, 208 B.R. 55, 60 (9th Cir. BAP 1997); *United States ex rel Block v. Aldrich (In re Rigden)*, 795 F.2d 727, 730 (9th Cir.1986); *In re Mehr*, 153 B.R. 430, 439 (Bankr.D.N.J. 1993); 11 U.S.C. §§ 323 (providing that the trustee is the representative of the estate).

The title "trustee" has "fiduciary significance in the equity sense," and thus the trustee "may not be the representative of any particular creditor, but must represent all creditors without partiality." *Gross v. Russo (In re Russo)*, 18 B.R. 257, 270-71 (Bankr.E.D.N.Y.1982) (under Bankruptcy Act) (citing 2 Remington on Bankruptcy § 1117, at 580 (1956)). "Equity tolerates in bankruptcy trustees no interest adverse to the trust." *Mosser v. Darrow*, 341 U.S. 267, 271, 71 S.Ct. 680, 95 L.Ed. 927 (1951). The chapter 7 trustee's role facilitates one of the Bankruptcy Code's fundamental concepts of "equitable distribution." *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005), *cert. denied*, 546 U.S. 927, 126 S.Ct. 397, 163 L.Ed.2d 275 (2005). *See generally, Dept. of Justice, U.S. Trustee Program, Annual Report of Significant Accomplishments, Fiscal Year 2004, ch. 6: Trustee Oversight*, at 39 (bankruptcy trustees have "the legal duty to act in the best interest of creditors and the estate").

[530 F.3d 845]

It follows that a bankruptcy trustee must have no interest adverse to the estate, nor profit from her handling of the estate. She "is an independent person with no prior connection to either the debtor or the



N/H-017230

In re AH Holding, Inc., 530 F.3d 832 (8th Cir. 2008)

creditors. [Her] primary job is to marshal and sell assets, so that those assets can be distributed to the estate's creditors and then close the estate." *Joseph,* 208 B.R. at 60 (quoting *In re Reed,* 178 B.R. 817, 821 (Bankr.D.Ariz.1995)); *see also* 11 U.S.C. § 704 (duties of trustee).

Once assigned to a particular case, a panel trustee can be removed from a pending case only if the bankruptcy court finds "cause" after notice and a hearing. *Brooks v. United States,* 127 F.3d 1192, 1193 (9th Cir.1997); 11 U.S.C. § 324(a). "[Although sufficient cause is not defined in the Bankruptcy Code, it is left for the courts to determine on a case by case basis." 3 *Collier on Bankruptcy* ¶ 324, 02, at 324-3 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2006).

It is well established that "cause" may include trustee incompetence, violation of the trustee's fiduciary duties, misconduct or failure to perform the trustee's duties, or lack of disinterestedness or holding an interest adverse to the estate. *Id.* at 324-3 to 324-4. Such cause must be supported by specific facts, *Schultz Mfg. Fabricating Co.,* 956 F.2d at 692, and the party seeking removal has the burden to prove them. *Alexander v. Jensen-Carter (In re Alexander),* 289 B.R. 711, 714 (8th Cir.BAP2003), *aff'd,* 80 Fed.Appx. 540 (8th Cir.2003). This listing is illustrative, "but not exhaustive.

In relevant part, the Code defines a "disinterested person" as one that:

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ..., *or for any other reason.*

11 U.S.C § 101(14)(E).[8] (Emphasis supplied.)

A generally accepted definition of "adverse interest" is the (1) possession or assertion of an economic interest that would tend to lessen the value of the bankruptcy estate; or (2) possession or assertion of an economic interest that would create either an actual or potential dispute in which the estate is a rival claimant; or (3) possession of a predisposition under circumstances that create a bias against the estate. *See Rome v. Braunstein,* 19 F.3d 54, 58 n. 1 (1st Cir.1994); *In re Roberts,* 46 B.R. 815, 826-27 (Bankr. D.Utah 1985) *aff'd in part, rev'd and remanded in part on other grounds,* 75 B.R. 402 (D.Utah 1987).[9]

Such an adverse interest is "material" if it exists "by reason of any direct or indirect

[530 F.3d 846]

relationship to, connection with, or interest in, the debtor ..., or for any other reason." 11 U.S.C. § 101(14)(E). *See also* Black's *Law Dictionary* 998 (8th ed.2004) (defining "material" as "[h]aving some logical connection with the consequential facts" or being "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential....").

This so-called "catch all" provision is broad enough to exclude a trustee with some interest or relationship that "would even faintly color the independence and impartial attitude required by the Code." *Kravit, Gass & Weber, S.C. v. Michel (In re Crivello),* 134 F.3d 831, 835 (7th Cir. 1998) (citation omitted); 3 *Collier, supra,* ¶ 327.04[2][a][E], at 327-41.

A frequent setting for disputes over trustee removal (as it also is for attorney disqualification) is an alleged conflict of interest, and the instant case is no exception. The bankruptcy court found that Dye had a potential conflict of interest or lack of disinterestedness due to her connections with insiders Meister and Eriksen.



N/H-017231