their affiliates such fees and costs as the Court may allow upon application.

## ARTICLE VIII

## MANAGEMENT

The managing members of Debtors will not change after reorganization or dismissal. Specifically, Howard Bulloch and David Gaffin shall remain the managing members of Desert Land, Desert Oasis Apartments and Desert Ranch. Tom Gonzales will become the managing member of New World.

## ARTICLE IX

## TRANSFER TAXES

Pursuant to Bankruptcy Code §1146(c), the transfers of property contemplated by the Plan (including but not limited to the transfers of interest in Parcel A to Desert Land by Gonzales and Fieldman, the transfer of property from Desert Land to The Ranch LLC, and the transfer of land from Desert Land to Desert Oasis Investments, LLC) shall not be subject to transfer taxes by Clark County or the State of Nevada.

## ARTICLE X

## DISCHARGE

Upon confirmation, Desert Land will be discharged of all those debts and claims dischargeable under 11 U.S.C. Sec. 1141 and will hold all property of the estate free and clear of all claims and interests, except as otherwise provided in the Plan. While Desert Ranch and Desert Oasis will not receive a discharge, the reorganization of the debt of Desert Land will mean that the debt to Gonzales is cancelled for all purposes. The confirmation will be deemed to be a permanent injunction against the commencement or continuation of any action to enforce a debt or membership interest provided for in the Plan, so long as the terms of the Plan are being complied with.

## ARTICLE XI

## EFFECTIVE DATE

2nd Amended Plan of Reorganization 041603.wpd

17

1    The Plan shall become effective on the Effective Date. In the event of an appeal

2  of the order approving Confirmation and the issuance of a stay that prevents the Plan from

3  being consummated, the Debtors will remain Debtors in Possession until the determination

4  of the issues raised on appeal.

5                              **ARTICLE XII**

6                        **RETENTION OF JURISDICTION**

7    This Court shall retain jurisdiction after confirmation of the plan; (a) to consider (and

8  reconsider if appropriate) claims and objections thereto; (b) to fix expenses of

9  administration and compensation therefor, (c) to hear and determine any dispute arising

10  under or relating to the plan or arising under or relating to the Chapter 11 reorganization

11  case; (d) to enforce all discharge provisions of the plan; and (e) to make such orders and

12  directions pursuant to 11 U.S.C. Sections 1127 and 1142 as may be necessary or

13  appropriate.

14                              **ARTICLE XIII**

15                              **CLOSING**

16    This case shall be deemed closed on the Effective Date and the Desert Land may

17  present an order closing the case thereafter. If there are any motions, matters or

18  adversary proceedings pending, the Court may keep the case open.

19  DATED: April _16_, 2003        Debtors-in-Possession

20

21                        SCHWARTZER & McPHERSON LAW FIRM

22

23

24  _____

25  Lenard E. Schwartzer, Esq.
    Nevada Bar No. 0399
26  3800 Howard Hughes Parkway, Suite 1100
    Las Vegas NV 89109
27  (702) 693-4230
    Attorneys for Debtors and
28  Debtors in Possession

2nd Amended Plan of Reorganization 041603.wpd                18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

N/H-017812

# SETTLEMENT AGREEMENT

This Settlement Agreement (this "*Agreement*") is dated for reference purposes only as of April _____, 2003 and made by and among Desert Land, LLC, a Nevada limited liability company ("*Desert Land*"), Desert Oasis Apartments, LLC, a Nevada limited liability company ("*Desert Oasis*"), Desert Ranch, LLC, a Nevada limited liability company ("*Desert Ranch*" and, together with Desert Land and Desert Oasis, the "*Debtors*"), and Tom Gonzales, an unmarried man ("*Gonzales*").

## PRELIMINARY STATEMENTS

A.      Desert Land, Desert Oasis, and Gonzales are parties to that certain Loan and Security Agreement dated as of December 7, 2000 (the "*Loan Agreement*"), whereby Gonzales extended a Forty-one Million Five Hundred Thousand Dollar ($41,500,000) loan to Desert Land and Desert Oasis (the "*Loan*"). The Loan is evidenced by that certain Promissory Note Secured by Deed of Trust made as of December 7, 2000 (the "*Note*") by Desert Land and Desert Oasis in favor of Gonzales. The Note is secured by that certain Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of December 7, 2000, as amended by that certain Amendment to Deed of Trust dated as of December 18, 2000 (collectively, the "*Deed of Trust*"), made by Desert Land and Desert Oasis, granting Gonzales a first priority lien on, among other things, the real property set forth on Exhibit "A" ("*Parcel A*").

B.      As additional collateral to secure the Note, Desert Land executed that certain Collateral Assignment of Purchase Agreement dated as of December 7, 2000 (the "*Assignment*"), whereby Desert Land made a collateral assignment to Gonzales of an option to purchase four (4) parcels from the FLT Trust (the "*FLT Option*").

C.      In addition, Desert Ranch executed that certain Guaranty dated as of December 18, 2000 (the "*Guaranty*") of the repayment of Desert Land and Desert Oasis of the Loan, as well as that certain Pledge dated as of December 7, 2000 (the "*Pledge*"), in favor of Gonzales, of a 32.5% membership interest in New World.

D.      As consideration for making the Loan, Desert Land and Desert Oasis conveyed to (i) Gonzales, an undivided 5% interest in Parcel A the ("*Gonzales Interest*"), and (ii) Barry Fieldman, as trustee of the Barry and Amy Fieldman Trust ("*Fieldman*"), an undivided .5% interest in Parcel A (the "*Fieldman Interest*").

E.      Desert Ranch owns a 65% membership interest in New World, LLC, a Nevada limited liability company ("*New World*") (together with all rights as a member, allocation of profits, losses, gains, deductions and credits, the "*Desert Ranch Interest*"). In addition, Desert Land is a party to various executory contracts and unexpired leases relating to and affecting New World and its assets.

F.      New World is the owner in fee simple of that certain property described on Exhibit "B" (the "*New World Parcels*"), with the exception of that certain land owned in fee simple by Mary Bartsas, described on Exhibit "C" (the "*Leasehold Parcel*" and, together with

N/H-017813

the New World Parcels and all buildings and improvements thereon and appurtenances thereto, the *"Real Estate"*) of which New World holds a leasehold interest.

G.    On May 31, 2002, Debtors filed voluntary petitions for relief under 11 U.S.C. §101 et. seq. (the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the District of Nevada (the *"Bankruptcy Court"*) as Case Nos. BK-S-02-16202-RCJ, BK-S-02-16204-RCJ, and BK-S-02-16205-RCJ (collectively, the *"Bankruptcy Case"*).

H.    Certain claims and disputes have arisen between the Debtors, on the one hand, and Gonzales, on the other hand, as evidenced by that certain Objection of Tom Gonzales to Confirmation of Plan of Reorganization filed with the Bankruptcy Court. Debtors and Gonzales have reached a settlement of their claims and disputes, in accordance with an agreement entered into in Bankruptcy Court on January 31, 2003, which was approved by the Bankruptcy Court. Pursuant to the terms and conditions of this Agreement and the confirmation of Debtors' Second Amended Plan of Reorganization (the *"Debtors' Plan"*), the Debtors, on the one hand, and Gonzales, on the other hand, desire to formally document their agreement and fully and finally settle all such claims existing between and among them. Capitalized terms used in this Agreement shall have the meanings set forth at the time of their first use or as defined on Schedule 1 attached hereto.

## AGREEMENT

In consideration of the foregoing Preliminary Statements, the mutual covenants and conditions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    *Transfer of Assets.*  On and subject to the terms and conditions contained in this Agreement, the Parties agree that the following assets will be transferred:

1.1.    *Transfers by the Debtors.*

(a)    On or before the Closing Date and in conformance with the Debtors' Plan and Confirmation Order, the Debtors shall cause Desert Ranch to transfer the Desert Ranch Interest to Gonzales or his designee, free and clear of any and all liens or other encumbrances.

(b)    Concurrently with a Parcel A Transfer, Desert Land and/or Desert Oasis shall pay to Gonzales a cash payment (the *"Parcel A Transfer Fee"*) of either (i) $7.5 million in the event that there is Bona Fide Escrow opened for the Parcel A Transfer on or before 90 days following Confirmation (as defined in the Debtors' Plan) and in fact closes within six months of the date such Bona Fide Escrow was opened, or (ii) $10 million in the event that the Parcel A Transfer occurs more than 90 days following Confirmation, with the exception of a Bona Fide Escrow for a Parcel A Transfer which was opened on or before 90 days following Confirmation and does in fact close within six months of the date that such Bona Fide Escrow was opened. Notwithstanding the foregoing to the contrary, upon a Parcel A Equity Transfer, Desert Land and/or Desert Oasis shall pay Gonzales the Parcel A Transfer Fee from the Net Proceeds received from the Parcel A Equity Transfer, *provided, however,* that Desert Land and/or Desert Oasis shall not be required to pay to Gonzales more than fifty percent (50%) of the Net

N/H-017814

Proceeds, and, *further, provided,* that if the Parcel A Transfer Fee is not satisfied from the Parcel A Equity Transfer, the remaining balance of the Parcel A Transfer Fee, after deducting amounts paid from the net proceeds of the Parcel A Equity Transfer, shall be paid to Gonzales upon any subsequent Parcel A Transfer. The Parcel A Transfer Fee shall be evidenced by the Parcel A Memorandum, which shall not, however, constitute a mortgage, deed of trust or other lien on Parcel A, and payment thereof shall be subordinate to any Parcel A Permitted Financing. Gonzales will subordinate his right to the payment of the Parcel A Transfer Fee to any such Parcel A Permitted Financing and shall execute, acknowledge and deliver, from time to time, upon no less than 20 days written notice to Gonzales, such subordination agreement(s) as may be reasonably required by the title insurer insuring the liens or security interests related to the Permitted Parcel A Financing.

1.2.    *Transfers by Gonzales.*  On or before the Closing Date, Gonzales shall transfer the Gonzales Interest and cause the Fieldman Interest to be transferred, to Desert Land and/or Desert Oasis or their designee, free and clear of any and all liens or other encumbrances on the ownership interest with the exception of those items affecting the title to Parcel A listed of record as of the Confirmation caused or created by Gonzales or Fieldman. In addition, Gonzales shall (i) cancel the Note, mark it "cancelled" and cause the lien of the Deed of Trust to be fully reconveyed, and (ii) release any and all rights, including all liens, security interests, pledges and assignments Gonzales may have under the Loan Agreement, Note, Deed of Trust, Assignment, Guaranty, Pledge, and any other related Loan document.

1.3.    *Closing.*  The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Gordon & Silver, Ltd., 3960 Howard Hughes Parkway, 9th Floor, Las Vegas, Nevada, commencing at 10:00 a.m. (Pacific Time) on the first business day following the tenth day following the entry of the Confirmation Order (the "*Closing Date*").

1.4.    *Allocations.*  As a material inducement to enter into this Agreement, the Parties expressly agree that they shall allocate the transactions set forth in Section 1.2 and 1.3 of this Agreement for all purposes, including, without limitation, financial accounting and Tax returns, in accordance with the schedule attached hereto as Exhibit "D" (the "*Allocation Schedule*"). The Parties shall make all appropriate Tax filings on a basis consistent with the Allocation Schedule and shall use their respective commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or dispute and no Party will take a position on any income, transfer or gains Tax return, before any governmental or regulatory authority charged with the collection of any such Tax or in any judicial proceeding that is inconsistent with the terms of any such allocation set forth on the Allocation Schedule without the prior written consent of the other Parties in their sole and absolute discretion.

N/H-017815

2.    *Representations and Warranties.*

2.1.    *General Statement.*  The Parties make the representations and warranties to each other which are set forth in this Section 2. All such representations and warranties and all representations and warranties that are set forth elsewhere in this Agreement and in any schedule, exhibit or document delivered by a Party to another Party pursuant to this Agreement shall survive the Closing for a period of eighteen (18) months (and none shall merge into any instrument of conveyance). No specific representation or warranty shall limit the generality or applicability of a more general representation or warranty. All representations and warranties of the Debtors are made subject to the exceptions that are noted in the disclosure schedules attached hereto delivered by the Parties to each other concurrently herewith (the "*Disclosure Schedule*") and are qualified and supplemented by (i) any and all information contained in the books and records of New World identified in Schedule 2.1 attached hereto (the "*New World Books and Records*"), (ii) the Debtors' schedules and other filings and the bankruptcy court hearings and other proceedings of record within the Bankruptcy Case; and (iii) any matters apparent from a visual inspection of the Real Estate or any improvements thereon. Furthermore, any exceptions noted in a Disclosure Schedule to a specific section of this Agreement shall be deemed incorporated automatically into any other section of this Agreement (and its applicable Disclosure Schedule) if the subject matter of the latter bears a reasonable relationship to the former, the representations overlap or if otherwise necessary or appropriate to make the representations or warranties in the latter more complete or accurate. All exceptions noted in the Disclosure Schedule shall be numbered to correspond to the applicable paragraph of this Agreement to which such exception refers. Reference in this Agreement to the "Debtors" shall mean each person or entity comprising the Debtors, and all of them, collectively, as applicable. All such representations and warranties contained in this Agreement and made by the Debtors, on the one hand, and Gonzales, on the other hand, shall be true and correct as of the date hereof, and true and correct as of the Closing Date. Representations made to the "*actual knowledge*" of Debtors, or any of them, shall mean the actual knowledge of Howard Bulloch or David Gaffin without responsibility for investigation of the falsity of such representation or of the breach of such warranty. As used in this Article 2, the term "*material*" shall mean the sum of $250,000 per item and $1,000,000 in the aggregate. The Parties acknowledge that each of them and New World have been engaged in numerous attempts to develop the Real Estate and Parcel A and that, in connection therewith, plans, drawings, proposals and other development proposals have been reviewed by the Parties and/or New World, and that none of the Parties makes any representation or warranty whatsoever concerning the value of any such plans, drawings or proposals, or, except as set forth in Exhibit D, the Business, the Real Estate or Parcel A.

