1    at the non-default rate, for a period ending August 1, 2003 (the "Initial CMC
2    Payment Period"). If payments during the Initial CMC Payment Period are
3    timely made and no other events of default have occurred, on the date that
4    the sixth payment is due, Debtor shall have the option of obtaining a six (6)
5    month extension (the "CMC Extension Period") upon the payment of an
6    extension fee equal to 1% of the principal balance in the approximate
7    amount of $75,000.

8  4.    During the CMC Extension Period, Desert Land or Desert Oasis Investments
9    will pay to CMC six (6) monthly interest payments at the non-default rate on
10    the first day of each month. At the expiration of the CMC Extension Period,
11    if the debt is not paid in full, CMC may commence foreclosure on the Arby
12    Avenue Property.

13  5.    Interest for the period prior to Confirmation will accrue at the non-default rate
14    and will be payable at the end of either the Initial CMC Payment Period, or
15    if the extension has been obtained, at the end of the CMC Extension Period.

16  6.    Interest will accrue at the non-default rate from Confirmation.

17  7.    In the event of any default under the terms of this section B of the Plan (the
18    section that applies to the treatment of CMC), CMC may immediately
19    reinstate default interest.

20  8.    Desert Land or Desert Oasis Investments will pay all attorney's fees, costs,
21    and foreclosure costs (which, to Confirmation, are estimated to be in the
22    approximate amount of $20,000) no later than the end of the Initial CMC
23    Payment Period, or if the extension has been obtained, at the end of the
24    CMC Extension Period.

25  9.    In event of appeal of the order confirming the Plan by a party other than
26    CMC, Desert Land and Desert Oasis Investments will continue to perform
27    their obligations under the Plan to CMC regardless of the appeal or of a stay
28    pending appeal.

N/H-017868

C.    Aspen.

1.    On the Effective Date, the two (2) five-acre parcels of undeveloped real property which are subject to deeds of trust for the benefit of Aspen (the "Eldorado Lane Property") shall be conveyed to The Ranch, LLC ("The Ranch"). Beginning on the Effective Date, payments on the notes secured by the Eldorado Lane Property (the "Aspen Eldorado Notes") for the period from February 1, 2003 through July 31, 2003 shall be made on the Effective Date (for the period of February 1, 2003, through the first business day of the calendar month in which the Effective Date occurs) and continuing on the first business day of each succeeding calendar month in the following amounts: (a) accrued interest at the non-default rate for the preceding month(s), plus (b) one-half of the amount of such accrued interest at the non-default rate for the preceding month(s) (until all accrued and unpaid interest for the period prior to February 1, 2003 shall have been paid). By these payments, current interest, as well as all accrued but unpaid interest at the nondefault rate for the period prior to February 1, 2003, shall be paid by August 1, 2003. All principal and accrued interest (at the non-default rate provided in the respective Aspen Eldorado Note) shall be due and payable August 1, 2003. Aspen shall retain its existing lien on the property transferred to The Ranch. Payments made by The Ranch or Desert Land shall be deemed made for fair and adequate consideration. In the event of any default by Desert Land or The Ranch, Aspen shall be immediately entitled to record a Notice of Breach and Election to Sell the Eldorado Lane Property, and all interest past due shall be recalculated at the default rate specified in the respective Aspen Eldorado Note, and shall all then be due and payable. Additional terms for this class are as follows:

a.    The Confirmation Order shall provide that (i) The Ranch is strictly prohibited from seeking bankruptcy protection until Aspen is paid in full; (ii) The Ranch shall not incur nor allow any unsecured debt to be incurred until Aspen is paid in full; (iii) The Ranch shall execute a stipulation that any automatic stay of 11 U.S.C. §362 shall terminate to permit Aspen to foreclose on the Eldorado Lane Property if any bankruptcy petition is filed by or against The Ranch; (iv) The Ranch shall not further transfer nor

2nd Amended Plan of Reorganization 041603.wpd                    10

1  encumber the Eldorado Lane Property or any interest therein, until after Aspen is paid in
2  full, without the prior written consent of Aspen; and (v) The Ranch shall irrevocably amend
3  its Operating Agreement to provide that it may not file a voluntary bankruptcy petition
4  without the written permission of Aspen, until after Aspen is paid in full.

5          b.    On or before August 1, 2003, Desert Land or The Ranch shall pay to
6  Aspen a forbearance fee equal to the difference between the default rate of interest and
7  the contract rate (the "Aspen Eldorado Forbearance Fee") in the approximate amount of
8  $21,000.

9          c.    If payments prior to August 1, 2003 as stated above are timely made
10  and no event of default hereunder have occurred, on or before August 1, 2003, Desert
11  Land or The Ranch shall have the option of obtaining a three (3) month extension (the
12  "Aspen Eldorado Extension Period"), so long as:

13          i.    during the Aspen Eldorado Extension Period, Desert Land or
14          The Ranch shall pay to Aspen on the first business day of such
15          month interest payments calculated at the non-default rate,
16          and

17          ii.    at the expiration of the Aspen Eldorado Extension Period, if the
18          debt is not paid in full, Aspen may complete foreclosure on the
19          Eldorado Lane Property, and all accrued and unpaid interest
20          shall be recalculated at the default rate of interest specified in
21          the Aspen Eldorado Note and shall then be due and payable.

22          d.    Interest will accrue at the non-default rate.

23          e.    In the event of any default under the terms of this section C.1 of the
24  Plan (the section that applies to the treatment of Aspen), Aspen may immediately reinstate
25  the default interest rate Aspen Eldorado Notes.

26          f.    Desert Land or The Ranch shall pay all attorney's fees, costs, and
27  foreclosure costs (which, to Confirmation, are estimated to be, when combined with the
28

N/H-017870

1   fees incurred relating to the Aspen Desert Oasis Note, in the approximate amount of

2   $30,000) no later than 6 months from Confirmation, or if the extension has been obtained,

3   at the end of the Aspen Eldorado Extension Period.

4         g.    In event of appeal of the order confirming the Plan, Desert Land and

5   The Ranch shall continue to perform their obligations to Aspen under the Plan, regardless

6   of the appeal or of a stay pending appeal.

7         2.    The 3.02 acre parcel of real property on which is located the

8   Desert Oasis Motel, and which is subject to a deed of trust for the benefit of Aspen

9   Financial Corporation (the "Desert Oasis Motel Property") shall remain titled in the name

10  of Desert Land.  Beginning on the Effective Date, payments on the notes secured by the

11  Desert Oasis Motel Property (the "Aspen Desert Oasis Motel Notes") for the period from

12  February 1, 2003 through July 31, 2003 shall be made on the Effective Date (for the period

13  of February 1, 2003, through the first business day of the calendar month in which the

14  Effective Date occurs) and continuing on the first business day of each succeeding

15  calendar month in the following amounts: (a) accrued interest at the non-default rate for

16  the preceding month(s), plus (b) one-half of the amount of such accrued interest at the

17  non-default rate for the preceding month(s) (until all accrued and unpaid interest for the

18  period prior to February 1, 2003 shall have been paid).  By these payments, current

19  interest, as well as all interest accrued for the period prior to February 1, 2003, shall be

20  paid. All principal and accrued interest (at the non-default rate provided in the respective

21  Aspen Desert Oasis Motel Note) shall be all due and payable on August 1, 2003.  Aspen

22  shall retain its existing lien on the Desert Oasis Motel.  In the event of a default by Desert

23  Land, Aspen shall be immediately entitled to record a Notice of Breach and Election to Sell

24  the Desert Oasis Motel Property, and all interest past due shall be recalculated at the

25  default rate specified in the respective Aspen Desert Oasis Motel Note, and shall then be

26  due and payable. Additional terms for this class are as follows:

27         a.   The Confirmation Order shall provide that (i) Desert Land is strictly

28  prohibited from seeking bankruptcy protection until Aspen is paid in full; (ii) Desert Land

N/H-017871

1   will not incur or allow unsecured debt to be incurred (except in the ordinary course of

2   business) until Aspen is paid in full; (iii) Desert Land shall execute a stipulation that any

3   automatic stay of 11 U.S.C. §362 shall terminate to permit Aspen to foreclose on the

4   Desert Oasis Motel Property if any bankruptcy petition is filed by or against Desert Land;

5   (iv) Desert Land shall not further transfer or encumber the Desert Oasis Motel Property or

6   any interest therein, until Aspen is paid in full, without the prior written consent of Aspen;

7   and (v) Desert Land shall immediately amend its Operating Agreement to provide that it

8   may not file a voluntary bankruptcy petition without the written permission of Aspen, until

9   after Aspen is paid in full.

10         b.  On or before August 1, 2003, Desert Land shall pay to Aspen a

11   forbearance fee equal to the difference between the default rate of interest and the

12   contract rate (the "Aspen Desert Oasis Forbearance Fee") in the approximate amount of

13   $60,000.

14         c.  If payments prior to August 1, 2003 as stated above are timely made

15   and no events of default hereunder have occurred, on the date that the sixth monthly

16   payment is due, Desert Land shall have the option of obtaining a three (3) month extension

17   (the "Aspen Desert Oasis Extension Period"), so long as:

18              i.  During the Aspen Desert Oasis Extension Period, Desert Land

19                or The Ranch shall pay to Aspen on the first business day of

20                such month interest payments calculated at the non-default

21                rate,

22              ii.  at the expiration of the Aspen Desert Oasis Extension Period,

23                if the debt is not paid in full, Aspen may complete foreclosure

24                on the Desert Oasis Motel Property, and all interest accrued

25                and unpaid interest shall be recalculated at the default rate of

26                interest specified in the Note and shall then be immediately

27                due and payable.

28

N/H-017872

1           d.     Interest shall accrue at the non-default rate.

2           e.     In the event of any default in under the terms of this section C.2 of the

3    Plan (the section that applies to the treatment of Aspen), Aspen may immediately reinstate

4    the default interest rate on the Aspen Desert Oasis Note.

5           f.     Desert Land shall pay all attorney's fees, costs, and foreclosure costs

6    (which, to Confirmation, are estimated to be, when combined with the fees incurred relating

7    to the Aspen Eldorado Note, in the approximate amount of $30,000) no later than 6 months

8    from Confirmation, or if the extension has been obtained, at the end of the Aspen Desert

9    Oasis Extension Period.

10           g.     In event of appeal of the order confirming the Plan by a party other

11    than Aspen, Desert Land shall continue to perform its obligations under the Plan to Aspen,

12    regardless of the appeal or of a stay pending appeal.

13           h.     Desert Land shall pay its debts to third parties promptly and timely, but

14    in no event later than 15 days after the due date, unless contested in good faith by Desert

15    Land. Monthly, Desert Land shall provide Aspen with a copy of the monthly management

16    report from the management company operating the Desert Oasis Motel and a statement

17    that all accounts payable are current or, if applicable, the nature of the dispute with regard

18    to unpaid claims.

19           Class 4:     The Members shall retain their interests in the Debtors as of the

20    Petition Date. The Desert Ranch case will be dismissed. The Desert Oasis case will be

21    dismissed.

22                          **ARTICLE IV**

23              **CLASSES IMPAIRED BY THE PLAN**

24         All classes of creditors of Desert Land will be impaired by the plan except Class 1.

25    Members of Desert Land are impaired.

26                          **ARTICLE V**

27          **MEANS FOR THE PLAN'S IMPLEMENTATION**

28         Funding of the plan and of ongoing operations of the business will be implemented

2nd Amended Plan of Reorganization 041603.wpd         14

N/H-017873

1    through several means:

2         (a)    By refinancing property of the Debtors.

3         (b)    Future earnings from the sale or lease of the properties owned by Desert

4               Land.

5         (c)    Howard Bulloch and David Gaffin.

6        Debtors may also utilize any net proceeds of any causes of action, rights, claims

7    and demands belonging to it as an additional source of funding for the Plan.  Desert Land

8    shall hold all assets free and clear of all claims and interests of creditors and equity

9    security holders and free and clear of all liens, encumbrances, liabilities and obligations of

10    debtors and debtors-in-possession, except as otherwise specifically stated in the Plan.

11        Howard Bulloch and David Gaffin (and their assigns) shall retain 100% of the

12    membership interests in Desert Land subject to all creditors being paid in full.

13        Debtors, and all other necessary parties, are authorized and empowered, without

14    further Court order, to execute and deliver any instrument, security agreement or

15    document, and to perform any act, that is necessary, desirable, or required for the

16    consummation of the Plan, including, without limitation, executing any appropriate

17    documents contemplated by, related to or in accordance with the Settlement Agreement,

18    to effectuate and consummate the transactions provided for in the Settlement Agreement.

19        Consistent with the Plan and Settlement Agreement, Reorganized Desert Land and

20    the other Debtors are hereby authorized to perform and transfer all of the transferred or

21    exchanged assets free and clear of all liens, claims, interests and encumbrances (except

22    as otherwise provided in the Plan and this Confirmation Order) as provided for in the

23    Settlement Agreement and to take all actions necessary or appropriate to implement,

24    consummate and effectuate the transactions contemplated thereby, together with all

25    additional instruments and documents that may be reasonably necessary or desirable to

26    implement the Settlement Agreement and the transactions contemplated thereby, and to

27    take all further actions as may be reasonably be requested by any of the parties for the

28    purpose of assigning, transferring, granting, conveying and conferring to the parties or

N/H-017874

1   reducing to possession any or all of the transferred or exchanged assets, as may be

2   necessary or appropriate to the performance of the Debtors' obligations as contemplated

3   by the Settlement Agreement, all without further action by the Court or corporate action by

4   the directors, members or stockholders (or similar positions) of Debtors.