2.2.    *Representations and Warranties of Gonzales.*  Gonzales represents and warrants to the Debtors that:

(a)    Gonzales has full power and authority to enter into and perform the obligations on his part to be performed pursuant to (i) this Agreement, and (ii) all documents and instruments to be executed by Gonzales pursuant to this Agreement (collectively, the "*Gonzales Ancillary Documents*"). This Agreement has been, and the Gonzales Ancillary Documents will be, duly executed and delivered by Gonzales. This Agreement constitutes a valid and legally binding obligation of Gonzales, enforceable against Gonzales in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy,

N/H-017816

reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies).

(b)    Except for the approval of the Bankruptcy Court, no consent, authorization, order or approval of, or filing or registration with, any governmental authority or other person is required for the execution and delivery by Gonzales of this Agreement and the Gonzales Ancillary Agreements, and the consummation by Gonzales of the transactions contemplated by this Agreement and the Gonzales Ancillary Agreements in accordance with their respective terms.

(c)    Neither the execution and delivery of this Agreement and the Gonzales Ancillary Documents by Gonzales, nor the consummation by Gonzales of the transactions herein contemplated, will conflict with or result in a breach of any of the terms, conditions or provisions of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any court or governmental authority or of any arbitration award, in each case applicable to Gonzales.

(d)    Gonzales is not a party to any unexpired, undischarged or unsatisfied written or oral contract, agreement, indenture, mortgage, debenture, note or other instrument under the terms of which performance by Gonzales according to the terms of this Agreement will be a default, or whereby timely performance by Gonzales according to the terms of this Agreement may be prohibited, prevented or delayed.

(e)    Gonzales and Fieldman are, respectively, the lawful owners of the Gonzales Interest and the Fieldman Interest, the same have not been previously assigned or otherwise transferred, and are free and clear of any and all liens, encumbrances and/or rights of others, with the exception of those items affecting the title to Parcel A listed of record as of the Confirmation.

(f)    Neither Gonzales, nor any of his Affiliates has dealt with any person or entity who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment for arranging the transactions contemplated hereby or introducing the Parties to each other for which the Debtors may be liable.

(g)    With respect to the representations and warranties of Desert Ranch regarding New World, Gonzales has no actual knowledge that any of said representations or warranties are false, incomplete or inaccurate in any material respect.

(h)    The representations and warranties of Gonzales in this Agreement or in any of the Gonzales' Ancillary Documents, do not and will not contain an untrue statement of material fact, do not and will not omit to state a material fact required to be stated in order to make the representations, warranties or statements contained herein or therein, in light of the context in which they were made, not misleading.

2.3.    *Representations and Warranties of the Debtors.*  The Debtors represent and warrant to Gonzales as follows:

(a)    *Organization.*

N/H-017817

(i)    Each Debtor and New World is duly organized, a limited liability company, validly existing and in good standing under the laws of the State of Nevada and has all necessary power and authority to conduct their respective businesses as such businesses are now being conducted.

(ii)    Upon entry of the Confirmation Order by the Bankruptcy Court, each of the Debtors has full power and authority to enter into and perform (a) this Agreement, and (b) all documents and instruments to be executed by any of the Debtors pursuant to this Agreement (collectively, the "*Debtors' Ancillary Documents*"). This Agreement has been, and the Debtors' Ancillary Documents will be, duly executed and delivered by duly authorized representatives of the Debtors. Upon approval of the Bankruptcy Court, this Agreement constitutes a valid and legally binding obligation of each of the Debtors, enforceable against the Debtors in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies).

(iii)    Except for the entry of the Confirmation Order by the Bankruptcy Court, no consent, authorization, order or approval of, or filing or registration with, any governmental authority or other agency is required for the execution and delivery of this Agreement and the Debtors' Ancillary Documents and the consummation by the Debtors of the transactions contemplated by this Agreement and the Debtors' Ancillary Documents.

(iv)    Neither the execution and delivery by the Debtors of this Agreement and the Debtors' Ancillary Documents, nor the consummation by the Debtors of the transactions herein contemplated, will conflict with or result in a breach of any of the terms, conditions or provisions of any of the Debtors' Articles of Organization operating agreement or other constituent document(s), or of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any court or any governmental authority or of any arbitration award, in each case applicable to any of the Debtors.

(v)    Section 2.3(a)(v) of the Disclosure Schedule sets forth all members of each of the Debtors and New World, in each case as of the date of this Agreement. Except as shown on

N/H-017818

Section 2.3(a)(v) of the Disclosure Schedule, New World has no subsidiaries and there is no outstanding ownership interest in the Debtors or New World, nor any debt or other interest in the Debtors or New World that is convertible into an ownership or voting interest of any kind. No parties other than Desert Ranch have any equity interest in any portion of the Desert Ranch Interest.

(b)     *Financial.*

    (i)     New World's books, accounts and records are, and have been, maintained in a usual, regular and ordinary manner, , and all material transactions to which New World is or has been a party are, in all material respects, fairly and accurately reflected therein.

    (ii)     The financial statements described in Schedule 2.3(b)(ii) (collectively, the "*Financial Statement*") fairly and accurately presents the financial position of New World as of the date thereof, and the results of operations and cash flows of New World for the period covered by said statement.

    (iii)     To Debtors' actual knowledge, New World has paid all Taxes due and owing and filed all Returns or extensions thereof in connection therewith by the required filing deadline. There are no liens for delinquent Taxes outstanding against New World. None of New World's Returns are materially inaccurate. New World is not a foreign person.

    (iv)     Except for liabilities and obligations incurred since the effective date of the Financial Statement listed above in the ordinary course of business consistent with past practices or as set forth in Section 2.3(b)(iv) of the Disclosure Schedule, Debtors have no actual knowledge of any material New World liabilities of any kind, whether accrued, contingent or otherwise, whether due or to become due, the aggregate amount of which would exceed $25,000.

    (v)     The executory contracts and unexpired leases which are to be assumed by the Debtors and assigned to New World are listed on Schedule 2.3(b)(v).

(c)     *Conduct of Business.*

    (i)     Since the effective date of the latest Financial Statement listed above and except for the Bankruptcy Case or as set

N/H-017819

forth in Section 2.3(c)(i) of the Disclosure Schedule, New World has not:

(A)     sold, assigned, leased, exchanged, transferred or otherwise disposed of any of its material assets or property relating in any way to the Business or the Real Estate, except for sales or other dispositions of Inventory in the ordinary course of the Business, in accordance with New World's past practices;

(B)     To Debtors' actual knowledge, suffered any material casualty, damage, destruction or loss of any assets or property (whether or not covered by insurance) relating in any way to the Business or the Real Estate, on account of fire, flood, riot, strike or other hazard or Act of God;

(C)     made (or committed to make) capital expenditures relating in any way to the Business or the Real Estate in an aggregate amount which exceeds $5,000;

(D)     borrowed any money or issued any bonds, debentures, notes or other corporate securities evidencing money borrowed, or incurred any other material liabilities other than in the ordinary course of business in each case relating in any way to the Business or the Real Estate;

(E)     made any material change in accounting methods or principles relating in any way to the Business ; or

(F)     without limitation by the enumeration of any of the foregoing, entered into any material transaction other than in the ordinary course of business, consistent with past practices, other than the transactions contemplated hereby relating to the Business or the Real Estate.

(ii)     Except as set forth in Section 2.3 (c)(i) above or Section 2.3(c)(ii) of the Disclosure Schedule, to the actual knowledge of Debtors, New World has not suffered or been threatened with any material change in the conduct or nature of the Business, operations, Assets, liabilities, financial condition or prospects of any of the Real Estate or the Business, including, without limiting the generality of the foregoing, the actual or threatened termination of any

N/H-017820

permit, license or government authorization relating to the Business, but excluding matters of a general economic nature.

(d)   *Contracts.*

(i)   Except those additional matters set forth in Sections 2.3(h)(i) and 2.3(h)(ix), Section 2.3(d)(i) of the Disclosure Schedule sets forth a complete list of all Material Contracts and, to the actual knowledge of Debtors, all other Contracts relating to the Business to which New World is a party, or by which New World or the Real Estate is bound, and identifying the parties thereto and the subject matter thereof, and a designation of all Contracts that are Material Contracts.

(ii)   Except as set forth in Section 2.3(d)(ii) of the Disclosure Schedule, no consent of any party to any Material Contract is required for the valid assignment to Gonzales of the Desert Ranch Interest.

(iii)   To the actual knowledge of Debtors except as disclosed in section 2.3(d)(iii) of the Disclosure Schedule, all the Contracts are in full force and effect and binding upon the parties thereto, no default by New World has occurred thereunder and: (i) no default by the other contracting parties has occurred thereunder; and (ii) no event, occurrence or condition exists which, with the lapse of time, the giving of notice, or both, or the happening of any further event or condition, would become a default by New World thereunder. New World has not knowingly waived any material rights under any Material Contract. To the actual knowledge of the Debtors, New World is not subject to any legal obligations to renegotiate, nor do Debtors have actual knowledge of a claim for a legal right to renegotiate, any of the Material Contracts.

(e)   *Employees.*

(i)   To Debtors' actual knowledge, New World has no employee pension benefit plans (as defined in Section 3(2) of the Employment Retirement Income Security Act of 1974, as amended ("*ERISA*")); employee welfare benefit plans (as defined in Section 3(1) of ERISA) ("*Welfare Plan*"); or bonus, deferred compensation, stock purchase, stock option, severance plans, salary continuation, vacation, sick leave, fringe benefit, incentive, insurance, welfare or

9

N/H-017821

similar arrangement ("*Employee Benefit Plan*") maintained, administered or contributed to New World or any Affiliate, as determined under Code section 414(b), (c), (m) or (o) ("*ERISA Affiliate*").

(ii)    To Debtors' actual knowledge, neither New World nor any ERISA Affiliate has incurred any liability to the Pension Benefit Guaranty Corporation ("*PBGC*"), and there are no pending or threatened claims against any of the Welfare Plans or Employee Benefit Plans by any employee or beneficiary covered under any Welfare Plans or Employee Benefit Plans or otherwise involving any Welfare Plan or Employee Benefit Plan.

(iii)    To Debtors' actual knowledge, the employment of each of the New World' employees is terminable at will without cost to New World except for payment of accrued salaries or wages, benefits and vacation pay.

(iv)    Section 2.3(e)(iv) of the Disclosure Schedule contains a true and complete list of all employees who are employed by New World as of the date indicated therein, other than part time, occasional employees, and said list correctly reflects their salaries, wages, and other compensation. Notwithstanding the foregoing, Section 2.3(e)(iv) of the Disclosure Schedule does not include any independent contractors of New World or any of such contractor's employees. New World does not owe any employees any sum other than amounts for accrued salaries, wages, and other compensation.

N/H-017822

(f)    *Litigation and Claims.*

(i)    Except for the Bankruptcy Case or as set forth in Section 2.3(f)(i) of the Disclosure Schedule, there is no litigation, arbitration or other proceeding, in law or in equity, and there are no proceedings or governmental investigations before any commission or other administrative authority, to which New World is a party and, to Debtors' knowledge, no such matters are threatened, against New World, or with respect to the ownership or use of the Business or the Real Estate or any portion thereof, or which if adversely determined, could have a material adverse effect on New World, the Business or the Real Estate.

(ii)    To the actual knowledge of Debtors, except as disclosed in this Agreement or the Disclosure Schedules, there are no facts which, if known by a potential claimant or governmental authority, would give rise to a claim, action, arbitration or proceeding which, if asserted or conducted with results unfavorable to New World, would have a material adverse effect on the Business or the Real Estate, or the use of the Business or the Real Estate.

(iii)    To the actual knowledge of Debtors, except as otherwise disclosed herein, in the New World Books and Records or within the Bankruptcy Case, New World is not a party to, bound by, any decree, order or arbitration award (or agreement entered into in any administrative, judicial or arbitration proceeding with any governmental authority) currently in effect, relating in any way to the Business or the Real Estate.

(iv)    To the actual knowledge of the Debtors, except as otherwise disclosed herein, in the New World Books and Records or within the Bankruptcy Case, New World is not in material breach or violation of any decree, order or arbitration award or law, statute, or regulation of or agreement with, or license or permit from, any federal, state or local governmental authority relating to the Business or the Real Estate (or to which its properties, assets, personnel, business activities or the Business or the Real Estate is subject or to which New World, itself, is subject).

N/H-017823

(g)     *Environmental Matters.*

    (i)    To the actual knowledge of Debtors, and except as otherwise disclosed on Disclosure Schedule 2.3(g)(i), New World and the Real Estate are not in material violation of any Environmental Laws or any permits, licenses, authorizations and approvals issued to New World or applicable to the Real Estate. Except as specifically disclosed in Section 2.3(g)(i) of the Disclosure Schedule, to Desert Ranch's actual knowledge, New World has not received any written notice regarding any actual or alleged material violation of any Environmental Law relating to New World or the Real Estate. To the Debtors' actual knowledge, except as disclosed in this Agreement or the Disclosure Schedules, there are no circumstances or conditions involving New World that could reasonably be expected to result in any material claims, liability, investigations, costs or restrictions on the ownership, use or transfer of any of the Real Estate pursuant to any Environmental Law.

    (ii)    To the actual knowledge of Debtors, (A) during the period in which New World has owned the Real Estate, except for Hazardous Materials customarily used in the operations of the Real Estate or the Business (including, without limitation the gas station at the Smart Mart), there has been no storage (except as set forth in Section 2.3(g)(ii) of the Disclosure Schedule), treatment, generation, transportation or Release of any Hazardous Materials by New World at any Facility (as herein defined) in violation of, or which could give rise to any material obligation under, Environmental Laws; and (B) New World is not subject to any orders, decrees, injunctions or other arrangements with any governmental entity or is subject to any indemnity or other agreement with any third party relating to any material liability under any Environmental Law or relating to Hazardous Materials. Notwithstanding the foregoing, Debtors disclose to Gonzales that there may be asbestos, certain glues or other materials used at the time the improvements on the Real Estate were constructed which may constitute toxic or hazardous substances or require special removal techniques.