5   **ARTICLE VI**

6   **ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

7       All executory contracts of Desert Land not heretofore assumed are hereby

8   assumed.  All unexpired leases of Desert Land not heretofore assumed are hereby

9   assumed.

10      The executory contracts and unexpired leases of Desert Land which relate to the

11  real estate owned by New World will be assigned to New World, specifically the following:

12      (A)    Ground Lease dated September 1, 1999 between Mary Bartsas as landlord

13  and Desert Land, LLC as tenant;

14      (B)    Management contract between Hospitality Associates and Desert Land, LLC

15  for the Glass Pool Inn;

16      (C)    Management contract between Hospitality Associates and Casa Malaga

17  Motel Inc. for the Casa Malaga Motel; and

18      (D)    Billboard lease or rental agreement between Outdoor Media Group and Casa

19  Malaga Motel Inc.  Outdoor Media Group has been purchased by Viacom Outdoor Inc.;

20  and

21      (E)    Billboard lease or rental agreement between Seiler, LLC and Desert Land,

22  LLC.  Seiler, LLC has been purchased by The Lamar Companies.

23  **ARTICLE VII**

24  **CONTEMPLATED COMPENSATION FOR SERVICES,**

25  **COSTS AND EXPENSES**

26      No compensation has been paid or promised by these the Debtors or to the Debtors'

27  knowledge by any other entity for services, costs or expenses except the following:

28      Schwartzer & McPherson Law Firm and Jones Vargas shall be paid by Debtors or

2nd Amended Plan of Reorganization 041603.wpd                16

1   their affiliates such fees and costs as the Court may allow upon application.

2

3

4                 **ARTICLE VIII**

5                 **MANAGEMENT**

6       The managing members of Debtors will not change after reorganization or dismissal.

7   Specifically, Howard Bulloch and David Gaffin shall remain the managing members of

8   Desert Land, Desert Oasis Apartments and Desert Ranch. Tom Gonzales will become the

9   managing member of New World.

10                **ARTICLE IX**

11              **TRANSFER TAXES**

12       Pursuant to Bankruptcy Code §1146(c), the transfers of property contemplated by

13   the Plan (including but not limited to the transfers of interest in Parcel A to Desert Land by

14   Gonzales and Fieldman, the transfer of property from Desert Land to The Ranch LLC, and

15   the transfer of land from Desert Land to Desert Oasis Investments, LLC) shall not be

16   subject to transfer taxes by Clark County or the State of Nevada.

17               **ARTICLE X**

18              **DISCHARGE**

19       Upon confirmation, Desert Land will be discharged of all those debts and claims

20   dischargeable under 11 U.S.C. Sec. 1141 and will hold all property of the estate free and

21   clear of all claims and interests, except as otherwise provided in the Plan. While Desert

22   Ranch and Desert Oasis will not receive a discharge, the reorganization of the debt of

23   Desert Land will mean that the debt to Gonzales is cancelled for all purposes. The

24   confirmation will be deemed to be a permanent injunction against the commencement or

25   continuation of any action to enforce a debt or membership interest provided for in the

26   Plan, so long as the terms of the Plan are being complied with.

27               **ARTICLE XI**

28             **EFFECTIVE DATE**

2nd Amended Plan of Reorganization 041603.wpd       17

1    The Plan shall become effective on the Effective Date. In the event of an appeal

2    of the order approving Confirmation and the issuance of a stay that prevents the Plan from

3    being consummated, the Debtors will remain Debtors in Possession until the determination

4    of the issues raised on appeal.

5                                **ARTICLE XII**

6                         **RETENTION OF JURISDICTION**

7        This Court shall retain jurisdiction after confirmation of the plan; (a) to consider (and

8    reconsider if appropriate) claims and objections thereto; (b) to fix expenses of

9    administration and compensation therefor, (c) to hear and determine any dispute arising

10   under or relating to the plan or arising under or relating to the Chapter 11 reorganization

11   case; (d) to enforce all discharge provisions of the plan; and (e) to make such orders and

12   directions pursuant to 11 U.S.C. Sections 1127 and 1142 as may be necessary or

13   appropriate.

14                               **ARTICLE XIII**

15                                  **CLOSING**

16       This case shall be deemed closed on the Effective Date and the Desert Land may

17   present an order closing the case thereafter. If there are any motions, matters or

18   adversary proceedings pending, the Court may keep the case open.

19   DATED: April 16, 2003        Debtors-in-Possession

20

21                    SCHWARTZER & McPHERSON LAW FIRM

22

23

24   _____

25   Lenard E. Schwartzer, Esq.
     Nevada Bar No. 0399

26   3800 Howard Hughes Parkway, Suite 1100
     Las Vegas NV 89109

27   (702) 693-4230
     Attorneys for Debtors and

28   Debtors in Possession

N/H-017877

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

N/H-017878

## SETTLEMENT AGREEMENT

This Settlement Agreement (this *"Agreement"*) is dated for reference purposes only as of April _____, 2003 and made by and among Desert Land, LLC, a Nevada limited liability company (*"Desert Land"*), Desert Oasis Apartments, LLC, a Nevada limited liability company (*"Desert Oasis"*), Desert Ranch, LLC, a Nevada limited liability company (*"Desert Ranch"* and, together with Desert Land and Desert Oasis, the *"Debtors"*), and Tom Gonzales, an unmarried man (*"Gonzales"*).

### PRELIMINARY STATEMENTS

A.    Desert Land, Desert Oasis, and Gonzales are parties to that certain Loan and Security Agreement dated as of December 7, 2000 (the *"Loan Agreement"*), whereby Gonzales extended a Forty-one Million Five Hundred Thousand Dollar ($41,500,000) loan to Desert Land and Desert Oasis (the *"Loan"*). The Loan is evidenced by that certain Promissory Note Secured by Deed of Trust made as of December 7, 2000 (the *"Note"*) by Desert Land and Desert Oasis in favor of Gonzales. The Note is secured by that certain Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of December 7, 2000, as amended by that certain Amendment to Deed of Trust dated as of December 18, 2000 (collectively, the *"Deed of Trust"*), made by Desert Land and Desert Oasis, granting Gonzales a first priority lien on, among other things, the real property set forth on Exhibit "A" (*"Parcel A"*).

B.    As additional collateral to secure the Note, Desert Land executed that certain Collateral Assignment of Purchase Agreement dated as of December 7, 2000 (the *"Assignment"*), whereby Desert Land made a collateral assignment to Gonzales of an option to purchase four (4) parcels from the FLT Trust (the *"FLT Option"*).

C.    In addition, Desert Ranch executed that certain Guaranty dated as of December 18, 2000 (the *"Guaranty"*) of the repayment of Desert Land and Desert Oasis of the Loan, as well as that certain Pledge dated as of December 7, 2000 (the *"Pledge"*), in favor of Gonzales, of a 32.5% membership interest in New World.

D.    As consideration for making the Loan, Desert Land and Desert Oasis conveyed to (i) Gonzales, an undivided 5% interest in Parcel A the (*"Gonzales Interest"*), and (ii) Barry Fieldman, as trustee of the Barry and Amy Fieldman Trust (*"Fieldman"*), an undivided .5% interest in Parcel A (the *"Fieldman Interest"*).

E.    Desert Ranch owns a 65% membership interest in New World, LLC, a Nevada limited liability company (*"New World"*) (together with all rights as a member, allocation of profits, losses, gains, deductions and credits, the *"Desert Ranch Interest"*). In addition, Desert Land is a party to various executory contracts and unexpired leases relating to and affecting New World and its assets.

F.    New World is the owner in fee simple of that certain property described on Exhibit "B" (the *"New World Parcels"*), with the exception of that certain land owned in fee simple by Mary Bartsas, described on Exhibit "C" (the *"Leasehold Parcel"* and, together with

N/H-017879

the New World Parcels and all buildings and improvements thereon and appurtenances thereto, the "*Real Estate*") of which New World holds a leasehold interest.

G.    On May 31, 2002, Debtors filed voluntary petitions for relief under 11 U.S.C. §101 et. seq. (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Nevada (the "*Bankruptcy Court*") as Case Nos. BK-S-02-16202-RCJ, BK-S-02-16204-RCJ, and BK-S-02-16205-RCJ (collectively, the "*Bankruptcy Case*").

H.    Certain claims and disputes have arisen between the Debtors, on the one hand, and Gonzales, on the other hand, as evidenced by that certain Objection of Tom Gonzales to Confirmation of Plan of Reorganization filed with the Bankruptcy Court. Debtors and Gonzales have reached a settlement of their claims and disputes, in accordance with an agreement entered into in Bankruptcy Court on January 31, 2003, which was approved by the Bankruptcy Court. Pursuant to the terms and conditions of this Agreement and the confirmation of Debtors' Second Amended Plan of Reorganization (the "*Debtors' Plan*"), the Debtors, on the one hand, and Gonzales, on the other hand, desire to formally document their agreement and fully and finally settle all such claims existing between and among them. Capitalized terms used in this Agreement shall have the meanings set forth at the time of their first use or as defined on Schedule 1 attached hereto.

AGREEMENT

In consideration of the foregoing Preliminary Statements, the mutual covenants and conditions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    *Transfer of Assets.* On and subject to the terms and conditions contained in this Agreement, the Parties agree that the following assets will be transferred:

1.1.    *Transfers by the Debtors.*

(a)    On or before the Closing Date and in conformance with the Debtors' Plan and Confirmation Order, the Debtors shall cause Desert Ranch to transfer the Desert Ranch Interest to Gonzales or his designee, free and clear of any and all liens or other encumbrances.

(b)    Concurrently with a Parcel A Transfer, Desert Land and/or Desert Oasis shall pay to Gonzales a cash payment (the "*Parcel A Transfer Fee*") of either (i) $7.5 million in the event that there is Bona Fide Escrow opened for the Parcel A Transfer on or before 90 days following Confirmation (as defined in the Debtors' Plan) and in fact closes within six months of the date such Bona Fide Escrow was opened, or (ii) $10 million in the event that the Parcel A Transfer occurs more than 90 days following Confirmation, with the exception of a Bona Fide Escrow for a Parcel A Transfer which was opened on or before 90 days following Confirmation and does in fact close within six months of the date that such Bona Fide Escrow was opened. Notwithstanding the foregoing to the contrary, upon a Parcel A Equity Transfer, Desert Land and/or Desert Oasis shall pay Gonzales the Parcel A Transfer Fee from the Net Proceeds received from the Parcel A Equity Transfer, *provided, however,* that Desert Land and/or Desert Oasis shall not be required to pay to Gonzales more than fifty percent (50%) of the Net

N/H-017880

Proceeds, and, *further, provided,* that if the Parcel A Transfer Fee is not satisfied from the Parcel A Equity Transfer, the remaining balance of the Parcel A Transfer Fee, after deducting amounts paid from the net proceeds of the Parcel A Equity Transfer, shall be paid to Gonzales upon any subsequent Parcel A Transfer. The Parcel A Transfer Fee shall be evidenced by the Parcel A Memorandum, which shall not, however, constitute a mortgage, deed of trust or other lien on Parcel A, and payment thereof shall be subordinate to any Parcel A Permitted Financing. Gonzales will subordinate his right to the payment of the Parcel A Transfer Fee to any such Parcel A Permitted Financing and shall execute, acknowledge and deliver, from time to time, upon no less than 20 days written notice to Gonzales, such subordination agreement(s) as may be reasonably required by the title insurer insuring the liens or security interests related to the Permitted Parcel A Financing.

      1.2.   *Transfers by Gonzales.* On or before the Closing Date, Gonzales shall transfer the Gonzales Interest and cause the Fieldman Interest to be transferred, to Desert Land and/or Desert Oasis or their designee, free and clear of any and all liens or other encumbrances on the ownership interest with the exception of those items affecting the title to Parcel A listed of record as of the Confirmation caused or created by Gonzales or Fieldman. In addition, Gonzales shall (i) cancel the Note, mark it "cancelled" and cause the lien of the Deed of Trust to be fully reconveyed, and (ii) release any and all rights, including all liens, security interests, pledges and assignments Gonzales may have under the Loan Agreement, Note, Deed of Trust, Assignment, Guaranty, Pledge, and any other related Loan document.

      1.3.   *Closing.* The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Gordon & Silver, Ltd., 3960 Howard Hughes Parkway, 9th Floor, Las Vegas, Nevada, commencing at 10:00 a.m. (Pacific Time) on the first business day following the tenth day following the entry of the Confirmation Order (the "*Closing Date*").

      1.4.   *Allocations.* As a material inducement to enter into this Agreement, the Parties expressly agree that they shall allocate the transactions set forth in Section 1.2 and 1.3 of this Agreement for all purposes, including, without limitation, financial accounting and Tax returns, in accordance with the schedule attached hereto as Exhibit "D" (the "*Allocation Schedule*"). The Parties shall make all appropriate Tax filings on a basis consistent with the Allocation Schedule and shall use their respective commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or dispute and no Party will take a position on any income, transfer or gains Tax return, before any governmental or regulatory authority charged with the collection of any such Tax or in any judicial proceeding that is inconsistent with the terms of any such allocation set forth on the Allocation Schedule without the prior written consent of the other Parties in their sole and absolute discretion.