    (iii)    The Debtors have delivered to Gonzales true and complete copies of any reports, studies, analyses, tests, or monitoring possessed or controlled by any of the Debtors or New World pertaining to: (i) Hazardous Materials in, on, or

N/H-017824

under any property or facility of New World, or (ii) compliance of New World with Environmental Laws.

(iv)   To Debtors' actual knowledge, the property located adjacent to the Real Estate is an airport and fuel farm which has probably suffered a Release of Hazardous Materials. Additional disclosures are contained in Disclosure Schedule 2.3(g)(iv).

(h)   *Real Estate*.

(i)   Except for the Bartsas Lease and those leases set forth in Section 2.3(h)(i) and Section 2.3(h)(ix) of the Disclosure Schedule and the overnight rental of motel and hotel rooms, none of the Real Estate is subject to any leases or tenancies.

(ii)   To the actual knowledge of Debtors, there has been no notice given by any governmental unit that any of the improvements comprising any part of the Real Estate, or the businesses conducted by New World thereon, are in material violation of any building or use or occupancy restriction, limitation, condition or covenant of record or any zoning or building law, code or ordinance or public utility easement, provided that nothing contained in this paragraph is intended to imply that the existing improvements may be rebuilt without complying, at the time of rebuilding, with all such laws, codes and ordinances then in effect.

(iii)   The Bartsas Lease landlord has alleged certain defaults by New World, which New World has disputed. To the Debtors' knowledge, the landlord to the Bartsas Lease is *not* in default thereunder. See Disclosure Schedule 2.3(d)(iii).

(iv)   To the actual knowledge of Debtors, the improvements located on the Real Estate are currently served by electricity, water, sewage and waste disposal and other utilities adequate to operate such improvement, as currently operated. All of said utilities are installed and operating and all installation and connection charges have been paid for in full.

(v)   To the actual knowledge of Debtors, except with respect to the NDOT matters described on Disclosure Schedule Section 2.3(f)(i), the continued maintenance and operation of the Real Estate as currently maintained and operated is

N/H-017825

not dependent on facilities located at any other property, and the continued maintenance and operation of any other property is not dependent on facilities comprising the Real Estate. To the actual knowledge of Debtors, no building or other improvement not part of the Real Estate relies on the Real Estate or any part thereof or any interest therein, to fulfill any governmental requirement; and no building or other improvement comprising the Real Estate relies on any property not included within the Real Estate to fulfill any governmental requirement.

(vi)     To the actual knowledge of the Debtors, there are no challenges or appeals pending regarding the amount of the real property Taxes on, or the assessed real property Tax valuation of, any of the Real Estate, nor any challenges or appeals pending regarding personal property Taxes on any personal property of New World, or the assessed valuation thereof, and no special arrangements or agreements exist with any governmental authority with respect thereto (the representations and warranties contained in this subparagraph (vi) shall not be deemed to be breached by any prospective general increase in real estate or personal property tax rates).

(vii)    To the actual knowledge of Debtors, there are no condemnation proceedings pending or, to the actual knowledge of the Debtors, threatened with respect to any portion of the Real Estate.

(viii)   To the actual knowledge of Debtors, except for the Strip Beautification Assessment and as set forth in Section 2.3(h)(viii) of the Disclosure Schedule, there is no special Tax assessment (i.e., in addition to the normal, annual general real estate tax assessment) pending or, to the actual knowledge of Debtors, threatened with respect to any portion of the Real Estate.

(ix)     Section 2.3(h)(ix) of the Disclosure Schedule sets forth a list of all billboard leases and rental agreements in connection with the Real Estate.

(x)      The representations and warranties of Debtors contained in this Section 2.3(h) are further qualified by all matters of record affecting the Real Estate as of the Closing Date. Furthermore, nothing herein shall constitute a representation or warranty concerning the right, title or

N/H-017826

interest of the landlord of the Bartsas lease in or to the real property subject thereto. See Disclosure Schedule 2.3(h)(x).

(i)     *Intellectual Property.*

    (i)     Except as set forth in the definition of "Trademarks," there are no Trademarks owned by (rather than licensed to) New World.    Debtors make no representation or warranty whatsoever as to the ownership or exclusivity of any Trademark.

(j)     *General.*

    (i)     Subject to the approval of the Bankruptcy Court, Desert Ranch has the power to sell and convey the Desert Ranch Interest to Gonzales, free and clear of any liens, claims, encumbrances and security interests.

    (ii)     To the Debtors' actual knowledge, except as disclosed in this Agreement, New World has good title to the Equipment and the other material Assets that constitute personal property of New World, free and clear of liens and encumbrances. To the Debtors' actual knowledge, there are no rights or options of any third party to acquire any ownership interest in any material Assets of New World, other than purchases of Inventory by customers in the ordinary course of the Business.

    (iii)     To the Debtor's actual knowledge, except as disclosed in this Agreement, the Assets are all owned by New World.

    (iv)     To the Debtors' actual knowledge, New World possesses all material licenses, permits, registrations, approvals, agreements and consents which are required in order for the New World to conduct the Business as presently conducted and neither New World nor the Debtors has received any notification of any asserted past or present failure to comply with the same.

    (v)     To the Debtors' actual knowledge, except as set forth in Section 2.3(j)(v) of the Disclosure Schedule, New World, the Assets and the Business are not in violation in any material respect, of existing requirements of Federal, state, local and other laws, regulations and ordinances, and New World has not received any notification of any asserted present failure to comply with any such laws which would prevent the continued operation of the Business in the manner presently operated.

N/H-017827

(vi)    The representations and warranties of the Debtors in this Agreement (including, without limitation, the information set forth in the Disclosure Schedule), or in any of Debtors' Ancillary Documents, do not and will not contain an untrue statement of material fact, do not and will not omit to state a material fact required to be stated in order to make the representations, warranties or statements contained herein or therein, in light of the context in which they were made, not misleading.

(vii)    Neither the Debtors, nor any of their respective Affiliates, has dealt with any person or entity who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment for arranging the transaction contemplated hereby or introducing the parties to each other for which Gonzales may be liable.

3.    *Conduct Prior to Closing.*

3.1.    *General.* The Debtors, on the one hand, and Gonzales, on the other hand, shall have the rights and obligations with respect to the period between the date hereof and the Closing Date which are set forth in this Section 3.

3.2.    *Obligations of the Debtors.*

(a)    The Debtors shall reasonably cooperate with Gonzales and its consultants in their due diligence with respect to the Business and the Assets, and with the Debtors' preparations for Closing.

(b)    The Debtors shall cause New World to conduct the Business in the ordinary course.

(c)    The Debtors shall cooperate with Gonzales in the transfer of all transferable governmental permits, authorizations and approvals necessary for the operation of the Business by New World.

(d)    Without the prior written consent of Gonzales, and without limiting the generality of any other provision of this Agreement, Debtors shall not with respect to the Business:

(i)    hire any new employee on any basis that is not terminable at will without cost;

(ii)    incur or commit to incur any capital expenditures in excess of $5,000, without the prior written consent of Gonzales which shall not be unreasonably withheld or delayed if incurred or committed to in the ordinary course of business in accordance with past practices;

N/H-017828

     (iii)    directly or indirectly, enter into or assume any contract, agreement, obligation, lease, license or commitment, other than in the ordinary course of business in accordance with past practices;

     (iv)    sell, transfer, encumber or otherwise dispose of any material asset or property, or any interest therein, except for sales, replacements and other dispositions of Inventory in the ordinary course of the Business; or

     (v)    amend, terminate or give notice of termination with respect to any Material Contract, or waive any material rights thereunder..

(e)    The Debtors shall use commercially reasonable efforts to attempt to obtain an estoppel certificate from Mary Bartsas on the Bartsas Lease and from certain other lessors, lessees and other third parties under any Material Contracts as may also be requested by Gonzales no later than five days after execution of this Agreement. Upon delivery of a properly executed estoppel certificate from Mary Bartsas on the Bartsas Lease, Debtors will have no further liability for representations concerning the Bartsas Lease under section 2.3(h)(iii).

(f)    For a period of 180 days after the Closing, the Debtors shall reasonably cooperate with Gonzales, or his designee, at no out-of-pocket expense to Debtors, in his efforts to obtain approval from the applicable gaming and liquor licensing authorities of the State of Nevada and all other state, county and local regulatory and licensing bodies with authority over gaming activities and devices and liquor licensing in the State of Nevada (collectively, the "*Licensing Authorities*") for (i) a temporary liquor license for off-premises sale of beer and wine for the premises located at 4207 S. Las Vegas Boulevard, Las Vegas, Nevada, doing business as "Smart Mart" ("*Smart Mart*"), and (ii) a change of ownership to permit New World to continue to receive rental payments associated with gaming devices located on or about the Smart Mart under that certain Space Lease Agreement, dated February 9, 1995, between New World and United Coin Machines Co., a Nevada corporation. Without limiting the foregoing, the Debtors shall as promptly as practicable, at any time or from time to time, at either Gonzales' or the Licensing Authorities' request and without further consideration, provide such other information and communications to the Licensing Authorities or other persons as Gonzales or the Licensing Authorities may reasonably request in connection with clauses (i) and (ii) of this Section 3.2(f), as such relate to any request, investigation, inquiry, communication, application or proceeding to or before the Licensing Authorities by Gonzales or by the Licensing Authorities with respect to the matters contemplated by this paragraph.

3.3.    *Joint Obligations.*  The following shall apply with equal force to the Debtors and Gonzales:

(a)    The Parties shall use their respective commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby as soon as practicable. Without limiting the generality of the foregoing, Debtors and Gonzales shall use their respective

N/H-017829

commercially reasonable efforts to cause New World to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby as soon as possible.

(b)     The Debtors, on the one hand, and Gonzales, on the other hand, shall promptly give the other written notice (the "*Development Notice*") of the existence or occurrence of any condition that would make any representation or warranty herein contained of either untrue in any material respect or which might reasonably be expected to prevent the consummation of the transaction contemplated hereby.

(c)     No Party shall intentionally perform any act (or cause another to perform such act) which, if performed, or intentionally omit to perform any act (or cause another to intentionally omit to perform such act) which, if omitted to be performed, would prevent or excuse the performance of this Agreement by any Party or which would result in any representation or warranty herein contained of said Party being untrue in any material respect as if originally made on and as of the Closing Date.

(d)     Each Party shall take all commercially reasonable efforts to ensure that the Bankruptcy Court approves, in an expedient manner, this Agreement and the transactions contemplated hereby in accordance with the prior agreements of the Parties in open court.

4.     *Conditions to Closing.*

4.1.     *Conditions to the Debtors' Obligations.*  The obligation of the Debtors to consummate the transactions contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date, upon the non-fulfillment of any of which this Agreement may, at the Debtors' option, be terminated pursuant to and with the effect set forth in this Agreement:

(a)     Except for misrepresentations arising because of facts to which the Debtors have consented in writing (excluding this Agreement itself as such a writing), each and every representation and warranty made by Gonzales shall have been true and correct as of the date hereof, and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

(b)     All obligations of Gonzales to be performed hereunder, through and including the Closing Date, shall have been performed.

(c)     No suit, proceeding or investigation shall have been commenced or threatened by any governmental authority or private person on any grounds to restrain, enjoin or hinder, or to seek material damages on account of, the consummation of the transactions contemplated hereby, and no order, ruling or judgment shall have been issued with the same effect.

(d)     No bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding shall have been initiated by or against Gonzales.

N/H-017830

(e)     The Bankruptcy Court shall have entered an order approving this Agreement and the transactions contemplated hereby.

4.2.   *Conditions to Gonzales' Obligations.*   The obligation of Gonzales to consummate the transactions contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date, upon the non-fulfillment of any of which this Agreement may, at Gonzales' option, be terminated pursuant to and with the effect set forth in this Agreement:

(a)     Except for misrepresentations arising because of facts to which Gonzales has consented in writing (excluding this Agreement itself as such a writing), each and every representation and warranty made by the Debtors shall have been true and correct when made and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

(b)     All obligations of the Debtors to be performed hereunder through, and including on, the Closing Date shall have been performed.

(c)     No suit, proceeding or investigation shall have been commenced or threatened by any governmental authority or private person on any grounds to restrain, enjoin or hinder, or to seek material damages on account of, the consummation of the transactions contemplated hereby, and no order, ruling or judgment shall have been issued with the same effect.

(d)     Other than the Bankruptcy Case, no bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding shall have been initiated by or against any of the Debtors.

(e)     The Bankruptcy Court shall have entered an order approving this Agreement and the transactions contemplated hereby.

4.3.   *Eminent Domain.*   If any part or parts of the Parcel A or the Real Estate shall be taken by exercise of the power of eminent domain after the date hereof, as evidenced by written notice received by Gonzales, Debtors or any of them or New World from any federal, state or local governmental authority or any other entity having the power of eminent domain, and such taking would, in the reasonable opinion of Gonzales or Debtors, have a material adverse effect on the value of Parcel A or such Real Estate, Gonzales or Debtors shall have the right to terminate this Agreement by giving written notice to the other Party within five (5) days after receiving notice of the taking. If neither Party elects to terminate this Agreement, then this Agreement shall continue in full force and effect. With respect to any such taking after the date hereof, the Party receiving such notice shall furnish the other Party with a copy of the notice of taking promptly after such Party's ' receipt thereof.

5.   *Closing.*

5.1.   *Form of Documents.*   At the Closing, the Parties shall deliver the documents, and shall perform the acts, which are set forth in this Section 5, and such additional or different documents and/or acts as may be reasonably necessary to consummate the

N/H-017831

transactions contemplated by this Agreement. All documents that the Debtors shall deliver shall be as previously agreed, or if not previously agreed, in form and substance reasonably satisfactory to Gonzales and his legal counsel. All documents that Gonzales shall deliver shall be as previously agreed, or if not previously agreed, in form and substance reasonably satisfactory to the Debtors and their counsel.