N/H-017881

2.    *Representations and Warranties.*

2.1.    *General Statement.* The Parties make the representations and warranties to each other which are set forth in this Section 2. All such representations and warranties and all representations and warranties that are set forth elsewhere in this Agreement and in any schedule, exhibit or document delivered by a Party to another Party pursuant to this Agreement shall survive the Closing for a period of eighteen (18) months (and none shall merge into any instrument of conveyance). No specific representation or warranty shall limit the generality or applicability of a more general representation or warranty. All representations and warranties of the Debtors are made subject to the exceptions that are noted in the disclosure schedules attached hereto delivered by the Parties to each other concurrently herewith (the *"Disclosure Schedule"*) and are qualified and supplemented by (i) any and all information contained in the books and records of New World identified in Schedule 2.1 attached hereto (the *"New World Books and Records"*), (ii) the Debtors' schedules and other filings and the bankruptcy court hearings and other proceedings of record within the Bankruptcy Case; and (iii) any matters apparent from a visual inspection of the Real Estate or any improvements thereon. Furthermore, any exceptions noted in a Disclosure Schedule to a specific section of this Agreement shall be deemed incorporated automatically into any other section of this Agreement (and its applicable Disclosure Schedule) if the subject matter of the latter bears a reasonable relationship to the former, the representations overlap or if otherwise necessary or appropriate to make the representations or warranties in the latter more complete or accurate. All exceptions noted in the Disclosure Schedule shall be numbered to correspond to the applicable paragraph of this Agreement to which such exception refers. Reference in this Agreement to the "Debtors" shall mean each person or entity comprising the Debtors, and all of them, collectively, as applicable. All such representations and warranties contained in this Agreement and made by the Debtors, on the one hand, and Gonzales, on the other hand, shall be true and correct as of the date hereof, and true and correct as of the Closing Date. Representations made to the *"actual knowledge"* of Debtors, or any of them, shall mean the actual knowledge of Howard Bulloch or David Gaffin without responsibility for investigation of the falsity of such representation or of the breach of such warranty. As used in this Article 2, the term *"material"* shall mean the sum of $250,000 per item and $1,000,000 in the aggregate. The Parties acknowledge that each of them and New World have been engaged in numerous attempts to develop the Real Estate and Parcel A and that, in connection therewith, plans, drawings, proposals and other development proposals have been reviewed by the Parties and/or New World, and that none of the Parties makes any representation or warranty whatsoever concerning the value of any such plans, drawings or proposals, or, except as set forth in Exhibit D, the Business, the Real Estate or Parcel A.

2.2.    *Representations and Warranties of Gonzales.* Gonzales represents and warrants to the Debtors that:

(a)    Gonzales has full power and authority to enter into and perform the obligations on his part to be performed pursuant to (i) this Agreement, and (ii) all documents and instruments to be executed by Gonzales pursuant to this Agreement (collectively, the *"Gonzales Ancillary Documents"*). This Agreement has been, and the Gonzales Ancillary Documents will be, duly executed and delivered by Gonzales. This Agreement constitutes a valid and legally binding obligation of Gonzales, enforceable against Gonzales in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy,

N/H-017882

reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies).

(b)    Except for the approval of the Bankruptcy Court, no consent, authorization, order or approval of, or filing or registration with, any governmental authority or other person is required for the execution and delivery by Gonzales of this Agreement and the Gonzales Ancillary Agreements, and the consummation by Gonzales of the transactions contemplated by this Agreement and the Gonzales Ancillary Agreements in accordance with their respective terms.

(c)    Neither the execution and delivery of this Agreement and the Gonzales Ancillary Documents by Gonzales, nor the consummation by Gonzales of the transactions herein contemplated, will conflict with or result in a breach of any of the terms, conditions or provisions of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any court or governmental authority or of any arbitration award, in each case applicable to Gonzales.

(d)    Gonzales is not a party to any unexpired, undischarged or unsatisfied written or oral contract, agreement, indenture, mortgage, debenture, note or other instrument under the terms of which performance by Gonzales according to the terms of this Agreement will be a default, or whereby timely performance by Gonzales according to the terms of this Agreement may be prohibited, prevented or delayed.

(e)    Gonzales and Fieldman are, respectively, the lawful owners of the Gonzales Interest and the Fieldman Interest, the same have not been previously assigned or otherwise transferred, and are free and clear of any and all liens, encumbrances and/or rights of others, with the exception of those items affecting the title to Parcel A listed of record as of the Confirmation.

(f)    Neither Gonzales, nor any of his Affiliates has dealt with any person or entity who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment for arranging the transactions contemplated hereby or introducing the Parties to each other for which the Debtors may be liable.

(g)    With respect to the representations and warranties of Desert Ranch regarding New World, Gonzales has no actual knowledge that any of said representations or warranties are false, incomplete or inaccurate in any material respect.

(h)    The representations and warranties of Gonzales in this Agreement or in any of the Gonzales' Ancillary Documents, do not and will not contain an untrue statement of material fact, do not and will not omit to state a material fact required to be stated in order to make the representations, warranties or statements contained herein or therein, in light of the context in which they were made, not misleading.

2.3.    *Representations and Warranties of the Debtors.*  The Debtors represent and warrant to Gonzales as follows:

(a)    *Organization.*

N/H-017883

(i)     Each Debtor and New World is duly organized, a limited liability company, validly existing and in good standing under the laws of the State of Nevada and has all necessary power and authority to conduct their respective businesses as such businesses are now being conducted.

(ii)     Upon entry of the Confirmation Order by the Bankruptcy Court, each of the Debtors has full power and authority to enter into and perform (a) this Agreement, and (b) all documents and instruments to be executed by any of the Debtors pursuant to this Agreement (collectively, the "*Debtors' Ancillary Documents*"). This Agreement has been, and the Debtors' Ancillary Documents will be, duly executed and delivered by duly authorized representatives of the Debtors. Upon approval of the Bankruptcy Court, this Agreement constitutes a valid and legally binding obligation of each of the Debtors, enforceable against the Debtors in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies).

(iii)     Except for the entry of the Confirmation Order by the Bankruptcy Court, no consent, authorization, order or approval of, or filing or registration with, any governmental authority or other agency is required for the execution and delivery of this Agreement and the Debtors' Ancillary Documents and the consummation by the Debtors of the transactions contemplated by this Agreement and the Debtors' Ancillary Documents.

(iv)     Neither the execution and delivery by the Debtors of this Agreement and the Debtors' Ancillary Documents, nor the consummation by the Debtors of the transactions herein contemplated, will conflict with or result in a breach of any of the terms, conditions or provisions of any of the Debtors' Articles of Organization operating agreement or other constituent document(s), or of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any court or any governmental authority or of any arbitration award, in each case applicable to any of the Debtors.

(v)     Section 2.3(a)(v) of the Disclosure Schedule sets forth all members of each of the Debtors and New World, in each case as of the date of this Agreement. Except as shown on

N/H-017884

Section 2.3(a)(v) of the Disclosure Schedule, New World has no subsidiaries and there is no outstanding ownership interest in the Debtors or New World, nor any debt or other interest in the Debtors or New World that is convertible into an ownership or voting interest of any kind. No parties other than Desert Ranch have any equity interest in any portion of the Desert Ranch Interest.

(b)     *Financial.*

(i)     New World's books, accounts and records are, and have been, maintained in a usual, regular and ordinary manner, , and all material transactions to which New World is or has been a party are, in all material respects, fairly and accurately reflected therein.

(ii)    The financial statements described in Schedule 2.3(b)(ii) (collectively, the *"Financial Statement"*) fairly and accurately presents the financial position of New World as of the date thereof, and the results of operations and cash flows of New World for the period covered by said statement.

(iii)   To Debtors' actual knowledge, New World has paid all Taxes due and owing and filed all Returns or extensions thereof in connection therewith by the required filing deadline.     There are no liens for delinquent Taxes outstanding against New World.  None of New World's Returns are materially inaccurate.  New World is not a foreign person.

(iv)    Except for liabilities and obligations incurred since the effective date of the Financial Statement listed above in the ordinary course of business consistent with past practices or as set forth in Section 2.3(b)(iv) of the Disclosure Schedule, Debtors have no actual knowledge of any material New World liabilities of any kind, whether accrued, contingent or otherwise, whether due or to become due, the aggregate amount of which would exceed $25,000.

(v)     The executory contracts and unexpired leases which are to be assumed by the Debtors and assigned to New World are listed on Schedule 2.3(b)(v).

(c)     *Conduct of Business.*

(i)     Since the effective date of the latest Financial Statement listed above and except for the Bankruptcy Case or as set

N/H-017885

forth in Section 2.3(c)(i) of the Disclosure Schedule, New World has not:

(A)     sold, assigned, leased, exchanged, transferred or otherwise disposed of any of its material assets or property relating in any way to the Business or the Real Estate, except for sales or other dispositions of Inventory in the ordinary course of the Business, in accordance with New World's past practices;

(B)     To Debtors' actual knowledge, suffered any material casualty, damage, destruction or loss of any assets or property (whether or not covered by insurance) relating in any way to the Business or the Real Estate, on account of fire, flood, riot, strike or other hazard or Act of God;

(C)     made (or committed to make) capital expenditures relating in any way to the Business or the Real Estate in an aggregate amount which exceeds $5,000;

(D)     borrowed any money or issued any bonds, debentures, notes or other corporate securities evidencing money borrowed, or incurred any other material liabilities other than in the ordinary course of business in each case relating in any way to the Business or the Real Estate;

(E)     made any material change in accounting methods or principles relating in any way to the Business ; or

(F)     without limitation by the enumeration of any of the foregoing, entered into any material transaction other than in the ordinary course of business, consistent with past practices, other than the transactions contemplated hereby relating to the Business or the Real Estate.

(ii)     Except as set forth in Section 2.3 (c)(i) above or Section 2.3(c)(ii) of the Disclosure Schedule, to the actual knowledge of Debtors, New World has not suffered or been threatened with any material change in the conduct or nature of the Business, operations, Assets, liabilities, financial condition or prospects of any of the Real Estate or the Business, including, without limiting the generality of the foregoing, the actual or threatened termination of any

N/H-017886

permit, license or government authorization relating to the Business, but excluding matters of a general economic nature.

(d) *Contracts.*

(i) Except those additional matters set forth in Sections 2.3(h)(i) and 2.3(h)(ix), Section 2.3(d)(i) of the Disclosure Schedule sets forth a complete list of all Material Contracts and, to the actual knowledge of Debtors, all other Contracts relating to the Business to which New World is a party, or by which New World or the Real Estate is bound, and identifying the parties thereto and the subject matter thereof, and a designation of all Contracts that are Material Contracts.

(ii) Except as set forth in Section 2.3(d)(ii) of the Disclosure Schedule, no consent of any party to any Material Contract is required for the valid assignment to Gonzales of the Desert Ranch Interest.

(iii) To the actual knowledge of Debtors except as disclosed in section 2.3(d)(iii) of the Disclosure Schedule, all the Contracts are in full force and effect and binding upon the parties thereto, no default by New World has occurred thereunder and: (i) no default by the other contracting parties has occurred thereunder; and (ii) no event, occurrence or condition exists which, with the lapse of time, the giving of notice, or both, or the happening of any further event or condition, would become a default by New World thereunder. New World has not knowingly waived any material rights under any Material Contract. To the actual knowledge of the Debtors, New World is not subject to any legal obligations to renegotiate, nor do Debtors have actual knowledge of a claim for a legal right to renegotiate, any of the Material Contracts.

(e) *Employees.*

(i) To Debtors' actual knowledge, New World has no employee pension benefit plans (as defined in Section 3(2) of the Employment Retirement Income Security Act of 1974, as amended ("*ERISA*")); employee welfare benefit plans (as defined in Section 3(1) of ERISA) ("*Welfare Plan*"); or bonus, deferred compensation, stock purchase, stock option, severance plans, salary continuation, vacation, sick leave, fringe benefit, incentive, insurance, welfare or

N/H-017887

similar arrangement ("*Employee Benefit Plan*") maintained, administered or contributed to New World or any Affiliate, as determined under Code section 414(b), (c), (m) or (o) ("*ERISA Affiliate*").

(ii)    To Debtors' actual knowledge, neither New World nor any ERISA Affiliate has incurred any liability to the Pension Benefit Guaranty Corporation ("*PBGC*"), and there are no pending or threatened claims against any of the Welfare Plans or Employee Benefit Plans by any employee or beneficiary covered under any Welfare Plans or Employee Benefit Plans or otherwise involving any Welfare Plan or Employee Benefit Plan.

(iii)    To Debtors' actual knowledge, the employment of each of the New World' employees is terminable at will without cost to New World except for payment of accrued salaries or wages, benefits and vacation pay.

(iv)    Section 2.3(e)(iv) of the Disclosure Schedule contains a true and complete list of all employees who are employed by New World as of the date indicated therein, other than part time, occasional employees, and said list correctly reflects their salaries, wages, and other compensation. Notwithstanding the foregoing, Section 2.3(e)(iv) of the Disclosure Schedule does not include any independent contractors of New World or any of such contractor's employees. New World does not owe any employees any sum other than amounts for accrued salaries, wages, and other compensation.