5.2.    *Deliveries of Gonzales.*    Subject to the fulfillment or waiver of the conditions on Gonzales' obligations set forth in Section 4 or elsewhere in this Agreement, Gonzales shall execute or cause to be executed, have the signatures acknowledged, as appropriate, and deliver or cause to be delivered to the Debtors all of the following:

(a)    The Note from Gonzales to the Debtors marked "Cancelled," a full reconveyance of the Deed of Trust, UCC termination statements and releases of any and all interests Gonzales may have in any and all collateral security securing the Loan Agreement, Deed of Trust, Assignment, Guaranty, Pledge, and any other related Loan document;

(b)    A Grant, Bargain and Sale Deed in the form attached hereto as Exhibit "E" executed by Gonzales, transferring the Gonzales Interest to the Desert Land and Desert Oasis or their designee;

(c)    A Grant, Bargain and Sale Deed in the form attached hereto as Exhibit "F" executed by Fieldman, transferring the Fieldman Interest to the Desert Land and Desert Oasis or their designee;

(d)    A Memorandum executed by Gonzales, Desert Land and Desert Oasis and any other parties owning a fee interest in Parcel A as of the Closing Date in the form attached as Exhibit "G" with respect to the obligation to pay the Parcel A Transfer Fee to Gonzales in accordance with the terms of this Agreement and that Gonzales' obligation to subordinate the Parcel A Transfer Fee to any Parcel A Permitted Financing;

(e)    A counterpart of a written consent of the members of New World, executed by Gonzales, authorizing and consenting to New World's performance of the transactions contemplated hereby and any other consents required by this Agreement;

(f)    A closing certificate executed by Gonzales pursuant to which Gonzales represents and warrants to the Debtors that Gonzales' representations and warranties to the Debtors are true and correct as of the Closing Date as if then originally made (or, if any such representation or warranty is untrue in any respect, specifying the respect in which the same is untrue);

(g)    Without limitation by the specific enumeration of the foregoing, all other documents reasonably required from Gonzales to consummate the transactions contemplated hereby; and

At the request of Desert Land or Desert Oasis prior to Closing, Gonzales shall, at Closing, execute separate instruments described above in order to convey certain items to the ' Desert Land or Desert Oasis' respective designee.

N/H-017832

5.3.    *Deliveries of the Debtors.*  Subject to the fulfillment or waiver of the conditions set forth in Section 4 or elsewhere in this Agreement, the applicable Debtor(s) shall execute or cause to be executed, have the signatures acknowledged, as appropriate, and/or deliver or cause to be delivered to Gonzales all of the following:

(a)    An Assignment of Membership Interest in the form attached hereto as Exhibit "II" executed by Desert Ranch, transferring the Desert Ranch Interest to Gonzales;

(b)    A resignation of Desert Ranch as the manager of New World, executed by Desert Ranch;

(c)    A counterpart of the Parcel A Memorandum;

(d)    Physical possession of the Real Estate and any Assets in their possession, including, without limitation, delivery of any and all keys, codes, combinations, source codes, alarm codes and security codes for the Assets;

(e)    An estoppel certificate with respect to the Bartsas Lease, if obtained, and all other estoppel certificates required by this Settlement Agreement;

(f)    A counterpart of a written consent of the members of New World, executed by Desert Ranch, authorizing and consenting to New World's performance of the transactions contemplated hereby and any other consents required by this Agreement;

(g)    A termination of that certain lease between New World and Desert Ranch dated as of May 15, 2001 executed on by Desert Ranch to become effective at the discretion of Gonzales but not more than 6 months from the Closing Date;

(h)    An incumbency and specimen signature certificate with respect to each manager of the Debtors executing this Agreement and the Debtors' Ancillary Documents;

(i)    A certified copy of the consent of each manager authorizing the execution, delivery and performance of this Agreement and the Debtors' Ancillary Documents;

(j)    A closing certificate duly executed by the manager or equivalent representative of each of the Debtors, on behalf of each of the Debtors, pursuant to which each of the Debtors represent and warrant to Gonzales that such of the Debtors' representations and warranties to Gonzales are true and correct as of the Closing Date as if then originally made (or, if any such representation or warranty is untrue in any respect, specifying the respect in which the same is untrue), and that all documents to be executed and delivered by such of the Debtors at the Closing have been executed by duly authorized representatives of such of the Debtors;

(k)    Without limitation by the specific enumeration of the foregoing, all other documents reasonably required from the Debtors to consummate the transactions contemplated hereby;

At the request of Gonzales prior to Closing, the Debtors shall at Closing execute separate transfer instruments described above in order to convey certain items to Gonzales' designee.

N/H-017833

5.4.    *Deliveries of New World.*  Subject to the fulfillment or waiver of the conditions set forth in Section 4 or elsewhere in this Agreement, the Debtors shall execute or cause to be executed, have the signatures acknowledged, as appropriate, and/or deliver or cause to be delivered to Desert Land and/or Desert Oasis or their designee all of the following:

(a)    A termination of that certain lease between New World and Desert Ranch dated as of May 15, 2001 executed by New World to become effective at the discretion of Gonzales but not more than 6 months from the Closing Date;

(b)    Without limitation by the specific enumeration of the foregoing, all other documents reasonably required from New World to consummate the transactions contemplated hereby.

5.5.    *Gonzales' Consent.*  Gonzales, as a member of New World, consents to the execution and delivery of the documents set forth in section 5.4 by New World at Closing.

6.    *Post-Closing Agreements.*

6.1.    *Use of Trademarks; References to the Debtors.*  The Debtors shall cease to use and shall not license any third party to use the Trademarks.

6.2.    *Sales, Payroll and Other Business Taxes and Fees.*  The Debtors shall cause New World to pay all Taxes applicable to the conduct of the Business which were due and payable prior to the Closing in the ordinary course of business in accordance with past practices. Gonzales shall cause New World to pay all Taxes applicable to the conduct of the Business which were incurred prior to the Closing which become due and payable after the Closing in the ordinary course of business and in accordance with past practices.

6.3.    *Further Assurances.*  The Parties shall execute (and, in the case of Desert Ranch, cause New World to execute) such further documents, and perform such further acts, as may be necessary to comply with the terms of this Agreement and consummate the transactions contemplated hereby, including, without limitation, the execution, delivery and acknowledgement by Gonzales, of any subordination agreements required by the Parcel A Memorandum.

6.4.    *Non-Interference.*  For a period of two (2) years from the Closing Date, the Debtors (either directly or through their members or Affiliates) will not interfere or attempt to interfere with the assemblage of property by New World which is south of Four Seasons Drive (adjacent to Parcels B, C and D) and Gonzales (either directly or through his Affiliates) will not interfere or attempt to interfere with the assemblage of property by Desert Land which is north of Four Seasons Drive (adjacent to Parcel A).  For purposes of this section, "interference" shall not include any actions taken for the purpose of participating in any governmental process or appearing before any governmental agency.

6.5.    *Tax Returns.*  For the years 2002 and 2003, Gonzales shall have an accountant of his choice prepare the tax returns for New World and deliver a copy of the tax returns to Desert Ranch.

N/H-017834

6.6. *Re-Recordation of Memorandum.* Upon exercise of the FLT Option, the Debtors on the one hand and Gonzales and on the other hand shall execute and cause to be recorded the Memorandum in the form attached hereto as Exhibit "I."

7. *Indemnification.*

7.1. *General.* From and after the Closing, the Parties shall indemnify each other as provided in this Section 7. No specifically enumerated indemnification obligation with respect to a particular subject matter as set forth below or elsewhere in this Agreement shall limit or affect the applicability of a more general indemnification obligation as set forth below with respect to the same subject matter.

7.2. *Indemnification Obligations of the Debtors.* The Debtors shall joint and severally indemnify, save and keep harmless Gonzales and his successors and permitted assigns against and from all Damages sustained or incurred by any of them resulting from or arising out of or by virtue of:

(a)    any inaccuracy in or breach of any representation and warranty made by such Debtors in this Agreement, or in any such Debtors' Ancillary Documents, other than those arising because of facts to which Gonzales has consented in writing (excluding this Agreement itself as such a writing);

(b)    any breach by any Debtor of, or failure by any Debtor to comply with, any of its covenants or obligations under this Agreement; or

(c)    the failure to discharge when due any liability or obligation of any Debtor or any claim against Gonzales with respect to any such liability or obligation or alleged liability or obligation, without regard to the fact that any indemnifiable matter described in this Section 7.2(c) may have been disclosed in the Disclosure Schedule or in any documents included or referred to therein or may be otherwise known to Gonzales at the date of this Agreement or on the Closing Date; or

(d)    any Third-Party Claims to the extent caused by the acts or omissions of Desert Land or Desert Oasis after the Closing Date with respect to Parcel A;

*provided, however,* that in no event shall the Debtors be obligated to pay Gonzales for any Damages sustained or incurred until such time, if any, that the Damages exceed Two Hundred Fifty Thousand Dollars in the aggregate, and then only for Damages in excess of Two Hundred Fifty Thousand Dollars ($250,000).

7.3. *Indemnification Obligations of Gonzales.* Gonzales shall indemnify, save and keep harmless the Debtors and their respective successors and permitted assigns against and from all Damages sustained or incurred by any of them resulting from or arising out of or by virtue of:

(a)    any inaccuracy in or breach of any representation and warranty made by Gonzales in this Agreement or in any of Gonzales Ancillary Documents, other than

N/H-017835

those arising because of facts to which any Debtor has consented in writing (excluding this Agreement itself as such a writing);

(b)    any breach by Gonzales of, or failure by Gonzales to comply with, any of his covenants or obligations under this Agreement; or

(c)    the failure to discharge when due any liability or obligation of Gonzales or any claim against a Debtor with respect to any such liability or obligation or alleged liability or obligation, without regard to the fact that any indemnifiable matter described in this Section 7.3(c) may have been disclosed in the Disclosure Schedule or in any documents included or referred to therein or may be otherwise known to such Debtor at the date of this Agreement or on the Closing Date; or

(d)    any Third-Party Claims to the extent caused by the acts or omissions of Gonzales or New World after the Closing Date with respect to the Contracts and the contracts listed in Schedule 2.3(b)(v);

*provided, however,* that in no event shall Gonzales be obligated to pay the Debtors, or any of them, for any Damages sustained or incurred, until such time, if any, that the Damages exceed $250,000 in the aggregate, and then only for Damages in excess of $250,000.

7.4.    *No Waiver.*    Failure by an Indemnified Party to give prompt notice to an Indemnifying Party above shall not release, waive or otherwise affect the Indemnifying Party's obligation to indemnify hereunder except to the extent that the Indemnifying Party can demonstrate actual loss and prejudice as a result of such failure.

7.5.    *Cooperation.*    Subject to the provisions of Section 7.7, the Indemnifying Party shall have the right, at its own expense, to participate in the defense of any Third Party Claim, and if said right is exercised, the Parties shall cooperate in the investigation and defense of said Third Party Claim.

7.6.    *Subrogation.*    The Indemnifying Party shall not be entitled to require that any action be brought against any other person before action is brought against it hereunder by the Indemnified Party but shall be subrogated to any right of action to the extent that it has paid or successfully defended against any Third Party Claim in accordance with the terms of this Agreement.

7.7.    *Third Party Claims.*    Forthwith following the receipt of notice of a Third Party Claim, the Party receiving the notice of the Third Party Claim shall (i) notify the other Party of its existence setting forth with reasonable specificity the facts and circumstances of which such Party has received notice, and (ii) if the Party giving such notice is an Indemnified Party, specifying the basis hereunder upon which the Indemnified Party's claim for indemnification is asserted. The Indemnified Party may, upon reasonable notice, tender the defense of a Third Party Claim to the Indemnifying Party. If:

(a)    the defense of a Third Party Claim is so tendered and such tender is accepted without qualification by the Indemnifying Party; or

N/H-017836

(b)    within thirty (30) days after the date on which written notice of a Third Party Claim has been given pursuant to this Section 7.7, the Indemnifying Party shall acknowledge with qualification its indemnification obligations as provided in this Section 7 in writing to the Indemnified Party, but shall commit to providing defense; then, except as hereinafter provided, the Indemnified Party shall not have the right to defend or settle such Third Party Claim. The Indemnified Party shall have the right to be represented by counsel at its own expense in any such contest, defense, litigation or settlement conducted by the Indemnifying Party provided that the Indemnified Party shall be entitled to reimbursement therefor only if the Indemnifying Party shall lose its right to contest, defend, litigate and settle the Third Party Claim as herein provided. The Indemnifying Party shall lose its right to defend and settle the Third Party Claim if it shall fail to diligently contest the Third Party Claim. So long as the Indemnifying Party has not lost its right and/or obligation to defend and settle as herein provided, the Indemnifying Party shall have the exclusive right to contest, defend and litigate the Third Party Claim and shall have the exclusive right, in its discretion exercised in good faith, and upon the advice of counsel, to settle any such matter, either before or after the initiation of litigation, at such time and upon such terms as it deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle shall be given to the Indemnified Party. All expenses (including, without limitation, reasonable attorneys' fees) incurred by the Indemnifying Party in connection with the foregoing shall be paid by the Indemnifying Party. Notwithstanding the foregoing, in connection with any settlement negotiated by an Indemnifying Party, no Indemnified Party shall be required by an Indemnifying Party to (x) enter into any settlement that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnified Party of a release from all liability in respect of such claim or litigation, (y) enter into any settlement that attributes by its terms liability to the Indemnified Party or (z) consent to the entry of any judgment that does not include as a term thereof a full dismissal of the litigation or proceeding with prejudice. No failure by an Indemnifying Party to acknowledge in writing its indemnification obligations under this Section 7 shall relieve it of such obligations to the extent they exist. If an Indemnified Party is entitled to indemnification against a Third Party Claim, and the Indemnifying Party fails to accept the defense of a Third Party Claim tendered pursuant to this Section 7.7, or if, in accordance with the foregoing, the Indemnifying Party shall lose its right to contest, defend, litigate and settle such a Third Party Claim, the Indemnified Party shall have the right, without prejudice to its right of indemnification hereunder, in its discretion exercised in good faith and upon the advice of counsel, to contest, defend and litigate such Third Party Claim, and may settle such Third Party Claim, either before or after the initiation of litigation, at such time and upon such terms as the Indemnified Party deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle is given to the Indemnifying Party. If, pursuant to this Section 7.7, the Indemnified Party so defends or settles a Third Party Claim, for which it is entitled to indemnification hereunder, as hereinabove provided, the Indemnified Party shall be reimbursed by the Indemnifying Party for the reasonable attorneys' fees and other expenses of defending the Third Party Claim which is incurred from time to time, forthwith following the presentation to the Indemnifying Party of itemized bills for said attorneys' fees and other expenses.