N/H-017888

(f)    *Litigation and Claims.*

(i)    Except for the Bankruptcy Case or as set forth in Section 2.3(f)(i) of the Disclosure Schedule, there is no litigation, arbitration or other proceeding, in law or in equity, and there are no proceedings or governmental investigations before any commission or other administrative authority, to which New World is a party and, to Debtors' knowledge, no such matters are threatened, against New World, or with respect to the ownership or use of the Business or the Real Estate or any portion thereof, or which if adversely determined, could have a material adverse effect on New World, the Business or the Real Estate.

(ii)    To the actual knowledge of Debtors, except as disclosed in this Agreement or the Disclosure Schedules, there are no facts which, if known by a potential claimant or governmental authority, would give rise to a claim, action, arbitration or proceeding which, if asserted or conducted with results unfavorable to New World, would have a material adverse effect on the Business or the Real Estate, or the use of the Business or the Real Estate.

(iii)    To the actual knowledge of Debtors, except as otherwise disclosed herein, in the New World Books and Records or within the Bankruptcy Case, New World is not a party to, bound by, any decree, order or arbitration award (or agreement entered info in any administrative, judicial or arbitration proceeding with any governmental authority) currently in effect, relating in any way to the Business or the Real Estate.

(iv)    To the actual knowledge of the Debtors, except as otherwise disclosed herein, in the New World Books and Records or within the Bankruptcy Case, New World is not in material breach or violation of any decree, order or arbitration award or law, statute, or regulation of or agreement with, or license or permit from, any federal, state or local governmental authority relating to the Business or the Real Estate (or to which its properties, assets, personnel, business activities or the Business or the Real Estate is subject or to which New World, itself, is subject).

N/H-017889

(g)   *Environmental Matters.*

(i)   To the actual knowledge of Debtors, and except as otherwise disclosed on Disclosure Schedule 2.3(g)(i), New World and the Real Estate are not in material violation of any Environmental Laws or any permits, licenses, authorizations and approvals issued to New World or applicable to the Real Estate. Except as specifically disclosed in Section 2.3(g)(i) of the Disclosure Schedule, to Desert Ranch's actual knowledge, New World has not received any written notice regarding any actual or alleged material violation of any Environmental Law relating to New World or the Real Estate. To the Debtors' actual knowledge, except as disclosed in this Agreement or the Disclosure Schedules, there are no circumstances or conditions involving New World that could reasonably be expected to result in any material claims, liability, investigations, costs or restrictions on the ownership, use or transfer of any of the Real Estate pursuant to any Environmental Law.

(ii)   To the actual knowledge of Debtors, (A) during the period in which New World has owned the Real Estate, except for Hazardous Materials customarily used in the operations of the Real Estate or the Business (including, without limitation the gas station at the Smart Mart), there has been no storage (except as set forth in Section 2.3(g)(ii) of the Disclosure Schedule), treatment, generation, transportation or Release of any Hazardous Materials by New World at any Facility (as herein defined) in violation of, or which could give rise to any material obligation under, Environmental Laws; and (B) New World is not subject to any orders, decrees, injunctions or other arrangements with any governmental entity or is subject to any indemnity or other agreement with any third party relating to any material liability under any Environmental Law or relating to Hazardous Materials. Notwithstanding the foregoing, Debtors disclose to Gonzales that there may be asbestos, certain glues or other materials used at the time the improvements on the Real Estate were constructed which may constitute toxic or hazardous substances or require special removal techniques.

(iii)   The Debtors have delivered to Gonzales true and complete copies of any reports, studies, analyses, tests, or monitoring possessed or controlled by any of the Debtors or New World pertaining to: (i) Hazardous Materials in, on, or

N/H-017890

under any property or facility of New World, or (ii) compliance of New World with Environmental Laws.

(iv)  To Debtors' actual knowledge, the property located adjacent to the Real Estate is an airport and fuel farm which has probably suffered a Release of Hazardous Materials. Additional disclosures are contained in Disclosure Schedule 2.3(g)(iv).

(h)  *Real Estate.*

(i)  Except for the Bartsas Lease and those leases set forth in Section 2.3(h)(i) and Section 2.3(h)(ix) of the Disclosure Schedule and the overnight rental of motel and hotel rooms, none of the Real Estate is subject to any leases or tenancies.

(ii)  To the actual knowledge of Debtors, there has been no notice given by any governmental unit that any of the improvements comprising any part of the Real Estate, or the businesses conducted by New World thereon, are in material violation of any building or use or occupancy restriction, limitation, condition or covenant of record or any zoning or building law, code or ordinance or public utility easement, provided that nothing contained in this paragraph is intended to imply that the existing improvements may be rebuilt without complying, at the time of rebuilding, with all such laws, codes and ordinances then in effect.

(iii)  The Bartsas Lease landlord has alleged certain defaults by New World, which New World has disputed.  To the Debtors' knowledge, the landlord to the Bartsas Lease is *not* in default thereunder.  See Disclosure Schedule 2.3(d)(iii).

(iv)  To the actual knowledge of Debtors, the improvements located on the Real Estate are currently served by electricity, water, sewage and waste disposal and other utilities adequate to operate such improvement, as currently operated. All of said utilities are installed and operating and all installation and connection charges have been paid for in full.

(v)  To the actual knowledge of Debtors, except with respect to the NDOT matters described on Disclosure Schedule Section 2.3(f)(i), the continued maintenance and operation of the Real Estate as currently maintained and operated is

N/H-017891

not dependent on facilities located at any other property, and the continued maintenance and operation of any other property is not dependent on facilities comprising the Real Estate. To the actual knowledge of Debtors, no building or other improvement not part of the Real Estate relies on the Real Estate or any part thereof or any interest therein, to fulfill any governmental requirement; and no building or other improvement comprising the Real Estate relies on any property not included within the Real Estate to fulfill any governmental requirement.

(vi)     To the actual knowledge of the Debtors, there are no challenges or appeals pending regarding the amount of the real property Taxes on, or the assessed real property Tax valuation of, any of the Real Estate, nor any challenges or appeals pending regarding personal property Taxes on any personal property of New World, or the assessed valuation thereof, and no special arrangements or agreements exist with any governmental authority with respect thereto (the representations and warranties contained in this subparagraph (vi) shall not be deemed to be breached by any prospective general increase in real estate or personal property tax rates).

(vii)    To the actual knowledge of Debtors, there are no condemnation proceedings pending or, to the actual knowledge of the Debtors, threatened with respect to any portion of the Real Estate.

(viii)   To the actual knowledge of Debtors, except for the Strip Beautification Assessment and as set forth in Section 2.3(h)(viii) of the Disclosure Schedule, there is no special Tax assessment (i.e., in addition to the normal, annual general real estate tax assessment) pending or, to the actual knowledge of Debtors, threatened with respect to any portion of the Real Estate.

(ix)     Section 2.3(h)(ix) of the Disclosure Schedule sets forth a list of all billboard leases and rental agreements in connection with the Real Estate.

(x)      The representations and warranties of Debtors contained in this Section 2.3(h) are further qualified by all matters of record affecting the Real Estate as of the Closing Date. Furthermore, nothing herein shall constitute a representation or warranty concerning the right, title or

N/H-017892

interest of the landlord of the Bartsas lease in or to the real property subject thereto. See Disclosure Schedule 2.3(h)(x).

(i)    *Intellectual Property.*

      (i)    Except as set forth in the definition of "Trademarks," there are no Trademarks owned by (rather than licensed to) New World. Debtors make no representation or warranty whatsoever as to the ownership or exclusivity of any Trademark.

(j)    *General.*

      (i)    Subject to the approval of the Bankruptcy Court, Desert Ranch has the power to sell and convey the Desert Ranch Interest to Gonzales, free and clear of any liens, claims, encumbrances and security interests.

      (ii)    To the Debtors' actual knowledge, except as disclosed in this Agreement, New World has good title to the Equipment and the other material Assets that constitute personal property of New World, free and clear of liens and encumbrances. To the Debtors' actual knowledge, there are no rights or options of any third party to acquire any ownership interest in any material Assets of New World, other than purchases of Inventory by customers in the ordinary course of the Business.

      (iii)    To the Debtor's actual knowledge, except as disclosed in this Agreement, the Assets are all owned by New World.

      (iv)    To the Debtors' actual knowledge, New World possesses all material licenses, permits, registrations, approvals, agreements and consents which are required in order for the New World to conduct the Business as presently conducted and neither New World nor the Debtors has received any notification of any asserted past or present failure to comply with the same.

      (v)    To the Debtors' actual knowledge, except as set forth in Section 2.3(j)(v) of the Disclosure Schedule, New World, the Assets and the Business are not in violation in any material respect, of existing requirements of Federal, state, local and other laws, regulations and ordinances, and New World has not received any notification of any asserted present failure to comply with any such laws which would prevent the continued operation of the Business in the manner presently operated.

N/H-017893

(vi)   The representations and warranties of the Debtors in this Agreement (including, without limitation, the information set forth in the Disclosure Schedule), or in any of Debtors' Ancillary Documents, do not and will not contain an untrue statement of material fact, do not and will not omit to state a material fact required to be stated in order to make the representations, warranties or statements contained herein or therein, in light of the context in which they were made, not misleading.

(vii)   Neither the Debtors, nor any of their respective Affiliates, has dealt with any person or entity who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment for arranging the transaction contemplated hereby or introducing the parties to each other for which Gonzales may be liable.

3.   *Conduct Prior to Closing.*

3.1.   *General.* The Debtors, on the one hand, and Gonzales, on the other hand, shall have the rights and obligations with respect to the period between the date hereof and the Closing Date which are set forth in this Section 3.

3.2.   *Obligations of the Debtors.*

(a)   The Debtors shall reasonably cooperate with Gonzales and its consultants in their due diligence with respect to the Business and the Assets, and with the Debtors' preparations for Closing.

(b)   The Debtors shall cause New World to conduct the Business in the ordinary course.

(c)   The Debtors shall cooperate with Gonzales in the transfer of all transferable governmental permits, authorizations and approvals necessary for the operation of the Business by New World.

(d)   Without the prior written consent of Gonzales, and without limiting the generality of any other provision of this Agreement, Debtors shall not with respect to the Business:

(i)   hire any new employee on any basis that is not terminable at will without cost;

(ii)   incur or commit to incur any capital expenditures in excess of $5,000, without the prior written consent of Gonzales which shall not be unreasonably withheld or delayed if incurred or committed to in the ordinary course of business in accordance with past practices;

16

N/H-017894

     (iii)     directly or indirectly, enter into or assume any contract, agreement, obligation, lease, license or commitment, other than in the ordinary course of business in accordance with past practices;

     (iv)     sell, transfer, encumber or otherwise dispose of any material asset or property, or any interest therein, except for sales, replacements and other dispositions of Inventory in the ordinary course of the Business; or

     (v)     amend, terminate or give notice of termination with respect to any Material Contract, or waive any material rights thereunder..

     (e)     The Debtors shall use commercially reasonable efforts to attempt to obtain an estoppel certificate from Mary Bartsas on the Bartsas Lease and from certain other lessors, lessees and other third parties under any Material Contracts as may also be requested by Gonzales no later than five days after execution of this Agreement. Upon delivery of a properly executed estoppel certificate from Mary Bartsas on the Bartsas Lease, Debtors will have no further liability for representations concerning the Bartsas Lease under section 2.3(h)(iii).

     (f)     For a period of 180 days after the Closing, the Debtors shall reasonably cooperate with Gonzales, or his designee, at no out-of-pocket expense to Debtors, in his efforts to obtain approval from the applicable gaming and liquor licensing authorities of the State of Nevada and all other state, county and local regulatory and licensing bodies with authority over gaming activities and devices and liquor licensing in the State of Nevada (collectively, the "*Licensing Authorities*") for (i) a temporary liquor license for off-premises sale of beer and wine for the premises located at 4207 S. Las Vegas Boulevard, Las Vegas, Nevada, doing business as "Smart Mart" ("*Smart Mart*"), and (ii) a change of ownership to permit New World to continue to receive rental payments associated with gaming devices located on or about the Smart Mart under that certain Space Lease Agreement, dated February 9, 1995, between New World and United Coin Machines Co., a Nevada corporation. Without limiting the foregoing, the Debtors shall as promptly as practicable, at any time or from time to time, at either Gonzales' or the Licensing Authorities' request and without further consideration, provide such other information and communications to the Licensing Authorities or other persons as Gonzales or the Licensing Authorities may reasonably request in connection with clauses (i) and (ii) of this Section 3.2(f), as such relate to any request, investigation, inquiry, communication, application or proceeding to or before the Licensing Authorities by Gonzales or by the Licensing Authorities with respect to the matters contemplated by this paragraph.

     3.3.    *Joint Obligations*.  The following shall apply with equal force to the Debtors and Gonzales:

     (a)     The Parties shall use their respective commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby as soon as practicable. Without limiting the generality of the foregoing, Debtors and Gonzales shall use their respective

N/H-017895

commercially reasonable efforts to cause New World to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby as soon as possible.