8.    *Effect of Termination/Proceeding.*

N/H-017837

8.1.    *General.* The Parties shall have the rights and remedies with respect to the termination and/or enforcement of this Agreement which are set forth in this Section 8.

8.2.    *Right to Terminate.* This Agreement and the transactions contemplated hereby may only be terminated by motion made in and granted by the Bankruptcy Court prior to the Closing Date.

8.3.    *Remedies.* No Party shall be limited to the termination right granted in Section 8.2 by reason of the nonfulfillment of any condition to such Party's Closing obligations but may, in the alternative, elect to do one of the following:

(a)    proceed to Close despite the nonfulfillment of any closing condition, it being understood that consummation of the transaction contemplated hereby shall not be deemed a waiver of a breach of any representation, warranty or covenant or of any Party's rights and remedies with respect thereto;

(b)    decline to Close, terminate this Agreement as provided in Section 8.2, and thereafter seek damages to the extent permitted in Section 8.4, but subject to the limitations of that provision; or

(c)    seek specific performance of the obligations of the other Party. Each Party hereby agrees that in the event of any breach by such Party of this Agreement, the remedies available to the other Party at law would be inadequate and that such Party's obligations under this Agreement may be specifically enforced.

8.4.    *Right to Damages.* If this Agreement is terminated pursuant to Section 8.2, no Party hereto shall have any claim against any other except if the circumstances giving rise to such termination were caused either by the other Party's material breach of any covenants herein contained, or by any of the representations and warranties made herein by such other Party being in a material respect incorrect at the execution of this Agreement, or when restated as of the Closing, in which event termination pursuant to Section 8.2 shall not be deemed or construed as limiting or denying any legal or equitable right or remedy of said Party, and said Party shall be entitled to recover, without limitation, its costs and expenses which are incurred in pursuing its rights and remedies (including reasonable attorneys' fees), provided that in no event shall any Party be entitled to the recovery of consequential or punitive damages.

9.    *Miscellaneous.*

9.1.    *Publicity.* At all times at or before the Closing, the Debtors, on the one hand, and Gonzales, on the other hand, will not issue or make any reports, statements or releases to the public with respect to the this Agreement or the transactions contemplated by this Agreement without the consent of the other, which shall not be unreasonably withheld or delayed. Nothing contained in this Agreement shall prevent any Party at any time from furnishing any information to any governmental agency, which such Party is requested or required to furnish to such agency or pursuant to any court order, regulation or applicable law or filing pleadings and documents in the Bankruptcy Case.

N/H-017838

9.2.    *Notices.*  All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by nationally recognized private courier, or by United States mail.  Notices delivered by mail shall be deemed given three (3) business days after being deposited in the United States mail, postage prepaid, certified mail.  Notices delivered by hand or by facsimile shall be deemed given on the day of receipt; notices delivered by nationally recognized private overnight carrier against receipt shall be deemed given on the first business day after sending.  All notices shall be addressed as follows:

| | |
|---|---|
| If to the Debtors: | 3951 S. Las Vegas Boulevard<br>Las Vegas, NV 89119<br>Attn: Howard Bulloch<br>Facsimile: (702) 948-3355 |
| with a copy to: | Jones Vargas<br>3773 Howard Hughes Parkway, 3rd Floor South<br>Las Vegas, NV 89109<br>Attn: Michael E. Buckley, Esq.<br>Facsimile: (702) 737-7705 |
| and | Schwartzer & McPherson Law Firm<br>3800 Howard Hughes Parkway, #1100<br>Las Vegas, NV 89109<br>Attn: Lenard E. Schwartzer, Esq.<br>Facsimile: (702) 892-0122 |
| If to Gonzales: | Mr. Tom Gonzales<br>TG Holdings, Inc.<br>110 Mason Circle<br>Concord, CA 94520<br>Facsimile: (925) 969-7870 |
| with a copy to: | Gordon & Silver, Ltd.<br>3960 Howard Hughes Parkway, 9th Floor<br>Las Vegas, NV 89109<br>Attn: James S. Mace, Esq.<br>Facsimile: (702) 796-5555 |

and/or to such other respective addresses and/or addressees as may be designated by notice given in accordance with the provisions of this Section 9.2.  Counsel for any Party may give notice in accordance with this Section on behalf of its client.

9.3.    *Expenses.*  Except as otherwise provided in this Agreement, each Party shall bear all fees and expenses incurred by such Party in connection with, relating to or arising out of the execution, delivery and performance of this Agreement and the consummation of the transaction contemplated hereby, including, without limitation, attorneys', accountants' and other professional fees and expenses.

N/H-017839

9.4.    *Entire Agreement.* This Agreement and the Second Amended Plan of Reorganization confirmed by the Bankruptcy Court in the Bankruptcy Case and the instruments to be delivered by the Parties pursuant to the provisions hereof constitute the entire agreement between the Parties. Each exhibit, and the Disclosure Schedule, shall be considered incorporated into this Agreement. Any amendments, or alternative or supplementary provisions to this Agreement, must be made in writing and duly executed by an authorized representative or agent of each of the Parties. In the event that there is any conflict between the provisions of this Agreement and the Second Amended Plan of Reorganization, the terms of the Second Amended Plan of Reorganization shall prevail.

9.5.    *Non-Waiver.* The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving Party.

9.6.    *Counterparts.* This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute but one instrument. For purposes of such execution, facsimile counterparts of any signature shall be valid as originals.

9.7.    *Severability.* The invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision.

9.8.    *Applicable Law; Venue.* This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Nevada applicable to contracts made in that State without giving effect to the conflicts of laws principles thereof. Each Party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court in any action, suit or proceeding arising out of or relating to this Agreement, any of the documents referenced in this Agreement or any of the transactions contemplated hereby or thereby, and agrees that any such action, suit or proceeding shall be brought only in such court. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court in any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum.

9.9.    *Binding Effect; Benefit.* This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer on any person other than the Parties, and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

N/H-017840

9.10. *Assignability.* This Agreement shall not be assignable by any Party without the prior written consent of the other Parties. No such assignment shall relieve any Party of any of its liabilities under this Agreement. Any such designee shall be treated as the granting Party for all purposes hereunder. Any assignment in violation of this provision shall be void.

9.11. *Amendments.* This Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the Parties.

9.12. *Headings.* The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

9.13. *Survival.* All covenants, representations, warranties and other terms and provisions hereof shall survive Closing, and none shall merge into any deed, assignment or other closing instrument or conveyance contemplated hereby, provided that the representations and warranties of the Parties set forth in Section 2 of this Agreement shall be of no further force or effect after the date which is eighteen (18) months after Closing.

9.14. *Service of Process.* The Debtors and Gonzales waive personal service of any and all process upon them, and consents that all services of process be made by certified mail, directed to it at its address as set forth in Section 9.2 as may be amended, and service so made shall be deemed to be completed when received. Nothing in this section shall affect the right of the Debtors or Gonzales to serve legal process in any other manner permitted by law.

9.15. *Time of the Essence.* Time is of the essence for each and every covenant contained in this Agreement.

9.16. *Licensees.* Gonzales acknowledges that he has been informed that Debtors are owned by Howard Bulloch and David Gaffin, Nevada real estate licensees.

N/H-017841

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

DESERT LAND:

Desert Land, LLC,
a Nevada limited liability company

By:_____
    Name:_____
    Title:  _____

DESERT OASIS:

Desert Oasis Apartments, LLC,
a Nevada limited liability company

By:_____
    Name:_____
    Title:  _____

DESERT RANCH:

Desert Ranch, LLC,
a Nevada limited liability company

By:_____
    Name:_____
    Title:  _____

GONZALES:

_____
Tom Gonzales

N/H-017842

**DRAFT**
**FOR DISCUSSION**
**PURPOSES ONLY**
4/16/03 1:47 PM

### SCHEDULE 1

### DEFINITIONS

1.      *"Affiliate"* shall mean any person or entity that Controls a Party, which that Party Controls, or which is under common Control with that Party.

2.      *"Agreement"* shall mean this Agreement made by and among the Parties.

3.      *"Allocation Schedule"* shall have the same meaning as set forth in Section 1.4.

4.      *"Assets"* shall mean all assets of New World, including, without limitation, the Real Estate, Contracts and Trademarks.

5.      *"Assignment"* shall have the same meaning as set forth in Preliminary Statement B.

6.      *"Bankruptcy Case"* shall have the same meaning as set forth in Preliminary Statement G.

7.      *"Bankruptcy Code"* shall have the same meaning as set forth in Preliminary Statement G.

8.      *"Bankruptcy Court"* shall have the same meaning as set forth in Preliminary Statement G.

9.      *"Bona fide escrow"* shall mean (i) an escrow opened with a party who deposits the greater of $1,000,000 or 5% of the purchase price in escrow (up to $2,500,000), (ii) which provides that the deposit will become non-refundable in 90 days from the opening of the escrow unless the escrow is cancelled, and (iii) which provides that the escrow must close within six (6) months from the opening of the escrow.

10.     *"Business"* shall mean all business conducted by or on behalf of New World, including, without limitation, the operation, maintenance and development of the Real Estate.

11.     *"Closing"* shall have the same meaning as set forth in Section 1.3.

12.     *"Closing Date"* shall have the same meaning as set forth in Section 1.3.

13.     *"Code"* means the Internal Revenue Code of 1986, as amended.

14.     *"Confirmation"* means the date of entry of an order which approves a plan of reorganization filed in the Bankruptcy Case.

N/H-017843

**DRAFT**
**FOR DISCUSSION**
**PURPOSES ONLY**
4/16/03 1:47 PM

15.    "*Confirmation Order*" shall mean the Order of the Bankruptcy Court confirming Debtors' Plan and approving this Settlement.

16.    "*Contract*" shall mean any lease, agreement, contract, commitment or binding contractual obligation of any type or nature (and any amendment, supplement, and modification thereto), whether written or oral, including, without limitation, all purchase orders and purchase contracts, agreements for services, goods, materials or supplies, utility agreements, license agreements, distribution agreements, agency agreements, maintenance agreements, billboard and other advertising agreements, franchise agreements, restrictive covenant agreements, employment and consulting agreements, confidentiality agreements, computer software agreements, leases and subleases of real or personal property, other real estate agreements, loan and security documents, guaranties and other financing agreements, and partnership or joint venture agreements, but the term shall exclude, however, (i) the New World operating agreement, articles of organization and other constituent documents, (ii) arrangements for the overnight occupancy of motel rooms, and (iii) software licensing agreements other than licensing agreements requiring the payment of licensing fees.

17.    "*Control*" shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of a person or entity through voting securities, contract or otherwise.

18.    "*Damages*" shall mean all liabilities, demands, claims, actions or causes of action, regulatory, legislative or judicial proceedings or investigations, assessments, levies, losses, fines, penalties, damages, costs and expenses, including, without limitation: (i) reasonable attorneys', accountants', investigators', and experts' fees and expenses, sustained or incurred in connection with the defense of any such claim; and (ii) costs and expenses reasonably incurred to comply with Environmental Laws including without limitation, all Environmental Costs, but excluding consequential and punitive damages.

19.    "*Debtor*" shall mean Desert Land, Desert Ranch and Desert Oasis.

20.    "*Debtors' Ancillary Documents*" shall have the same meaning as set forth in Section 2.3(a)(ii).

21.    "*Debtors' Plan*" shall mean the Second Amended Plan of Reorganization filed by the Debtors in the Bankruptcy Case."

22.    "*Deed of Trust*" shall have the same meaning as set forth in Preliminary Statement A.

23.    "*Desert Land*" shall mean Desert Land, LLC, a Nevada limited liability company.

24.    "*Desert Oasis*" shall mean Desert Oasis Apartments, LLC, a Nevada limited liability company.

N/H-017844

**DRAFT**
**FOR DISCUSSION**
**PURPOSES ONLY**
4/16/03 1:47 PM

25.    *"Desert Ranch"* shall mean Desert Ranch, LLC, a Nevada limited liability company.

26.    *"Desert Ranch Interest"* shall have the same meaning as set forth in Preliminary Statement E.

27.    *"Disclosure Schedule"* shall have the same meaning as set forth in Section 2.1.

28.    *"Employee Benefit Plan"* shall have the same meaning as set forth in Section 2.3(e)(i).

29.    *"Environmental Laws"* shall mean all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever. Environmental Laws include, without limitation, those relating to: manufacture, processing, use, distribution, treatment, storage, disposal, generation or transportation of Hazardous Materials; air, surface or ground water or noise pollution; Releases; protection of wildlife, endangered species, wetlands or natural resources; Containers; health and safety of employees and other persons; and notification requirements relating to the foregoing.

30.    *"Equipment"* shall mean all furniture, furnishings, artwork, fixtures, equipment, machinery, appliances, parts, computer hardware, tools, dies, jigs, patterns, molds, motor vehicles, carts, other transportation equipment, signs and signage, linens, utensils, tableware, chinaware, glassware, silverware and all other tangible personal property (other than the Inventory), used or intended for use in the ownership, operation or maintenance of any of the Real Estate or the Business, including, without limitation, any of the foregoing that have been fully depreciated.