(b)    The Debtors, on the one hand, and Gonzales, on the other hand, shall promptly give the other written notice (the "*Development Notice*") of the existence or occurrence of any condition that would make any representation or warranty herein contained of either untrue in any material respect or which might reasonably be expected to prevent the consummation of the transaction contemplated hereby.

(c)    No Party shall intentionally perform any act (or cause another to perform such act) which, if performed, or intentionally omit to perform any act (or cause another to intentionally omit to perform such act) which, if omitted to be performed, would prevent or excuse the performance of this Agreement by any Party or which would result in any representation or warranty herein contained of said Party being untrue in any material respect as if originally made on and as of the Closing Date.

(d)    Each Party shall take all commercially reasonable efforts to ensure that the Bankruptcy Court approves, in an expedient manner, this Agreement and the transactions contemplated hereby in accordance with the prior agreements of the Parties in open court.

4.    *Conditions to Closing.*

4.1.    *Conditions to the Debtors' Obligations.* The obligation of the Debtors to consummate the transactions contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date, upon the non-fulfillment of any of which this Agreement may, at the Debtors' option, be terminated pursuant to and with the effect set forth in this Agreement:

(a)    Except for misrepresentations arising because of facts to which the Debtors have consented in writing (excluding this Agreement itself as such a writing), each and every representation and warranty made by Gonzales shall have been true and correct as of the date hereof, and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

(b)    All obligations of Gonzales to be performed hereunder, through and including the Closing Date, shall have been performed.

(c)    No suit, proceeding or investigation shall have been commenced or threatened by any governmental authority or private person on any grounds to restrain, enjoin or hinder, or to seek material damages on account of, the consummation of the transactions contemplated hereby, and no order, ruling or judgment shall have been issued with the same effect.

(d)    No bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding shall have been initiated by or against Gonzales.

N/H-017896

(e)    The Bankruptcy Court shall have entered an order approving this Agreement and the transactions contemplated hereby.

4.2.    *Conditions to Gonzales' Obligations.*    The obligation of Gonzales to consummate the transactions contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date, upon the non-fulfillment of any of which this Agreement may, at Gonzales' option, be terminated pursuant to and with the effect set forth in this Agreement:

(a)    Except for misrepresentations arising because of facts to which Gonzales has consented in writing (excluding this Agreement itself as such a writing), each and every representation and warranty made by the Debtors shall have been true and correct when made and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

(b)    All obligations of the Debtors to be performed hereunder through, and including on, the Closing Date shall have been performed.

(c)    No suit, proceeding or investigation shall have been commenced or threatened by any governmental authority or private person on any grounds to restrain, enjoin or hinder, or to seek material damages on account of, the consummation of the transactions contemplated hereby, and no order, ruling or judgment shall have been issued with the same effect.

(d)    Other than the Bankruptcy Case, no bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding shall have been initiated by or against any of the Debtors.

(e)    The Bankruptcy Court shall have entered an order approving this Agreement and the transactions contemplated hereby.

4.3.    *Eminent Domain.* If any part or parts of the Parcel A or the Real Estate shall be taken by exercise of the power of eminent domain after the date hereof, as evidenced by written notice received by Gonzales, Debtors or any of them or New World from any federal state or local governmental authority or any other entity having the power of eminent domain, and such taking would, in the reasonable opinion of Gonzales or Debtors, have a material adverse effect on the value of Parcel A or such Real Estate, Gonzales or Debtors shall have the right to terminate this Agreement by giving written notice to the other Party within five (5) days after receiving notice of the taking. If neither Party elects to terminate this Agreement, then this Agreement shall continue in full force and effect. With respect to any such taking after the date hereof, the Party receiving such notice shall furnish the other Party with a copy of the notice of taking promptly after such Party's ' receipt thereof.

5.    *Closing.*

5.1.    *Form of Documents.*    At the Closing, the Parties shall deliver the documents, and shall perform the acts, which are set forth in this Section 5, and such additional or different documents and/or acts as may be reasonably necessary to consummate the

N/H-017897

transactions contemplated by this Agreement. All documents that the Debtors shall deliver shall be as previously agreed, or if not previously agreed, in form and substance reasonably satisfactory to Gonzales and his legal counsel. All documents that Gonzales shall deliver shall be as previously agreed, or if not previously agreed, in form and substance reasonably satisfactory to the Debtors and their counsel.

5.2.    *Deliveries of Gonzales.*  Subject to the fulfillment or waiver of the conditions on Gonzales' obligations set forth in Section 4 or elsewhere in this Agreement, Gonzales shall execute or cause to be executed, have the signatures acknowledged, as appropriate, and deliver or cause to be delivered to the Debtors all of the following:

(a)    The Note from Gonzales to the Debtors marked "Cancelled," a full reconveyance of the Deed of Trust, UCC termination statements and releases of any and all interests Gonzales may have in any and all collateral security securing the Loan Agreement, Deed of Trust, Assignment, Guaranty, Pledge, and any other related Loan document;

(b)    A Grant, Bargain and Sale Deed in the form attached hereto as Exhibit "E" executed by Gonzales, transferring the Gonzales Interest to the Desert Land and Desert Oasis or their designee;

(c)    A Grant, Bargain and Sale Deed in the form attached hereto as Exhibit "F" executed by Fieldman, transferring the Fieldman Interest to the Desert Land and Desert Oasis or their designee;

(d)    A Memorandum executed by Gonzales, Desert Land and Desert Oasis and any other parties owning a fee interest in Parcel A as of the Closing Date in the form attached as Exhibit "G" with respect to the obligation to pay the Parcel A Transfer Fee to Gonzales in accordance with the terms of this Agreement and that Gonzales' obligation to subordinate the Parcel A Transfer Fee to any Parcel A Permitted Financing;

(e)    A counterpart of a written consent of the members of New World, executed by Gonzales, authorizing and consenting to New World's performance of the transactions contemplated hereby and any other consents required by this Agreement;

(f)    A closing certificate executed by Gonzales pursuant to which Gonzales represents and warrants to the Debtors that Gonzales' representations and warranties to the Debtors are true and correct as of the Closing Date as if then originally made (or, if any such representation or warranty is untrue in any respect, specifying the respect in which the same is untrue);

(g)    Without limitation by the specific enumeration of the foregoing, all other documents reasonably required from Gonzales to consummate the transactions contemplated hereby; and

At the request of Desert Land or Desert Oasis prior to Closing, Gonzales shall, at Closing, execute separate instruments described above in order to convey certain items to the ' Desert Land or Desert Oasis' respective designee.

N/H-017898

5.3.    *Deliveries of the Debtors*.  Subject to the fulfillment or waiver of the conditions set forth in Section 4 or elsewhere in this Agreement, the applicable Debtor(s) shall execute or cause to be executed, have the signatures acknowledged, as appropriate, and/or deliver or cause to be delivered to Gonzales all of the following:

(a)    An Assignment of Membership Interest in the form attached hereto as Exhibit "H" executed by Desert Ranch, transferring the Desert Ranch Interest to Gonzales;

(b)    A resignation of Desert Ranch as the manager of New World, executed by Desert Ranch;

(c)    A counterpart of the Parcel A Memorandum;

(d)    Physical possession of the Real Estate and any Assets in their possession, including, without limitation, delivery of any and all keys, codes, combinations, source codes, alarm codes and security codes for the Assets;

(e)    An estoppel certificate with respect to the Bartsas Lease, if obtained, and all other estoppel certificates required by this Settlement Agreement;

(f)    A counterpart of a written consent of the members of New World, executed by Desert Ranch, authorizing and consenting to New World's performance of the transactions contemplated hereby and any other consents required by this Agreement;

(g)    A termination of that certain lease between New World and Desert Ranch dated as of May 15, 2001 executed on by Desert Ranch to become effective at the discretion of Gonzales but not more than 6 months from the Closing Date;

(h)    An incumbency and specimen signature certificate with respect to each manager of the Debtors executing this Agreement and the Debtors' Ancillary Documents;

(i)    A certified copy of the consent of each manager authorizing the execution, delivery and performance of this Agreement and the Debtors' Ancillary Documents;

(j)    A closing certificate duly executed by the manager or equivalent representative of each of the Debtors, on behalf of each of the Debtors, pursuant to which each of the Debtors represent and warrant to Gonzales that such of the Debtors' representations and warranties to Gonzales are true and correct as of the Closing Date as if then originally made (or, if any such representation or warranty is untrue in any respect, specifying the respect in which the same is untrue), and that all documents to be executed and delivered by such of the Debtors at the Closing have been executed by duly authorized representatives of such of the Debtors;

(k)    Without limitation by the specific enumeration of the foregoing, all other documents reasonably required from the Debtors to consummate the transactions contemplated hereby;

At the request of Gonzales prior to Closing, the Debtors shall at Closing execute separate transfer instruments described above in order to convey certain items to Gonzales' designee.

N/H-017899

5.4.    *Deliveries of New World.*  Subject to the fulfillment or waiver of the conditions set forth in Section 4 or elsewhere in this Agreement, the Debtors shall execute or cause to be executed, have the signatures acknowledged, as appropriate, and/or deliver or cause to be delivered to Desert Land and/or Desert Oasis or their designee all of the following:

(a)    A termination of that certain lease between New World and Desert Ranch dated as of May 15, 2001 executed by New World to become effective at the discretion of Gonzales but not more than 6 months from the Closing Date;

(b)    Without limitation by the specific enumeration of the foregoing, all other documents reasonably required from New World to consummate the transactions contemplated hereby.

5.5.    *Gonzales' Consent.*  Gonzales, as a member of New World, consents to the execution and delivery of the documents set forth in section 5.4 by New World at Closing.

6.    *Post-Closing Agreements.*

6.1.    *Use of Trademarks; References to the Debtors.*  The Debtors shall cease to use and shall not license any third party to use the Trademarks.

6.2.    *Sales, Payroll and Other Business Taxes and Fees.*  The Debtors shall cause New World to pay all Taxes applicable to the conduct of the Business which were due and payable prior to the Closing in the ordinary course of business in accordance with past practices. Gonzales shall cause New World to pay all Taxes applicable to the conduct of the Business which were incurred prior to the Closing which become due and payable after the Closing in the ordinary course of business and in accordance with past practices.

6.3.    *Further Assurances.*  The Parties shall execute (and, in the case of Desert Ranch, cause New World to execute) such further documents, and perform such further acts, as may be necessary to comply with the terms of this Agreement and consummate the transactions contemplated hereby, including, without limitation, the execution, delivery and acknowledgement by Gonzales, of any subordination agreements required by the Parcel A Memorandum.

6.4.    *Non-Interference.*  For a period of two (2) years from the Closing Date, the Debtors (either directly or through their members or Affiliates) will not interfere or attempt to interfere with the assemblage of property by New World which is south of Four Seasons Drive (adjacent to Parcels B, C and D) or Gonzales (either directly or through his Affiliates) will not interfere or attempt to interfere with the assemblage of property by Desert Land which is north of Four Seasons Drive (adjacent to Parcel A).  For purposes of this section, "interference" shall not include any actions taken for the purpose of participating in any governmental process or appearing before any governmental agency.

6.5.    *Tax Returns.*  For the years 2002 and 2003, Gonzales shall have an accountant of his choice prepare the tax returns for New World and deliver a copy of the tax returns to Desert Ranch.

N/H-017900

6.6.    *Re-Recordation of Memorandum.*  Upon exercise of the FLT Option, the Debtors on the one hand and Gonzales and on the other hand shall execute and cause to be recorded the Memorandum in the form attached hereto as Exhibit "I."

7.    *Indemnification.*

7.1.    *General.*  From and after the Closing, the Parties shall indemnify each other as provided in this Section 7.  No specifically enumerated indemnification obligation with respect to a particular subject matter as set forth below or elsewhere in this Agreement shall limit or affect the applicability of a more general indemnification obligation as set forth below with respect to the same subject matter.

7.2.    *Indemnification Obligations of the Debtors.*  The Debtors shall joint and severally indemnify, save and keep harmless Gonzales and his successors and permitted assigns against and from all Damages sustained or incurred by any of them resulting from or arising out of or by virtue of:

(a)    any inaccuracy in or breach of any representation and warranty made by such Debtors in this Agreement, or in any such Debtors' Ancillary Documents, other than those arising because of facts to which Gonzales has consented in writing (excluding this Agreement itself as such a writing);

(b)    any breach by any Debtor of, or failure by any Debtor to comply with, any of its covenants or obligations under this Agreement; or

(c)    the failure to discharge when due any liability or obligation of any Debtor or any claim against Gonzales with respect to any such liability or obligation or alleged liability or obligation, without regard to the fact that any indemnifiable matter described in this Section 7.2(c) may have been disclosed in the Disclosure Schedule or in any documents included or referred to therein or may be otherwise known to Gonzales at the date of this Agreement or on the Closing Date; or

(d)    any Third-Party Claims to the extent caused by the acts or omissions of Desert Land or Desert Oasis after the Closing Date with respect to Parcel A;

*provided, however,* that in no event shall the Debtors be obligated to pay Gonzales for any Damages sustained or incurred until such time, if any, that the Damages exceed Two Hundred Fifty Thousand Dollars in the aggregate, and then only for Damages in excess of Two Hundred Fifty Thousand Dollars ($250,000).