31.    *"ERISA"* shall have the same meaning as set forth in Section 2.3(e)(i).

32.    *"ERISA Affiliate"* shall have the same meaning as set forth in Section 2.3(e)(i).

33.    *"Facility"* shall mean any facility as defined in CERCLA.

34.    *"Fieldman"* shall mean Barry Fieldman, as trustee of the Barry and Amy Fieldman Trust.

35.    *"Fieldman Interest"* shall have the same meaning as set forth in Preliminary Statement D.

36.    *"Financial Statement"* shall have the same meaning as set forth in Section 2.3(b)(ii).

37.    *"FLT Option"* shall have the same meaning as set forth in Preliminary Statement B.

**DRAFT
FOR DISCUSSION
PURPOSES ONLY
4/16/03 1:47 PM**

38.    "*Gonzales*" shall mean Tom Gonzales, a unmarried man.

39.    "*Gonzales Interest*" shall have the same meaning as set forth in Preliminary Statement D.

40.    "*Gonzales Ancillary Documents*" shall have the same meaning as set forth in Section 2.2(a).

41.    "*Guaranty*" shall have the same meaning as set forth in Preliminary Statement C.

42.    "*Hazardous Materials*" shall mean: (a) pollutants, contaminants, pesticides, radioactive substances, solid wastes or hazardous or extremely hazardous, special, dangerous or toxic wastes, substances, chemicals or materials within the meaning of any Environmental Law, including, without limitation, any (i) "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et. seq., as amended and reauthorized ("*CERCLA*"), and (ii) any "hazardous waste" as defined in the Resource Conservation and Recovery Act ("*RCRA*"), 42 U.S.C., Sec. 6902 et. seq., and all amendments thereto and reauthorizations thereof; and (b) asbestos-containing material in any form or condition, materials or equipment containing polychlorinated biphenyls, or landfills, surface impoundments, or disposal areas.

43.    "*Indemnified Party*" shall mean a Party who is entitled to indemnification from another Party pursuant to Section 7.

44.    "*Indemnifying Party*" shall mean a Party who is required to provide indemnification under Section 7 to another Party.

45.    "*Inventory*" shall mean all inventory held for sale, consumption or use in the ownership, operation of maintenance of any of the Real Estate or Business.

46.    "*Leasehold Parcel*" shall have the same meaning as set forth in Preliminary Statement F.

47.    "*Licensed Intellectual Property*" shall mean all rights under licenses to use computer software, trademarks, patents, copyrights, unpatented formulations, manufacture methods and other know-how.

48.    "*Loan*" shall have the same meaning as set forth in Preliminary Statement A.

49.    "*Loan Agreement*" shall have the same meaning as set forth in Preliminary Statement A.

50.    "*Material Contract*" shall mean any Contract:   (i) under which the cost of payment or performance required of New World is an amount greater than $25,000 per year; (ii) which would not by its terms be terminable by New World without material cost or obligation, on not more than sixty (60) days' written notice of termination by New World, regardless of the

N/H-017846

**DRAFT
FOR DISCUSSION
PURPOSES ONLY**
4/16/03 1:47 PM

amounts otherwise payable thereunder; (iii) containing covenants that in any way purport to restrict the business activity of New World or limit the freedom of New World to engage in any line of business or to compete with any other party, regardless of the amounts payable thereunder; or (iv) constituting or imposing a lien or encumbrance of any type on any of the Real Estate, regardless of amount.

51.    "*Mortgage*" shall mean a mortgage, deed of trust, security agreement and/or collateral assignment securing a bona fide loan for value.

52.    "*Multiemployer Plan*" shall have the same meaning as set forth in Section 2.3(e)(i).

53.    "*Net Proceeds*" for purposes of Section 1.1(b) shall mean the gross proceeds of a Parcel A Equity Transfer, less the transaction costs directly related to a Parcel A Equity Transfer paid to unrelated parties, including, but not limited to, brokerage commissions paid to parties other than Howard Bulloch and/or David Gaffin. Net proceeds shall not include consideration wholly in the form of stock, membership, partnership or other equity interests in a corporation, limited liability company, partnership or other entity wholly owned or controlled by Howard Bulloch or David Gaffin or their trusts.

54.    "*New World*" shall mean New World, LLC, a Nevada limited liability company.

55.    "*New World Parcels*" shall have the same meaning as set forth in Preliminary Statement F.

56.    "*Note*" shall have the same meaning as set forth in Preliminary Statement A.

57.    "*PBGC*" shall have the same meaning as set forth in Section 2.3(e)(ii).

58.    "*Parcel A*" shall mean the premises described on Exhibit A and, upon exercise of the FLT Option, shall include the FLT option parcels.

59.    "*Parcel A Permitted Financing*" shall mean (i) one or more Mortgages against Parcel A or any part thereof securing financing in the principal amount of up to $25,000,000 at any one time outstanding, and (ii) a Mortgage securing the purchase of the real property subject to the FLT Option, the proceeds of which are used exclusively for the purchase of such real property subject to the FLT Option.

60.    "*Parcel A Transfer*" shall mean either: (a) the sale, transfer or other conveyance of any legal or beneficial interest in the entity or entities that own Parcel A (a "*Parcel A Equity Transfer*"); or (b) the sale, transfer or other conveyance of all or any part of Parcel A, other than (i) a Parcel A Mortgage or (ii) sales, transfers or other conveyances or purchases for easements or to realign property lines, or condemnations involving less than 5% of the gross Parcel A land area.

61.    "*Parcel A Transfer Fee*" shall have the same meaning as set forth in Section 1.1.

N/H-017847

**DRAFT
FOR DISCUSSION
PURPOSES ONLY**
4/16/03 1:47 PM

62.     *"Pledge"* shall have the same meaning as set forth in Preliminary Statement C.

63.     *"Real Estate"* shall have the same meaning as set forth in Preliminary Statement F.

64.     *"Release"* shall mean any spill, discharge, leak, emission, escape, injection, dumping, or other release or threatened release of any Hazardous Materials into the environment, whether or not notification or reporting to any governmental agency was or is, required, including without limitation any Release which is subject to CERCLA.

65.     *"Return"* means any return, declaration, report, statement and other document required to be filed in respect of Taxes.

66.     *"Smart Mart"* shall have the same meaning as set forth in Section 3.2(h).

67.     *"Tax"* means any federal, state, local, foreign and other net income, gross income, gross receipts, gaming, sales, use, ad valorem, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profits, customs, duty or other tax, fee, governmental assessment or charge of any kind whatever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

68.     *"Third Party Claims"* shall mean any claims for Damages which are asserted or threatened by a party other than the Parties hereto, their successors and permitted assigns, against any Indemnified Party or to which an Indemnified Party is subject.

69.     *"Trademarks"* shall mean all trademarks, service marks, slogans, trade names and trade dress whether registered with the United States Patent and Trademark Office or with the State of Nevada or unregistered and existing at common-law, and all applications therefor, including without limitation, New World's and/or its Affiliates' entire right and interest, if any, in the names "New World," "London Las Vegas" and "Asia-Pacific Resort" and all marks associated with the foregoing.

70.     *"Welfare Plan"* shall have the same meaning as set forth in Section 2.3(e)(i).

N/H-017848

## Jason A. Imes

| | |
|---|---|
| From: | Randon Hansen [RHansen@sheacarlyon.com] |
| Sent: | Wednesday, April 16, 2003 1:55 PM |
| To: | William Holland (E-mail); Jim Lisowski (E-mail); Jason Imes (E-mail) |
| Cc: | Barry Jenkins (E-mail) |
| Subject: | Ptak |

Gentlemen:

As you may be aware, we recovered from the Ptaks' residence a 2002 Chevy Trailblazer financed by Wells Fargo and formerly listed as one of the vehicles missing from SVJ's inventory. It is our understanding the vehicle was not registered or licensed. The dealer plate (numbered 43801) on the vehicle was not active and we have been unable to get any additional information on it. In addition, our investigation revealed the Ptaks are driving a Dodge Durango also with a dealer plate (numbered 41509) which also appears to have expired or been revoked. Additionally, a Chevy pickup truck, license number 723PCL is being kept at the Ptak residence and appears to be licensed in Ptak's name. An older vehicle (possibly and El Camino) was also observed parked at the Ptaks' residence. It does not appear Wells Fargo financed the Durango and we are checking on the pickup truck. Thus, one or more of the vehicles may belong to the estate.

Please let me know if you have any questions regarding the above.

Randon D. Hansen, Esq.
SHEA & CARLYON, LTD.
233 S. Fourth St., Second Floor
Las Vegas, NV 89101
Telephone (702) 471-7432
Facsimile (702) 471-7435

The information in this electronic message is confidential and may be attorney-client privileged. The information is intended only for the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and/or return of the original message by reply e-mail.

1

N/H-017849

ORIGINAL

FILED AND ENTERED
ON DOCKET

'03 APR 21 A10 :09

U.S. BANKRUPTCY COURT
PATRICIA GRAY, CLERK

1   Lenard E. Schwartzer
    Nevada Bar No. 0399
2   Jeanette E. McPherson
    Nevada Bar No. 5423
3   Schwartzer & McPherson Law Firm
    3800 Howard Hughes Pkwy, Suite 1100
4   Las Vegas, NV 89109
    Telephone: (702) 693-4230
5   Facsimile: (702) 892-0122
  Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re

DESERT LAND, LLC,

      Debtor.

_____/

In re

DESERT OASIS APARTMENTS, LLC,

      Debtor.

_____/

In re

DESERT RANCH, LLC,

      Debtor.

_____/

BK-S-02-16202 RCJ
Chapter 11

BK-S-02-16204
Desert Oasis Apartments, LLC
BK-S-02-16205
Desert Ranch, LLC

**ORDER CONFIRMING DESERT
LAND'S SECOND AMENDED PLAN
OF REORGANIZATION;
APPROVING SETTLEMENT
AGREEMENT; APPROVING
ASSUMPTION AND ASSIGNMENT
OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND
DISMISSING CASES OF DESERT
OASIS APARTMENTS AND DESERT
RANCH**

Date: January 29, 2003
Time: 9:30 a.m.

On January 29, 2003 through January 31, 2003, the Court held a hearing to consider the confirmation of the Plan of Reorganization for Desert Land, LLC ("Desert Land"); Desert Oasis Apartments, LLC ("Desert Oasis Apartments") and Desert Ranch, LLC ("Desert Ranch") (collectively, the "Debtors") appeared by and through their principals, Howard Bulloch and David Gaffin and their counsel, Lenard E. Schwartzer, Esq. of Schwartzer & McPherson Law Firm; creditor Consolidated Mortgage Corporation ("CMC")

N/H–017850

1   appeared through its counsel, Denise Abramow, Esq. and Candace C. Carlyon, Esq. of

2   Shea & Carlyon; creditor Aspen Financial Corporation ("Aspen") appeared through its

3   counsel, Nile Leatham, Esq. of Kolesar & Leatham; creditor Tom Gonzales ("Gonzales")

4   and his affiliates appeared in person and through their counsel, Gerald M. Gordon, Esq.

5   and Matthew C. Zirzow, Esq. of Gordon & Silver; and the Office of the U.S. Trustee

6   appeared through Scott Farrow, Esq.

7         The Court having heard the testimony of the witnesses, reviewed the documents

8   admitted into evidence and, on January 31, 2003, having heard the settlement reached

9   among Gonzales and the Debtors as presented by their counsel, and having been

10  presented with a written Settlement Agreement which will be executed by Gonzales and

11  the Debtors (the "Settlement Agreement"), a copy of which is attached to the Plan as

12  Exhibit "A" and good cause appearing therefor;

13        IT IS ORDERED, ADJUDGED AND DECREED that the Debtors have given proper

14  notice of the confirmation hearing and that the Second Amended Plan of Reorganization

15  (the "Plan"), a copy of which has been attached to this Order as Exhibit "1", which modifies

16  the original Plan of Reorganization either (i) treats creditors the same or better than they

17  were treated under the original Plan or (ii) has the consent of the creditors affected thereby

18  (those creditors being CMC, Aspen and Gonzales); and

19        IT IS ORDERED that the Plan meets all the requirements for confirmation set forth

20  in Bankruptcy Code § 1129; and

21        IT IS ORDERED that the Plan be, and hereby is, confirmed and shall be binding on

22  all creditors of Desert Land; and

23        IT IS ORDERED that the Settlement Agreement between the Debtors and

24  Gonzales, a copy of which is attached hereto (the "Settlement Agreement"), is approved

25  and shall be binding on the parties thereto and, on or before the Effective Date, shall be

26  executed by the parties thereto ; and

27        IT IS ORDERED that in accordance with the provisions of the Plan the transfers of

28  property and interests required by the Plan and the Settlement Agreement shall be exempt

N/H-017851

1   from transfer taxes pursuant to Bankruptcy Code § 1146; and

2   IT IS ORDERED that (a) Desert Oasis Investments, LLC ("Desert Oasis

3   Investments")  is strictly prohibited from seeking bankruptcy protection until CMC is paid

4   in full; (b) Desert Oasis Investments will not accrue unsecured debt until CMC is paid in full;

5   (c) Desert Oasis Investments will execute a stipulation that the automatic stay of 11 U.S.C.