7.3.    *Indemnification Obligations of Gonzales.*  Gonzales shall indemnify, save and keep harmless the Debtors and their respective successors and permitted assigns against and from all Damages sustained or incurred by any of them resulting from or arising out of or by virtue of:

(a)    any inaccuracy in or breach of any representation and warranty made by Gonzales in this Agreement or in any of Gonzales Ancillary Documents, other than

N/H-017901

those arising because of facts to which any Debtor has consented in writing (excluding this Agreement itself as such a writing);

(b)       any breach by Gonzales of, or failure by Gonzales to comply with, any of his covenants or obligations under this Agreement; or

(c)       the failure to discharge when due any liability or obligation of Gonzales or any claim against a Debtor with respect to any such liability or obligation or alleged liability or obligation, without regard to the fact that any indemnifiable matter described in this Section 7.3(c) may have been disclosed in the Disclosure Schedule or in any documents included or referred to therein or may be otherwise known to such Debtor at the date of this Agreement or on the Closing Date; or

(d)       any Third-Party Claims to the extent caused by the acts or omissions of Gonzales or New World after the Closing Date with respect to the Contracts and the contracts listed in Schedule 2.3(b)(v);

*provided, however,* that in no event shall Gonzales be obligated to pay the Debtors, or any of them, for any Damages sustained or incurred, until such time, if any, that the Damages exceed $250,000 in the aggregate, and then only for Damages in excess of $250,000.

7.4.    *No Waiver.*    Failure by an Indemnified Party to give prompt notice to an Indemnifying Party above shall not release, waive or otherwise affect the Indemnifying Party's obligation to indemnify hereunder except to the extent that the Indemnifying Party can demonstrate actual loss and prejudice as a result of such failure.

7.5.    *Cooperation.*  Subject to the provisions of Section 7.7, the Indemnifying Party shall have the right, at its own expense, to participate in the defense of any Third Party Claim, and if said right is exercised, the Parties shall cooperate in the investigation and defense of said Third Party Claim.

7.6.    *Subrogation.*  The Indemnifying Party shall not be entitled to require that any action be brought against any other person before action is brought against it hereunder by the Indemnified Party but shall be subrogated to any right of action to the extent that it has paid or successfully defended against any Third Party Claim in accordance with the terms of this Agreement.

7.7.    *Third Party Claims.*  Forthwith following the receipt of notice of a Third Party Claim, the Party receiving the notice of the Third Party Claim shall (i) notify the other Party of its existence setting forth with reasonable specificity the facts and circumstances of which such Party has received notice, and (ii) if the Party giving such notice is an Indemnified Party, specifying the basis hereunder upon which the Indemnified Party's claim for indemnification is asserted.  The Indemnified Party may, upon reasonable notice, tender the defense of a Third Party Claim to the Indemnifying Party.  If:

(a)       the defense of a Third Party Claim is so tendered and such tender is accepted without qualification by the Indemnifying Party; or

N/H-017902

(b)     within thirty (30) days after the date on which written notice of a Third Party Claim has been given pursuant to this Section 7.7, the Indemnifying Party shall acknowledge with qualification its indemnification obligations as provided in this Section 7 in writing to the Indemnified Party, but shall commit to providing defense; then, except as hereinafter provided, the Indemnified Party shall not have the right to defend or settle such Third Party Claim. The Indemnified Party shall have the right to be represented by counsel at its own expense in any such contest, defense, litigation or settlement conducted by the Indemnifying Party provided that the Indemnified Party shall be entitled to reimbursement therefor only if the Indemnifying Party shall lose its right to contest, defend, litigate and settle the Third Party Claim as herein provided. The Indemnifying Party shall lose its right to defend and settle the Third Party Claim if it shall fail to diligently contest the Third Party Claim.  So long as the Indemnifying Party has not lost its right and/or obligation to defend and settle as herein provided, the Indemnifying Party shall have the exclusive right to contest, defend and litigate the Third Party Claim and shall have the exclusive right, in its discretion exercised in good faith, and upon the advice of counsel, to settle any such matter, either before or after the initiation of litigation, at such time and upon such terms as it deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle shall be given to the Indemnified Party.  All expenses (including, without limitation, reasonable attorneys' fees) incurred by the Indemnifying Party in connection with the foregoing shall be paid by the Indemnifying Party.    Notwithstanding the foregoing, in connection with any settlement negotiated by an Indemnifying Party, no Indemnified Party shall be required by an Indemnifying Party to (x) enter into any settlement that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnified Party of a release from all liability in respect of such claim or litigation, (y) enter into any settlement that attributes by its terms liability to the Indemnified Party or (z) consent to the entry of any judgment that does not include as a term thereof a full dismissal of the litigation or proceeding with prejudice.  No failure by an Indemnifying Party to acknowledge in writing its indemnification obligations under this Section 7 shall relieve it of such obligations to the extent they exist.  If an Indemnified Party is entitled to indemnification against a Third Party Claim, and the Indemnifying Party fails to accept the defense of a Third Party Claim tendered pursuant to this Section 7.7, or if, in accordance with the foregoing, the Indemnifying Party shall lose its right to contest, defend, litigate and settle such a Third Party Claim, the Indemnified Party shall have the right, without prejudice to its right of indemnification hereunder, in its discretion exercised in good faith and upon the advice of counsel, to contest, defend and litigate such Third Party Claim, and may settle such Third Party Claim, either before or after the initiation of litigation, at such time and upon such terms as the Indemnified Party deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle is given to the Indemnifying Party.  If, pursuant to this Section 7.7, the Indemnified Party so defends or settles a Third Party Claim, for which it is entitled to indemnification hereunder, as hereinabove provided, the Indemnified Party shall be reimbursed by the Indemnifying Party for the reasonable attorneys' fees and other expenses of defending the Third Party Claim which is incurred from time to time, forthwith following the presentation to the Indemnifying Party of itemized bills for said attorneys' fees and other expenses.

8.     *Effect of Termination/Proceeding.*

N/H-017903

8.1.    *General.* The Parties shall have the rights and remedies with respect to the termination and/or enforcement of this Agreement which are set forth in this Section 8.

8.2.    *Right to Terminate.* This Agreement and the transactions contemplated hereby may only be terminated by motion made in and granted by the Bankruptcy Court prior to the Closing Date.

8.3.    *Remedies.* No Party shall be limited to the termination right granted in Section 8.2 by reason of the nonfulfillment of any condition to such Party's Closing obligations but may, in the alternative, elect to do one of the following:

(a)    proceed to Close despite the nonfulfillment of any closing condition, it being understood that consummation of the transaction contemplated hereby shall not be deemed a waiver of a breach of any representation, warranty or covenant or of any Party's rights and remedies with respect thereto;

(b)    decline to Close, terminate this Agreement as provided in Section 8.2, and thereafter seek damages to the extent permitted in Section 8.4, but subject to the limitations of that provision; or

(c)    seek specific performance of the obligations of the other Party. Each Party hereby agrees that in the event of any breach by such Party of this Agreement, the remedies available to the other Party at law would be inadequate and that such Party's obligations under this Agreement may be specifically enforced.

8.4.    *Right to Damages.* If this Agreement is terminated pursuant to Section 8.2, no Party hereto shall have any claim against any other except if the circumstances giving rise to such termination were caused either by the other Party's material breach of any covenants herein contained, or by any of the representations and warranties made herein by such other Party being in a material respect incorrect at the execution of this Agreement, or when restated as of the Closing, in which event termination pursuant to Section 8.2 shall not be deemed or construed as limiting or denying any legal or equitable right or remedy of said Party, and said Party shall be entitled to recover, without limitation, its costs and expenses which are incurred in pursuing its rights and remedies (including reasonable attorneys' fees), provided that in no event shall any Party be entitled to the recovery of consequential or punitive damages.

9.    *Miscellaneous.*

9.1.    *Publicity.* At all times at or before the Closing, the Debtors, on the one hand, and Gonzales, on the other hand, will not issue or make any reports, statements or releases to the public with respect to the this Agreement or the transactions contemplated by this Agreement without the consent of the other, which shall not be unreasonably withheld or delayed. Nothing contained in this Agreement shall prevent any Party at any time from furnishing any information to any governmental agency, which such Party is requested or required to furnish to such agency or pursuant to any court order, regulation or applicable law or filing pleadings and documents in the Bankruptcy Case.

N/H-017904

9.2.    *Notices.*  All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by nationally recognized private courier, or by United States mail.  Notices delivered by mail shall be deemed given three (3) business days after being deposited in the United States mail, postage prepaid, certified mail.  Notices delivered by hand or by facsimile shall be deemed given on the day of receipt; notices delivered by nationally recognized private overnight carrier against receipt shall be deemed given on the first business day after sending.  All notices shall be addressed as follows:

| | |
|---|---|
| If to the Debtors: | 3951 S. Las Vegas Boulevard<br>Las Vegas, NV 89119<br>Attn:  Howard Bulloch<br>Facsimile: (702) 948-3355 |
| with a copy to: | Jones Vargas<br>3773 Howard  Hughes Parkway, 3rd Floor South<br>Las Vegas, NV 89109<br>Attn:  Michael E. Buckley, Esq.<br>Facsimile: (702) 737-7705 |
| and | Schwartzer & McPherson Law Firm<br>3800 Howard Hughes Parkway, #1100<br>Las Vegas, NV 89109<br>Attn:  Lenard E. Schwartzer, Esq.<br>Facsimile: (702) 892-0122 |
| If to Gonzales: | Mr. Tom Gonzales<br>TG Holdings, Inc.<br>110 Mason Circle<br>Concord, CA  94520<br>Facsimile: (925) 969-7870 |
| with a copy to: | Gordon & Silver, Ltd.<br>3960 Howard Hughes Parkway, 9th Floor<br>Las Vegas, NV 89109<br>Attn:  James S. Mace, Esq.<br>Facsimile: (702) 796-5555 |

and/or to such other respective addresses and/or addressees as may be designated by notice given in accordance with the provisions of this Section 9.2.  Counsel for any Party may give notice in accordance with this Section on behalf of its client.

9.3.    *Expenses.*  Except as otherwise provided in this Agreement, each Party shall bear all fees and expenses incurred by such Party in connection with, relating to or arising out of the execution, delivery and performance of this Agreement and the consummation of the transaction contemplated hereby, including, without limitation, attorneys', accountants' and other professional fees and expenses.

N/H-017905

9.4.    *Entire Agreement.* This Agreement and the Second Amended Plan of Reorganization confirmed by the Bankruptcy Court in the Bankruptcy Case and the instruments to be delivered by the Parties pursuant to the provisions hereof constitute the entire agreement between the Parties. Each exhibit, and the Disclosure Schedule, shall be considered incorporated into this Agreement. Any amendments, or alternative or supplementary provisions to this Agreement, must be made in writing and duly executed by an authorized representative or agent of each of the Parties.   In the event that there is any conflict between the provisions of this Agreement and the Second Amended Plan of Reorganization, the terms of the Second Amended Plan of Reorganization shall prevail.

9.5.    *Non-Waiver.* The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving Party.

9.6.    *Counterparts.* This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute but one instrument.   For purposes of such execution, facsimile counterparts of any signature shall be valid as originals.

9.7.    *Severability.* The invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision.

9.8.    *Applicable Law; Venue.* This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Nevada applicable to contracts made in that State without giving effect to the conflicts of laws principles thereof. Each Party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court in any action, suit or proceeding arising out of or relating to this Agreement, any of the documents referenced in this Agreement or any of the transactions contemplated hereby or thereby, and agrees that any such action, suit or proceeding shall be brought only in such court. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court in any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum.

9.9.    *Binding Effect; Benefit.* This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer on any person other than the Parties, and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

N/H-017906

9.10. *Assignability.* This Agreement shall not be assignable by any Party without the prior written consent of the other Parties. No such assignment shall relieve any Party of any of its liabilities under this Agreement. Any such designee shall be treated as the granting Party for all purposes hereunder. Any assignment in violation of this provision shall be void.

9.11. *Amendments.* This Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the Parties.

9.12. *Headings.* The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

9.13. *Survival.* All covenants, representations, warranties and other terms and provisions hereof shall survive Closing, and none shall merge into any deed, assignment or other closing instrument or conveyance contemplated hereby, provided that the representations and warranties of the Parties set forth in Section 2 of this Agreement shall be of no further force or effect after the date which is eighteen (18) months after Closing.

9.14. *Service of Process.* The Debtors and Gonzales waive personal service of any and all process upon them, and consents that all services of process be made by certified mail, directed to it at its address as set forth in Section 9.2 as may be amended, and service so made shall be deemed to be completed when received. Nothing in this section shall affect the right of the Debtors or Gonzales to serve legal process in any other manner permitted by law.

9.15. *Time of the Essence.* Time is of the essence for each and every covenant contained in this Agreement.

9.16. *Licensees.* Gonzales acknowledges that he has been informed that Debtors are owned by Howard Bulloch and David Gaffin, Nevada real estate licensees.

29

N/H-017907

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

DESERT LAND:

Desert Land, LLC,
a Nevada limited liability company

By:_____
    Name:_____
    Title:_____


DESERT OASIS:

Desert Oasis Apartments, LLC,
a Nevada limited liability company


By:_____
    Name:_____
    Title:_____


DESERT RANCH:

Desert Ranch, LLC,
a Nevada limited liability company


By:_____
    Name:_____
    Title:_____


GONZALES:

_____
Tom Gonzales

N/H-017908

DRAFT
FOR DISCUSSION
PURPOSES ONLY
4/16/03 1:47 PM

## SCHEDULE 1

## DEFINITIONS

1.      *"Affiliate"* shall mean any person or entity that Controls a Party, which that Party Controls, or which is under common Control with that Party.