6   §362 will terminate to permit CMC to foreclose on the Arby Avenue Property (as defined

7   in the Plan) if any bankruptcy petition is filed by or against Desert Oasis Investments; and

8   (d) Desert Oasis Investments may not further transfer of the Arby Avenue Property until

9   CMC is paid in full, without the prior written consent of CMC; and

10   IT IS ORDERED that (i) The Ranch, LLC ("The Ranch") is strictly prohibited from

11   seeking bankruptcy protection until Aspen is paid in full; (ii) The Ranch shall not incur or

12   allow any unsecured debt to be incurred until Aspen is paid in full; (iii) The Ranch shall

13   execute a stipulation that any automatic stay of 11 U.S.C. §362 shall terminate to permit

14   Aspen to foreclose on the Eldorado Lane Property (as defined in the Plan) if any

15   bankruptcy petition is filed by or against The Ranch; (iv) The Ranch shall not further

16   transfer or encumber the Eldorado Lane Property or any interest therein, until after Aspen

17   is paid in full, without the prior written consent of Aspen; and (v) The Ranch shall

18   irrevocably amend its Operating Agreement to provide that it may not file a voluntary

19   bankruptcy petition without the written permission of Aspen, until after Aspen is paid in full;

20   and

21   IT IS ORDERED that (i) Desert Land is strictly prohibited from seeking bankruptcy

22   protection until Aspen is paid in full; (ii) Desert Land will not incur or allow unsecured debt

23   to be incurred (except in the ordinary course of business) until Aspen is paid in full; (iii)

24   Desert Land shall execute a stipulation that any automatic stay of 11 U.S.C. §362 shall

25   terminate to permit Aspen to foreclose on the Desert Oasis Motel Property (as defined in

26   the Plan) if any bankruptcy petition is filed by or against Desert Land ; (iv) Desert Land

27   shall not further transfer or encumber the Desert Oasis Motel Property or any interest

28   therein, until Aspen is paid in full, without the prior written consent of Aspen; and (v) Desert

N/H-017852

1  Land shall immediately amend its Operating Agreement to provide that it may not file a

2  voluntary bankruptcy petition without the written permission of Aspen, until after Aspen is

3  paid in full; and

4  IT IS ORDERED that the executory contracts and unexpired leases of Desert Land

5  (the "Assumed Contracts") are hereby assumed and, the executory contracts and

6  unexpired leases relating to property or businesses on the real estate described as Parcels

7  B, C and D (south of Four Seasons Drive, Las Vegas, Nevada) are assigned to New World,

8  LLC, specifically the following:

9  (A)  Ground Lease dated September 1, 1999 between Mary Bartsas as landlord

10  and Desert Land, LLC as tenant (which may have been previously assigned to New World,

11  LLC);

12  (B)  Management contract between Hospitality Associates and Desert Land, LLC

13  for the Glass Pool Inn;

14  (C)  Management contract between Hospitality Associates and Casa Malaga

15  Motel Inc. for the Casa Malaga Motel;

16  (D)  Billboard lease or rental agreement between Outdoor Media Group and Casa

17  Malaga Motel Inc. Outdoor Media Group has been purchased by Viacom Outdoor Inc.;

18  and

19  (E)  Billboard lease or rental agreement between Seiler, LLC and Desert Land,

20  LLC. Seiler, LLC has been purchased by The Lamar Companies; and

21  IT IS ORDERED that the cases of Desert Oasis Apartments and Desert Ranch be,

22  and hereby are, dismissed; and

23  IT IS ORDERED that the modifications in the Second Amended Plan do not

24  materially adversely affect any holder of a Claim or Interest, or other party in interest to the

25  Second Amended Plan. As such, pursuant to Fed. R. Bankr. P. 3019, these modifications

26  do not require additional disclosure pursuant to Section 1125 of the Bankruptcy Code or

27  resolicitation of acceptances or rejections of the Plan under Section 1126 of the

28  Bankruptcy Code, nor do they require the holders of Claim or Interests be afforded any

P:\WorldPortResorts\Pleadings\Order Confirm Plan 041303.wpd          4

N/H-017853

1    opportunity to change previously cast acceptances or rejections of the Plan; and

2        IT IS ORDERED that the Settlement Agreement is hereby authorized and approved

3    pursuant to 11 U.S.C. §§ 105 and 1123(b) and Fed. R. Bankr. P. 9019, as a fair and

4    equitable settlement among the parties thereto, and as an integral part of the Plan, and is

5    in the best interests of the Debtors, their estates and holders of claims, and shall be binding

6    on the parties thereto; and

7        IT IS ORDERED that Debtors and all other necessary parties are authorized and

8    empowered, without further Court order, to execute and deliver any instrument, security

9    agreement or document, and to perform any act, that is necessary, desirable, or required

10    for the consummation of the Plan, including, without limitation executing any appropriate

11    documents contemplated by, related to or in accordance with the Settlement Agreement,

12    to effectuate and consummate the transactions provided for in the Settlement Agreement;

13    and

14        IT IS ORDERED that except as otherwise provided in this Confirmation Order,

15    immediately upon the entry of this Confirmation Order, the terms of the Plan shall be, and

16    hereby are, deemed binding upon Reorganized Desert Land and the other Debtors, any

17    and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity

18    Interests are impaired under the Plan or whether the holders of such Claims or Equity

19    Interests accepted, rejected or are deemed to have accepted or rejected the Plan), any

20    and all non-Debtor parties to executory contracts and unexpired leases with Reorganized

21    Desert Land  and any and all entities who are parties to or are subject to the settlements,

22    compromises, releases, discharges and injunctions described in the Plan and the

23    respective heirs, executors, administrators, successors or assigns, if any, of any of the

24    foregoing; and

25        IT IS ORDERED that consistent with the Plan and Settlement Agreement,

26    Reorganized Desert Land and the other Debtors are  hereby authorized to perform and

27    transfer all of the transferred or exchanged assets free and clear of all liens, claims,

28    interests and encumbrances (except as otherwise provided in the Plan and this

N/H-017854

1   Confirmation Order) as provided for in the Settlement Agreement and to take all actions

2   necessary or appropriate to implement, consummate and effectuate the transactions

3   contemplated thereby, together with all additional instruments and documents that may be

4   reasonably necessary or desirable to implement the Settlement Agreement and the

5   transactions contemplated thereby, and to take all further actions as may be reasonably

6   requested by any of the parties for the purpose of assigning, transferring, granting,

7   conveying and conferring to the parties or reducing to possession any or all of the

8   transferred or exchanged assets, as may be necessary or appropriate to the performance

9   of the Debtors' obligations as contemplated by the Settlement Agreement, all without

10  further action by the Court or corporate action by the directors, members or stockholders

11  (or similar positions) of Debtors; and

12      IT IS ORDERED that this Confirmation Order is and shall be  binding upon and

13  govern the acts of all entities, including, without limitation, all filing agents, filing officers,

14  title agents, title companies, recorders of mortgages, recorders of deeds, registrars of

15  deeds, registrars of patents, trademarks or other intellectual property, administrative

16  agencies, governmental departments, secretaries of state, federal, state, and local officials,

17  and all other persons and entities who may be required by operation of law, the duties of

18  their office, or contract, to accept, file, register or otherwise record or release any

19  documents or instruments, or who may be required to report any title or state of title in or

20  to any of the transactions contemplated or occurring pursuant to the Plan, this Confirmation

21  Order or the Settlement Agreement; and

22      IT IS ORDERED that except as provided in the Settlement Agreement,

23  consummation of the transactions contemplated therein does not and will not subject

24  Gonzales to any debts, liabilities, obligations, commitments, responsibilities or claims of

25  any kind or nature whatsoever, whether known or unknown, contingent or otherwise,

26  existing as of the date hereof or hereafter arising, of or against Debtors, any affiliate of

27  Debtors, or any other person by reason of such transfers and assignments under the laws

28  of the United States, any state, territory or possession applicable to such transactions; and

N/H-017855

1      IT IS ORDERED that the terms and provisions of the Plan and the Settlement

2 Agreement, together with the terms and provisions of this Confirmation Order, shall be

3 binding in all respects upon the Debtors, Gonzales, and their respective affiliates,

4 successors and assigns, and any affected third parties, including, but not limited to all non-

5 debtor parties to the Assumed Contracts, and persons asserting a claim against or interest

6 in the Debtors' estate or any assets to be transferred or exchanged to Gonzales pursuant

7 to the Settlement Agreement, and shall estop any affected non-debtor to any Assumed

8 Contract from asserting any consent, approval, offset or similar right under any Assumed

9 Contract; and

10      IT IS ORDERED that any non-debtor party to an Assumed Contract which asserts

11 that Desert Land has defaulted under an Assumed Contract and has not cured such

12 default prior to the Confirmation or that the Assumed Contract cannot be assigned to New

13 World, LLC shall appear at a hearing before the Bankruptcy Court on _Apr 28_ , 2003

14 **at the hour of** _2:30 pm_ and file and serve any objections in writing on counsel for

15 the Debtors and Gonzales at least one (1) business day before the hearing or be forever

16 barred from asserting such default or claim; and

17      IT IS ORDERED that until entry of a final decree, Desert Land shall file with the clerk

18 of this Court, not later than twenty (20) days from the end of each calendar quarter which

19 occurs after the entry of this Order, a report of action taken by Desert Land and the

20 progress toward consummation of the Plan; and

21      IT IS ORDERED that the Debtor shall mail, by first class mail, a copy of this Order

22 to all creditors and parties in interest, including all non-debtor parties to the Assumed

23 Contracts, within two (2) business days of the entry of this Order.

24

25

26 DATED: April _2 /_ 2003

27                              ROBERT CLIVE JONES

                                U.S. BANKRUPTCY JUDGE

28

N/H-017856

1

2    Prepared by:                                Approved as to form and content:

3    SCHWARTZER & McPHERSON LAW FIRM             KOLESAR & LEATHAM

4
     _____           _____
5    Lenard E. Schwartzer, Esq.                  Nile Leatham, Esq.
     3800 Howard Hughes Pkwy, Suite 1100         3320 W. Sahara Ave., Suite 380
6    Las Vegas NV 89109                          Las Vegas, NV 89102
     Attorneys for Debtors and Debtors in        Attorneys for Aspen Financial Services
7    Possession

8    Approved/Disapproved as to form:            Approved/Disapproved/Reviewed

9    GORDON & SILVER                             OFFICE OF THE U.S. TRUSTEE

10
     _____           _____
11   Gerald M. Gordon, Esq.                      Scott Farrow, Esq.
     Matthew C. Zirzow, Esq.                     600 Las Vegas Blvd. S., Suite 430
12   3980 Howard Hughes Pkwy, 9th Fl.            Las Vegas, NV 89101
     Las Vegas, NV 89109
13   Attorneys for Gonzales

14
     Approved as to form and content:
15
     SHEA & CARLYON
16

17
     _____
18   Candace C. Carlyon, Esq.
     Denise Abramow, Esq.
19   233 S. Fourth St., Suite 200
     Las Vegas, NV 89101
20   Attorneys for Consolidated Mortgage
     Corporation
21

22

23

24

25

26

27

28

N/H-017857

1  Prepared by:                                    Approved as to form and content:

2  SCHWARTZER & McPHERSON LAW FIRM                 KOLESAR & LEATHAM

3

4  Lenard E. Schwartzer, Esq.                      Nile Leatham, Esq.
   3800 Howard Hughes Pkwy, Suite 1100             3320 W. Sahara Ave., Suite 380
5  Las Vegas NV 89109                              Las Vegas, NV 89102
   Attorneys for Debtors and Debtors in            Attorneys for Aspen Financial Services
6  Possession

7

8  Approved/Disapproved as to form:                Approved/Disapproved/Reviewed

9  GORDON & SILVER                                 OFFICE OF THE U.S. TRUSTEE

10

11 Gerald M. Gordon, Esq.                          Scott Farrow, Esq.
   Matthew C. Zirzow, Esq.                         600 Las Vegas Blvd. S., Suite 430
12 3980 Howard Hughes Pkwy, 9th Fl.                Las Vegas, NV 89101
   Las Vegas, NV 89109
13 Attorneys for Gonzales

14 Approved as to form and content:

15 SHEA & CARLYON

16

17 Candace C. Carlyon, Esq.
   Denise Abramow, Esq.
18 233 S. Fourth St., Suite 200
   Las Vegas, NV 89101
19 Attorneys for Consolidated Mortgage
   Corporation
20

21

22

23

24

25

26

27

28

P:\WorldPortResorts\Pleadings\Order Confirm Plan 040303.wpd              8

N/H-017858



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "1"

N/H-017859

1 | Lenard E. Schwartzer
Nevada Bar No. 0399
2 | Jeanette E. McPherson
Nevada Bar No. 5423
3 | Schwartzer & McPherson Law Firm
3800 Howard Hughes Pkwy, Suite 1100
4 | Las Vegas, NV 89109
Telephone: (702) 693-4230
5 | Facsimile: (702) 892-0122
Attorneys for Debtors and
6 | Debtors in Possession

7

8

9 **UNITED STATES BANKRUPTCY COURT**

10 **DISTRICT OF NEVADA**

11 | In re                                  BK-S-02-16202 RCJ
                                              Chapter 11
12 | DESERT LAND, LLC,
                                              BK-S-02-16204
13 |          Debtor.                       Desert Oasis Apartments, LLC
                                              BK-S-02-16205
14 | In re                                  Desert Ranch, LLC

15 | DESERT OASIS APARTMENTS, LLC,          **SECOND  AMENDED  PLAN  OF
                                              REORGANIZATION**
16 |          Debtor.
                                              Date: January 29, 2003
17 | In re                                  Time: 9:30 a.m.

18 | DESERT RANCH, LLC,

19 |          Debtor.

20

21 |       Desert Land, LLC ("Desert Land"), Desert Oasis Apartments, LLC ("Desert Oasis")

22 | and Desert Ranch, LLC ("Desert Ranch") (collectively, the "Debtors") by and through their

23 | counsel, Schwartzer & McPherson Law Firm, are proposing this Plan Of Reorganization

24 | (the "Plan") pursuant to 11 U.S.C. § 1123, and are seeking approval of the Plan by the

25 | creditors and members of Desert Land and by the Court.  Under the Plan, the debts of

26 | Desert Land are reorganized and the Chapter 11 cases of Desert Oasis and Desert Ranch

27 | are dismissed.