2.      *"Agreement"* shall mean this Agreement made by and among the Parties.

3.      *"Allocation Schedule"* shall have the same meaning as set forth in Section 1.4.

4.      *"Assets"* shall mean all assets of New World, including, without limitation, the Real Estate, Contracts and Trademarks.

5.      *"Assignment"* shall have the same meaning as set forth in Preliminary Statement B.

6.      *"Bankruptcy Case"* shall have the same meaning as set forth in Preliminary Statement G.

7.      *"Bankruptcy Code"* shall have the same meaning as set forth in Preliminary Statement G.

8.      *"Bankruptcy Court"* shall have the same meaning as set forth in Preliminary Statement G.

9.      *"Bona fide escrow"* shall mean (i) an escrow opened with a party who deposits the greater of $1,000,000 or 5% of the purchase price in escrow (up to $2,500,000), (ii) which provides that the deposit will become non-refundable in 90 days from the opening of the escrow unless the escrow is cancelled, and (iii) which provides that the escrow must close within six (6) months from the opening of the escrow.

10.     *"Business"* shall mean all business conducted by or on behalf of New World, including, without limitation, the operation, maintenance and development of the Real Estate.

11.     *"Closing"* shall have the same meaning as set forth in Section 1.3.

12.     *"Closing Date"* shall have the same meaning as set forth in Section 1.3.

13.     *"Code"* means the Internal Revenue Code of 1986, as amended.

14.     *"Confirmation"* means the date of entry of an order which approves a plan of reorganization filed in the Bankruptcy Case.

N/H-017909

**DRAFT**
**FOR DISCUSSION**
**PURPOSES ONLY**
4/16/03 1:47 PM

15.    *"Confirmation Order"* shall mean the Order of the Bankruptcy Court confirming Debtors' Plan and approving this Settlement.

16.    *"Contract"* shall mean any lease, agreement, contract, commitment or binding contractual obligation of any type or nature (and any amendment, supplement, and modification thereto), whether written or oral, including, without limitation, all purchase orders and purchase contracts, agreements for services, goods, materials or supplies, utility agreements, license agreements, distribution agreements, agency agreements, maintenance agreements, billboard and other advertising agreements, franchise agreements, restrictive covenant agreements, employment and consulting agreements, confidentiality agreements, computer software agreements, leases and subleases of real or personal property, other real estate agreements, loan and security documents, guaranties and other financing agreements, and partnership or joint venture agreements, but the term shall exclude, however, (i) the New World operating agreement, articles of organization and other constituent documents, (ii) arrangements for the overnight occupancy of motel rooms, and (iii) software licensing agreements other than licensing agreements requiring the payment of licensing fees.

17.    *"Control"* shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of a person or entity through voting securities, contract or otherwise.

18.    *"Damages"* shall mean all liabilities, demands, claims, actions or causes of action, regulatory, legislative or judicial proceedings or investigations, assessments, levies, losses, fines, penalties, damages, costs and expenses, including, without limitation: (i) reasonable attorneys', accountants', investigators', and experts' fees and expenses, sustained or incurred in connection with the defense of any such claim; and (ii) costs and expenses reasonably incurred to comply with Environmental Laws including without limitation, all Environmental Costs, but excluding consequential and punitive damages.

19.    *"Debtor"* shall mean Desert Land, Desert Ranch and Desert Oasis.

20.    *"Debtors' Ancillary Documents"* shall have the same meaning as set forth in Section 2.3(a)(ii).

21.    *"Debtors' Plan"* shall mean the Second Amended Plan of Reorganization filed by the Debtors in the Bankruptcy Case."

22.    *"Deed of Trust"* shall have the same meaning as set forth in Preliminary Statement A.

23.    *"Desert Land"* shall mean Desert Land, LLC, a Nevada limited liability company.

24.    *"Desert Oasis"* shall mean Desert Oasis Apartments, LLC, a Nevada limited liability company.

**DRAFT**
**FOR DISCUSSION**
**PURPOSES ONLY**
4/16/03 1:47 PM

25.    *"Desert Ranch"* shall mean Desert Ranch, LLC, a Nevada limited liability company.

26.    *"Desert Ranch Interest"* shall have the same meaning as set forth in Preliminary Statement E.

27.    *"Disclosure Schedule"* shall have the same meaning as set forth in Section 2.1.

28.    *"Employee Benefit Plan"* shall have the same meaning as set forth in Section 2.3(e)(i).

29.    *"Environmental Laws"* shall mean all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever. Environmental Laws include, without limitation, those relating to: manufacture, processing, use, distribution, treatment, storage, disposal, generation or transportation of Hazardous Materials; air, surface or ground water or noise pollution; Releases; protection of wildlife, endangered species, wetlands or natural resources; Containers; health and safety of employees and other persons; and notification requirements relating to the foregoing.

30.    *"Equipment"* shall mean all furniture, furnishings, artwork, fixtures, equipment, machinery, appliances, parts, computer hardware, tools, dies, jigs, patterns, molds, motor vehicles, carts, other transportation equipment, signs and signage, linens, utensils, tableware, chinaware, glassware, silverware and all other tangible personal property (other than the Inventory), used or intended for use in the ownership, operation or maintenance of any of the Real Estate or the Business, including, without limitation, any of the foregoing that have been fully depreciated.

31.    *"ERISA"* shall have the same meaning as set forth in Section 2.3(e)(i).

32.    *"ERISA Affiliate"* shall have the same meaning as set forth in Section 2.3(e)(i).

33.    *"Facility"* shall mean any facility as defined in CERCLA.

34.    *"Fieldman"* shall mean Barry Fieldman, as trustee of the Barry and Amy Fieldman Trust.

35.    *"Fieldman Interest"* shall have the same meaning as set forth in Preliminary Statement D.

36.    *"Financial Statement"* shall have the same meaning as set forth in Section 2.3(b)(ii).

37.    *"FLT Option"* shall have the same meaning as set forth in Preliminary Statement B.

P:\WorldPortResorts\Settlement\SettlementAgr'09.doc

N/H-017911

**DRAFT**
**FOR DISCUSSION**
**PURPOSES ONLY**
4/16/03 1:47 PM

38.     *"Gonzales"* shall mean Tom Gonzales, a unmarried man.

39.     *"Gonzales Interest"* shall have the same meaning as set forth in Preliminary Statement D.

40.     *"Gonzales Ancillary Documents"* shall have the same meaning as set forth in Section 2.2(a).

41.     *"Guaranty"* shall have the same meaning as set forth in Preliminary Statement C.

42.     *"Hazardous Materials"* shall mean: (a) pollutants, contaminants, pesticides, radioactive substances, solid wastes or hazardous or extremely hazardous, special, dangerous or toxic wastes, substances, chemicals or materials within the meaning of any Environmental Law, including, without limitation, any (i) "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et. seq., as amended and reauthorized ("*CERCLA*"), and (ii) any "hazardous waste" as defined in the Resource Conservation and Recovery Act ("*RCRA*"), 42 U.S.C., Sec. 6902 et. seq., and all amendments thereto and reauthorizations thereof; and (b) asbestos-containing material in any form or condition, materials or equipment containing polychlorinated biphenyls, or landfills, surface impoundments, or disposal areas.

43.     *"Indemnified Party"* shall mean a Party who is entitled to indemnification from another Party pursuant to Section 7.

44.     *"Indemnifying Party"* shall mean a Party who is required to provide indemnification under Section 7 to another Party.

45.     *"Inventory"* shall mean all inventory held for sale, consumption or use in the ownership, operation of maintenance of any of the Real Estate or Business.

46.     *"Leasehold Parcel"* shall have the same meaning as set forth in Preliminary Statement F.

47.     *"Licensed Intellectual Property"* shall mean all rights under licenses to use computer software, trademarks, patents, copyrights, unpatented formulations, manufacture methods and other know-how.

48.     *"Loan"* shall have the same meaning as set forth in Preliminary Statement A.

49.     *"Loan Agreement"* shall have the same meaning as set forth in Preliminary Statement A.

50.     *"Material Contract"* shall mean any Contract: (i) under which the cost of payment or performance required of New World is an amount greater than $25,000 per year; (ii) which would not by its terms be terminable by New World without material cost or obligation, on not more than sixty (60) days' written notice of termination by New World, regardless of the

N/H-017912

DRAFT
FOR DISCUSSION
PURPOSES ONLY
4/16/03 1:47 PM

amounts otherwise payable thereunder; (iii) containing covenants that in any way purport to restrict the business activity of New World or limit the freedom of New World to engage in any line of business or to compete with any other party, regardless of the amounts payable thereunder; or (iv) constituting or imposing a lien or encumbrance of any type on any of the Real Estate, regardless of amount.

51.    "*Mortgage*" shall mean a mortgage, deed of trust, security agreement and/or collateral assignment securing a bona fide loan for value.

52.    "*Multiemployer Plan*" shall have the same meaning as set forth in Section 2.3(e)(i).

53.    "*Net Proceeds*" for purposes of Section 1.1(b) shall mean the gross proceeds of a Parcel A Equity Transfer, less the transaction costs directly related to a Parcel A Equity Transfer paid to unrelated parties, including, but not limited to, brokerage commissions paid to parties other than Howard Bulloch and/or David Gaffin. Net proceeds shall not include consideration wholly in the form of stock, membership, partnership or other equity interests in a corporation, limited liability company, partnership or other entity wholly owned or controlled by Howard Bulloch or David Gaffin or their trusts.

54.    "*New World*" shall mean New World, LLC, a Nevada limited liability company.

55.    "*New World Parcels*" shall have the same meaning as set forth in Preliminary Statement F.

56.    "*Note*" shall have the same meaning as set forth in Preliminary Statement A.

57.    "*PBGC*" shall have the same meaning as set forth in Section 2.3(e)(ii).

58.    "*Parcel A*" shall mean the premises described on Exhibit A and, upon exercise of the FLT Option, shall include the FLT option parcels.

59.    "*Parcel A Permitted Financing*" shall mean (i) one or more Mortgages against Parcel A or any part thereof securing financing in the principal amount of up to $25,000,000 at any one time outstanding, and (ii) a Mortgage securing the purchase of the real property subject to the FLT Option, the proceeds of which are used exclusively for the purchase of such real property subject to the FLT Option.

60.    "*Parcel A Transfer*" shall mean either: (a) the sale, transfer or other conveyance of any legal or beneficial interest in the entity or entities that own Parcel A (a "*Parcel A Equity Transfer*"); or (b) the sale, transfer or other conveyance of all or any part of Parcel A, other than (i) a Parcel A Mortgage or (ii) sales, transfers or other conveyances or purchases for easements or to realign property lines, or condemnations involving less than 5% of the gross Parcel A land area.

61.    "*Parcel A Transfer Fee*" shall have the same meaning as set forth in Section 1.1.

N/H-017913

**DRAFT
FOR DISCUSSION
PURPOSES ONLY**
4/16/03 1:47 PM

62.    *"Pledge"* shall have the same meaning as set forth in Preliminary Statement C.

63.    *"Real Estate"* shall have the same meaning as set forth in Preliminary Statement F.

64.    *"Release"* shall mean any spill, discharge, leak, emission, escape, injection, dumping, or other release or threatened release of any Hazardous Materials into the environment, whether or not notification or reporting to any governmental agency was or is, required, including without limitation any Release which is subject to CERCLA.

65.    *"Return"* means any return, declaration, report, statement and other document required to be filed in respect of Taxes.

66.    *"Smart Mart"* shall have the same meaning as set forth in Section 3.2(h).

67.    *"Tax"* means any federal, state, local, foreign and other net income, gross income, gross receipts, gaming, sales, use, ad valorem, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profits, customs, duty or other tax, fee, governmental assessment or charge of any kind whatever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

68.    *"Third Party Claims"* shall mean any claims for Damages which are asserted or threatened by a party other than the Parties hereto, their successors and permitted assigns, against any Indemnified Party or to which an Indemnified Party is subject.

69.    *"Trademarks"* shall mean all trademarks, service marks, slogans, trade names and trade dress whether registered with the United States Patent and Trademark Office or with the State of Nevada or unregistered and existing at common-law, and all applications therefor, including without limitation, New World's and/or its Affiliates' entire right and interest, if any, in the names "New World," "London Las Vegas" and "Asia-Pacific Resort" and all marks associated with the foregoing.

70.    *"Welfare Plan"* shall have the same meaning as set forth in Section 2.3(e)(i).