28 | ///

2nd Amended Plan of Reorganization 041603.wpd                1

1                                               **ARTICLE I**

2                                            **DEFINITIONS:**

3      "Allowed Claim" shall mean a pre-petition claim against or an interest in Desert Land

4 to the extent that such claim or interest has been scheduled as undisputed, non-contingent

5 and liquidated.  Claims may also be allowed by virtue of their having been filed under

6 § 1111(a) and by specific order of the Court.

7      "Administrative Expense or Claim" shall mean those expenses incurred after the

8 commencement of the case and which are allowed under § 503 of the Code.  Such

9 expenses include wages, salaries, rents, taxes, management fees, trade credits and the

10 like which are incurred in the ordinary course of the Debtors' business, after the

11 commencement of the case, which shall be paid in the ordinary course of the Debtors'

12 business.  Such expenses include all of the fees and costs for Debtors' counsel which shall

13 be paid on the Effective Date or when allowed by the Court.

14      "Aspen" shall mean Aspen Financial Services, Inc. or its affiliates.

15      "Bankruptcy Code" or "Code" refers to Title 11 of the United States Code.

16      "Bankruptcy Court" or "Court" refers to the United States Bankruptcy Court for the

17 District of Nevada, Southern Division, or such other Court where the venue may be proper.

18      "Case" shall mean these joint proceedings for the Debtors for relief under Chapter

19 11 presently pending in this Court.

20      "Claim" shall mean the right to payment or performance as defined under § 101(4)

21 of the Code.

22      "CMC" shall mean Consolidated Mortgage corporation or its affiliates.

23      "Confirmation" shall mean the entry of an order of the Court which approves this

24 Plan.

25      "Creditor" shall mean any entity that has a claim against Desert Land or the estate,

26 and which arose prior to the filing of the case.

27      "Debtors" means, collectively, Desert Land, LLC, Desert Oasis Apartments, LLC and

28 Desert Ranch, LLC.

N/H-017861

1   "Effective Date of the Plan" or "Effective Date" shall mean the first business day ten

2   (10) days after Confirmation.

3   "Fieldman" shall mean Barry Fieldman, Makena Entertainment Las Vegas

4   Boulevard, LLC and their affiliates as defined in Bankruptcy Code § 101(31).

5   "Gonzales" shall mean Tom Gonzales and his affiliates as defined in Bankruptcy

6   Code § 101(31).

7   "Members" shall mean members of Desert Land as of the Petition Date and their

8   affiliates as defined in Bankruptcy Code § 101(31).

9   "New World" shall mean New World LLC, a Nevada limited liability company.

10   "Parcel A" shall have the same meaning as set forth in the Settlement Agreement.

11   "Petition Date" means the day these cases were filed, e.g., May 31, 2002, and upon

12   which an order for relief was entered.

13   "Plan" means this plan of reorganization under § 1121 proposed by the Debtors,

14   which may be amended or modified, from time to time.

15   "Priority Claims" shall mean those allowed claims and expenses that are defined in

16   § 507 of the Code, or that otherwise arise by operation of law.

17   "Secured Creditor" shall mean any creditor of Desert Land holding an allowed

18   secured claim under the Code.

19   "Settlement Agreement" shall mean the agreement between the Debtors and

20   Gonzales attached hereto as Exhibit "A"

21   "Unsecured Creditor" shall mean any creditor of Desert Land who is not a Secured

22   Creditor and who is holding an allowed claim which is not a Priority Claim.

23   <u>**ARTICLE II**</u>

24   <u>**CLASSIFICATION OF CREDITORS AND INTERESTS**</u>

25   The Debtors hereby propose the following classification of creditors, pursuant to 11

26   U.S.C. § 1123(a)(1):

27   CLASS 1 shall consist of priority creditors of Desert Land.

28   CLASS 2 shall consist of Unsecured Creditors of Desert Land.

N/H-017862

1      CLASS 3 shall consist of the Secured Creditors of Desert Land.  Class 3 shall be

2  divided into a subclass for each Secured Creditor.

3           a.   Gonzales

4           b.   CMC

5           c.   Aspen (debt secured by Eldorado Lane Property)

6           d.   Aspen (debt secured by Desert Oasis Motel Property)

7      CLASS 4 shall consist of the Members.

8                    **ARTICLE III**

9               **TREATMENT OF CLASSES**

10     _Class 1_:   These Claims will be paid in full upon confirmation except to the extent

11  that the claim holders agree to some other treatment.

12     _Class 2_:   These Claims shall will be paid in full in six (6) equal monthly

13  installments beginning within thirty (30) days of the Effective Date of the Plan, except that

14  the claim of The Ranch LLC shall be subordinated to all claims and shall not be paid until

15  all other Unsecured Creditors have been paid in full and funds are available from the sale

16  or refinancing of Desert Land's property.

17     _Class 3_:   Each Claim in Class 3 shall be paid up to 100% of the Claim to be paid

18  as follows:

19          A.   _Gonzales_.   Pursuant to and subject to the terms and conditions as

20  more fully set forth in the Settlement Agreement by and among Debtors and Gonzales, the

21  debt to Gonzales will be cancelled.  On the Effective Date, and pursuant to the terms and

22  subject to the conditions as more fully set forth in the Settlement Agreement:

23          (a)   On or before the Effective Date, Desert Ranch will convey its 65%

24  membership interest in New World to Gonzales free and clear of any and all liens and

25  encumbrances.

26          (b)   On or before the Effective Date, Gonzales will convey his undivided 5%

27  interest in Parcel A to Desert Land free and clear of any and all liens and encumbrances

28  other than those of record as of Confirmation.

N/H-017863

1      (c)    On or before the Effective Date, Gonzales will cancel that certain debt in the

2 amount of $41.5 million made by Gonzales to Desert Land and Desert Oasis, any accrued

3 interest and attorneys' fees and costs and will reconvey the deed of trust on Parcel A and

4 release all other security for the debt.

5      (d)    On or before the Effective Date, Gonzales will cause Fieldman to convey

6 Fieldman's undivided 0.5% interest of Parcel A to Desert Land free and clear of any and

7 all liens and encumbrances other than those of record as of Confirmation.

8      (e)    *Parcel A Transfer Fee.* Concurrently with a Parcel A Transfer, Desert Land

9 and/or Desert Oasis shall pay to Gonzales a cash payment (the "*Parcel A Transfer Fee*")

10 of either (i) $7.5 million in the event that (A) there is a Bona Fide Escrow opened for the

11 Parcel A Transfer on or before 90 days following Confirmation (as defined in the Debtors'

12 Plan) and in fact closes within six months of the date such Bona Fide Escrow was opened

13 or (B) the Parcel A Transfer Fee is paid within six months of Confirmation; or (ii) $10 million

14 in the event that the Parcel A Transfer occurs more than 90 days following Confirmation,

15 with the exception of an escrow for a Parcel A Transfer which was opened on or before 90

16 days following Confirmation and does in fact close within six months of the date that such

17 escrow was opened. Notwithstanding the foregoing to the contrary, (i) upon a Parcel A

18 Equity Transfer, Desert Land and/or Desert Oasis shall not be required to pay the entire

19 Parcel A Transfer Fee, but shall pay Gonzales 50% of the Net Proceeds received from the

20 Parcel A Equity Transfer until such time as the Parcel A Transfer Fee has been paid in full;

21 and (ii) all payments on account of a Parcel A Equity Transfer shall be credited to and

22 reduce the amount of the Parcel A Transfer Fee subsequently due. The Parcel A Transfer

23 Fee shall be evidenced by the Parcel A Memorandum, which shall not, however, constitute

24 a mortgage, deed of trust or other lien on Parcel A, and payment thereof shall be

25 subordinate to any Parcel A Permitted Financing. Gonzales will subordinate his right to the

26 payment of the Parcel Transfer Fee to any such Parcel A Permitted Financing and shall

27 execute, acknowledge and deliver, from time to time, upon no less than 20 days written

28 notice to Gonzales, such subordination agreement(s) as may be reasonably required by

N/H-017864

1    the title insurer insuring the liens or security interests related to the Permitted Parcel A
2    Financing.
3       As used in this Plan:
4       "*Bona fide escrow*" shall mean (i) an escrow opened with a party who deposits the
5    greater of $1,000,000 or 5% of the purchase price in escrow (up to $2,500,000), (ii) which
6    provides that the deposit will become non-refundable in 90 days from the opening of the
7    escrow unless the escrow is cancelled, and (iii) which provides that the escrow must close
8    within six (6) months from the opening of the escrow.
9       "*Mortgage*" shall mean a mortgage, deed of trust, security agreement and/or
10   collateral assignment securing a bona fide loan for value.
11      "*Net proceeds*" shall mean the gross proceeds of a Parcel A Equity Transfer, less
12   the transaction costs directly related to the Parcel A Equity Transfer paid to unrelated
13   parties, including, but not limited to, brokerage commissions paid to parties other than
14   Howard Bulloch and/or David Gaffin.  Net proceeds shall not include consideration wholly
15   in the form of stock, membership, partnership or other equity interests in a corporation,
16   limited liability company, partnership or other entity wholly owned or controlled by Howard
17   Bulloch or David Gaffin or their trusts. Gonzales acknowledges and agrees that
18   membership interests in Desert Land and/or Desert Oasis may be transferred in
19   consideration of past services or other consideration and that, so long as the Net Proceeds
20   received by the transferor are nothing more than such past consideration, the Net
21   Proceeds shall be deemed to be zero.
22      "*Parcel A Transfer*" shall mean: (a) the sale, transfer or other conveyance of all or
23   any part of Parcel A, other than (i) a Parcel A Mortgage or (ii) sales, transfers or other
24   conveyances or purchases for easements or to realign property lines, or condemnations
25   involving less than 5% of the gross Parcel A land area; or (b) the sale, transfer or other
26   conveyance of any legal or beneficial interest in the entity or entities that own Parcel A (a
27   "*Parcel A Equity Transfer*").
28      "*Parcel A Permitted Financing*" shall mean (i) one or more Mortgages against Parcel

N/H-017865

1    A or any part thereof, securing financing in the principal amount of up to $25,000,000 at

2    any one time outstanding and (ii) a Mortgage securing the purchase of the real property

3    subject to the FLT Option, the proceeds of which are used exclusively for the purchase of

4    such real property.

5        (f)  The $25,000,000 portion of the Parcel A Permitted Financing shall be used to

6    pay expenses of Desert Land and The Ranch, LLC to maintain, develop and promote the

7    sale of the property owned by these entities, to pay the expenses of these entities, to repay

8    or refinance the loans secured by the property owned by Desert Land or The Ranch, LLC

9    (which in the case of The Ranch, LLC are the three loans in the approximate amount of

10   $2,200,000 each from Aspen Financial Services), to pay reasonable compensation to

11   Howard Bulloch and David Gaffin and up to $5,000,000 (the "safe harbor" amount) for any

12   purpose, including a distribution to members.  Desert Land shall deliver to Gonzales'

13   counsel a report on expenditures from Parcel A Permitted Financing on August 1, 2003

14   and the first day of each three (3) months thereafter until the Parcel A Transfer Fee has

15   been paid in full.

16       (g)  A memorandum will be recorded in the Office of the County Recorder of Clark

17   County, Nevada to give notice of Gonzales' right to the Parcel A Transfer Fee and that the

18   right to the Parcel A Transfer Fee will be subordinate to Parcel A Permitted Financing

19   which may encumber all or portions of Parcel A.

20       (h)  Gonzales and the Debtors shall be bound to the terms of the Settlement

21   Agreement.

22       B.  Consolidated Mortgage Corporation.  On the Effective Date, the

23   19.2 acres of undeveloped real property which is subject to the deed of trust for the benefit

24   of CMC (the "Arby Avenue Property") shall be conveyed to Desert Oasis Investments, LLC

25   ("Desert Oasis Investments"), a Nevada limited liability company owned by Howard Bulloch

26   and David Gaffin or their trusts.  Beginning on the Effective Date, (a) payment shall be

27   made of the interest accrued on the note secured by the Arby Avenue Property (the "CMC

28   Note") at the non-default rate provided in the CMC Note from February 1, 2003 to the end

2nd Amended Plan of Reorganization 041603.wpd                7

1   of the month of the Effective Date and (b) monthly payments on the first day of each month

2   beginning after the Effective Date of current interest only at the non-default rate provided

3   in the CMC Note. All principal and interest (at the non-default rate provided in the CMC

4   Note) accrued prior to February 1, 2003 and attorneys' fees and costs (but not penalties

5   or late charges) will be all due and payable August 1, 2003. CMC will retain its existing lien

6   on the property transferred to Desert Oasis Investments. Payments made by Desert Oasis

7   Investments or Desert Land shall be deemed made for fair and adequate consideration.

8   In the event of default by Desert Land or Desert Oasis Investments, CMC shall be

9   immediately entitled to record a Notice of Breach and Election to Sell the Arby Avenue

10   Property, and all past-due interest shall be recalculated at the default rate specified in the

11   CMC Note, and shall all then be due and payable. Additional terms for this class are as

12   follows:

13       1.    The Confirmation Order shall provide that (a) Desert Oasis Investments is

14            strictly prohibited from seeking bankruptcy protection until CMC is paid in full;

15            (b) Desert Oasis Investments will not accrue unsecured debt until CMC is

16            paid in full; (c) Desert Oasis Investments will execute a stipulation that the

17            automatic stay of 11 U.S.C. §362 will terminate to permit CMC to foreclose

18            on the Arby Avenue Property if any bankruptcy petition is filed by or against

19            Desert Oasis Investments; and (d) Desert Oasis Investments may not further

20            transfer the Arby Avenue Property until CMC is paid in full without the prior

21            written consent of CMC.

22       2.    On the Effective Date, Desert Land or Desert Oasis Investments will pay to

23            CMC a forbearance fee equal to the difference between the default rate of

24            interest under the CMC Note and the contract rate under the CMC Note (the

25            "CMC Forbearance Fee") in the approximate amount of $38,000.

26       3.    On the Effective Date, Desert Land or Desert Oasis Investments will

27            commence monthly interest payments to CMC on the first day of each month

28

N/H-017867