N/H-017914

# EXHIBIT U

## Kevin Coleman

| | |
|---|---|
| **From:** | Kavita Gupta <kgupta@guptaferrer.com> |
| **Sent:** | Tuesday, February 11, 2020 1:04 PM |
| **To:** | Talitha Gray; Vicki DiMaio |
| **Cc:** | Kevin Coleman |
| **Subject:** | Re: Desert Oasis Apartments - Case No. 02-16204 |

Hi Talitha – I'm not sure we need any more documents. I wanted to see whether the $4.5M debt was scheduled and if so, whether it was dealt with in any confirmed plan. The documents you obtained answers those questions so I think we are good. Thanks,

### Kavita Gupta

GUPTA | FERRER LLP
1300 Bristol Street North, Suite 100
Newport Beach, CA 92660
Tel: 949.387.4470
Fax: 949.258.9786
*www.guptaferrer.com*
vCard  Bio

**Confidentiality Notice:** The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure:** To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Talitha Gray <tgray@Gtg.legal>
**Date:** Monday, February 10, 2020 at 4:54 PM
**To:** Vicki DiMaio <vdimaio@Gtg.legal>, Kavita Gupta <kgupta@guptaferrer.com>
**Subject:** RE: Desert Oasis Apartments - Case No. 02-16204

Hi Kavita,

It was $0.50 per page and so we only ordered the items noted on the spreadsheet. I am happy to order the rest, but wanted to confirm with you before we incurred the cost.

Also, based on my review, it does not appear that the $4.5M claim was asserted in the prior bankruptcy. It is not in the schedules and the disclosure statement includes the financial statements as exhibits, which also do not disclose the $4.5M claim.

Talitha

### Talitha Gray Kozlowski

Partner

1

P 725 777 3000 | F 725 777 3112

GARMAN | TURNER | GORDON

7251 AMIGO STREET, SUITE 210
LAS VEGAS, NV 89119

website | vCard | map | email

  

---

**From:** Vicki DiMaio <vdimaio@Gtg.legal>
**Sent:** Monday, February 10, 2020 4:01 PM
**To:** Kavita Gupta <kgupta@guptaferrer.com>
**Cc:** Talitha Gray <tgray@Gtg.legal>
**Subject:** Desert Oasis Apartments - Case No. 02-16204

Kavita,

Attached please find the documents that we were able to pull from the 2002 Desert Oasis Apartments bankruptcy.

**Vicki DiMaio**
Legal Assistant

P 725 777 3000 | F 725 777 3112

GARMAN | TURNER | GORDON

7251 AMIGO STREET, SUITE 210
LAS VEGAS, NV 89119

website | vCard | map | email

  

N/H-017916

# EXHIBIT V

## Kevin Coleman

| | |
|---|---|
| **From:** | Kevin Coleman |
| **Sent:** | Monday, January 20, 2020 4:30 PM |
| **To:** | Talitha Gray Kozlowski |
| **Cc:** | 'Kavita Gupta'; Kim Fineman; Chris Hart; Greg Nuti |
| **Subject:** | FW: Desert Land - potential intracompany conflict/claims spreadsheet |
| **Attachments:** | 2019 0930 GuptaAnswers.docx |

Hi Talitha,

Is your office in a position to assist in obtaining three 2004 orders requiring the production of documents and appearances for examination? I am leaving on a trip to Africa on Friday until Feb. 11 and likely won't be able to get to it before then.

As I think you know, we are trying to nail down the facts related to a $4.5M scheduled debt ostensibly owed by Desert Oasis Apartments to Desert Land. A summary of what we have been told about this issue is attached. There are apparently 3 people knowledgeable on the topic and we would like to examine all three. We have also received some documents and have been told that those are all there is.

Ben Howard at Grobstein Teeple looked into this as well.

Is this something your firm is in a position to help out with?

Best regards,

--Kevin

PS: Kavita, while I am away, you can contact Greg, Chris or Kim to assist with anything that comes up.

**From:** Kavita Gupta [mailto:kgupta@guptaferrer.com]
**Sent:** Monday, January 20, 2020 11:12 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Subject:** Re: Desert Land - potential intracompany conflict/claims spreadsheet

Hi Kevin –

**Potential inter-company conflict** – after further thought, I think we should file Rule 2004 examinations instead of seeking declarations from likely hostile witnesses. The reason is that counsel will likely rewrite the declarations and will have unlimited time to do so. While counsel can try to coach/rehabilitate witnesses during the exam, we will still likely get more honest answers. If you need help drafting the Rule 2004, please ask Talitha to help.

**Josh's claims spreadsheet** – did you have a chance to review and if so, do you have any proposed changes. I would like to get a copy to Matt today or tomorrow with the understanding that it might be updated if we get different payoff amounts from the secured creditors.

**Vacation** – who is my contact in your office during your vacation?

I'm in the office after 2 today and all day tomorrow if you wish to discuss.

N/H-017577

Best,

**Kavita Gupta**

GUPTA | FERRER LLP
1300 Bristol Street North, Suite 100
Newport Beach, CA  92660
Tel:  949.387.4470
Fax: 949.258.9786
*www.guptaferrer.com*
vCard  Bio

**Confidentiality Notice**: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged.  If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure**: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Kavita Gupta <kgupta@guptaferrer.com>
**Date:** Friday, January 17, 2020 at 2:35 PM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Subject:** Re: Desert Land - Memo on pricing guidance

Lets talk next week.  Thanks and have a great weekend!

Sent from my iPhone

On Jan 17, 2020, at 2:07 PM, Kevin Coleman <kcoleman@nutihart.com> wrote:

> I'm going to call you from a different phone.
>
> **From:** Kavita Gupta [mailto:kgupta@guptaferrer.com]
> **Sent:** Friday, January 17, 2020 1:18 PM
> **To:** Kevin Coleman <kcoleman@nutihart.com>
> **Subject:** Re: Desert Land - Memo on pricing guidance
>
> Can we talk at 2? Running a bit late.  Thanks.
>
> Sent from my iPhone
>
> On Jan 17, 2020, at 11:33 AM, Kevin Coleman <kcoleman@nutihart.com> wrote:
>
>> Sure.  I'll call you at 1:30.
>>
>> —Kevin
>>
>> Sent from my iPhone

2

N/H-017578

On Jan 17, 2020, at 10:16 AM, Kavita Gupta
<kgupta@guptaferrer.com> wrote:

Hi Kevin - do you have a few minutes to discuss?  I'm available all
day with the exception of 11:45-1:30.  Thanks.

Sent from my iPhone

On Jan 16, 2020, at 4:23 PM, Kevin Coleman
<kcoleman@nutihart.com> wrote:

> Hi Kavita,
>
> Here is my proposed communication to the brokers on
> pricing guidance.
>
> Let me know if you have any comments or revisions.
>
> Best regards,
>
> --Kevin
>
> ------------------------------------------------------------------------
> ------------------------
>
> Matt/Mike/Michael,
>
> The Trustee asks that you respond in the following
> manner if a potential buyer asks you for guidance on
> how much the Trustee would be willing to accept for
> the Debtors' assets:
>
> 1. We cannot give pricing guidance on any
>    individual parcel sales.
> 2. Any sale will be subject to court
>    approval.  Creditors/equity holders could
>    object to a proposed sale for a variety of
>    reasons, including if they think the sale
>    price is below the property's fair market
>    value.
> 3. We would therefore encourage the buyer
>    to look at comparable sales and do its own
>    internal evaluation, and make us its best
>    offer.
> 4. An additional reason a buyer should make
>    us its best offer is that under the approved
>    bid procedures, in order to participate in
>    the auction, the bid must be among the
>    four highest for a lot, or be within 25% of
>    the highest bid.

3

N/H-017579

5. If a buyer is interested in the entire 38.5 acres, it can close sooner, and wishes to avoid the auction process, we can tell them that $310M would be the minimum price at which the Trustee would consider a private sale. (This figure is based on the Gonzales appraisal and the fact that equity was encouraging us to move forward with the Aljoaib LOI, which was for $310M. However, if a buyer asks where the $310M figure comes from, I would tell it only that it is based on the appraisal and fairly recent discussions with the equity holders.) It should be emphasized, however, that the Trustee would consult with creditors and equity holders before making a final decision about pursuing a private sale.

Let me know if you have questions or would like to discuss.

Best regards,

--Kevin

**From:** Kavita Gupta [mailto:kgupta@guptaferrer.com]
**Sent:** Thursday, January 16, 2020 10:18 AM
**To:** Kevin Coleman <kcoleman@nutihart.com>
**Subject:** Desert Land - Memo on pricing guidance

Kevin – could you send me a draft today, if possible? Thanks,

## Kavita Gupta

GUPTA | FERRER LLP
1300 Bristol Street North, Suite 100
Newport Beach, CA 92660
Tel: 949.387.4470
Fax: 949.258.9786
*www.guptaferrer.com*
vCard Bio

**Confidentiality Notice**: The information contained in this electronic mail message and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please notify me by return e-mail

4

immediately, and delete the original message and all copies from your system. Thank you.

**IRS Circular 230 Disclosure**: To ensure compliance with IRS's requirements, please be advised that any tax advice contained in this communication (including any attachments) is not intended or written to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

N/H-017581

1. What bank(s) did Desert Land, LLC have bank accounts for the period of 2000-2017. Please specify the Debtor, the bank(s) including address, the bank account number(s) for each year.

Desert Land, LLC
First Security Bank of Nevada  Jan 2000 to Dec 2000          Account  #4602000304
First Security Bank of Nevada  Nov 1999 to Dec 2000          Account  #602005221
P. O Box 19250
Las Vegas, NV  89132
Wells Fargo December 2000 to June 2002 Account #602005221
Wells Fargo December 2000 to June 2002 Account #4602000304
Wells Fargo June 2002 to July 2003 Account #1010213567
Wells Fargo June 2002 to June 2018 Account #2054305178
Wells Fargo M Market Account June 2002 to June 2018 Account #2054302304
PO Box 6995
Portland OR 97228
Desert Oasis Motel, LLC
Bank of America Operating Account about 2006 to June 2018 Account #004970389093
P O Box 25118
Tampa, FL  33622
Larry Pittman may have copies of this information

2. What bank(s) did Desert Oasis Apartments, LLC have bank accounts for the period of 2000-2017. Please specify the Debtor, the bank(s) including address, the bank account number(s) for each year.

Desert Oasis Apartments, LLC
Bank of America May 2003 to May 2004 Account # 004963778543
Bank of America May 2003 to Aug 2011 Account # 004964888924
P. O Box 25118
Tampa, FL 33622
Westcorp Management would have the banking information of the bank accounts they used during this period.

3. Who was the accountant(s)/bookkeeper(s) for Desert Land, LLC from 2000-2017? If there was more than one accounting firm, please list the accountant firm including the contact person and address, telephone number and the years that the accounting firm was employed; Gina Reed Swecker and Company 2000 to 2011.  2451 S Buffalo Dr Ste 140, Las Vegas, NV 89117  702-877-9351
Blake Comish from 2011 to 2017  Comish and Armus CPAs 922 N Beaver Street Flagstaff, AZ 86001 928-779-9420
Bruce Bulloch Capital Consulting, LLC  From 2001 to 2017 4540 Campus Drive, Suite 108 Newport Beach, CA  92660  949-252-5347

4. Who was the accountant(s)/bookkeeper(s) for Desert Oasis Investments, LLC from 2000-2017? If there was more than one accounting firm, please list the accountant firm including the contact person, address and telephone number, and the years that the

accounting firm was employed;  Same as above Gina Reed Swecker and Company 2000 to 2011. Blake Comish from 2011 to 2017.  Bruce Bulloch 2001 to 2017

5. The Debtor's schedules list a $4.5 million debt owed by Desert Oasis Apartments, LLC to Desert Land, LLC as of December 2017. When did the debt owed by Desert Oasis Apartments, LLC to Desert Land, LLC first arise? 1999 - 2000

6. What is the basis for the debt owed by Desert Oasis Apartments, LLC to Desert Land, LLC debt? **The basis of the debt owed by owed by Desert Oasis Apartments, LLC to Desert Land, LLC was its face amount.  During early years (around 2000), cash was borrowed by Desert Land to cover capital and operating needs of other entities.  These amounts were advanced by related entities as valid due to/due from amounts on the books of both entities.**

7. Do you have any written documentation – e.g., a loan agreement - to support the $4.5 million scheduled debt owed by Desert Oasis Apartments, LLC to Desert Land, LLC? Although there is no loan agreement, there are company records including schedules and ledgers, bank records, records held by management company and records held by accountants.

8. Who are the individuals most knowledgeable about the basis for the $4.5 million debt scheduled as owing from Desert Oasis Apartments, LLC to Desert Land, LLC? Gina Reed, Bruce Bulloch and David Gaffin.

9. What operating income/liquid assets did Desert Land, LLC have in 2001-2017? In other words, did Desert Land, LLC have any assets with which it could have given Desert Oasis Apartments, LLC over $7 million dollars prior to 2002? Desert Land, LLC had borrowings which it used for Desert Oasis Apartments, LLC over the years.

10. Desert Land's general ledger reflects that the following changes in account balances were made by Desert Oasis Apartments, LLC to Desert Land, LLC in prior years: $87,000.00 in 2017, $177,000 in 2016, $218,000 in 2015, $185,442 in 2014, $210,000 in 2013, and $28,000 in 2012. Do you have copies of checks, transfers or payment of expenses, in the form of documentary proof that these changes can be substantiated?  These amounts were made in monthly payments from the cash flow from the Desert Oasis Apartments to Desert Land, LLC. Westcorp Property Management could print out a disbursement to Desert Land during these years.  The Monthly Management Reports would have copies of these amounts.  I believe that these were on the thumb drive that was given to Kavita Gupta.